# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a<br>AT&T ILLINOIS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 08 CV 1680 |
| | ) | |
| COMCAST OF ILLINOIS III, INC., | ) | Honorable Elaine E. Bucklo |
| COMCAST CORPORATION, | ) | |
| COMCAST CABLE HOLDINGS LLC, and | ) | Magistrate Judge Martin C. Ashman |
| COMCAST OF CHICAGO, INC. | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................... 5

    A.  The Market For Residential Television Services in Illinois ...................... 5

    B.  The U-verse Video-Ready Access Device ("VRAD") ............................. 6

    C.  The Location Of VRADs ......................................................................... 8

    D.  Comcast's False Advertising ................................................................... 9

        1.  Comcast's False Print Advertisement .......................................... 10

        2.  Comcast's False Video Advertisements ....................................... 11

        3.  Harm to AT&T Illinois ................................................................ 14

III. ARGUMENT .................................................................................................... 15

    A.  Because Comcast's Claims Are Literally False, AT&T Illinois Is Likely
        To Prevail On The Merits ....................................................................... 16

        1.  Comcast's Claim Is Literally False ............................................. 19

        2.  Comcast's False Representations Are Material To Consumers ...... 22

        3.  Comcast Placed Its False Advertising In Interstate Commerce ..... 22

        4.  AT&T Illinois Is Likely To Be Injured By Comcast's False
            Advertising ................................................................................. 23

    B.  Because The Advertisements Are Literally False, They Are Presumed To
        Harm AT&T Illinois ............................................................................... 23

    C.  The Harm To AT&T Illinois Outweighs Any Potential Harm To Comcast
        From A Preliminary Injunction ............................................................... 24

    D.  Enjoining Comcast's False Claims Would Serve The Public Interest ....... 25

    E.  AT&T Illinois Is Prepared To Post Adequate Security For The Preliminary
        Injunction .............................................................................................. 26

IV. CONCLUSION .................................................................................................. 26

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abbott Labs. v. Mead Johnson & Co.*,
  971 F.2d 6 (7th Cir. 1992) .................................................................... passim

*AT&T Corp. v. Synet, Inc.*, No. 96 C 0110,
  1997 WL 89228 at *11 (N.D. Ill. Feb. 13, 1997) ................................ 22

*Avis Rent A Car Sys., Inc. v. Hertz Corp.*,
  782 F.2d 381 (2d Cir.1986) ................................................................. 17

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
  857 F. Supp. 1241 (N.D. Ill. 1994) ............................................... 17, 18

*Bober v. Glaxo Wellcome PLC*,
  246 F.3d 934 (7th Cir. 2001)) ............................................................. 18

*Castrol Inc. v. Pennzoil Co.*,
  987 F.2d 939 (3d Cir. 1993) ................................................................ 19

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*,
  228 F.3d 24 (1st Cir. 2000) ................................................................. 19

*Coca-Cola Co. v. Tropicana Prods., Inc.*,
  538 F. Supp. 1091 (S.D.N.Y. 1982),
  *rev'd*, 690 F.2d 312 (2d Cir. 1982) ............................................... 19, 22

*Eli Lilly and Co. v. Natural Answers, Inc.*,
  86 F. Supp. 2d 834 (S.D. Ind. 2000) .................................................. 15

*Estate of Presley v. Russen*,
  513 F.Supp 1339 (D.N.J. 1981) .......................................................... 25

*Genderm Corp. v. Biozone Labs.*,
  No. 92 C 2533,1992 WL 220638 at *13 (N.D. Ill. Sept. 3, 1992) .................. 22, 23

*Guardsmark, Inc. v. Pinkerton's Inc.*,
  739 F.Supp. 173, 175 (S.D.N.Y. 1990),
  *aff'd without opinion*, 923 F.2d 845 (2d Cir. 1990) ............................ 17

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
  191 F.3d 813 (7th Cir. 1999) ...................................................... 17, 19, 22

*Illinois Bell Tel. Co. v. MCI Telecomms. Corp.*,
  No. 96 C 2378, 1996 WL 717466
  at *4 (N.D. Ill. Dec. 9, 1996) ....................................................... 23, 25

*McNeilab, Inc. v. Am. Home Prods. Corp.*,
  848 F.2d 34 (2d Cir. 1988) .................................................................. 23

*McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*,
  938 F.2d 1544 (2nd Cir. 1991) ............................................................ 22

*Merix Pharm. Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*,
  No. 5 c 1403, 2006 WL 1843370 at *2 (N.D. Ill. 2006) ...................... 18

## TABLE OF AUTHORITIES
### (continued)

Page

Mid-West Mgmt., Inc. v. Capstar Radio Operating Co.,
   No. 04-C-720-C., 2004 WL 2535404
   at *2 (W.D. Wis. Oct. 21, 2004) ................................................................. 23

Nav-Aids, Ltd. v. Nav-Aids USA, Inc.,
   No. 01 C 0051, 2001 WL 1298719 at *9 (N.D. Ill. Oct. 25, 2001) ................... 25

Navistar Int'l Transp. Corp. v. Freightliner Corp.,
   1999 WL 569577 at *2 (N.D. Ill. 1999) ....................................................... 19

Novartis Consumer Health, Inc. v. Johnson & Johnson-Merc
   Consumer Pharm. Co., 290 F.3d 578 (3d Cir. 2002) ................................... 19

People ex rel. Hartigan v. Knecht Servs., Inc.,
   216 Ill. App. 3d 843 N.E.2d 1378, (Ill. App. Ct. 1991) ................................ 18

Popp v. Cash Station, Inc. .................................................................................. 18

Porter & Dietsch, Inc. v. FTC,
   605 F.2d 294 (7th Cir. 1979) ..................................................................... 21

Prentice Med. Corp. v. Todd,
   145 Ill. App. 3d 692 (Ill. Ct. App. 1986) .................................................... 15

PS Promotions, Inc v. Stern,
   No. 97 C 3742, 2000 WL 283092
   at *12 (N.D. Ill. Mar. 8, 2000) ................................................................... 22

Republic Tobacco L.P. v. North Atlantic Trading Co.,
   Civ. A. No. 06-2738, 2007 WL 1424093
   at *4 (N.D. Ill. May 10, 2007) ................................................................... 18

Rosenthal Collins Group, LLC v. Trading Techs. Int'l, Inc.,
   No. 05 c 4088, 2005 WL 3557947 at *9, (N.D. Ill. 2005) ............................. 17

S.C. Johnson & Son, Inc. v. The Clorox Co.,
   241 F.3d 232 (2d Cir. 2001) ............................................................ 19, 21, 22

Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.,
   902 F.2d 222 (3d Cir. 1990) ...................................................................... 17

Schick Mfg., Inc. v. Gillette Co.,
   372 F. Supp. 2d 273 (D.Conn. 2005) ........................................................... 19

Scotts Co. v. United Indus. Corp.,
   315 F.3d 264 (4th Cir. 2002) ..................................................................... 19

SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
   Consumer Pharms. Co., No. 01 Civ. 2775 (DAB), 2001 WL 588846 at *8
   (S.D.N.Y. 2001) ....................................................................................... 17

Southland Sod Farms v. Stover Seed Co.,
   108 F.3d 1134 (9th Cir. 1997) ................................................................... 19

Time Warner Cable, Inc. v. DIRECTV, Inc.,
   497 F.3d 144 (2d Cir. 2007) ...................................................................... 19

## TABLE OF AUTHORITIES
### (continued)

Page

*United Indus. Corp. v. The Clorox Co.,*
  140 F.3d 1175 (8th Cir. 1998) .......................................................................... 19

*Vidal Sassoon, Inc. v. Bristol-Myers, Co.,*
  661 F.2d 272 (2d Cir. 1981) ............................................................................. 17

## STATUTES

15 U.S.C. §1125(a) ............................................................................................... 1, 16

220 ILCS 5/21-100 *et seq.* ...................................................................................... 6

244 Illinois App. 3d 87, 98,
  613 N.E.2d 1150 (1st Dist. 1992) .................................................................... 18

Illinois Consumer Fraud and Deceptive Business Practice Act,
  815 ILCS 505/1, *et seq.*.............................................................................. 17, 18

Illinois Uniform Deceptive Trade Practices Act,
  815 ILCS 510.................................................................................................. 18

Cable and Video Competition Law
  (Public Act 95-009)........................................................................................... 6

## RULES

Federal Rules of Civil Procedure Rule 65 ........................................................... 1, 26

30207639.1

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Illinois Bell Telephone, d/b/a AT&T Illinois ("AT&T Illinois"), moves for a

preliminary injunction against Defendants Comcast of Illinois III, Inc., Comcast Corporation,

Comcast Cable Holdings, LLC, and Comcast of Chicago, Inc. (collectively, "Comcast"),

pursuant to Rule 65 of the Federal Rules of Civil Procedure. AT&T Illinois submits this

memorandum in support of its Motion. The underlying action, and this Motion are brought

under Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a), the Illinois Consumer Fraud and

Deceptive Business Practices Act and the Illinois Uniform Deceptive Trade Practices Act.

**I.    INTRODUCTION**

Comcast is advertising in a manner that falsely disparages AT&T Illinois and its

subscription television service offerings. These services directly compete with Comcast's cable

television offerings for Illinois consumers. Specifically, AT&T Illinois promotes and offers two

television subscription services to potential customers in the greater Chicago, Illinois

metropolitan area: (1) a satellite television service branded AT&T | DISH Network that is

provided by EchoStar Satellite L.L.C. DISH Network ("DISH Network"); and (2) a recently

launched Internet Protocol ("IP")-based wireline video service provided by AT&T Illinois

named U-verse™ TV ("U-verse TV").

In a recent print advertisement and several commercials in the northeast Illinois area,

Comcast falsely claims, and in spite of AT&T Illinois' objections continues to claim, that the

selection of AT&T Illinois' television service offerings results in the placement of a "giant",

"ugly" utility box on the consumer's property or in the consumer's neighborhood. Contrary to

this false claim, there is absolutely no correlation between the placement of AT&T Illinois'

facility boxes, which are necessary to provide its U-verse TV service and are installed in

neighborhoods prior to the service being offered to residents, and a consumer's selection of either of AT&T Illinois' television service offerings.

For example, a recent print advertisement falsely claims that AT&T's "[g]iant utility box[]" will "block" the customer's house. *See* Declaration of Christopher A. Cole (a true and correct copy of which is attached hereto as Exhibit 1) ("Cole Decl."), Exs. A, B. Likewise, a representative Comcast television commercial shows a utility box suddenly appearing on the front lawn of a home owned by an AT&T Illinois customer, stating, "Oh yeah the other big difference [between AT&T and Comcast television service], one home may get some free landscaping in their yard." *Id.* at Exs. C, D. These claims are literally false as to both AT&T Illinois television service offerings – U-verse TV and DISH Network. Simply put, ordering either television service offered by AT&T Illinois will not result in the installation of any size utility box (let alone a "[g]iant one") on a customer's lawn, in front of a customer's home, or in a customer's neighborhood.

The "giant utility boxes" to which Comcast's ads apparently refer are known as video ready access devices ("VRADs"). VRADs are part of AT&T Illinois' local network infrastructure upgrade, which is being undertaken to bring its new U-verse TV service to communities in northeast Illinois. Any single VRAD serves between 150-750 homes and can be located several thousand feet from the customers that it serves. VRADs are installed near existing utility structures in public rights of way or easements and *not* in a manner that blocks a home. Further, they are placed, tested, and brought into service well before any AT&T U-verse TV sales are made to residents in the neighborhood served by the VRAD. Moreover, DISH Network requires no VRAD whatsoever for the provision of service.

Consequently, there is no causal link between subscribing to AT&T Illinois television service offerings and the subsequent placement of VRADs near a consumer's property. It is therefore patently false, as represented in the Comcast advertisements, that consumers who order television service offered by AT&T Illinois can expect to have a "[g]iant utility box," "a big ugly box" or any size utility box subsequently placed in his or her front yard or neighborhood as a result of choosing AT&T Illinois.

Comcast plainly intends with these false advertisements to harm AT&T Illinois by disrupting its launch of AT&T U-verse TV. U-verse is a new television service offered in northern Illinois, with which many consumers are not yet familiar. The opening credits of two of the challenged video ads leave no doubt as to Comcast's malicious intent, as they reveal that Comcast's advertising campaign is called **"ANTI-AT&T LAUNCH."**

AT&T Illinois went to great lengths to avoid litigation over these claims, but has been met with evasion and obfuscation by Comcast. On March 14, 2008, attorneys for AT&T Illinois first complained to Comcast about the initial print ad, and demanded that it be stopped. Cole Decl. at ¶ 6, Ex. E. On March 19, 2008, following AT&T Illinois' discovery of the first two Comcast commercials disparaging AT&T Illinois' television services, AT&T Illinois' lawyer again wrote to Comcast to demand that Comcast withdraw the patently false claims in the ads. *Id.* at ¶ 7, Ex. F. Comcast refused to make any binding commitment, however. Because Comcast refused to comply with AT&T's reasonable request, and because the harm being caused by the challenged ads is immediate and potentially severe, AT&T Illinois filed the initial complaint. Hoping to leave a window for negotiation, however, AT&T Illinois did not serve the complaint.

The parties engaged in additional discussions on March 24 and during the following week. These discussions initially led AT&T Illinois to believe that Comcast would indeed cease its false claims. For example, on March 24, 2008, Comcast's attorney informed AT&T Illinois that the challenged print ads were no longer running, but suggested that the company would not necessarily cease the false VRAD claims, reserving the right to make the VRAD the centerpiece of future ads. *Id.* at Exs. H, I. However, on or about April 3, 2008, Comcast ran one of the ads that it previously advised was not in market. Further, around April 8, 2008, AT&T Illinois discovered that Comcast had begun to run an entirely new, and even more egregiously false, television advertisement entitled "Split-Screen." *Id.* at ¶ 5, Exs. C, D. The Split-Screen ad not only claimed that customers who purchase television services from AT&T will likely have VRADs in their front yard, it included a host of additional new false claims regarding the parties' respective television content offerings, including the literally false claim that AT&T Illinois does not offer any local programming. AT&T Illinois does in fact offer a full lineup of local network programming through both its AT&T | DISH offering, as well as through U-verse TV.

The new Comcast ad caused AT&T Illinois to file an Amended Complaint on April 10, 2008, and again to forego service in a futile effort to negotiate a resolution. Comcast refused to commit to unconditionally end the obviously false claims. *Id.* at ¶ 11, Ex. J. Consequently, the parties could not reach agreement, necessitating AT&T Illinois' service of the Complaint and submission of this Motion for Preliminary Injunction.

While there are numerous false claims made in each of the challenged Comcast ads, this Motion specifically requests that the Court bar Comcast, pending trial, from continuing to disseminate a limited number of highly injurious and literally false claims -- that: (1) if a consumer selects an AT&T Illinois television service offering, AT&T Illinois will subsequently

place a VRAD on or near the consumer's property; (2) the purchase of AT&T Illinois' television

service offerings result in a consumer being adversely affected by AT&T Illinois subsequently

installing a large utility box (or any size utility box); (3) there is any causal connection between a

customer's decision to purchase AT&T Illinois' television service offerings and the placement or

installation of a VRAD; and (4) AT&T Illinois does not offer local channels to subscribers of its

television service offerings.  As demonstrated below, AT&T Illinois is likely to show that these

claims are literally false and therefore prevail on the merits of its claims.  Therefore, under well-

established Lanham Act precedent, irreparable harm must be presumed.  The public interest

favors the injunction of these patently false ads, and the equities favor AT&T Illinois.

This Court should enjoin Comcast's false claims.

## II.    FACTUAL BACKGROUND[1]

### A.    The Market For Residential Television Services in Illinois.

Comcast is the dominant incumbent provider of subscription television services to

residential consumers in Illinois.  On information and belief, Comcast currently holds a

substantial majority of the subscription television market within the Chicago area.  *See*

Declaration of Steven Mitchell ("Mitchell Decl.") (a true and correct copy of which is attached

hereto as Ex. 2) at ¶ 7.  Comcast competes with AT&T Illinois in the offering of these

subscription television services in certain Illinois markets, including the greater Chicago

metropolitan area.  *Id.* at ¶ 5.  AT&T Illinois and Comcast also compete for voice

communications services and Internet access services.  *Id.* at ¶ 7.

---

[1]    The underlying facts are set forth more completely in the Complaint, in the Declaration of
Christopher A. Cole, Esq. ("Cole Decl."), the Declaration of Steven D. Mitchell of AT&T ("Mitchell
Decl.") and the Declaration of Marc Blakeman ("Blakeman Decl.") all of which are filed
contemporaneously with this Memorandum and attached hereto as Exhibits 1, 2 and 3, respectively.

In 2004, AT&T Illinois began to offer its subscribers access to the co-branded and jointly marketed DISH Network service. *Id.* at ¶ 3. In January 2008, AT&T Illinois began offering another subscription television product, U-verse TV, in northeastern Illinois, which is described in more detail below. *Id.* at ¶ 4. AT&T Illinois is in the process of upgrading its terrestrial networks in order to expand distribution of U-verse TV in Illinois. *Id.* at ¶ 8. AT&T Illinois currently markets both DISH Network and U-verse TV in the northeastern Illinois area. Where U-verse TV is available, it will be offered to a consumer along with DISH. Where U-verse TV is not currently available, only DISH Network is offered. *Id.* at ¶ 5.

**B.      The U-verse Video-Ready Access Device ("VRAD")**

In 2007, the State of Illinois enacted the Cable and Video Competition Law (Public Act 95-009),[2] in order to encourage competition within the state for the delivery of wireline subscription television service. In enacting this new law, the General Assembly determined that the citizens of Illinois would benefit from wireline based television service competition between the incumbent cable provider, like Comcast, and new entrants, like AT&T Illinois. *See* Declaration of Marc Blakeman ("Blakeman Decl.") (a true and correct copy of which is attached hereto as Ex. 3) at ¶ 8. The law removes previous impediments to competition and creates a process by which video providers can obtain a statewide video license, which allows them to offer television services throughout the state. Because such services typically require substantial infrastructure upgrades, the legislation requires video providers to follow local ordinances and regulations regarding placement of facilities necessary to provide this service in local communities. *Id.* at ¶ 9.

---

[2]      220 ILCS 5/21-100 *et seq.*

This law represents the Assembly's mandate to encourage competition, and opened the door for AT&T Illinois and other providers to expand television options for consumers within the state. *Id.* at ¶ 8. In 2007, AT&T Illinois began a series of extensive, and expensive, network upgrades to facilitate its introduction of the U-verse TV service to Illinois consumers. *Id.* at ¶ 11. U-verse TV is a unique, IP-based service that provides 100% digital television and high definition ("HD") channels to consumers. Unlike satellite or cable television, U-verse TV is typically delivered to homes over homeowners' existing copper telephone wires. Mitchell Decl. at ¶ 8. The typical homeowner who orders U-verse TV need not have any new wires run from the street to his or her home, or install a satellite dish.

The network improvements required to make U-verse TV available are extensive. As part of this process and prior to selling the service to consumers, AT&T Illinois has installed, and is installing, fiber-optic cables to each neighborhood that U-verse TV will reach. Blakeman Decl. at ¶¶ 6, 20. These cables run from the AT&T Illinois Central Office[3] to neighborhood facility cabinets called "VRADs." *Id.* at ¶¶ 11-12. A VRAD cabinet houses, among other components, the complex equipment and backup battery power needed to provide U-verse TV service. *Id.*

Each VRAD serves from 150 to as many as 750 homes. *Id.* at ¶ 12. For technical reasons, it must be installed within about 300 feet of an existing AT&T Illinois cross-connection cabinet. *Id.* at ¶ 15.[4] It is most often located adjacent to an existing cross-connection cabinet.

---

[3]    A "Central Office" is a distribution facility that houses the network facilities necessary to provide voice, Internet, and facilities-based subscription television service for several thousand residents in an area. Blakeman Decl. at ¶ 11.
[4]    Cross-connection cabinets are the familiar telephone connection boxes that have been located throughout the state's neighborhoods in the public right of way and private easements for many decades. *Id.* at ¶ 15. The cross-connection cabinets serve as the point at which the main telephone trunk line originating from the Central Office is split into multiple lines for the delivery of traditional telephone

*Id.* at ¶ 15.  A VRAD can be located up to several thousand feet away from any given home that it might serve.  *Id.* at ¶ 12.  There are several different types of VRADs, ranging from four to about five feet tall.  *Id.* at ¶ 13.  All of them are clad in low-sheen metallic housing with minimal adornment.  *Id.* at ¶ 14.  Thus, there is no truth to the claim that a VRAD must necessarily be installed on the front lawn of a home in a manner that will "block" a home to provide service. *Id.* at ¶¶ 19, 21.  Further, all VRADs are installed in neighborhoods prior to the sale of U-verse TV to the residents in those neighborhoods.  *Id.* at ¶ 20.

      **C.**    **The Location Of VRADs**

      AT&T Illinois has a long history of installing its equipment in public rights of way and recognizes that in some communities there have been aesthetic concerns about the installation of such equipment, including VRADs.  In an attempt to address these issues when they have arisen, the company has worked diligently with local governments to minimize any visual or aesthetic disturbance, by finding alternative locations and landscaping the areas around the VRADs.  *Id.* at ¶¶ 16, 18.

      In each municipality where AT&T Illinois installs the equipment necessary to deliver the U-verse TV product prior to selling the service, AT&T Illinois has offered to meet and cooperate with municipal authorities to select suitable locations for the U-verse VRADs.  *Id.*  VRADs are placed on public rights of way or, in some instances, on easements, preferably near existing facility structures.  *Id.* at ¶¶ 19, 22.  When placed on easements, AT&T Illinois has always received the consent of the property owner.  *Id.* at ¶ 19.  This process should be no surprise to Comcast, which also uses public rights of way and easements to install equipment and facilities necessary to serve Illinois residents with its services.  *Id.*

---

service to individual consumers.  *Id.*  These individual telephone lines carry U-verse TV service to the subscriber's home.

As stated above, VRADs are installed in neighborhoods before sales of U-verse TV are even made to homes in those neighborhoods. ***Thus, contrary to Comcast's false claims, VRADs are never installed next to a customer's home or in a neighborhood after and because a customer has chosen subscription television service offered by AT&T Illinois.*** *Id.* at ¶¶ 20-23. Moreover, also contrary to Comcast's ads, VRADs are ***not*** installed such that they block homes. *Id.* at ¶ 21.

### D.    Comcast's False Advertising

On March 13, 2008, AT&T Illinois learned of a newspaper advertisement by Comcast that aggressively attacks AT&T Illinois and its television offerings. AT&T Illinois subsequently learned of three television commercials, two of which were first made available on the popular Internet video site called www.YouTube.com, and two of which have been, on information and belief, shown on television. All of the ads convey the literally false claim that customers who subscribe to AT&T Illinois' television service offerings will subsequently have, or are more likely to have, "giant" utility boxes installed on or near to their property or in their neighborhood. For example, the print advertisement depicts a utility box mere steps from a home, and falsely claims that AT&T's Illinois "utility boxes" will actually "block[]" the subscriber's home. Likewise, the "Split-Screen" television commercial shows a utility box suddenly appearing on the front lawn of a home owned by an AT&T Illinois customer, stating, "Oh yeah the other big difference [between AT&T and Comcast television service], one home may get some free landscaping in their yard."

### 1.    Comcast's False Print Advertisement

One version of the false claim appears in a print advertisement that ran in *The Herald News* on March 13, and in *The Daily Southtown Star* a couple of days thereafter. True and correct copies of this advertisement are attached as Exhibits A and B to the Cole Declaration.

The advertisement purports to show a photograph of an AT&T Illinois VRAD apparently placed extremely close to a home. The photograph is taken in a manner that suggests a real-life scene, although the photo's perspective purposefully accentuates the height and size of the VRAD. Beneath the photo is the headline claim, "AT&T not only blocks your house, it blocks your HD options . . . ." Below, the advertisement further states that "[w]hat you get with AT&T" includes "[g]iant utility boxes." The ad, which generally compares Comcast's television offerings to those offered by AT&T Illinois, plainly and literally makes the claim that, if you order television service from AT&T Illinois, a "giant" utility box will be installed so as to "block[] your house."

To date, AT&T Illinois has asked for, but Comcast has refused to provide, the street address of the home appearing in the advertisement. *Id.* at ¶¶ 5-7. This prevents AT&T Illinois from independently determining the actual location/size of this VRAD in relation to the pictured house and from determining whether Comcast fabricated, exaggerated or altered the picture in the advertisement. It also prevents AT&T Illinois from ascertaining whether the customer in the pictured house subscribes to U-verse TV or Comcast service. Comcast obviously altered the photograph of the VRAD in at least one respect – adding the words "HD BLOKR" on a simulated plaque in the front of the VRAD cabinet. *See* Blakeman Decl. at ¶ 24.

The photograph in the Comcast advertisement, even if real, is falsely portrayed by Comcast to represent the typical experience of a consumer that purchases an AT&T Illinois television service offering. *Id.* at ¶ 23. The ad purposefully obscures what Comcast well knows – the selection of either of AT&T Illinois's television service offerings does not result in the subsequent placement of a VRAD at a customer's home. VRADs are installed in a neighborhood in advance of U-verse TV being offered in that neighborhood. Like trenching for

cable installation, VRADs are part of an infrastructure build-out that is planned in advance of any specific consumer order. *Id.* at ¶ 16. Consequently, and contrary to Comcast's false claims, no consumer who purchases AT&T Illinois' television service offerings will receive or be subject to an increased chance of having a VRAD placed at or near to their home. *Id.* at ¶ 21.

Moreover, because VRADs are not involved in the delivery of the DISH Network service, Comcast's claims are equally false for those customers that purchase the DISH Network service offered by AT&T Illinois. *Id.* at ¶ 12.

### 2.    Comcast's False Commercials

Comcast has distributed at least three false commercials that advance the same false theme and claims.[5] Comcast and/or its agents have placed these videos on the Internet at www.youtube.com, a highly popular video-sharing website, and on television, including in the greater Chicago, Illinois metropolitan area. The commercials are 30-seconds long, and contain false visual images and other disparaging claims that improperly suggest that a customer choosing AT&T Illinois' television service offerings will be adversely affected by the subsequent placement of a large utility box at their home or in their neighborhood.

One commercial, entitled "No Curb Appeal," features a homeowner looking despondently out of the front window of his home as he mourns: "[w]e got AT&T, and look what we got. I thought technology was supposed to get smaller, not bigger. Look at it, taunting us."[6] The camera then cuts to the front lawn where a person dressed in what appears to be a VRAD costume cavorts on the homeowner's front lawn, as the voiceover states:

> Once you see AT&T, you'll want it to go away. A network with less HD, slower internet, and a BIG BOX. What else did you

---

[5]    True and correct copies of these advertisements are attached as Cole Decl. Exhibit C.
[6]    At one time, this video could be found on the internet at http://www.youtube.com/watch?v=GnSIyDiTVyU.

expect from the big, old phone company.  Stick with Comcast, the proven advanced technology.[7]

The commercial concludes with a dog urinating on the VRAD character.

A more recent Comcast commercial, (referred to herein as "Split-Screen") also appeared on television.  The ad purports to compare the features and benefits between AT&T Illinois' and Comcast's television services by showing a split screen of two homes, one with AT&T Illinois and one with Comcast.  (A true and correct copy of this ad and the storyboard of this ad is attached to Cole Decl., as Exs. C, D).

As the commercial makes various verbal comparative claims, written words that emphasize the claims appear over the respective AT&T Illinois and Comcast homes.  The voiceover begins by saying "Two homes.  One connected with narrowband copper wire."  As those words are stated, a picture of a phone wire appears over the AT&T Illinois home, with text simultaneously stating, "**Narrowband** copper wire" (emphasis in original).   The voiceover continues ". . . the other with powerful broadband cable," as a picture of a coaxial cable appears over the Comcast home along with the text, "**Powerful** broadband cable."  (emphasis in original).

Focusing on the AT&T Illinois home again, the voiceover states, "one limits a home to view only one HD channel at a time," as text over the AT&T home reads, "View **one** HD channel at a time."  The voiceover then continues to say that, "the other can watch . . . unlimited HD channels," as text above the Comcast home appears that reads "View **unlimited** HD channels at a time" (emphasis in original).

---

[7]    As with the other television/internet advertisement and the print advertisement, this commercial makes a number of false and misleading claims about AT&T Illinois, including the "slower internet" and "less HD" claims.  However, for purposes of this Motion, AT&T Illinois is only challenging the claims relating to the need for a "big box."

The voiceover goes on to state that "one home has limited On Demand content . . . with no local programming," as text appears above the AT&T Illinois home that reads "**Limited** On Demand content" on one line and "**No** local programming" immediately below it. (emphasis in original). The voiceover then states, "The other has tons of On Demand choices . . . most of which are free and include local programming," as text above the Comcast house reads "**Tons of** On Demand choices most are **FREE**" and "**Includes** local programming." (emphasis in original).

The voiceover then concludes with the final punch line by saying, "Oh yeah the other big difference, one home may get some free landscaping in their yard," as the commercial shows a VRAD materializing on the front lawn of the AT&T Illinois house, accompanied by a loud thud.

The Split-Screen ad thus makes at least two literally false claims. First, it claims that an AT&T Illinois television customer, unlike the Comcast customer, may get a VRAD in their yard as a result of selecting AT&T Illinois' service. This claim is false for all of the reasons set forth at length above. Second, the commercial asserts that AT&T offers "no local programming." This is also false, as AT&T offers a multitude of local television channels through both its DISH Network and U-verse offerings. Mitchell Decl. at ¶ 6.

A third Comcast commercial, entitled "Line-Up," continues the false and injurious VRAD theme. It features a young woman who is reviewing a police line-up of suspects.[8] Cole Decl. at Ex. C. The woman is asked by the detective to identify the "culprit," which turns out to be a man dressed in a VRAD costume. She points him out immediately, exclaiming "Yes! There's no mistaking it. That is the big, ugly thing that's been limiting my HD." The camera then cuts to the person dressed in an AT&T Illinois VRAD costume, standing in the line-up,

---

[8]    At one time, this video could be found on the internet at http://www.youtube.com/watch?v=5fCS_Do1tK8.

complete with comical music. Judging from the height demarcations on the back wall, the VRAD appears to be nearly seven feet tall and almost a foot taller than the height of the next tallest actor. The voiceover then states, "AT&T. Offering so little HD, it's practically criminal." *Id.* This ad, like the others, directly links the consumer's decision to purchase television services from AT&T Illinois with the consumer's subjection to a "big ugly" VRAD.

Comcast's malicious intent in disseminating these commercials is made clear by the opening credits for the No Curb Appeal and Line-Up videos. The credits state that the ads were prepared for Comcast as part of an ad campaign called *"Anti-AT&T Launch." See id.*

### 3.    Harm to AT&T Illinois

In order to serve Illinois consumers, and pursuant to the Illinois legislative invitation, AT&T Illinois has invested significant resources in technology and network upgrades that are necessary to provide its brand new U-Verse TV offering. Mitchell Decl. at ¶ 10; Blakeman Decl. at ¶11. Because U-verse TV is a new product in Illinois for AT&T Illinois, it is at a very delicate stage of acceptance. Mitchell Decl. at ¶ 11. Consumers are just learning about the product and its capabilities through advertising and word of mouth. *Id.* Consumer recognition of U-verse TV is not nearly as broad as recognition of Comcast cable. *Id.*

As set forth in the attached Declaration of Steven Mitchell, who has served as AT&T Illinois' Vice President and General Manager, Comcast's false claims about VRADs threaten irreparable harm to AT&T Illinois, and in particular to the sales and reputation of the new U-verse TV product. *Id.* at ¶ 12-14. This kind of false claim is particularly harmful, because it plants a highly false and disparaging image in the minds of potential consumers who see the ads. *Id.* These consumers will falsely be led to believe that, if they order any television service from AT&T Illinois, AT&T Illinois will have to install a "giant", "big ugly" utility box on their property or in their neighborhood. *Id.* at ¶ 13. In fact, these ads convey to consumers that they

can prevent the installation of VRADs in their neighborhoods by choosing Comcast over AT&T Illinois, and that, if they order AT&T Illinois television service, they will not be able to view local channels.

## III.    ARGUMENT

AT&T Illinois can demonstrate that it should be entitled to relief under all four factors of the preliminary injunction test.  A party seeking a preliminary injunction must establish: "(1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied."[9]  Once the moving party has so established, the Court then considers, "(3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties."[10]  The Court weighs these four factors and then makes an equitable determination as to whether relief is warranted:

> We call this process the "sliding scale" approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side.  This weighing process, as noted, also takes into consideration the consequences to the public interest of granting or denying preliminary relief.  While we have at times framed the sliding scale approach in mathematical terms, it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.[11]

---

[9]    *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992) (citations and quotations omitted); *Eli Lilly and Co. v. Natural Answers, Inc.*, 86 F. Supp. 2d 834, 840 (S.D. Ind. 2000) (quoting *Abbott Labs.*); *see also Prentice Med. Corp. v. Todd*, 145 Ill. App. 3d 692, 697, 495 N.E.2d 1044, 1048 (Ill. Ct. App. 1986).

[10]    *Id.*

[11]    *Abbott Labs.* at 12 (citations and quotations omitted), *Eli Lilly* at 840.

AT&T Illinois satisfies this test in every respect.  AT&T Illinois is likely to succeed on the merits of its claim that Comcast engaged in literally false advertising.  As a result, AT&T Illinois is entitled to a well-established presumption under the Lanham Act that it will suffer irreparable harm if the false advertising continues.  The balance of harms weighs against Comcast heavily.  An injunction will simply prohibit Comcast from spreading its egregious false claims, a relatively easy task for it to accomplish.  In contrast, AT&T Illinois is likely to suffer extensive reputational damage, which cannot be undone, if Comcast is permitted to continue its false claims.  The public interest also strongly favors the cessation of Comcast's false claims, which are designed to mislead consumers and hinder fair competition for subscription television services in the state.

A. **Because Comcast's Claims Are Literally False, AT&T Illinois Is Likely To Prevail On The Merits.**

As set forth below, Comcast has in its print and video advertising literally falsely portrayed AT&T Illinois's television service offerings.  AT&T Illinois has clearly established a likelihood of success on the merits for its claims under the Lanham Act, the Illinois Uniform Deceptive Trade Practices Act, and the Illinois Consumer Fraud and Deceptive Business Practices Act.

Section 43(a)(2) of the Lanham Act prohibits the use of false or misleading statements or representations of fact in commercial advertising, and establishes a private remedy for any violation thereof.  The Lanham Act prohibits the use of any "false or misleading" description or representation of fact concerning the nature, characteristics, qualities or geographic origin of goods.[12]

---

[12]    15 U.S.C. §§ 1125(a)(1)(A) and (B).

"The private remedy thus created applies with equal force to two different types of false advertising."[13]  A plaintiff must prove a false advertising claim under section 43(a) of the Lanham Act by showing that the challenged advertising or promotional statements are either: (1) literally false; or (2) literally true or ambiguous but convey a false impression or are misleading in context, as demonstrated by actual consumer confusion.[14]  When considering Lanham Act challenges based on literal falsity, courts may also consider any claims the advertisement conveys by "necessary implication" through visual images or visual images combined with an audio message.[15]

To establish a Lanham Act false advertising claim, a plaintiff must prove that: (1) the defendant made a false factual statement in a commercial advertisement about its own or another's product; (2) the statement actually deceived or is likely to deceive a substantial segment of its audience; (3) the deception is material to a purchasing decision; (4) the statement is about goods entering interstate commerce; and (5) the plaintiff has been injured or injury is probable as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of good will associated with its products.[16]

The requirements regarding proof of falsity are highly similar under the Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/1, *et seq.* (the "ICFA").[17]

---

[13]    *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 857 F. Supp. 1241, 1244 (N.D. Ill. 1994).

[14]    *Abbott Labs.*, 971 F.2d at 13 (citing *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.,* 902 F.2d 222, 228-29 (3d Cir. 1990); *Avis Rent A Car Sys., Inc. v. Hertz Corp.,* 782 F.2d 381, 386 (2d Cir.1986); *Vidal Sassoon, Inc. v. Bristol-Myers, Co.,* 661 F.2d 272, 277 (2d Cir. 1981); *Guardsmark, Inc. v. Pinkerton's Inc.,* 739 F.Supp. 173, 175 (S.D.N.Y. 1990), *aff'd without opinion,* 923 F.2d 845 (2d Cir. 1990); *cert. denied,* 501 U.S. 1252, 111 S.Ct. 2893, 115 L.Ed.2d 1058 (1991)).

[15]    *See, e.g., SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* No. 01 Civ. 2775 (DAB), 2001 WL 588846, at *8 (S.D.N.Y. June 1, 2001) .

[16]    *Rosenthal Collins Group, LLC v. Trading Techs. Int'l, Inc.,* No. 05 c 4088, 2005 WL 3557947, at *9, (N.D. Ill. Dec. 26, 2005) (citing *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir. 1999)).

[17]    815 Ill. Comp. Stat. 505/2.

"To establish a violation of the ICFA's prohibition on deceptive acts or practices, a plaintiff must prove that: (1) the defendant engaged in a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the act or practice; and (3) the act or practice occurred in the course of conduct involving trade or commerce."[18] Under the ICFA, a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive.[19] If the alleged deceptive practice implicates consumer protection concerns, a competitor may bring an ICFA claim.[20] When determining whether a statement has the capacity to deceive, courts should examine the statement in the context of other information available to consumers.[21]

Likewise, the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510 ("IUDTPA") also provides injunctive relief for a plaintiff who can demonstrate that a defendant engaged in any of the twelve enumerated types of conduct listed in Section 510/2, including disparagement of goods, services, or business of another by false or misleading representation of fact.[22] In *Popp v. Cash Station, Inc.*,[23] the court explained that the General Assembly enacted the statute to prohibit unfair competition-its focus "is primarily directed towards acts which unreasonably interfere with another's conduct of his business." Unfair competition claims under the IUDTPA are evaluated under the same analysis as false advertising claims under the Lanham Act.[24]

---

[18]    *Merix Pharm. Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, No. 5 c 1403, 2006 WL 1843370, at *2 (N.D. Ill. June 28, 2006).
[19]    *Id.* (citing *People ex rel. Hartigan v. Knecht Servs., Inc.,* 216 Ill. App. 3d 843, 575 N.E.2d 1378, 1387 (Ill. App. Ct. 1991); *see also Bober v. Glaxo Wellcome PLC,* 246 F.3d 934, 938 (7th Cir. 2001)).
[20]    *B. Sanfield, Inc.*, 857 F. Supp. at 1247-48.
[21]    *See Bober,* 246 F.3d at 940.
[22]    815 Ill. Comp. Stat. 510/2.
[23]    244 Ill. App. 3d 87, 98, 613 N.E.2d 1150, 1156 (1st Dist. 1992).
[24]    *See Republic Tobacco L.P. v. North Atlantic Trading Co.,* Civ. A. No. 06-2738, 2007 WL 1424093, at *4 (N.D. Ill. May 10, 2007).

**1.     Comcast's Claim Is Literally False**

Whether an advertising claim is literally false is an issue of fact for the Court.[25]  In

addition to written or spoken claims, the Court should also look at "the visual images in a

commercial to assess whether it is literally false."[26]  "[P]icture depictions can constitute false

advertising" and "a party may not distort an inherent quality of its product in either graphics or

animation."[27]

Moreover, a visual, written or oral statement in advertising can be found to be literally

false by necessary implication if the intended audience would recognize the claim "as readily as

if it had been explicitly stated."[28]  When evaluating whether an advertisement is literally false by

necessary implication, the Court "must analyze the message conveyed in full context[;] . . . it

must consider the advertisement in its entirety and not . . . engage in disputatious dissection."[29]

Comcast's advertisements each convey the literally false claim that Chicago-area

consumers of either of AT&T Illinois' television service offerings will be adversely affected by

the subsequent placement of a VRAD on their property or in their neighborhood.  The newspaper

---

[25]     *Abbott Labs.,* 971 F.2d at 13; *Hot Wax, Inc. v. Turtle Wax, Inc.,* 27 F. Supp. 2d 1043, 1048 (N.D. Ill. 1998).

[26]     *S.C. Johnson & Son, Inc. v. The Clorox Co.,* 241 F.3d 232, 238 (2d Cir. 2001); *Coca-Cola Co. v. Tropicana Prods., Inc.,* 538 F. Supp. 1091 (S.D.N.Y. 1982), *rev'd,* 690 F.2d 312, 318 (2d Cir. 1982) (false visual demonstration suggesting that orange juice contained only fresh-squeezed, unprocessed juice actionable because it is "clearly a misrepresentation as to that product's inherent quality or characteristic"); *see also Navistar Int'l Transp. Corp. v. Freightliner Corp.,* No. 97-C-3792, 1999 WL 569577, at *2 (N.D. Ill. July 30, 1999) (a visual image may be literally false if the information is inaccurate) (citing *United Indus. Corp. v. The Clorox Co.,* 140 F.3d 1175, 1180-81 (8th Cir. 1998) (noting that a visual image may be literally false if the false comparison is sufficiently explicit)).

[27]     *Schick Mfg., Inc. v. Gillette Co.,* 372 F. Supp. 2d 273, 285 (D.Conn. 2005).

[28]     *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 35 (1st Cir. 2000); *see also Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 274 (4th Cir. 2002); *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir. 1997); *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 946-47 (3d Cir. 1993); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,* 290 F.3d 578, 586 (3d Cir. 2002).

[29]     *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 158 (2d Cir. 2007) (internal citations and quotations omitted).

ad actually claims that these "giant utility boxes" will "block" the home, as it shows a VRAD looming in front of a home. The "No Curb Appeal" commercial shows a man in an oversized VRAD costume dancing on a distraught homeowners' front yard. The "Line-Up" commercial shows a woman quickly identifying another oversized VRAD as the "big, ugly thing that's been limiting my HD." And the Split-Screen ad shows a VRAD materializing directly on the front lawn of the AT&T Illinois customer home with a loud thud, but not on the Comcast home.

The only reasonable interpretation of these ads is that selecting AT&T Illinois' television service offerings results in the placement or an increased chance of placement of a "large," "big ugly" utility box in a consumer's front yard or neighborhood, which is false. Like the network equipment necessary to bring cable television services, telephone services, electricity, and other utilities to neighborhoods, VRADs are installed in neighborhoods before sales of U-verse TV are made to any individual homes in any neighborhood. Blakeman Decl. at ¶ 20. Moreover, VRADs are not installed at every home in a neighborhood. Far from it: a single VRAD can serve from 150 to 750 homes and be located up to several thousand feet away from any given home that it serves. *Id.* at ¶ 12. Indeed, one could be a Comcast customer and have a VRAD placed closer to one's home than others in the same neighborhood who subsequently order U-verse TV. Further, VRADs are not even used to provide the DISH Network service, which is also offered by AT&T Illinois.

Not only are Comcast's visual depictions literally false, Comcast's written claims that a "utility box" will "block" a consumer's home are also false. VRADs are *not* installed such that they block homes. *Id.* at ¶ 21-22.

AT&T Illinois does not deny the possibility that, in advance of U-verse TV being sold in an area, a VRAD, by happenstance, may have been installed in public rights of way or easements

that are in proximity to homes. Comcast's advertisements, however, falsely claim that the installation occurs after and only if a consumer selects AT&T Illinois' television service offerings. As such, Comcast falsely portrays a fictitious occurrence (location of a VRAD near an AT&T Illinois subscriber's home as a result of selecting AT&T Illinois service offerings) as the invariable, or even likely, experience of every consumer who orders television service offered by AT&T Illinois.

Even if Comcast were able to point to photographs or other evidence of VRADs near to homes owned by AT&T subscribers, this would not constitute evidence that the purchase of television service from AT&T Illinois *caused* the particular VRAD placement, which is the false claim contained in the advertisements. Depicting an atypical situation as the normal occurrence (whether in pictures or words) can also be found to be literally false under the Lanham Act.[30] For example, in *S.C. Johnson & Son, Inc. v. The Clorox Co.*, plaintiff S.C. Johnson challenged Clorox's advertising comparing S.C. Johnson's Slide-Loc bag to Clorox's Glad-Lock bag. The commercial showed the Slide-Loc bag leaking water at a rapid rate, while the Glad-Lock bag did not leak at all. The District Court concluded that the commercial conveyed the literally false visual claim that the typical Slide-Loc bag leaks at the rate depicted in the commercial. The evidence showed that very few Slide-Loc bags leaked at the rate shown in the commercial.[31] The Second Circuit affirmed the court's finding on appeal, concluding the ads conveyed a visual claim that was "literally false as to the inherent quality or characteristic" of the Slide-Loc bags.[32]

---

[30] *See S.C. Johnson & Son, Inc. v. The Clorox Co.*, 241 F.3d 232 (2d Cir. 2001); *Porter & Dietsch, Inc. v. FTC*, 605 F.2d 294 (7th Cir. 1979) (Similarly, the FTC has required a disclosure if the endorser's experience is not typical of that of the average consumer.).

[31] *S.C. Johnson & Son, Inc.*, 241 F.3d at 240.

[32] *Id.* at 238-240.

As in the *S.C. Johnson* case, this court may enjoin the literally false visual claim portrayed by the Comcast newspaper ad "without reference to the advertisement's impact on the buying public."[33] Because the false claims made in all four ads are so crystal clear and susceptible of no other reasonable interpretation, this Court does not need to consider consumer survey evidence of the advertisements' tendency to mislead and confuse consumers.

### 2.    Comcast's False Representations Are Material To Consumers

A Lanham Act Plaintiff also must demonstrate that "the deception [in the false advertising] is material, in that it is likely to influence the purchasing decision."[34] Common sense dictates that consumers would be less likely to subscribe to AT&T Illinois' television service offerings if they believed that doing so would result in the installation of a "giant", "ugly" metal box that would mar their front yard or neighborhood. A consumer presented with this commercial would likely consider buying other services. The fact that Comcast has built an entire "Anti-AT&T" advertising campaign around this premise is itself strong evidence that Comcast itself believes the false claim to be material to consumers. The same conclusions hold true to the false claim that AT&T Illinois service does not offer local programming.

### 3.    Comcast Placed Its False Advertising In Interstate Commerce

Comcast's false advertising affects interstate commerce. Comcast is a national provider of residential and business telecommunications services, including Internet, television and telephone service. Its services are inherently interstate in nature and it advertises these same services throughout the country, including in Illinois. The harm to AT&T Illinois from these

---

[33]    *Genderm Corp. v. Biozone Labs.*, No. 92 C 2533, 1992 WL 220638, at *13 (N.D. Ill. Sept. 3, 1992) (citing *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2nd Cir. 1991) (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982))); *see also AT&T Corp. v. Synet, Inc.*, No. 96 C 0110, 1997 WL 89228, at *11 (N.D. Ill. Feb. 13, 1997); *PS Promotions, Inc v. Stern*, No. 97 C 3742, 2000 WL 283092, at *12 (N.D. Ill. Mar. 8, 2000).
[34]    *Hot Wax*, 191 F.3d at 819.

advertisements will be felt not only acutely in Illinois, but also nationwide.  On information and

belief, one of the video ads also has appeared in Kansas City on television.  The video ads on

YouTube were also freely available nationwide.[35]  Where a party makes broadcasts "available to

a worldwide audience over the Internet," such advertising has "affected interstate commerce."[36]

> **4.    AT&T Illinois Is Likely To Be Injured
> By Comcast's False Advertising**

As discussed more fully below, AT&T Illinois is entitled to a presumption of injury and

causation because AT&T Illinois has demonstrated that Comcast's advertising is literally false.

But even if AT&T Illinois were required to prove injury, it is clear that Comcast's false claims

are likely to harm AT&T Illinois irreparably if allowed to continue.

> **B.    Because The Advertisements Are Literally False,
> They Are Presumed To Harm AT&T Illinois.**

It is "well-established" that, if the ads are proven to be literally false, Plaintiffs are

entitled to a "presumption that Lanham Act injuries are irreparable."[37]  This is true, "even absent

a showing of business loss."[38]  "This presumption . . . is based upon the judgment that it is

virtually impossible to ascertain the precise economic consequences of intangible harms, such as

damage to reputation and loss of goodwill, caused by such violations."[39]  Additionally,

irreparable harm may be presumed "[i]n cases of false comparative advertising, where there is a

misleading comparison to a specific competing product . . . ."[40]

---

[35]    *See Mid-West Mgmt., Inc. v. Capstar Radio Operating Co.*, No. 04-C-720-C., 2004 WL 2535404, at *2 (W.D. Wis. Oct. 21, 2004).

[36]    *Id.*

[37]    *Abbott Labs.*, 971 F.2d at 18; *see also Genderm Corp.*, 1992 WL 220638, at *18 ("Further, where, as here, a defendant's representations are literally false, irreparable injury is presumed").

[38]    *Abbott Labs.*, 971 F.2d. at 16.

[39]    *Id.*

[40]    *Ill. Bell Tel. Co. v. MCI Telecomms. Corp.*, No. 96 C 2378, 1996 WL 717466, at *4 (N.D. Ill. Dec. 9, 1996) (*citing McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988)).

Comcast's advertisements expressly refer to AT&T Illinois and its competing television services. The false claims regarding utility boxes are indisputably targeted at AT&T Illinois. As such, Comcast's advertisements constitute false comparative advertising triggering the Court's presumption of irreparable harm. Regardless, AT&T Illinois has established that Comcast's false and misleading advertising campaign is likely to cause irreparable injury to AT&T Illinois.[41] The prospect of irreparable injury is particularly ripe in cases such as this, where Comcast's egregious and patently false advertising presents substantial and ongoing harm to AT&T Illinois's nascent U-verse TV service. Here, Comcast's calculated and ongoing false advertising campaign threatens to prevent AT&T Illinois from gaining a foothold in a marketplace where Comcast is the dominant subscription television service provider.

## C. The Harm To AT&T Illinois Outweighs Any Potential Harm To Comcast From A Preliminary Injunction

Comcast will not be harmed substantially if the Court enters the preliminary injunction requested by AT&T Illinois. An injunction enjoining Comcast from disseminating its false and disparaging advertisements today would result in the cessation of only four specific advertisements: one print ad, and three commercials. The requested injunction would also stop Comcast from airing the challenged false claims in new or different executions, pending a trial. Such an injunction would leave Comcast free to engage in truthful and non-misleading advertising in all media. Comcast no doubt has many other truthful advertisements that could take the place of these three false ads.

Denial of a preliminary injunction, however, would cause AT&T Illinois and its new U-verse TV business to sustain substantial, irreparable damage. The false Comcast claims go to the heart of the material considerations of consumers who buy such subscription television services.

---

[41]    *See* Mitchell Decl. at ¶¶ 11-14.

The commercials are couched in highly insulting and disparaging terms, which are designed to inflict reputational harm on AT&T Illinois.

### D.    Enjoining Comcast's False Claims Would Serve The Public Interest

The public interest also weighs heavily in favor of issuing a preliminary injunction in this case. The public has a strong interest in truthful advertising, which favors issuance of an injunction.[42] Consumers depend and rely upon truthful advertising in order to fairly evaluate competing products in the marketplace. False advertising claims deprive consumers of accurate information, and they may be discouraged for the wrong reasons from purchasing an appropriate product for their needs.

Comcast's false advertising improperly inflames consumer perceptions regarding AT&T Illinois in an attempt to stifle growing competition from AT&T Illinois in the market for wireline subscription television service. Comcast's false comparative advertising here is likely to be exceptionally influential and damaging to a new service such as AT&T U-verse TV, because most potential consumers do not have access to firsthand or word-of-mouth information that would enable them to investigate and weigh Comcast's false claims on their own.[43] For these reasons, the public interest weighs heavily in favor of enjoining Comcast's false advertising.

---

[42]    *See, e.g., Abbott Labs.*, 971 F.2d at 19 ("[R]elief, such as ordering [defendant] to purge the false aspects of its promotional campaign and issue corrective advertising . . .would serve, rather than disserve, the public interest in truthful advertising, an interest that lies at the heart of the Lanham Act."); *see also Nav-Aids, Ltd. v. Nav-Aids USA, Inc.*, No. 01 C 0051, 2001 WL 1298719, at *9 (N.D. Ill. Oct. 25, 2001) (citing *Estate of Presley v. Russen*, 513 F.Supp 1339, 1382 (D.N.J. 1981) for the proposition that "[T]he public is interested in fair competitive practices and clearly opposed to being deceived in the marketplace")).

[43]    *Ill. Bell Tel. Co.*, 1996 WL 717466, at *9 (acknowledging that MCI, a new provider of local toll calls in a market dominated by a former monopolist, would be injured by an injunction preventing it from convincing consumers that there is a reason to switch services).

**E.    AT&T Illinois Is Prepared To Post Adequate
Security For The Preliminary Injunction**

Federal Rule of Civil Procedure 65(c) requires AT&T Illinois to post "security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." AT&T Illinois is prepared to post such security upon entry of an order for preliminary injunction in the form of an injunction bond or credit. However, given the strength of AT&T Illinois's case and the minimal potential harm to Comcast, AT&T Illinois respectfully urges the Court to require minimal security.

**IV.    CONCLUSION**

For the foregoing reasons, AT&T Illinois respectfully requests that the Court issue a preliminary injunction against Comcast prohibiting it from continuing its false and disparaging advertising claims, pending a trial on the merits.

DATED:  April 14, 2008                                Respectfully submitted,

ILLINOIS BELL TELEPHONE, D/B/A
AT&T ILLINOIS


By:  /s/ Brian L. Crowe
One of Its Attorneys

Brian L. Crowe (ARDC #0549584)
bcrowe@shefskylaw.com
James D. Wilson (ARDC #3033643)
jwilson@shefskylaw.com
John F. Kennedy (ARDC #6196185)
jkennedy@shefskylaw.com
Lynn A. Ellenberger (ARDC #6244188)
lellenberger@shefskylaw.com
SHEFSKY & FROELICH LTD.
111 E. Wacker Drive, Suite 2800
Chicago, IL  60601
Telephone:  (312) 527-4000
Facsimile:   (312) 527-4011

and

Christopher A. Cole
ccole@manatt.com
Manatt Phelps Phillips, LLP
700 12th Street, N.W., Suite 1100
Washington, D.C.  20005
Telephone:  (202) 585-6524
Facsimile:   (202) 637-1535

# EXHIBIT 1

# TO MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

ILLINOIS BELL TELEPHONE, d/b/a AT&T
ILLINOIS,

    Plaintiff,

     v.

COMCAST OF ILLINOIS III, INC.,
COMCAST CORPORATION,
COMCAST CABLE HOLDINGS, LLC, and
COMCAST OF CHICAGO, INC.

    Defendants.

Case No.:  08-CV-1680 EDA

## DECLARATION OF CHRISTOPHER A. COLE, ESQ.

I, Christopher A. Cole, hereby declare as follows:

1.  I am a partner with the law firm Manatt, Phelps & Phillips, LLP, which is counsel of record for Plaintiff Illinois Bell Telephone, d/b/a AT&T Illinois in this action. I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction.  I have personal knowledge of the facts stated herein, except where stated on information and belief.

2.  Attached hereto as Exhibit A is a true and correct copy of a Comcast print advertisement that on information and belief appeared in *The Herald News* on March 13, 2008.

3.  Attached hereto as Exhibit B is a true and correct copy of a Comcast print advertisement that, upon information and belief, appeared in *The Daily Southtown Star* on or about March 20, 2008.

4.  Attached hereto as Exhibit C is a compact disc containing true and correct copies of two different Comcast commercials as they appeared on March 20, 2008, on

YouTube at https://www.youtube.com/watch?v=GnSIyDiTVyU and

http://www.youtube.com/watch?v=5fCS_Do1tK8.

5.      Attached hereto as Exhibit D is a true and correct copy of a storyboard of

the Comcast television commercial as it appeared on April 8, 2008.  Also contained in

Exhibit C is a true and correct video copy of the television commercial as it appeared on

April 8, 2008.

6.      Attached hereto as Exhibit E is a true and correct copy of a letter sent from

Sidney J. White, Jr. ("Mr. White"), Senior Counsel to AT&T, Inc., to Mr. Kyle T. Birch

("Mr. Birch"), Assistant General Counsel to Comcast Cable, on March 14, 2008.

7.      Attached hereto as Exhibit F is a true and correct copy of a letter sent from

Mr. White to Mr. Birch on March 19, 2008.

8.      Attached as Exhibit G is a true and correct copy of a letter sent from Mr.

Birch to Mr. White on March 20, 2008.

9.      Attached as Exhibit H is a true and correct copy of a letter sent from Mr.

Birch to Mr. White on March 24, 2008.

10.     Attached as Exhibit I is a true and correct copy of a letter sent from me to

Mr. Kenneth R. Florin ("Mr. Florin"), Comcast's attorney from Loeb & Loeb LLP, on

April 8, 2008.

11.     Attached as Exhibit J is a true and correct copy of a letter sent form Mr.

Florin to me on April 11, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 14, 2008                    Christopher A. Cole, Esq.

2

# EXHIBIT A

# TO THE DECLARATION OF CHRISTOPHER A. COLE, ESQ.

The Herald News   Thursday, March 13, 20



## AT&T not only blocks your house, it blocks your HD options.

With Comcast, you get more HD options than with any other provider. And with On Demand from Comcast Digital Cable, you can choose from over 200 hours of free and pay-per-view movies and shows in HD whenever you want. Something AT&T can't offer. Best of all, you can watch different HD channels on multiple TV's, so no one in the family is blocked from their favorite HD programs.

**What you get with AT&T:**
- Giant utility boxes.
- Less HD options.
- No HD On Demand.
- Multiple TV's only receive one HD channel at a time.

**Comcast.**

The proven advanced technology.

HD equipment required to receive HD programming. HD programming varies based on digital package. Visit tvdemo.comcast.net for Comcast HD programming in your area. Call 1.866.594.1234 for restrictions and complete details. ©2008 Comcast. All rights reserved.

# EXHIBIT B

# TO THE DECLARATION OF CHRISTOPHER A. COLE, ESQ.



# EXHIBIT C

# TO DECLARATION OF CHRISTOPHER A. COLE, ESQ.

# COMPACT DISK TO BE FILED "OVER THE COUNTER"

# SEE NOTICE OF PAPER FILING

Competitrack

**Advertiser:** Comcast Cable
**Product:** Digital Cable Service
**Title:** Up To Date
**Ad Code:** COMCA-17842

**First Date:** 04/04/08
**Source:** Chicago
**Length:** 30
**New/Recut:** New



**(Music)**
**VOICE OVER:** Two homes.



One connected with narrowband copper wire...

the other with powerful broadband cable.



One limits a home to view only 1 HD channel at a time.



The other can watch...



unlimited HD channels.



One home has limited On Demand content...



with no local programming.



The other has tons of On Demand choices...



most of which are free and include local programming.
**Text:** Restrictions apply. Not available in all areas. Basic service subscription required. Programming claims based on the number of On Demand shows...



Oh yeah the other big difference, one home may get...

**Text cont.:** available on Comcast Digital Cable as compared to AT&T as of 2/25/08. For more information call 1-866-4-BEST-TV.



some free landscaping in their yard.
**(Fade out)**

**- Tapes and MPEGs can be ordered by contacting us at 718.482.4211 -**
*This material may be used for internal review, analysis or research only. No part of this document may be reproduced, published, or publicly displayed in any form.*

# EXHIBIT E

# TO THE DECLARATION OF CHRISTOPHER A. COLE, ESQ.

**White, Sid**

| | |
|---|---|
| **From:** | White, Sid |
| **Sent:** | Friday, March 14, 2008 1:19 PM |
| **To:** | 'Kyle_Birch@comcast.com' |
| **Cc:** | Drexel, William R (Legal); Meza, James |
| **Subject:** | FW: Herald News - Comcast Ad |

| | |
|---|---|
| **Attachments:** | Scan001.PDF |

Kyle,

Attached is a Joliet, Illinois advertisement that contains a number of false and misleading statements and claims. I doubt that you had a chance to see this one due to its obvious deficiencies. I would appreciate your prompt action in pulling this one from the marketplace in Joliet, and anywhere else it might be used currently.

Examples of the false and misleading statements and claims are:

1. "AT&T not only blocks your house, it blocks your HD options..." What is the meaning of this disparaging statement? This statement falsely suggests that AT&T somehow blocks access to a customer's house and that is patently false. The statement can only be included to denigrate AT&T and has no other discernible purpose other than to cast aspersions on AT&T, especially since Comcast also has facility cabinets/boxes in its network.

2. "With Comcast, you get more HD options than with any other provider." Kyle, we have discussed this claim on numerous occasions and you have committed to me that Comcast would not run this claim without the



Scan001.PDF
(70 KB)

necessary clarifying disclosure            hat the basis for the claim is the combination of HD Channels and VOD HD program availability. No such disclosure appears on this advertisement.

3. "...free and pay per view movies...." Please provide substantiation for the claim that the movies are free. Moreover, the claim that these features are "Something that AT&T can't offer" is patently false. AT&T U-verse TV service offers all of these capabilities, and therefore this claim is false on its face. Kyle, we talked two days ago about the issue of "AT&T Advanced TV" being a term used to describe AT&T's full range of TV services. You know that we offer multiple TV service options, and it is unfair advertising to make these unqualified claims knowing that one of our TV service options does in fact have similar capabilities.

4. "What you get with AT&T:"

*Giant utility boxes---Comcast has STBs as well. Certainly, this is not a material/meaningful comparison to make regarding our respective services, and the equipment associated with such services. This claim is also mean-spirited, and could only be designed to unfairly deceive and inflame customers without any factual basis for making the claim.

*Less HD options---Again, you agreed that all advertising containing such claims would include appropriate disclosures re: basis for the claim. No such disclosures in this ad.

*No HD on demand--This claim is patently false as it relates to AT&T U-verse TV service.

1

Kyle, I am certain that you will see the clear problems with this advertisement, and would expect that you will take immediate actions to ensure that this piece is discontinued in Joliet, and in any other AT&T market in which it is currently running.

I appreciate your prompt attention to this matter. Let me know today if possible that you will be pulling this bad ad. Also, I anticipate your response today on the other 3 ads challenges I sent earlier this week.

The foregoing is without waiver of any rights or remedies Comcast may have, at law or in equity. If you wish to discuss this matter further, please feel free to contact me.

Regards,

Sid

# EXHIBIT F

# TO THE DECLARATION OF CHRISTOPHER A. COLE, ESQ.

 **at&t**

Sid J. White, Jr.
Senior Counsel          T: 404.927.3565
675 West Peachtree Street   F: 404.614.4054
Suite 4200
Atlanta, Georgia 30342

March 19, 2008

<u>*Via FAX, Email and U.S. Mail*</u>

Mr. Kyle T. Birch
Assistant General Counsel3/20/2008
Comcast Cable
1500 Market Street
Philadelphia, Pennsylvania 19102

Re: Joliet and Chicago, Illinois "Block Your House" Advertisement campaign

Dear Kyle,

Since last Friday, March 14, 2008, when I sent you AT&T's original cease and desist correspondence relating to the "Block the House print advertisement, I have sent you a number of subsequent email communications relating to AT&T's objections to this print advertisement and to other very similar TV ads we have reason to believe may still be running in the Chicago, Illinois area. We have also had several phone conversations relating to these challenges. Consequently, I am sending this letter to summarize all of the pertinent legal issues/problems we have raised and continue to have with this advertising campaign.

I do appreciate your willingness to reassess these ads in consideration of these issues/arguments. I am hopeful that Comcast will change its position and agree to pull these false, misleading and disparaging ads without further delay.

Following is a summary of our legal challenges to the Joliet, Illinois "Block the House" print advertisement, a copy of which is attached, and to two similar television advertisements:

A. <u>"AT&T Blocks Your House" Visual Image Claim with Depiction of Box and House and Associated Written Claims</u>.--The ad shows a purported actual photo of an AT&T Video Ready Access Device ("VRAD") apparently placed within 10 or 20 feet of a home. VRADS are facility cabinets that house certain AT&T equipment and facilities that provide video and data services to neighborhoods. The photograph is taken in a manner that suggests it is a real-life scene, although the perspective of the photo purposefully accentuates the height and size of theVRAD, making the VRAD appear to be equal in height to the first story of a two-story house.

Kyle T. Birch
March 19, 2008
Page 2 of 4

To date, Comcast has not provided AT&T with the street address for this purported VRAD. Consequently, I renew AT&T's request for the street address of the subject house so that we can independently verify the actual location/size of this VRAD in relation to the pictured house and determine to what extent, if any, the picture in the advertisement has been fabricated or altered. Clearly, the VRAD in the photograph has been altered in some respects as it bears the words "HD BLOKR" on a small plaque in front of the cabinet. AT&T does not us this nomenclature on its VRADs.

In addition, beneath the photo is the headline claim, "AT&T not only blocks your house, it blocks your HD options . . ." Below, the ad copy further states in relevant part that "What you get with AT&T" includes "Giant utility boxes."

Focusing on the "Blocks Your House" claim, this advertisement conveys the literal claim that a customer subscribing to AT&T TV service will have a "Giant utility box" installed at their home that will "block" the home visually and/or physically. The advertisement speaks to the typical homeowner, rather than to apartment dwellers, as it shows a single residential home and refers to "house[s]" rather than apartments or condominiums. It depicts the VRAD obstructing the view of a major access point to the home. The advertisement never qualifies or limits in any way this express visual and written claim. AT&T does not believe the ad is susceptible of any reasonable interpretation other than that stated above—"AT&T blocks your house". We also believe that those individuals seeing this advertisement will conclude that the VRAD depicted and its location is typical and that all current and future AT&T TV customers will have the same experience. This claim is false. A single VRAD services 150-750 homes. Accordingly, the vast majority of customers will not have the experience depicted by the advertisement.

Finally, it is beyond contestation that the VRAD box is associated only with the provision of AT&T's U-verse TV service and is not in any way associated with the provision of AT&T/Dish Network TV service, which as you know, is a satellite-based TV service. Thus, as bad as the advertisements are, and even assuming that the intended target of the ads is AT&T's U-verse TV service, the advertisements are even more clearly false when applied to AT&T/Dish Network TV service facilities and capabilities.

There is ample precedent that a visual claim, including one which misrepresents an atypical situation as one that is typical, can be found to be literally false. *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232 (2d Cir. 2001) (the Court explicitly looked to the visual images in a commercial to assess whether it is literally false); *Schick Manufacturing, Inc. v. Gillette Co.*, 372 F.Supp.2d 273 (D.Conn. 2005) (the Court found that "picture depictions can constitute false advertising and a party may not distort an inherent quality of its product in either graphics or animation."); *Coca-Cola Co. v. Tropicana Products, Inc.*, 538 F.Supp. 1091 (S.D.N.Y. 1982) (the Court found advertising visuals to be misleading, stating that "[t]he visual component of the ad is not a true representation of how the product is prepared."). In this instance, the visual images represent literally false, misleading and disparaging advertising, and the written language used in conjunction with the visual images further attests to the literally false claims.

Kyle T. Birch
March 19, 2008
Page 3 of 4

B. TV Ads -- Comcast also has at least two TV ads using the same "Giant box" theme. As with the print ad, these TV ads contain false visual images and other disparaging claims that improperly suggest that a "Giant box" is required for every customer of AT&T service. As stated above, this is patently false. In addition, the ad containing the criminal line-up with the purported AT&T "Box" as a participant is not only false and misleading but disparaging to AT&T.

C. Unqualified Claims Regarding HD Limitations/Options -- Throughout these advertisements, Comcast refers only to "AT&T", and what it allegedly can and cannot offer via its TV services. Moreover, in some instances, the ads make unqualified comparative speed deficiency claims relating to AT&T's Internet services. Notable examples of these unqualified false and misleading claims include the following:

1. "No HD on Demand" -- This claim is patently false as it relates to AT&T U-verse TV service. Our U-verse TV service has many VOD choices available, and to suggest universally that AT&T does not offer HD on demand is false and misleading.

2. "Blocks HD Options"-- This claim is false and misleading on its face and leaves the impression that AT&T somehow universally "blocks" HD TV programming to the house, which is not true. Both U-verse and AT&T/DISH Network customers can receive HD channels.

3. "With Comcast you get more HD options than with any other provider" -- This claim is misleading on its face and requires an appropriate disclosure. You and I have discussed this particular matter in the past, and you had assured me that all Comcast advertising containing the "More HD" and "More HD Choices" claims would only be run if they included the disclosure stating that the claim was based on the combination of HD Channels and HD VOD program availability. This ad does not comply with Comcast's prior commitment in that regard.

D. Unqualified Comparative Superiority Claims Relating to AT&T's Internet service speeds -- One TV ad contains a claim that AT&T has "slower Internet" without clearly and conspicuously disclosing the basis for that comparison. This type of claim should not be made without appropriate qualifying comparative speed references.

707192

Kyle T. Birch
March 19, 2008
Page 4 of 4

For the reasons outlined above, AT&T has or will suffer irreparable harm if these literally false claims/advertisements are not discontinued. AT&T renews its demand that Comcast discontinue these offensive ads immediately, and requests that Comcast advise AT&T no later than 5:00 PM tomorrow, Thursday, March 20, 2008, that Comcast will pull the subject ads in the Joliet and Chicago, Illinois markets and in all other AT&T markets in which they may be running. Further, AT&T requests assurances that Comcast will not run these advertisements or other advertisements containing the same false and disparaging claims in the future in any AT&T market.

If we do not receive your response within this timeframe, AT&T will have no choice but to consider all legal and equitable remedies available. I will be available tonight at 404.889.4733, and tomorrow at the office all day. I hope to hear from you by tomorrow.

Regards,

Sidney J. White, Jr.

707192

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

# O F F I C I A L   U S E

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To  Kyle T Birch
Street, Apt. No.; or PO Box No.  1500 MARKOF St
City, State, ZIP+4  Philadelphia PK 19107

7002 0460 0006 6059 6601

PS Form 3800, April 2002                    See Reverse for Instructions

# EXHIBIT G

# TO THE DECLARATION OF CHRISTOPHER A. COLE, ESQ.



Comcast Corporation
One Comcast Center
Philadelphia, PA 19103-2838

Kyle T. Birch
Assistant General Counsel
Direct Dial: (215) 286-7714
Direct Fax: (215) 286-5039
Email: kyle_birch@comcast.com

March 20, 2008

**VIA OVERNIGHT DELIVERY
AND FACSIIMLIE (404) 927-3619**

Sid J. White, Jr., Esquire
AT&T
675 West Peachtree Street
Suite 4200
Atlanta, GA 30342

Dear Sid:

I received your March 19, 2008 letter.  Your letter indicates that a print advertisement is attached, but I did not see an attachment.  Please fax that advertisement to 215-286-5039.

I will provide a substantive response to your letter on March 24, 2008.

Very truly yours,

Kyle T. Birch
Assistant General Counsel

KTB/ch

# EXHIBIT H

# TO THE DECLARATION OF CHRISTOPHER A. COLE, ESQ.

03/24/2008 04:46 FAX                                                                 ☒002



Comcast Corporation
One Comcast Center
Philadelphia, PA 19103-2838

Kyle T. Birch
Assistant General Counsel
Direct Dial: (215) 286-7714
Direct Fax: (215) 286-5039
Email: kyle_birch@comcast.com

March 24, 2008

**VIA OVERNIGHT DELIVERY**
**AND FACSIMLIE (404) 927-3619**

Sidney J. White, Jr., Esq.
Senior Counsel
ATT
675 W. Peachtree Street
Suite 4200
Atlanta, Georgia 30342

Dear Sid:

This letter is further to our discussions today regarding your March 21, 2008, letter and the attached Complaint. Our outside counsel has also confirmed this information with Mr. Cole, your counsel. In short, while we disagree with the allegations you have made, Comcast will take the steps outlined below to address your concerns. Having agreed to take these steps, we also reiterate our demand for a satisfactory and prompt resolution of Comcast's concerns regarding damage to its equipment and cable service as outlined below. Given the anticipated resolution of your concerns, we expect that you will direct your counsel to voluntarily dismiss the lawsuit it filed in Chicago last Friday.

First, with respect with the print advertisements attached to your complaint, this confirms that they have run their course and are not scheduled to appear again.

With regard to the Line Up advertisement found on You Tube, this advertisement has not run on television and we are in the process of determining how it came to appear on You Tube. While Comcast determines what plans it has to run this advertisement, we will send a DMCA notice to You Tube requesting that it take the video clip down.

The Curb Appeal advertisement is being pulled from airing, which should be completed no later than by Thursday March 27, 2008. We also will send a DMCA notice to You Tube requesting that it take that video clip down. While we can not commit to what advertisements Comcast will run in the future, Comcast does not concede that the

Sid White, Esquire
March 24, 2008
Page 2

Curb Appeal ad is false or misleading, but will take into account the concerns that AT&T
has raised.

Finally, we require by close of business on Wednesday, March 26, 2008, written
confirmation that AT&T has ensured that installation of its U-verse service will no longer
result in damage to Comcast's cable infrastructure with its resulting outages to blocks of
its customers.  As you know, this is a serious problem for Comcast and we have had
numerous communications in attempting to resolve it.  Indeed, the outages are now
escalating. Since Friday, at least two additional incidents have been identified at the
following locations: 440 Kenilworth, Elmhurst, Illinois and 10254 W. Beach Road,
Beach Park, Illinois. If we can not get resolution by Wednesday, we will have no choice
but to consider AT&T's actions to be a deliberate attempt to harm Comcast's business,
and will take the appropriate steps to protect Comcast's interests.

This letter shall not waive or prejudice any rights or remedies that Comcast may
have with respect to the matters set forth in this letter, all of which are expressly reserved.

Very truly yours,

Kyle T. Birch
Assistant General Counsel

cc:  Kenneth R. Florin, Esq
     Douglas N. Masters, Esq.
     Christopher A. Cole, Esq.
     Jeffrey E. Smith, Esq.

# EXHIBIT I

# TO THE DECLARATION OF CHRISTOPHER A. COLE, ESQ.



Christopher A. Cole
Manatt, Phelps & Phillips, LLP
Direct Dial: (202) 585-6524
E-mail: CCole@Manatt.com

April 8, 2008

**VIA E-MAIL KFLORIN@LOEB.COM**

Kenneth R. Florin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154

      Re:    Illinois Bell Telephone, D/B/A AT&T Illinois v.
               Comcast of Illinois III, Inc., *et al.,* Case No. 08-CV-1680  EDA

Dear Ken:

      I write on behalf of plaintiff Illinois Bell Telephone, d/b/a AT&T Illinois ("AT&T"). AT&T has learned that Comcast is airing in the Chicago area a television commercial featuring a split-screen comparison of AT&T's television services to those of Comcast.[1] The Split-Screen Ad not only makes a number of false comparative claims regarding the respective programming and HD offerings, it concludes with an image of an AT&T video-ready access device ("VRAD") appearing on the AT&T customer's front lawn as the voiceover states, "Oh yeah the other big difference, one home may get . . . some free landscaping in their yard." Because it is false and misleading in numerous respects, the Split-Screen Ad must be stopped immediately.

      As with each of the other advertisements challenged in AT&T's pending complaint against Comcast, the Split-Screen Ad is literally false because it claims that the average consumer who purchases HD television service from AT&T is at increased risk of having a VRAD located on their front lawn or in front of their home as a result of their subscription to AT&T. This is obviously untrue as to AT&T customers who order HD television through AT&T/DISH Network, as no VRAD whatsoever is associated with the delivery of that service to subscribers. It is also untrue as to AT&T U-verse customers, because VRADs will not be located on the front lawn of any U-verse customer as a consequence of their subscription to U-verse; nor are VRADs remotely likely to be installed at the average AT&T subscriber's home in the manner depicted in the commercial.

      While we are aware of Comcast's inadequate attempt to qualify this unambiguously false claim through the use of the word "may," the fact remains that the ad urges consumers to weigh what it falsely portrays as a heightened risk of installation of a VRAD on their front lawn against

---

[1] A storyboard is attached as Exhibit 1. We refer to the ad hereafter as the "Split-Screen Ad."



**manatt**
manatt | phelps | phillips

Kenneth R. Florin
April 8, 2008
Page 2

their decision to subscribe to HD television service from AT&T. The average AT&T HD consumer is no more likely to have a VRAD installed at or near their property as a result of ordering HD television service from AT&T than is the average consumer who subscribes to Comcast.

Making matters exponentially worse in this circumstance is the fact that Comcast's counsel had committed two weeks ago that Comcast would cease making such egregiously false VRAD claims in previously challenged advertisements, in what AT&T then-believed to be a good-faith effort to resolve the litigation. At that time, and based on Comcast's representations, AT&T agreed to forego service of its complaint. With no warning, Comcast has now apparently intentionally reneged on this agreement, as evidenced by its airing of the Split-Screen Ad.

The Split-Screen Ad also is also false in the following respects:

First, the ad claims that AT&T offers "no local programming." This is literally false. AT&T offers U-verse customers access to local affiliate broadcasts, including those of CBS (WBBM-2 and WBBM-HD-2), NBC (WMAQ-5 and WMAQ-HD-5), ABC (WLS-7 and WLS-HD-7), Fox (WFLD-32 and WFLD-HD-32), Independents (WCIU-26, WCIU-HD-26 and WJYS-62), ION (WCPX-38), UNI (WGBO-66), WGN Superstation and WGN HD; and the CW (WGN9 and WGN-HD-9). AT&T offers a similar lineup through AT&T/DISH Network.

Second, the ad states that Comcast subscribers can "view unlimited HD channels at a time." This is also literally false. Comcast's HD offerings are inarguably limited. It does not offer all programming in HD.

Third, the ad falsely claims that the AT&T home is limited to viewing one HD channel at a time. This is flatly untrue as to the AT&T/DISH Network offering, which provides access to multiple live streams of HD television for AT&T customers. It is also untrue as to AT&T's U-verse offerings, which provide consumers with one "live" HD stream, and the ability for consumers to simultaneously view pre-recorded HD programming and content.

For all of these reasons, AT&T demands that Comcast immediately cease airing the Split-Screen Ad – and any other current or planned advertisement containing any of the above-described false claims. AT&T must receive Comcast's written commitment by no later than 12 PM EST April 9, 2008, or it will proceed with the litigation.



**manatt**
manatt | phelps | phillips

Kenneth R. Florin
April 8, 2008
Page 3

     This letter, and the facts set forth herein, should not be construed as a complete statement of AT&T's contentions or as any limitation on AT&T's rights and remedies under applicable law, all of which are hereby expressly reserved.

          Sincerely,

          Christopher A. Cole

Attachment

cc:    James Meza, III

30207500.1

**EXHIBIT 1**





**Advertiser: Comcast Cable**
**Product: Digital Cable Service**
**Title: Up To Date**
**Ad Code: COMCA-17842**

First Date: 04/04/08
Source: Chicago
Length: 30
New/Recut: New





(Music)
VOICE OVER: Two homes.

One connected with narrowband copper
wire...

the other with powerful broadband cable.







One limits a home to view only 1 HD channel
at a time.

The other can watch...

unlimited HD channels.







One home has limited On Demand content...

with no local programming.

The other has tons of On Demand choices...









most of which are free and include local
programming.
Text: Restrictions apply. Not available in all areas. Basic service
subscription required. Programming claims based on the number
of On Demand shows...

Oh yeah the other big difference, one home
may get...
Text cont: available on Comcast Digital Cable as compared to
AT&T as of 2/26/08. For more information call 1-866-4-BEST-TV.

some free landscaping in their yard.
(Fade out)

- Tapes and MPEGs can be ordered by contacting us at 718.482.4211 -
*This material may be used for internal review, analysis or research only. No part of this document may be reproduced, published, or publicly displayed in any form.*

# EXHIBIT J

# TO THE DECLARATION OF CHRISTOPHER A. COLE, ESQ.



KENNETH FLORIN
Partner

345 Park Avenue
New York, NY 10154

Direct  212.407.4966
Main   212.407.4000
Fax     212.656.1884
kflorin@loeb.com

Via E-mail
CCole@Manatt.com

April 11, 2008

Christopher A. Cole, Esq.
Manatt, Phelps & Phillips, LLP
700 12th Street, N.W., Suite 1100
Washington, District of Columbia 20005

Re:   Illinois Bell Telephone, d/b/a AT&T Illinois v.
      Comcast of Illinois III, Inc., et al., Case No. 08-cv-1680 EDA

Dear Chris:

I am writing in response to your April 8, 2008 letter. As the history of correspondence
demonstrates, our client has been and remains open to a meaningful dialogue with AT&T
regarding the nature of its advertisements. Your latest letter, however, significantly distorts the
nature of the parties' previous dealing and thus requires that the record be set straight.

Comcast has never agreed to cease making claims regarding AT&T's VRAD boxes. Rather, in
response to AT&T's complaints regarding the phrasing of certain comparative ads, Comcast
agreed, in good faith, to stop running the specific advertisements at issue that had not already
run their course despite strenuously disagreeing with AT&T's stated concerns. Comcast has
honored those commitments even though AT&T has still failed to fulfill its obligations with
respect to the widespread service disruptions it is causing through the installation of its U-Verse
service.

Comcast has also never represented, nor will it now represent, that it will refrain from
comparative claims that focus on AT&T's U-verse service, including AT&T's installation and use
of large VRAD boxes. The undeniable facts are that (a) AT&T's U-Verse service requires the
installation of large, unsightly VRAD boxes throughout the neighborhoods it services and (b) the
functionality of, and HD content available through, AT&T's U-Verse service is demonstrably
inferior to the HD content provided by Comcast. It is, of course, understandable that AT&T
would desire that the public not learn this truthful information, but the public has a right to it, and
Comcast intends to provide it, as it is entitled to do.

As to AT&T's other stated concerns, they are, once again, based on strained interpretations of
the advertisement that consumers would not and could not reasonably share.

As a threshold matter, AT&T contests a number of claims in the advertisement solely on the
basis that they may not be true with respect to as to AT&T customers who order HD television
through AT&T/Dish Network. Comcast's commercial, however, clearly conveys that its claims
are with respect to homes who receive television services from AT&T through a narrowband

A limited liability partnership including professional corporations

CH41545.1
207716-10034



copper wire—i.e., U-Verse customers, a point that is reinforced visually throughout the commercial. There is thus no basis for consumer confusion as to this point.

AT&T also asserts that Comcast's commercial claims that AT&T offers no local programming, but that is just not the case. The commercial clearly limits this claim to AT&T's On Demand content, which does not include local programming, unlike Comcast's.

AT&T takes issue with Comcast's claim that Comcast consumers can view unlimited channels at a time on the basis that Comcast does not offer all programming in HD. AT&T's complaint is absurd. No consumer could reasonably understand Comcast's advertisement to be saying that Comcast offers all of its programming in HD. Instead, the advertisement clearly conveys that it is referring to the ability of Comcast subscribers to view more than one of the many HD channels that are available through Comcast at a time.

Finally, AT&T takes issues with Comcast's claim that AT&T U-Verse customers can only view one HD channel at a time. AT&T suggests this claim is not true because U-Verse customers get "one 'live' HD stream, and the ability . . . to simultaneously view pre-recorded HD programming and content." But pre-recorded HD programming and content is no not an "HD channel." We are sure that AT&T customers can watch recorded HD programs on VHS and DVDs, as well.

We appreciate AT&T's communication of its concerns and continue to believe that the parties should attempt to find a negotiated resolution to those concerns. AT&T must accept, however, Comcast's right to make the basic comparison underlying all of the challenged advertisements. If AT&T's true goal is to prevent Comcast from bringing to light the deployment of large boxes to offer an inferior service, there is no reason to attempt further compromise. It is clear to Comcast that in the end, a court will permit Comcast to communicate this basic message about AT&T's U-verse service. If AT&T cannot adopt a more reasonable approach to these negotiations, we will have no choice but to have a court determine the boundaries of such claims.

With regard to the "split-screen ad", we disagree with your contentions that it is false or misleading in any way. Nonetheless, we have agreed to cease running that advertisement temporarily while the parties continue to discuss whether there are reasonable ways to accommodate each other's concerns. In this regard, we note that the issue of AT&T's interference with the delivery of Comcast cable service has not been adequately addressed. We continue to wait for AT&T to address that issue with the seriousness that it deserves.

Cordially,

Kenneth Florin
Partner

# EXHIBIT 2

# TO MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

ILLINOIS BELL TELEPHONE, d/b/a AT&T
ILLINOIS,

        Plaintiff,

        v.

COMCAST OF ILLINOIS III, INC.,
COMCAST CORPORATION,
COMCAST CABLE HOLDINGS LLC, and
COMCAST OF CHICAGO, INC.

        Defendants.

Case No.:  08 C 1680

## DECLARATION OF STEVEN D. MITCHELL

I, Steven D. Mitchell, declare as follows:

1.      I submit this declaration in support of the Motion for Preliminary Injunction of Illinois Bell Telephone Company d/b/a AT&T Illinois ("AT&T Illinois").  I have personal knowledge of the facts stated herein, except where stated on information and belief.

2.      From May 2007 until April 1, 2008, I served as Vice President and General Manager of AT&T Illinois.  In that capacity, I was responsible for AT&T branded consumer wireline market activities in both Illinois and Ohio and was ultimately responsible for managing the sales performance of AT&T branded voice, data and television products within the state of Illinois.  As part of my job, I monitored reports regarding the activities of competitors to AT&T Illinois in all of these consumer markets.  AT&T Illinois obtains such reports from a variety of sources.

3.      Since 2004, AT&T Illinois has offered subscription satellite television services in Illinois through a co-branded and jointly marketed service provided by Echostar Satellite L.L.C. DISH Network ("DISH Network"). AT&T Illinois continues to offer DISH Network services to consumers in Illinois. Consumers subscribing to DISH Network receive access to a variety of high-definition ("HD") television channels, as well as 100% digital television.

4.      In January 2008, AT&T Illinois also began offering a new subscription television product in the northeastern Illinois area called AT&T U-verse™ TV. Among other attributes, AT&T U-verse TV also provides consumers access to HD television channels and 100% IP-based digital television. U-verse TV offers the ability to record four programs at once, web access to DVR, built-in picture-in picture, video on demand, and other advanced features.

5.      AT&T Illinois thus currently offers two television subscription services to potential customers in the Chicago area: DISH Network and U-verse TV. Where U-verse TV is available, a customer can purchase either service. Where U-verse is not currently available, only DISH is offered. Both services compete with Comcast in northeastern Illinois.

6.      As part of its U-verse TV service, AT&T Illinois offers customers access to a wide variety of local and national network programming. In Joliet Illinois (zip code 60431), AT&T Illinois offers customers access to local affiliate broadcasts of CBS (WBBM-2 and WBBM-HD-2), NBC (WMAQ-5 and WMAG-HD-5), ABC (WLS-7 and WLS-HD-7), Fox (WFLD-32 and WFLD-HD-32), Independents (WWME-23, WCIU-26, WCIU-HD-26, WJYS-62), PBS (WTTW-11, WTTW-HD-11, WYCC-20 and WYIN-56), Univision (WGBO-66), Telemundo (WSNS-44), TeleFutura (WXFT-60), WGN Superstation and WGN HD, the CW (WGN-9 and WGN-HD-9), Trinity Broadcasting Network (TBN-35 and TBN-560) and My Network TV (WPWR-50 and WPWR-HD-50). Dish Network also offers local programming.

7.      AT&T Illinois and Comcast also compete in the market for residential voice and data services.  On information and belief, Comcast has the majority of the Chicago area subscription television market.

8.      In order to make U-verse TV available, AT&T Illinois has and is continuing to upgrade its network in Illinois.  AT&T is deploying fiber deeper into its access network in order to provide increased bandwidth for the transmission of data and video services.  In established neighborhoods and unlike cable television, U-verse TV is delivered to homes over homeowners' existing copper telephone wires.

9.      U-verse TV is sold both individually, or bundled with a high-speed Internet product.  The high-speed Internet offers download speeds up to 10 megabits per second (Mbps) where available.

10.     AT&T Illinois has invested significant company resources in the development and rollout of U-verse TV and in the promotion of subscription television services that it offers. AT&T Illinois continues to expand the service availability of U-Verse TV to more Illinois consumers.  In addition, AT&T Illinois continues to promote and offer the DISH Network television subscription service.

11.     Because U-verse is a new product in the northeastern Illinois area, however, it is at a very delicate stage of consumer acceptance.  Consumers are just learning about the product and its capabilities through advertising and word of mouth.  While consumers are beginning to gain awareness of the AT&T/U-verse brand in conjunction with video services, the consumer recognition of U-verse TV still lags significantly behind that of Comcast cable in the communities where U-verse TV is available.

12.     I have reviewed Comcast's newspaper print ad and YouTube video ads in which Comcast claims that consumers who want to buy subscription television products offered by AT&T must have a giant utility box installed on their property.  I have also reviewed the Comcast print advertisement claiming that these giant boxes "block" a subscriber's home.  I have further reviewed Comcast's commercial which states that a customer purchasing AT&T's television service will not receive local programming, but may receive "free landscaping" in the form of a utility box in front of their house.  These claims are absolutely false and threaten significant damage to AT&T Illinois' reputation, and the reputation of both subscription television products that AT&T Illinois offers.

13.     This kind of false claim is particularly threatening to AT&T's U-verse TV product, because it gives consumers the false message that a huge utility box in front of their homes must be installed in order to obtain the service, as well as the false message that they would not be able to receive local programming through U-verse.

14.     In my experience, if these ads are not stopped, they could irreversibly harm AT&T Illinois, and in particular the reputation of the U-verse TV product among potential Illinois consumers of that product, as it will discourage consumers from considering AT&T Illinois' competing television service offerings.

I declare under penalty of perjury that the foregoing is true and correct.

_4 14.08_
Date

Steven D. Mitchell

# EXHIBIT 3

# TO MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, <br><br> Plaintiff, <br><br> v. <br><br> COMCAST OF ILLINOIS III, INC., COMCAST CORPORATION, COMCAST CABLE HOLDINGS LLC, and COMCAST OF CHICAGO, INC. <br><br> Defendants. | Case No.: 08:CV-1680 EDA |

**DECLARATION OF MARC DAVID BLAKEMAN**

I, Marc David Blakeman, declare as follows:

      1.      I submit this declaration in support of the Motion for Preliminary Injunction of Illinois Bell Telephone Company d/b/a AT&T Illinois ("AT&T Illinois"). I have personal knowledge of the facts stated herein, except where stated on information and belief.

      2.      I am the Regional Vice President of External Affairs for AT&T Illinois. I have held this position since 2002. From 1997 to 1999, I was Area Manager of External Affairs for AT&T Illinois. From 1999 to 2002, I was the Senior Director of External Affairs for AT&T Illinois.

      3.      As Regional Vice President of External Affairs, I am primarily responsible for AT&T Illinois' relationships with state and municipal governments, chambers of commerce, universities, and corporations. I have responsibility in this area for the entire State of Illinois. I have also been primarily responsible for AT&T Illinois' efforts to gain

state and municipal approvals for the roll-out of AT&T's U-verse™ TV service in Illinois.

4.     AT&T Illinois currently offers, and has offered through predecessor companies for years, wireline telephone and high-speed digital subscriber line ("DSL") Internet access services to millions of Illinois consumers.  AT&T Illinois has also offered consumers access to satellite TV, through a co-branding relationship with DISH Network.

5.     AT&T U-verse TV is a new video service offered by AT&T that provides 100% digital television, including high-definition ("HD") television.  U-verse TV is sold by AT&T Illinois both as a standalone product and bundled with an Internet access service, with speeds of up to 10 Mbps.

6.     The U-verse product is being made possible by AT&T's continuing upgrades and network enhancements that are currently underway in Illinois.  These include ongoing installation of an advanced fiber-optic network.

7.     I supervise a team of 11 field directors who have worked with the State of Illinois government and almost 300 municipalities around the state to plan the rollout of the fiber-optic and other infrastructure required to support the U-verse TV service.

8.     In 2007, Illinois enacted a cable and video competition law that allows video service providers, such as AT&T, to provide television service offerings that compete with incumbent cable companies for Illinois consumers.  In enacting this new law, the General Assembly determined that the citizens of Illinois would benefit from the incumbent cable provider and new entrants, like AT&T Illinois, competing for consumers.

9. The law creates a process for obtaining a statewide license, which allows a competitive video service provider to offer services throughout the state. The legislation also requires video providers to follow local ordinances and regulations regarding placement of facilities in local communities.

10. In compliance with this law, my team of field directors and I have worked to secure required permits for network upgrades that make U-verse TV available.

11. In order to serve Illinois consumers, and pursuant to the Illinois Legislative invitation, AT&T Illinois has invested significant resources to roll out its U-verse television offerings within the state. To provide U-verse, AT&T must use fiber-optic cable from the Central Offices to each neighborhood it intends to serve. A Central Office is a distribution facility that houses the network facilities necessary to provide voice, Internet access, and facilities-based subscription television service for several thousand residents in an area.

12. Each such fiber-optic cable connects to video ready access devices ("VRADs"). Each VRAD can serve from 150-750 individual homes, which can be located up to several thousand feet away from the VRAD. The VRAD contains complex equipment needed to amplify and distribute the U-verse data signal, as well as the associated switching equipment and backup battery power. VRADs are not used to provide the DISH Network service.

13. There are four different types of VRADs, ranging from four to about five feet tall. The size of VRAD used depends on how many homes it will serve. Larger VRADs can serve a larger number of homes.

14.     The VRAD is clad in low-sheen metallic housing, with minimal adornment. A picture of a typical VRAD is attached as Exhibit A.

15.     A VRAD is almost always located within about 300 feet of an existing AT&T cross-connection cabinet for technical reasons relating to amplification of the data signal and because the VRAD is connected by cables to the existing cross-connection hub. The VRAD is most often located adjacent to an existing cross-connection cabinet. Cross-connection cabinets are the familiar telephone connection boxes that have already been located throughout the state's neighborhoods in the public right of way and private easements for many decades. The cross-connection cabinets serve as the point at which the main telephone trunk line originating from the Central Office is split into multiple lines for the delivery of traditional telephone service to individual residences within a neighborhood. As such, there is no truth to the claim that a VRAD must necessarily be installed on the front lawn of (or even in sight of) a home that it serves.

16.     In an Illinois community such as Joliet, the process for locating a VRAD is as follows. Members of my team are available to meet with the city manager, attorney, and/or public works director to discuss placement of VRADs, prior to any U-verse TV sales being made to customers that will be served by the VRAD. The specific location of each VRAD will depend on the overall network design, which as explained above, also depends on where existing cross connection cabinets are located. Like telephone poles or trenching for cable installation, U-verse VRADs are part of an infrastructure build-out that is planned in advance of any specific consumer order.

17.    AT&T Illinois submits permit applications for each proposed VRAD.  As part of the permit review process, we offer to visit each proposed location with city public works officials to determine if the proposed location is suitable.

18.    While local ordinance and regulations vary, whether a proposed VRAD location is determined to be suitable depends on a variety of factors, including public safety, aesthetics, proximity to existing utilities, and the technical requirements of the network.  VRAD locations are subject to review, consultation with, and approval by local government authorities.

19.    VRADs are placed on public utility rights of way or on easements.  We will not place a VRAD on a homeowner's private property unless necessary and a homeowner has agreed to this location.  Other companies, including Comcast, also use public rights of way and easements to install equipment and facilities necessary to serve Illinois residents with services.  I have provided some illustrations of the network architecture, showing how the AT&T U-verse network is configured. These illustrations are attached as Exhibit B.

20.    No sales of U-verse are made in a neighborhood until VRADs for that neighborhood are installed.

21.    It is simply false to say that a consumer who orders AT&T U-verse TV or DISH Network will have a VRAD installed in a manner that blocks their home.  In fact, VRADs are installed in neighborhoods before sales of U-verse TV are even made to homes in those neighborhoods.   There is no connection between a consumer's purchase of either U-verse TV or the Dish Network and the installation of a VRAD.

5

22.    In most cases, the VRADs will be located adjacent to existing utility connections for phone, electricity and cable.  The location of new VRADs do not typically change the historical and traditional location of equipment used to serve consumers.

23.    I have reviewed the Comcast Print Ad that appears to show a VRAD "blocking" a house.  I have never personally seen the home or VRAD depicted in the ad, and to the best of my knowledge, I am not familiar with any actual situation like the one depicted in the Comcast ad.  In my duties, I have personally seen hundreds of VRAD locations in the state of Illinois.  I do not know if the photograph in the Comcast ad is real, but even if it is, the type of placement shown in the Comcast ad would be very rare, in my opinion. This ad conveys to consumers that they can prevent the installation of VRADs in their neighborhoods by choosing Comcast over AT&T Illinois.

24.    AT&T has no VRAD that bears the letters "HDBLOKR."

I declare under penalty of perjury that the foregoing is true and correct.

_4/14/2008_____                    _____
Date                                          Marc David Blakeman

1078927_1

30207633.1

6



