UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS,<br><br>        Plaintiff,<br><br>   v.<br><br>COMCAST OF ILLINOIS III, INC; COMCAST CORPORATION; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC.,<br><br>        Defendants.<br><br>COMCAST OF ILLINOIS III, INC; COMCAST CORPORATION; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC.,<br><br>        Counterclaimants,<br><br>   v.<br><br>ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS,<br><br>        Counterdefendant,<br><br>and AT&T, INC.,<br><br>        Third-party Defendant. | **Case No.: 08 CV 1680**<br><br>**Honorable Elaine E. Bucklo**<br><br>**Magistrate Judge Martin C. Ashman** |

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Defendants Comcast of Illinois III, Inc., Comcast Corporation, Comcast Cable Holdings LLC, and Comcast of Chicago, Inc. (collectively, "Comcast"), by and through their attorneys, bring these counterclaims and third party complaint against plaintiff Illinois Bell Telephone d/b/a AT&T Illinois and third party AT&T Inc. (collectively, "AT&T"), and in support thereof, allege:

**NATURE OF THE ACTION**

1. AT&T's attempt to become a provider of television services is starting badly, and the public is paying a high price.  In an effort to compete with Comcast and other television service providers, AT&T began rolling out a video product branded "U-Verse TV" in late 2005 or early 2006 in various markets throughout the United States.  The roll-out has been fraught with controversy as AT&T's ability to deliver this new service is dependent on placing large, unsightly video-ready access devices ("VRAD boxes") throughout the communities in which the service is to be offered.  The placement of these boxes, and their negative effect on community aesthetics, has engendered significant public commentary and criticism, and has caused various communities to take measures in an attempt to delay or control the placement of the boxes.

2. The damage incurred by the public is not only aesthetic.  In the course of installing the service, AT&T has repeatedly trespassed on and interfered with Comcast's cable infrastructure, leaving hundreds of Comcast customers at a time, suddenly and without warning, with limited or no phone, Internet, or television services.  Since the impacted customers have no idea that it is AT&T—not Comcast—causing these service disruptions, all blame falls on Comcast, to AT&T's competitive benefit.

3. In 2008, when AT&T began marketing U-Verse TV in Chicago and installing VRAD boxes in neighborhoods throughout the region, Comcast commenced a series of advertisements that play on citizens' exasperated and angry reactions to the size and placement of the boxes.  The advertisements also point out that the television service that results from the placement of the unsightly boxes is inferior in significant respects to the service available from Comcast.  Concerned that Comcast's advertisements were giving too public a voice to the

frustrations shared by ordinary citizens throughout the country, AT&T filed a complaint seeking an injunction against Comcast's truthful advertisements.

4. Through these counterclaims, Comcast seeks a declaration of its right to truthfully criticize the size and placement of AT&T's VRAD boxes and to inform the public of the significant differences between Comcast's television service and AT&T's U-Verse TV. Comcast also seeks preliminary and permanent injunctive relief to stop AT&T from interfering with Comcast's ability to provide telephone, Internet, and television services to its customers, damages to compensate Comcast for the harm it has incurred because of AT&T's wrongful acts, and disgorgement of all profits and benefits that AT&T has acquired from its wrongful acts.

## JURISDICTION

5. This Court has original jurisdiction over Comcast's claims pursuant to 28 U.S.C. §§ 1331, 1338, & 1367, as Comcast is asserting claims under the Cable Communications Policy Act, 47 U.S.C. § 521, *et seq.*, and the Lanham Act, 15 U.S.C. 1051, *et seq.*, and its state-law claims arise from the same operative facts. The Court also has jurisdiction over Comcast's state-law claims under 28 U.S.C. § 1367, as the claims are sufficiently related to the claims asserted by AT&T against Comcast that they form part of the same case or controversy under Article III of the United States Constitution.

## PARTIES

6. Comcast of Illinois III, Inc., is an Illinois corporation with a principal place of business located at 1500 McConnor Parkway, Schaumburg, Illinois 60173..

7. Comcast Corporation is a Pennsylvania corporation with a principal place of business located at One Comcast Center, Philadelphia, Pennsylvania 19103 and with a Registered Office located at 208 South LaSalle Street, Chicago, Illinois 60604.

8.      Comcast Cable Holdings LLC is a Delaware limited liability company with a principal place of business located at One Comcast Center, Philadelphia, Pennsylvania 19103, with a Registered Office located at 208 South LaSalle Street, Chicago, Illinois 60604, and with branch offices throughout Illinois, including in this District.

9.      Comcast of Chicago, Inc. is an Illinois corporation with a principal place of business located at 1500 McConnor Parkway, Schaumburg, Illinois 60173.

10.     Third party defendant AT&T Inc., on information and belief, is a Delaware corporation with its principal place of business in San Antonio, Texas. On information and belief, defendant AT&T Inc. directly or indirectly owns defendant Illinois Bell Telephone d/b/a AT&T Illinois and controls all or most of its principle activities, including the roll-out and marketing of new services such as U-Verse TV.

11.     Counterdefendant Illinois Bell Telephone d/b/a AT&T Illinois, on information and belief, is a corporation organized and existing under the laws of the State of Illinois and has its principal place of business in Chicago, Illinois.

## FACTUAL BACKGROUND

12.     At its inception, the cable television industry relied on analog technology to provide customers with multiple channels of television programming. Generally, data flowed in a single direction—from the cable provider to the customer. Since 1996, the cable industry has invested over $85 billion to rebuild and upgrade its facilities, and to transform networks designed for the delivery of a one-way analog video service into two-way digital thoroughfares capable of delivering consumers advanced digital television programming, high-speed Internet service, and most recently, digital home telephone service.

13. Comcast is the nation's largest cable operator and a leading provider of entertainment and communications products and services, with 24.2 million cable customers, 12.1 million high-speed Internet customers and over 4.0 million voice customers. Through its affiliates and subsidiaries, Comcast provides advanced digital television, Internet, and voice services to consumers in locations throughout the country, including in this District. The combination of these three services—television, Internet, and voice—is often advertised by Comcast to the public as a "Triple Play."

14. Historically, AT&T has been a provider of telephone phone services. More recently, AT&T has also offered DSL Internet service to its customers. Within the past few years, on information and belief, AT&T has sought to develop its own television delivery system so that it too can provide a Triple Play of services like Comcast.

15. AT&T launched U-Verse to the public in 2005 or 2006. On information and belief, U-Verse is the family name for a bundle of Internet Protocol ("IP") based services—voice, Internet, and television—that AT&T intends to offer in the areas where it operates in the United States.

16. VRAD boxes are a critical component of the infrastructure necessary to deliver the U-Verse services. On information and belief, VRAD boxes are a junction where AT&T's fiber optic network terminates and the electronic data associated with the U-Verse services transitions on to traditional copper phone wires running into most residential dwellings, or back from the copper phone line on to AT&T's fiber optic network.

17. On information and belief, the architecture AT&T has employed in rolling out its U-Verse services imposes significant limitations on the end-product a consumer is able to receive. First, on information and belief, the copper telephone wires connecting consumers to

the VRAD boxes have less bandwidth than the coaxial and fiber optic cable infrastructure used by Comcast and are therefore unable to simultaneously deliver the same amount of electronic information as Comcast can (hereinafter, "Copper Wire Limitation").  Second, on information and belief, the amount of electronic information an AT&T customer is able to receive from a VRAD box is inversely related to the customer's proximity to the box so that customers who are farther away from the box are subject to even greater bandwidth constraints than those unfortunate customers who live next to or near a box (hereinafter, "Distance Limitation").

18.     There are at least two significant consequences to the limitations discussed above.  First, on information and belief, because of the overall Copper Wire Limitation, AT&T imposes blanket limitations on, among other things, the number of high-definition television channels that a single household who subscribes to U-Verse TV can view at the same time.  Thus, while Comcast customer families with multiple television sets can each watch a different high definition television channel, U-Verse TV customer families with multiple television sets are limited to watching the same high definition channel.  Second, on information and belief, because of the Distance Limitation, AT&T must install dozens of VRAD boxes in each community where U-Verse TV is to be offered, and the boxes must be located as close as possible to the customers' homes.

### THE SIZE AND LOCATION OF VRAD BOXES ARE MATTERS OF PUBLIC CONCERN

19.     The VRAD boxes that AT&T must employ to deliver U-Verse TV are large and unsightly.  AT&T positions the VRAD boxes on and immediately next to private property, in plain sight of the families who live there.  One location for the VRAD boxes is on the slender parkways that separate sidewalks from the streets, as shown below:



20.     Not surprisingly, AT&T's placement of the VRAD boxes throughout people's neighborhoods has generated significant public controversy in these communities. Complaints have been raised about their placement by and to the local government authorities who have sought to delay their deployment. In response to concerns raised by various municipalities, AT&T, on information and belief, commenced litigation in an attempt to enforce its "right" to place the boxes wherever and on whatever schedule it deems suitable. Citizens have also voiced their concerns about the "Godzilla Boxes" through the Internet by creating blogs (http://godzillabox.blogspot.com/), posting videos on youtube (http://www.youtube.com/watch?v=73UOBVrvrBg), and various other means.

## COMCAST'S TRUTHFUL ADVERTISEMENTS

21.     In 2008, when AT&T began marketing U-Verse TV in Chicago and installing VRAD boxes in neighborhoods throughout the region, Comcast joined the public discussion concerning the placement of the boxes through a series of humorous advertisements that play on

7

citizens' exasperated and angry reactions to the size and placement of the boxes. The advertisements also point out that the television service that results from the placement of the unsightly boxes is inferior in significant respects to the service available from Comcast.

22. Concerned that Comcast's advertisements were giving too public a voice to the frustrations shared by ordinary citizens throughout the country, AT&T filed a complaint seeking to stop Comcast's truthful advertisements and fair competition.

23. Through its complaint and demands to Comcast, AT&T has challenged Comcast's legal right to base advertisements on the size and placement of the VRAD boxes, or to point out the inferiorities in AT&T's television service. AT&T seeks to stop this fair competition by claiming that Comcast's criticisms of its VRAD boxes and U-Verse TV service are false advertising in violation of the Lanham Act and state law.

## AT&T's DISRUPTION OF COMCAST'S SERVICE

24. AT&T is disrupting Comcast's provision of telephone, Internet, and television to its customers. On information and belief, during the process of installing the U-Verse TV service in certain homes, AT&T co-opts the coaxial cable system through which the electronic information associated with Comcast's telephone, Internet, and television services flows to and from Comcast. In doing so, on information and belief, AT&T introduces AT&T's own electronic information into the coaxial wiring system which then exits the dwelling where the installation is taking place back into Comcast's proprietary infrastructure.

25. AT&T's electronic information is inconsistent with the hardware and software that Comcast has in place to deliver telephone, Internet, and television services to its customers. The introduction of the foreign information into Comcast's infrastructure causes Comcast's

telephone, Internet, and televisions to slow or, in many cases, to completely shut down to hundreds of other homes in the area where the U-Verse TV installation is taking place.

26.     The disruption to Comcast's service continues until Comcast technicians are able to locate and address the problem, which can be hours since Comcast cannot always quickly locate the source of the interference.

27.     Comcast informed AT&T that it is trespassing into Comcast's infrastructure, and of its consequences, yet the trespasses continue.  On information and belief, AT&T had reason to know of the disruptions it was causing even before Comcast notified it.

28.     Comcast customers have no way of knowing that it is AT&T that is causing the Comcast service to slow or stop and therefore place the blame solely on Comcast, to AT&T's competitive benefit.

29.     AT&T and its installers have trespassed into Comcast's infrastructure within this District at least 40 times since February 2008, causing significant damage to Comcast and its customers.

## COUNT I
## VIOLATION OF CABLE COMMUNICATIONS POLICY ACT

30.     Comcast repeats and realleges the allegations in paragraphs 1 through 29.

31.     The telephone, Internet, and television services that Comcast provides to its customers are each a communications service offered over a cable system.

32.     AT&T and its installers have, on repeated occasions, introduced foreign electronic information into Comcast's cable infrastructure without Comcast's authorization.

33.     By introducing its electronic information into Comcast's cable infrastructure, AT&T has, on repeated occasions, prevented Comcast's communications services from reaching their intended targets—Comcast's customers.

9

34. AT&T and has knowledge of the effect its actions are having on Comcast's infrastructure and have continued with its conduct despite that knowledge. Its actions were taken to further AT&T's own commercial advantage and for private financial gain.

35. The conduct of AT&T has damaged Comcast's cable infrastructure. Its actions have also damaged Comcast's goodwill and reputation with its customers and are likely to impact Comcast's sales.

36. AT&T has been unjustly enriched by these actions by, among other things, increased sales, decreased expenses, and increased profitability.

37. On information and belief, AT&T's conduct is willful, deliberate, intentional, and in bad faith.

38. By reason of the foregoing acts, AT&T has caused, and unless enjoined will continue to cause, irreparable harm to Comcast. Comcast has no adequate remedy at law.

## COUNT II
## TRESPASS TO CHATELLS

39. Comcast repeats and realleges the allegations in paragraphs 1 through 38.

40. Comcast owns the infrastructure through which it provides its telephone, Internet, and television services to its customers.

41. AT&T has, on repeated occasions, introduced foreign information into Comcast's cable infrastructure without Comcast's authorization.

42. AT&T has knowledge of the effect its actions are having on Comcast's infrastructure and has continued with its conduct despite that knowledge. AT&T's actions were taken to further its own commercial advantage and for private financial gain.

43.     AT&T's actions have damaged Comcast's cable infrastructure. Its actions have also damaged Comcast's goodwill and reputation with its customers and are likely to impact Comcast's sales.

44.     AT&T has been unjustly enriched by its actions by, among other things, increased sales, decreased expenses, and increased profitability.

45.     On information and belief, AT&T conduct is willful, deliberate, intentional, and in bad faith.

46.     By reason of the foregoing acts, AT&T has caused, and unless enjoined will continue to cause, irreparable harm to Comcast. Comcast has no adequate remedy at law.

### COUNT III
### NEGLIGENCE

47.     Comcast repeats and realleges the allegations in paragraphs 1 through 46.

48.     Comcast owns the infrastructure through which it provides its telephone, Internet, and television services to its customers.

49.     AT&T has a duty to Comcast to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of its actions.

50.     In breach of that duty, AT&T has, on repeated occasions, introduced foreign information into Comcast's cable infrastructure without Comcast's authorization.

51.     By introducing foreign information into Comcast's cable infrastructure, AT&T has, on repeated occasions, prevented Comcast's communications services from reaching their intended targets—Comcast's customers.

52.     AT&T has knowledge of the effect its actions are having on Comcast's infrastructure and has continued with its conduct despite that knowledge. AT&T's actions were taken to further its own commercial advantage and for private financial gain.

53. AT&T's actions have damaged Comcast's cable infrastructure. Its actions have also damaged Comcast's goodwill and reputation with its customers and are likely to impact Comcast's sales.

54. AT&T has been unjustly enriched by its actions by, among other things, increased sales, decreased expenses, and increased profitability.

55. On information and belief, AT&T conduct is willful, deliberate, intentional, and in bad faith.

56. By reason of the foregoing acts, AT&T has caused, and unless enjoined will continue to cause, irreparable harm to Comcast. Comcast has no adequate remedy at law.

### COUNT IV
### COMMON LAW UNFAIR COMPETITION

57. Comcast repeats and realleges the allegations in paragraphs 1 through 56.

58. Comcast and AT&T are competitors in the provision of phone, Internet, and television services in this District.

59. AT&T has, on repeated occasions, introduced foreign information into Comcast's cable infrastructure without Comcast's authorization.

60. By introducing foreign information into Comcast's cable infrastructure, AT&T has, on repeated occasions, prevented Comcast's communications services from reaching their intended targets—Comcast's customers.

61. AT&T's actions have caused damage to the relationship between Comcast and its customers which, on information and belief, has caused Comcast customers to consider switching their service to AT&T or one of Comcast's other competitors.

62. AT&T has knowledge of the effect its actions are having on Comcast's infrastructure and its customer relationships, and has continued with its conduct despite that

knowledge.  AT&T's actions were taken to further its own commercial advantage and for private financial gain.

63.    AT&T's actions have damaged Comcast's cable infrastructure.  Its actions have also damaged Comcast's goodwill and reputation with its customers and are likely to impact Comcast's sales.

64.    AT&T has been unjustly enriched by its actions by, among other things, increased sales, decreased expenses, and increased profitability.

65.    On information and belief, AT&T conduct is willful, deliberate, intentional, and in bad faith.

66.    By reason of the foregoing acts, AT&T has caused, and unless enjoined will continue to cause, irreparable harm to Comcast.  Comcast has no adequate remedy at law.

## COUNT V
## DECLARATORY JUDGMENT

67.    Comcast repeats and realleges the allegations in paragraphs 1 through 66.

68.    An actual controversy has arisen between Comcast and AT&T as to Comcast's right to advertise its television service by comparison to AT&T's U-Verse TV service, and to associate the VRAD boxes that AT&T is deploying to provide with AT&T's inferior U-Verse TV service.  AT&T asserts that Comcast's criticisms are false or misleading and constitute false advertising.  Comcast contends that its criticisms are true and not misleading.

69.    Consequently, pursuant to 28 U.S.C. § 2201, Comcast requests a declaration from this Court that the following statements are not false or misleading and may form the basis of advertising by Comcast without liability under the Lanham Act, 15 U.S.C. § 1051, *et. seq.*, or any similar state or federal law:

a. AT&T's ability to provide U-Verse TV to its customers is dependent upon the placement of VRAD boxes nearby in the customers' neighborhoods;

b. VRAD boxes are large and unsightly;

c. AT&T locates VRAD boxes in locations that can be viewed from the front and side windows of many houses and apartments without the consent of the affected residents;

d. AT&T locates VRAD boxes without customers' consent and over their objection in the parkways in front, or to the side, of certain of their houses;

e. AT&T locates VRAD boxes without customers' consent and over their objection in other public places that affect the aesthetic view that nearby residents would otherwise enjoy;

f. There is a maximum number of houses that a VRAD box can effectively service;

g. If the number of customers in a particular neighborhood exceeds the maximum number of customers that can be serviced by a VRAD box, AT&T may replace or add another VRAD box in the neighborhood;

h. Comcast provides more high definition programming options through its television service than AT&T does through its U-Verse TV service;

i. A single household that with multiple television that subscribes to U-Verse TV cannot watch more than one live high definition television channel at the same time;

j. AT&T configures its U-Verse TV service so that a single household with multiple television sets cannot watch more than one live high definition television at the same time;

k.  The on demand feature of AT&T's U-Verse TV has less programming available from which to choose than the on demand feature of Comcast's television service;

l.  The on demand feature of AT&T's U-Verse TV does not contain local programming; and

m.  The on demand feature of Comcast's television service does contain local programming.

### PRAYER FOR RELIEF ON COUNTERCLAIMS

WHEREFORE, Comcast respectfully requests that the Court:

1. Preliminarily and permanently enjoin AT&T, and its officers, agents, employees, attorneys, and all others in active concert or participation with them, from interfering with Comcast's cable signal and otherwise trespassing on Comcast's property.

2. A declaration consistent with paragraph 69 of these counterclaims.

3. Require AT&T to:

    a)  account for and pay over to Comcast all profits wrongfully derived by AT&T from its wrongful conduct;

    b)  pay to Comcast such damages as have been suffered by Comcast;

    c)  pay to Comcast, at its election, statutory damages for AT&T's violation of the Cable Communications Policy Act;

    d)  pay to Comcast the full costs of this action, together with Comcast's reasonable attorneys' fees and disbursements; and

    e)  pay to Comcast exemplary and punitive damages to punish AT&T for its wrongful actions and to deter it from such further actions; and

4.       Grant Comcast such other and further relief as this Court deems just and equitable.

Date:   April 20, 2008                              Respectfully submitted,

                                                               LOEB & LOEB LLP

                                    By:      /s/ Douglas N. Masters
                                               Douglas N. Masters
                                               Thomas P. Jirgal
                                               Julie P. Samuels
                                               321 North Clark Street, Suite 2300
                                               Chicago, Illinois 60610
                                               Telephone:  (312) 464-3100
                                               Fax:  (312) 464-3111

                                               Attorneys for Comcast of Illinois III, Inc., Comcast Corporation, Comcast Holdings LLC, and Comcast of Chicago, Inc.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Comcast respectfully demands a trial by jury of all issues triable by a jury.

Date:  April 20, 2008

Respectfully submitted,

LOEB & LOEB LLP

By:      /s/ Douglas N. Masters
Douglas N. Masters
Thomas P. Jirgal
Julie P. Samuels
321 North Clark Street, Suite 2300
Chicago, Illinois 60610
Telephone:  (312) 464-3100
Fax:  (312) 464-3111

Attorneys for Comcast of Illinois III, Inc., Comcast Corporation, Comcast Holdings LLC, and Comcast of Chicago, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of April, 2008, a copy of the foregoing Counterclaims and Third-Party Complaint was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Brian L. Crowe, Esq.
James D. Wilson, Esq.
John F. Kennedy, Esq.
Lynn A. Ellenberger, Esq.
Shefsky & Froelich Ltd.
111 E. Wacker Drive, Suite 2800
Chicago, IL 60601


LOEB & LOEB LLP


By: __s/ Julie Samuels_____
Douglas N. Masters
Thomas P. Jirgal
Julie P. Samuels
321 North Clark Street, Suite 2300
Chicago, Illinois 60610
Telephone: (312) 464-3100
Fax: (312) 464-3111

Attorneys for Comcast of Illinois III, Inc., Comcast Corporation, Comcast Holdings LLC, and Comcast of Chicago, Inc.