UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| COMCAST OF ILLINOIS III, INC; COMCAST CORPORATION; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., | ) ) ) ) ) | **Case No.: 08 CV 1680** **Honorable Elaine E. Bucklo** |
| Defendants. | ) ) | **Magistrate Judge Martin C. Ashman** |
| COMCAST OF ILLINOIS III, INC; COMCAST CORPORATION; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., | ) ) ) ) | |
| Counterclaimants, | ) ) | |
| v. | ) ) | |
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, | ) ) ) | |
| Counterdefendant, | ) ) | |
| and AT&T Inc., | ) ) | |
| Third-party Defendant. | ) ) | |

**MEMORANDUM IN SUPPORT OF COMCAST'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

AT&T's installation of its competitive television service is interfering with

Comcast's cable signal, and causing wide spread disruptions to telephone, Internet, and

video services received by Comcast customers.  In just over two months, AT&T has

interfered with Comcast's cable signal approximately 40 times, causing the telephone,

1

Internet, and television services of over 17,000 Comcast customers to cease functioning altogether or as intended. These service outages and disruptions can last anywhere from one to 20 hours, causing damage to Comcast's customers and to Comcast, whom the customers necessarily blame.

AT&T has been aware it is interfering with Comcast's signal, and of the effect it is having on Comcast's customers and Comcast, since at least March 12, 2008 when Comcast informed it of the harm AT&T is causing. AT&T, in fact, has been aware from its experience in markets other than Chicago that its installation of U-Verse TV in homes that also subscribe to cable services can lead to cable outages and disruptions not only for that customer, but for all other Comcast customers in the customer's neighborhood. Yet, when it rolled out U-Verse TV in Chicago, it gave no warning to Comcast that these outages and disruptions might occur, has failed to take its legal obligations to the community and to Comcast seriously, and has resisted Comcast's reasonable efforts to come up with a workable solution to protect each party's interests.

Comcast thus has no choice but to seek emergency assistance from this Court. AT&T's actions constitute trespass to Comcast's property, negligence, and are unlawful under the federal Cable Communications Policy Act, which prohibits any interception of a cable communications service. Its actions are causing irreparable injury to Comcast by impairing its ability to provide reliable and quality service to its customers, who have no idea AT&T is the cause of their service outages and disruptions, and thus blame Comcast. Comcast respectfully requests that the Court grant this motion and enjoin AT&T from any further interference with Comcast's cable signal.

## FACTUAL BACKGROUND

Comcast provides Internet, telephone, and video services to customers in Chicago and the surrounding areas through its cable network.  (Declaration of Robert B. Curtis ("Curtis Decl.") ¶ 2.)  AT&T is a competitor of Comcast's with respect to Internet, telephone, and most recently, video services.  (Amended Complaint ¶ 11.)  AT&T's television service is called U-Verse TV.  (*Id.* ¶ 13.)  It began rolling out U-Verse TV in other markets in late 2005 or early 2006, and introduced it to the Chicago market in early 2008.  (*Id.*; Curtis Decl. ¶ 9.)

A.    **AT&T Is Interfering with Comcast's Cable Signal and Causing Repeated and Widespread Service Outages**

As soon as AT&T started hooking up customers in the Chicagoland area to U-Verse TV, Comcast began to experience significant and repeated interference with its network.  (Curtis Decl. ¶ 9.)  Comcast investigated and discovered that the interference occurs when AT&T hooks up its U-Verse TV to a home that is also receiving voice, Internet, or television services from Comcast.  (*Id.* ¶¶ 9-16.)  In certain U-Verse TV installations, AT&T apparently runs its signal through internal wiring where Comcast's signal is also running.  (*Id.* ¶ 10.)  The internal wiring in a Comcast customer's home or office is directly connected to Comcast's broader cable infrastructure and constantly sends and receives electrical information to and from the broader cable infrastructure, which Comcast owns.  (*Id.* ¶¶ 3-6.)  Presumably due to some defect in AT&T's installation procedure, AT&T's signal is exiting the home or office of the shared customer and entering into Comcast's proprietary infrastructure.  (*Id.* ¶ 10.)

In just over two months, Comcast has detected approximately 40 instances where AT&T's U-Verse TV signal has invaded Comcast's proprietary cable infrastructure.  (*Id.*

3

¶ 12.) The consequences are dramatic and widespread. Within Comcast's infrastructure, AT&T's signal acts as noise that prevents Comcast's return signal from operating as intended. (*Id.* ¶ 11.) Services that depend on the return signal—telephone, Internet, and interactive television—either shut down completely or cease functioning properly, resulting in slowed Internet services and voice quality impairments. (*Id.*)

The effect of AT&T's interference is felt not only by the home or office from which the interference is originating but all customers who are connected to the same node as that home or office. (*Id.*)[1] Up to 1200 customers at a time can lose Internet service and the ability to make phone calls (or suffer a general degradation in service quality) during the hours it takes Comcast to locate the home or office that is connected to both Comcast and AT&T and disconnect that home or office from Comcast's system. (*Id.* ¶ 5.) In total, Comcast calculates that over 17,000 Comcast customers have lost their phone or Internet service, or suffered degraded service, because of AT&T in just over two months. (*Id.* ¶ 12.)

**B.    AT&T Has Refused Comcast's Efforts to Resolve This Matter Without Assistance of the Court**

AT&T has shown little to no regard for its legal obligations or the injuries it is causing to Comcast and its customers. As an initial matter, based on its experiences in other markets, AT&T knew when it began rolling out its U-Verse TV system in the

---

[1] Within Comcast's cable infrastructure, a "node" is a transition place. (Curtis Decl. ¶ 5.) One side of the node is connected by fiber-optic cable to Comcast's "head end," which is the location where Comcast receives and aggregates different television channels, *etc.*, through satellite dishes, *etc.* (*Id.*) The other side of the node is connected by coaxial cable to anywhere from 50 to 1200 homes, apartments, and business addresses in a particular neighborhood. (*Id.*) As detailed in the Declaration of Bob Curtis, the disruption that results from AT&T's signal interference affects all customers connected to the node through which the interference passes on its way to the head end. (*Id.* ¶ 11.)

Chicagoland area that the process of installing U-Verse TV could cause interference with Comcast's system and service outages.[2]  Yet, AT&T failed to inform Comcast of this fact, or to engage Comcast ahead of time about ways to avoid or ameliorate the service disruptions.  Left in the dark, Comcast had to figure out what the problem was on its own and to take corrective measures that are far from ideal—namely, tracking down which of its customers is also connected to AT&T's U-Verse TV and then physically going to that location to disconnect the customer from Comcast's cable system.  (*Id.* ¶¶ 9-16.)[3]

Beginning in early March 2008, Comcast reached out to AT&T to discuss possible solutions to the service disruptions.  (Masters Decl. ¶ 2, Ex. B.)  It informed AT&T of the precise nature of the interference, and the harm it was causing to Comcast and its customers.  (*Id.* ¶¶ 2-4, Exs. B-D; Curtis Decl. ¶ 17.)  Although AT&T does not deny it is causing interference to Comcast's cable system (Curtis Decl. ¶ 17), it has refused to acknowledge that it has any obligations to prevent it from occurring in the first place.  Comcast specifically sought a voluntary resolution of the situation along the lines of what is being proposed by this motion, but AT&T rejected Comcast's proposal. (Masters Decl. ¶ 8, Exs. I & J.)  Rather, it proposed that Comcast just call AT&T once it detects a service disruption, and then AT&T will see what it can do to track down the source of the interference.  (Curtis Decl. ¶ 18, Ex. A.)

As a practical matter, AT&T's proposal is ineffective and will take hours to resolve a service disruption, whereas Comcast needs, and is entitled to, a solution that

---

[2] Time Warner Cable, another cable company, filed claims against AT&T in Texas in March 2007 based on AT&T's disruption of its cable signal through the installation of U-Verse TV.  (Declaration of Douglas N. Masters ("Masters Decl.") ¶ 1, Ex. A.)

[3] Comcast must do this even when the customer wishes to continue service with Comcast in addition to receiving AT&T's television service.  (Curtis Decl. ¶ 16.)

will prevent the interference from occurring at all, or resolve it within minutes, not hours. (Curtis Decl. ¶¶ 19-20.)  Nonetheless, Comcast endeavored this last week to see whether AT&T's system would work.  When it faced yet another disruption this last Friday, and called AT&T for its assistance, AT&T gave Comcast the run around and waited four hours before even acknowledging it would look into the issue.  (*Id.* ¶ 19.)  And this begrudging response came only after Comcast's outside lawyer contacted AT&T's outside lawyer.  (Masters Decl. ¶ 10, Ex. L.)

Comcast informed AT&T Friday afternoon that if it was not willing to come to the bargaining table and work out a real resolution to Comcast's legitimate needs, Comcast would seek emergency relief from the Court on Monday.  (Masters Decl. ¶ 11.) In response, AT&T sent a letter that made clear it was unwilling to acknowledge its responsibility or work with Comcast to come up with a mutual resolution.  (*Id.* ¶ 9.) Consequently, Comcast brings this motion.

**ARGUMENT**

AT&T's interference with Comcast's cable system constitutes a violation of the Cable Communications Policy Act, trespass to Comcast's personal property, and negligence.  Comcast has a strong likelihood of prevailing on the merits of each of these claims, and is suffering irreparable injury from the service disruptions being caused by AT&T.  The balance of hardships also tips sharply in favor of the entry of a temporary restraining order to prevent or ameliorate the harm to Comcast and its customers from the

service disruptions caused by AT&T.  Consequently, Comcast respectfully requests that the Court enjoin AT&T from any further interference with Comcast's cable system.[4]

## A.    Comcast Will Prevail on the Merits of Its Claims Against AT&T

### 1.    AT&T's Disruption of Comcast's Cable Services Violates the Cable Communications Policy Act

Section 553 of the Cable Communications Policy Act ("Section 553") prohibits the unauthorized interception of any communications service offered over a cable system. 47 U.S.C. § 553(a)(1).  Doing so gives rise to criminal penalties and a civil right of action in favor or any party aggrieved by such interference, such as Comcast.  *See id.* §§ 553(b), 553(c).  The prohibition is broad and does not depend on an intent to violate the statute, or to profit from the violation.  *See International Cablevision, Inc. v. Sykes*, 997 F.2d 998, 1004 (2d Cir. 1993).  Nor need it be shown that the interception was for the purpose of "stealing cable" even though a primary purpose of the statute was to deter theft of cable services.  *See CSC Holdings, Inc. v. Westchester Terrace at Crisfield Condominium*, 235 F. Supp. 2d 243, 263 (S.D.N.Y. 2002).  In short, Section 553 proscribes "any sort of interception of a cable television signal," for whatever reason, *see id.*, and gives the Court broad authority to enjoin further interceptions.  *See* 47 U.S.C. § 553(c)(2)(A).

The evidence is clear that by introducing its electronic information into Comcast's cable infrastructure, AT&T has, on dozens of occasions, disrupted Comcast's cable system from functioning properly and prevented Comcast's telephone, Internet, and

---

[4] "The standards for a temporary restraining order and preliminary injunction are identical."  *Daniels v. Zbieranek*, No. 07-C-1005, 2008 WL 473640, *2 (E.D. Wis. Feb. 20, 2008).  "A party seeking a preliminary injunction is required to demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if the relief is not granted."  *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002) (citing *Ty, Inc. v. Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001)).

7

television services from reaching their intended targets—Comcast's customers.  (Curtis Decl. ¶¶ 9-16.)  Such conduct is an "interception" of a "communications service offered over a cable system" within the plain meaning of Section 553.[5]  Comcast is thus likely to prevail on this claim.

### 2.  AT&T's Interference with Comcast's Cable Infrastructure Constitutes a Trespass to Chattels

The entry by AT&T's U-Verse TV signal into Comcast's proprietary infrastructure is a trespass to chattels for which AT&T is liable.  A trespass to chattels, is committed by intentionally "using or meddling with a chattel in the possession of another."  RESTATEMENT (SECOND) OF TORTS § 217; *MCI LLC v. JPK Excavating, Inc.*, No. 06-206, 2007 WL 2028791 at *2 (S.D. Ill. July 12, 2007); *Sotelo v. DirectRevenue*, 384 F. Supp. 2d 1219, 1229 (N.D. Ill. 2005).

Multiple courts, including the Northern District of Illinois, have concluded that the unauthorized introduction of electrical signals or information into another's electronic system is actionable as a trespass to chattels when it interferes with the proper functioning of that system.  *See Sotelo*, 384 F. Supp. 2d at 1229-30 (causing spyware to be downloaded on personal computer without authorization actionable as trespass to personal property under Illinois law); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) (defendant's unauthorized automated searches of plaintiff's website constituted trespass where it caused "reduced system performance, system

---

[5] The normal and plain meaning of the word "intercept" is "to stop, deflect, or interrupt the progress or intended course of."  *See* AMERICAN HERITAGE COLLEGE DICTIONARY 708 (3d ed. 2000);  *see also* WEBSTER'S NINTH NEW COLLEGE DICTIONARY 630 (1988) ("2: to stop, seize, or interrupt in progress or course before arrival");  http://dictionary.reference.com/browse/intercept ("1. to take, seize, or halt (someone or something on the way from one place to another); cut off from an intended destination").

8

unavailability or data losses"); *America Online, Inc. v. IMS*, 24 F. Supp. 2d 548, 550 (E.D. Va. 1998) (sending unauthorized spam e-mail over ISP's network systems constitutes actionable trespass to chattels); *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1021 (S.D. Ohio 1997) ("Electronic signals … have been held to be sufficiently physically tangible to support a trespass cause of action.").

Here, the evidence establishes that AT&T's signal is entering Comcast's proprietary infrastructure and causing Comcast's cable system to shut or slow down. (Curtis Decl. ¶¶ 9-16.) Comcast, moreover, notified AT&T on March 12, 2008 that its installation processes were resulting in this invasion and interference, and AT&T had notice of the significant risk of such interference from its prior experience in Texas where it is being sued for interfering with another cable company's cable system in the same manner. (Masters Decl. ¶¶ 1-2, Exs. A & B.) Despite this knowledge, the interference and disruptions have continued—on average, more than once every other day for the last two months. (Curtis Decl. ¶ 12.)[6] AT&T's deliberate decision to follow its same installation procedures in the face of the this significant risk is sufficient to establish that its actions are intentional.[7] Comcast is thus likely to prevail on this claim.

---

[6] The Declaration of Robert Curtis demonstrates that it is AT&T and not some other source that is causing the interference that Comcast seeks to enjoin. (Curtis Decl. ¶¶ 9-16.) First, Comcast has, through the use of spectrum analyzers, detected a discernible pattern to AT&T's interfering signals that is different than other types of interference that Comcast's cable signal sometimes experiences. (*Id.* ¶ 14.) Second, and most convincingly, the interference ceases when Comcast disconnects the shared customer from Comcast' cable system. (*Id.* ¶ 15.)

[7] A specific intent to violate the law need not be shown to prove trespass. *See Sotelo*, 384 F. Supp. 2d at 1232. It is sufficient to show, as here, that the wrongdoer knew from past experiences that its conduct was likely to cause the harm in question. *See Porter v. Urbana-Champaign Sanitary Dist.*, 237 Ill. App. 3d 296, 303, 604 N.E. 2d 393, 398 (1992) (three prior instances where city sewers overflowed onto plaintiff's property could

**3.      AT&T's Conduct Constitutes Negligence**

Even if AT&T could somehow show that its actions were not intentional in the
face of all the evidence to the contrary, they are grossly negligent.  Under Illinois law, a
party is bound to exercise ordinary, reasonable, or due care in order to avoid injuring
another person.  *Kahn v. James Burton Co.,* 5 Ill. 2d 614, 126 N.E.2d 836 (1955).  In
particular, "every person owes to others a duty to exercise ordinary care to guard against
injury which may naturally flow as a reasonably probable and foreseeable consequence of
his actions."  *Krakowiak v. Sampson,* 85 Ill. App. 2d 71, 71, 229 N.E.2d 578, 579 (1967).
Breach of this duty that results in injury gives rise to a claim for negligence.  *See Pavlik
v. Wal-Mart Stores, Inc*., 323 Ill. App. 3d 1060, 1063, 753 N.E.2d 1007, 1010  (2001).
And repeated acts of negligence causing injury are a sufficient basis for injunctive relief.
*See Illinois Bell Tele. Co. v. Lake County Grading Co.,* 313 Ill. App. 3d 184, 191, 728
N.E.2d 1178, 1183 (2000) (it would be "impossible for plaintiff to … [file] a timely suit
seeking an injunction to prevent damages" each time defendant was about to undertake a
negligent act in a series of such acts).

Here, there is no question that AT&T and its installers owe a duty of due care to
avoid taking actions that are going to injure Comcast and its customers.  Moreover, given
that AT&T and its installers are on notice that its installation of U-Verse TV has caused
interference with and disruption of Comcast's cable signal (and that of other cable
companies) in the past, injury to Comcast and its customers was and is foreseeable.
AT&T has breached its duty of due care to Comcast and its customers, and this breach
has caused them injury.  Comcast is thus likely to prevail on this claim.

---

support a finding that fourth incident was an intentional trespass by city through it failure
to properly operate the sewer system).

10

**B.    The Service Disruptions to Comcast's Cable System Caused by AT&T Are Causing Irreparable Injury to Comcast**

The Seventh Circuit has repeatedly recognized that harm to customer goodwill is irreparable and therefore warrants preliminary relief.  *See Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) ("Because of the difficulty in assessing the damages associated with a loss of goodwill, the district court was correct in finding that Promatek lacked an adequate remedy at law."); *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages."); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992) ("it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill") (citation omitted).

A service provider's goodwill with its customers is irreparably harmed where service is disrupted or degraded by another's improper conduct.  *See eBay*, 100 F. Supp. 2d at 1066 ("[R]educed system performance, system unavailability or data loss would inflict irreparable harm on eBay consisting of lost profits and lost customer goodwill. Harm resulting from lost profits and lost customer goodwill is irreparable because it is neither easily calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief.").

Courts have also recognized that an ongoing trespass to personal property, including unauthorized access to computer networks, constitutes irreparable harm.  *See eBay*, 100 F. Supp. 2d at 1067 ("[F]undamental to the concept of ownership of personal property is the right to exclude others.  If preliminary injunctive relief against an ongoing

11

trespass to chattels were unavailable, a trespasser could take a compulsory license to use another's personal property for as long as the trespasser could perpetuate the litigation. . . . . [O]ngoing violation of eBay's fundamental property right to exclude others from its computer system potentially causes sufficient irreparable harm to support a preliminary injunction.") (citation omitted); *see also Clark v. Pub. Serv. Co. of N. Ill.*, 278 Ill. App. 426, 448 (1934) ("it frequently happens that an injury or trespass to real property may be in a certain sense irreparable. The condition of things before the trespass was committed or the injury done cannot be restored at all, or can be restored only at a very great and disproportionate expense.").

In this case, AT&T is trespassing on and directly interfering with Comcast's cable system. (Curtis Decl. ¶¶ 9-16.) As in *eBay*, such interference is *per se* irreparable injury. AT&T's conduct, moreover, is causing wide-scale shut downs and slow downs to Comcast's telephone, Internet, and television services. (*Id.*) These disruptions cause Comcast's customers to question Comcast's ability to deliver a quality service even though it is AT&T, not Comcast, who is causing the disruptions.[8] Such unjustifiable blame for poor service is irreparable injury. Comcast has met its burden of demonstrating irreparable injury.

## C.    The Cable Communications Policy Act Expressly Authorizes Temporary Injunctions Against Disruptions to Comcast's Cable Signal

In addition to an injunction on equitable grounds based on the irreparable harm caused by AT&T, Comcast is entitled to an injunction on statutory grounds because AT&T is violating section 553 of the Cable Communications Policy Act. The Act

---

[8] The harm is exacerbated by the fact that Comcast's competitors such as AT&T consistently compete against Comcast by questioning the reliability of its service.

expressly authorizes temporary injunctions to prevent ongoing violations.  *See* 47 U.S.C. § 553(c)(2) ("The court may—(A) grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of [section 553(a)(1)] . . . .").

"[W]here the plaintiff seeks an injunction to prevent the violation of a federal statute that specifically provides for injunctive relief, it need not show irreparable harm." *Illinois Bell Tel. Co. v. Illinois Commerce Comm'n,* 740 F.2d 566, 571 (7th Cir. 1984); *see also CSC Holdings, Inc. v. Greenleaf Electronics, Inc.*, 2000 WL 715601, at *7 (N.D. Ill. June 20, 2000) ("In an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief."); *Lake County Grading Co.,* 313 Ill. App. 3d at 189, 728 N.E.2d at 1181 ("where a statute expressly authorizes injunctive relief … [t]he general rules of equity requiring a showing of irreparable injury and a lack of adequate remedy at law need not be shown.").  Consequently, even without proof of irreparable injury, which Comcast has sufficiently demonstrated, the Court would be empowered to temporarily restrain AT&T's violations of the Cable Communications Policy Act.

**D.    The Relief that Comcast Is Seeking Is Justified by AT&T's Transgressions and the Facts of This Case**

Comcast is entitled to an injunction against any future interference with its cable system by AT&T, even if such injunction might prohibit AT&T from installing U-Verse TV in homes that are connected to Comcast.  Comcast is proposing, however, that the Court specify a procedure in its restraining order that would allow AT&T to continue such installations subject to certain prerequisites.  *See* Proposed Order.

Specifically, under the protocols set forth in Comcast's proposed order, AT&T would be required to notify Comcast ahead of time whenever it intended to connect its U-

13

Verse TV system to the cable infrastructure in a home that is already connected to Comcast. This would allow Comcast to monitor its system while the installation is taking place to immediately detect any interference by AT&T's signal. AT&T would also be required to set up a communications pathway whereby Comcast could immediately contact AT&T if such interference occurs, and then AT&T would have to immediately contact its installers to inform them of the interference. Finally, upon receiving notice that such interference is taking place, AT&T's installers would be obligated to immediately cease installation, and, if necessary, disconnect its facilities, until the source of the interference is determined, corrected, and appropriately addressed to prevent a recurrence.

If this protocol is followed, interference to Comcast's cable system, and the disruptions to the cable services received by Comcast's customers, could be resolved in a manner of minutes, instead of the hours that it presently takes. (Curtis Decl. ¶ 20.)[9]

**E.    The Balance of Equities Tips Sharply in Favor of the Relief Comcast Is Seeking**

The balance of equities tips sharply in favor of the relief Comcast is requesting. AT&T's actions violate Comcast's clear legal rights and are causing it irreparable injury. AT&T's actions are also causing enormous injury to the public when they lose their phone and Internet services for hours at a time because of AT&T interference with Comcast's cable network. Balanced against these specific harms, AT&T's obligations would be primarily to notify Comcast prior to installing U-Verse TV in any home that subscribes to Comcast's telephone, Internet, or video services and to disconnect its

---

[9] If day-to-day adherence to these protocols demonstrates a need for revision thereto, such revisions can be discussed when the Court holds a hearing on Comcast's request for a preliminary injunction.

service if any interference occurs.  Adhering to these protocols would not cause

irreparable injury to AT&T, let alone the kind of harm that would outweigh the harm that

Comcast and its customers are suffering because of AT&T.  To the contrary, getting real-

time feedback as to which of its installations are causing interference with Comcast's

network should help AT&T and its installers to improve their installation methods so that

future interference can be eliminated altogether.  (Curtis Decl. ¶ 20.)

## <u>CONCLUSION</u>

For the foregoing reasons, Comcast respectfully requests that the Court grant its

motion, enter the accompanying temporary restraining order, and schedule a hearing on

its request for a preliminary injunction.

LOEB & LOEB LLP


By:    __s/ Douglas N. Masters_____
       Douglas N. Masters
       Thomas P. Jirgal
       Julie P. Samuels
       321 North Clark Street, Suite 2300
       Chicago, Illinois 60610
       Telephone:  (312) 464-3100
       Fax:  (312) 464-3111

       Attorneys for Comcast of Illinois III, Inc., Comcast
       Corporation, Comcast Holdings LLC, and Comcast
       of Chicago, Inc.

**Exhibit A**



Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 2028791 (S.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 2028791)**

CMCI LLC v. JPK Excavating, Inc.
S.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Illinois.
MCI LLC, d/b/a Verizon Business, et al., Plaintiff,
v.
JPK EXCAVATING, Inc., Defendant.
**Civil Case No. 06-206-PMF.**

July 12, 2007.

Cicely I. Lubben, Sandra J. Wunderlich, Stinson, Morrison Et Al., St. Louis, MO, James J. Proszek, Hall, Estill Et Al., Tulsa, OK, for Plaintiff.
Julie A. Webb, Paul R. Lynch, Craig & Craig, Mt. Vernon, IL, for Defendant.

### MEMORANDUM AND ORDER

FRAZIER, Magistrate Judge.
**\*1** Before the Court is plaintiffs' motion for partial summary judgment (Doc. No. 31). The motion is opposed (Doc. No. 35). In this case, the Court exercises diversity jurisdiction over plaintiffs' claims of trespass, negligence, and statutory liability.

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). The facts and reasonable inferences drawn from those facts are construed in favor of the defendant. Because plaintiff seeks a decision only on the issue of liability, the Court considers whether there is a genuine issue concerning any fact that might affect the liability aspect of this case.

Viewed under this standard, the material facts are summarized as follows. Over the years, various organizations and groups evaluated problems related to damage to underground utilities. Standards, practices, and guidelines have been proposed for drilling and excavating industries. In general, drillers and excavators have been urged to take reasonable precautions to avoid damaging underground utilities

in and around work areas. Recommended steps include utilizing the state's one-call notification system, verifying that underground utilities in the area have been marked, and reviewing the actual location of underground utilities on the site before work begins.

In 1991, the Illinois Underground Utility Facilities Damage Prevention Act took effect. The statute requires excavators to contact a one-call notice system known as the Joint Utilities Location Information for Excavators (JULIE) at least 48 hours before excavation begins. 220 ILCS 50/1-50/14. The Act also requires excavators to take reasonable action to inform themselves of the location of any underground utility facilities in the area and plan the excavation to avoid or minimize interference with underground facilities in or near the excavation area. 220 ILCS 50/4(a). An excavator who fails to comply with these standards with resulting damages is guilty of prima facie negligence. 220 ILCS 50/9. In August, 2000, an Excavators Manual was published. The manual explains different types of location requests, notice times, the response process, and dig numbers.

In 1996, legal documents were recorded in St. Clair County, reflecting an agreement between WorldCom Network Services, Inc. (WorldCom) and certain property owners to alter an existing utility easement. At some point, WorldCom installed a fiber-optic cable system to a location along the east side of property in the village of Freeburg, Illinois. Permanent orange markers were placed at intervals along the route of the cable, advising of the cable's presence and directing excavators to call a toll free number before digging. The toll-free number was part of the state's one-call notification system. At some point, plaintiff MCI acquired the cable system installed by WorldCom.

**\*2** In April, 2005, defendant JPK Excavating, Inc. was performing work for a developer at a site in Freeburg, Illinois, known as the first addition to Timberwolf Estates. The developer provided defendant with plans, including a preliminary plat map showing a 20-foot wide utility easement to WorldCom running along the east side of Lot 77. John Klopmeyer, a JPK employee, spoke with the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                 Page 2
Slip Copy, 2007 WL 2028791 (S.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 2028791)**

developer regarding the location of the cable and shared information with Sam Shute, another JPK employee. Neither Klopmeyer nor Shute called JULIE or took other steps to mark or establish the location of underground utilities on or near Lot 77 within 48 hours before excavation began on that location.

On the afternoon of April 27, 2005, Mr. Shute used excavation equipment known as a track hoe to remove steel pipe from Lots 86 and 77. Mr. Shute did not know WorldCom had installed a fiberoptic cable system in or near the area where he was working.[FN1] He used the track hoe to lift sections of pipe from Lot 77. As Mr. Shute approached the eastern edge of that lot, he lifted a section pipe from the ground that was connected to a manhole box containing a splice case and wires. Mr. Shute thought the equipment was part of an abandoned utility system. He was wrong. The box, splice case, and wires were part of plaintiff's underground cable system. When Mr. Shute used the track hoe to remove the equipment from the ground, he severed plaintiff MCI's cable. Mr. Shute later observed a warning sign located approximately 25 feet from the spot where he was working. The warning sign was partly concealed by trees.

> FN1. Portions of Shute's testimony conflict with other evidence. For purposes of this motion, it is assumed that a jury would find Shute's testimony to be credible.

Arthur Sheridan investigated the incident and prepared an investigative report. A temporary restoration was made to restore traffic on the cable.

Plaintiff asserts three grounds for judgment on the issue of liability: trespass, negligence, and statutory violation. Because the Court is exercising diversity jurisdiction, the law of the forum state controls the analysis. *See Wolverine Mut. Ins. v. Vance,* 325 F.3d 939, 942 (7th Cir.2003). Before considering the arguments, the Court notes that plaintiff submitted new evidence with its reply brief. Because defendant did not receive a fair opportunity to respond to this evidence, it is not considered. SDIL LR 7.1(c).

**I. Trespass**

**Trespass** to **personal property** is committed by

intentionally (a) dispossessing another of property or (b) using or **meddling** with property in possession of another. *Sotelo v. DirectRevenue, LLC,* 384 F.Supp.2d 1219 (N.D.Ill.2005).Restatement (Second) Of Torts, § 217.

Plaintiffs argue that defendant's act of severing MCI's cable is a trespass. Defendant responds that the facts could support a finding that it did not act with a substantial degree of certainty of intruding on MCI's cable. Viewing the evidence in favor of the defense, the Court agrees that the facts could support a finding that defendant did not know the location of MCI's buried cable and hence did not anticipate or realize that its excavation on Lots 86 and 77 would interfere with MCI's property. Plaintiffs are not entitled to judgment on their trespass claim.

**II. Negligence**

*3 A negligence claim succeeds with proof of (1) a duty of care, (2) breach of the duty of care, (3) injury proximately resulting from the breach, and (4) damages. *Pelham v. Griesheimer,* 440 N.E.2d 96, 98 (Ill.1982). As noted above, noncompliance with the provisions of the Underground Utility Facilities Damage Prevention Act is prima facie evidence of negligence.

Plaintiffs argue that the evidence proves all elements of their negligence claim. Defendant suggests that issues of breach and damage cannot be resolved unless a jury decides that JPK excavated within the easement. The Court is not persuaded that this fact is in dispute or that any such dispute is germane to plaintiffs' negligence claim.

On summary judgment, the Court considers facts established by the pleadings.Fed.R.Civ.P. 56(c). In their Complaint, plaintiffs allege that "JPK was performing excavation work in the Easement to remove a steel pipe."(Doc. No. 1, para.13.) The Federal Rules provide two ways to deny an allegation. The first is a simple denial; the second is to claim lack of knowledge or information sufficient to form a belief as to the truth of the allegation. Either response is deemed a denial, while allegations that are not denied are deemed admitted. Fed.R.Civ.P. 8(b), 8(d). JPK attempted to craft a partial admission but did not deny that it was excavating in the easement or claim to lack

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2028791 (S.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 2028791)**

knowledge of information sufficient to form a belief as to the truth of that allegation. (Doc. No. 12, para.13.) The absence of a proper denial is an admission. Moreover, because JPK's duty to exercise reasonable care arose before it started to excavate, plaintiffs have proved breach of that duty and need not prove that JPK further breached its duty of care by encroaching on MCI's easement.

The facts, construed in defendants' favor, establish all of the elements of plaintiffs' negligence claim. No genuine issues of material fact remain for trial.

**III. Statutory Violation**

Plaintiffs also seek judgment in their favor on their claim of a statutory violation. The defendant generally argues that plaintiffs have not satisfied their burden of proof. The Court disagrees. The evidence points to only one conclusion-that JPK excavated underground utilities without complying with the requirements of the Illinois Underground Utility Facilities Damage Prevention Act.

**IV. Conclusion**

IT IS ORDERED that plaintiffs' motion for partial summary judgment (Doc. No. 31) is GRANTED in part and DENIED in part. Pursuant to Rule 56(d), the following issues are established prior to trial:

(1). Defendant is liable to plaintiffs for negligence under Count II

(2). Defendant is liable to plaintiffs for statutory violation under Count III.

**SO ORDERED.**

S.D.Ill.,2007.
MCI LLC v. JPK Excavating, Inc.
Slip Copy, 2007 WL 2028791 (S.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit B**

*Westlaw*

Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2000 WL 715601 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 715601)**

CCSC Holdings, Inc. v. Greenleaf Electronics, Inc.
N.D.Ill.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
CSC HOLDINGS, INC., Plaintiff,
v.
GREENLEAF ELECTRONICS, INC., Christine
Alonso, Kathy "Doe", John Does 1-10, Jane Does 1-
10, Unidentified Corporations 1-10, and Unidentified
Business Entities 1-10, Defendants.
**No. 99 C 7249.**

June 2, 2000.

*Report & Recommendation*

ROSEMOND, Magistrate J.
**\*1** Before the Court are Plaintiff's *Motion For
Preliminary Injunction;* Defendant *Christine Alonso's
Motion To Partially Dissolve Preliminary Injunction;*
and the *Motion By Timothy L. Alonso & Anthony
Serra To Intervene In The Motion To Partially
Dissolve Preliminary Injunction.*Plaintiff's *Motion
For Preliminary Injunction* is granted. The *Motion
By Timothy L. Alonso & Anthony Serra To Intervene
In The Motion To Partially Dissolve Preliminary
Injunction* is granted. *Christine Alonso's Motion To
Partially Dissolve Preliminary Injunction* is denied.

*Background.*

On November 8, 1999 Plaintiff brought an *ex parte
Motion For Temporary Restraining Order, For
Preliminary Injunction, For Asset Freeze And
Accounting, And To Expedite Discovery.*On
November 8, 1999, the District Judge granted an *ex
parte Temporary Restraining Order* which provided
for a freeze of Defendants' assets, an accounting, and
expedited discovery.[FN1]Pursuant to the *Order,*
Plaintiff posted a $15,000 bond with the Clerk of the
Court. The *Motion For Preliminary Injunction* was
referred to the Magistrate Judge. *Christine Alonso's
Motion To Partially Dissolve Preliminary Injunction*
and the *Motion By Timothy L. Alonso & Anthony
Serra To Intervene In The Motion To Partially
Dissolve The Preliminary Injunction* are also

included within the scope of the referral. The
Magistrate Judge held a preliminary injunction
hearing on December 9, 1999.

> FN1. District Judge's November 8, 1999
> *Order* (docket entry # 10).

FINDINGS OF FACT.

1. Plaintiff is a cable television service provider that
operates and maintains cable television systems
pursuant to franchises awarded to it, which authorize
it to construct, operate, and maintain cable television
systems in communities located in parts of New
York, New Jersey, Connecticut, Massachusetts, Ohio,
and Michigan. Plaintiff offers cable television
programming to subscribers who request and pay for
the programming.[FN2]

> FN2. Aff. of Donald Kempton, ¶ 3 (Oct. 29,
> 1999).

2. Plaintiff's programming is offered to its subscribers
in "packages" of programming services. "Basic" and
"Family" are packages of programming services that
a subscriber selects at a monthly rate. Subscribers
may also elect to purchase one or more "premium"
programming services, such as Cinemax, Home Box
Office, and Showtime for an additional monthly
charge per service.[FN3]

> FN3.*Id.* at ¶ 4.

3. Plaintiff also offers pay-per-view programming, a
service enabling subscribers to purchase individual
movies, sporting events, or other entertainment for a
per event fee over and above the subscriber's regular
monthly subscription fee.[FN4]

> FN4.*Id.,* at ¶ 5.

4. Each subscriber is entitled to receive only that
level of programming and services that he or she
selects and purchases.[FN5]

> FN5.*Id.,* at ¶ 6.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 715601 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 715601)**

5. The signals for all of Plaintiff's cable television services, many of which originate as over-the-air satellite signals, are transmitted from Plaintiff's reception facilities to subscribers' homes through a network of cable wiring and equipment (the "System"). In order for a subscriber to receive these transmitted "non-broadcast" cable television signals on his or her television set, Plaintiff provides each subscriber with a device known as a "converter", which converts the signals of multiple services simultaneously transmitted over the System into different "channels" which can be viewed clearly on a subscriber's television set.[FN6]

FN6. *Id.,* at ¶ 7-8.

**\*2**   6.   Plaintiff's   signals   are   private telecommunications not intended for public use.[FN7]

FN7. *Id.,* at ¶ 14.

7. To prevent subscribers from receiving programming services for which they have not paid, Plaintiff encodes or "scrambles" the signals for specific programming services. Subscribers purchasing scrambled programming services are provided with a device known as a "decoder", which is incorporated into a converter. Together, they are called a "converter-decoder". This device decodes the scrambled signals so that the programming selected and purchased can be viewed clearly on a subscriber's television set. Programming services not purchased, therefore, will continue to be scrambled and will be unviewable on the subscriber's television set.[FN8]

FN8. *Id.,* at ¶ 8.

8. Encoding or "scrambling" is a primary security method employed by Plaintiff (and most cable systems) to prevent subscribers from receiving programming services for which they have not paid.[FN9]

FN9. *Id.,* at ¶ 9.

9. The authorized converter-decoders provided by Plaintiff to its subscribers each have the function and feature known as "addressability". An addressable converter-decoder is one which, when attached to the System, can communicate with Plaintiff's central computer. The feature and function of addressability is essential to the billing of pay-per-view programs. The reception of a pay-per-view program is authorized when a command is sent from the central computer of the System to the converter-decoder of the purchasing subscriber. This command instructs the converter-decoder to decode the otherwise unscrambled picture of the pay-per-view program to be shown. A charge for the purchased pay-per-view program is documented and generated by the System's central computer only when the corresponding purchase order and authorization command for the viewing of a pay-per-view program is received and acted upon through the addressability function and feature of the subscriber's converter-decoder.[FN10]

FN10. *Id.,* at ¶ 10.

10. It is possible for a dishonest individual to install an unauthorized or "pirate" cable television decoding device (one programmed to descramble all programming services) onto Plaintiff's cable system in order to receive all of Plaintiff's scrambled programming, without authorization and without making payment therefor. In most cases, Plaintiff cannot detect or prevent the theft of its programming services from such devices without affirmative permission from a subscriber to conduct an on-site inspection.[FN11]

FN11. *Id.,* at ¶ 11.

11. Defendant Greenleaf is an Illinois corporation, organized on May 7, 1991. Greenleaf's place of business is at 801 Eagle Drive, Bensenville, Illinois.[FN12]

FN12. Aff. of Joseph Flaim, ¶ 4 (Oct. 29, 1999); *see also* Plaintiff's Ex. 1.

12. Defendant Christine Alonso is Greenleaf's President and Secretary.[FN13]

FN13. *Id.; see also* R. at 28.

13. Defendant Alonso was on Greenleaf's payroll as early as 1991.[FN14]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 715601 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 715601)

FN14. Plaintiff's Ex. 4.

14. Defendant Alonso signed checks on behalf of Greenleaf.[FN15]

FN15. Plaintiff's Ex. 5.

15. Defendants Greenleaf and Alonso have engaged in the business of selling for profit unauthorized or "pirate" cable television decoding devices for use on Cablevision's cable systems.[FN16]

FN16.*Id.* at ¶¶ 5-17.

**\*3** 16. The decoding devices sold by Defendants are not practicably detectable by Plaintiff, meaning that they are capable of defeating or circumventing Plaintiff's software-driven electronic security measures that have as their sole purpose the disabling of "pirate" decoding devices.[FN17]

FN17.*Id.* at ¶¶ 14, 17.

17. Defendants advertised and marketed their products to Plaintiff's cable television subscribers *via* publications with national distribution and, in the process of selling their decoding devices, indicated that the devices were for use on Plaintiff's cable television system.[FN18]

FN18.*Id.* at ¶¶ 2, 5, & 15.

18. In or around March, 1999, Plaintiff commenced its investigation of Greenleaf based on Greenleaf's advertisements in publications with national circulation such as *Nuts & Volts* magazine.[FN19]

FN19. Aff. of Donald Kempton, ¶ 15; Aff. of Joseph Flaim, ¶ 2.

19. On March 4, 1999, Flaim called the telephone number listed in Greenleaf's advertisement and purchased a "Storm Plus" descrambling device. During the call, Flaim spoke to someone who identified herself as "Chris".[FN20]

FN20. Aff. of Joseph Flaim, ¶ 5.

20. On March 10, 1999, Flaim received a Federal

Express package from "Chris" at Greenleaf Electronics, 801 Eagle Drive, Bensenville, Illinois, in which he found the decoding device he ordered on March 4, 1999.[FN21]

FN21. Aff. of Joseph Flaim, ¶ 6; *see also* Plaintiff's Ex. 2.

21. On March 10, 1999, Flaim tested the device and found it to be inoperable.[FN22]

FN22. Aff. of Joseph Flaim, ¶ 7.

22. After attempting with the assistance of a Greenleaf representative to get the device to function, Flaim returned the device to Greenleaf for an exchange. He received a replacement device on April 14, 1999.[FN23]

FN23. Aff. of Joseph Flaim, ¶¶ 8-13; *see also* Plaintiff's Ex. 2.

23. On April 15, 1999, Flaim tested the device and found it to be capable of permitting a television set attached to Plaintiff's Nassau County, New York system to receive all of Plaintiff's scrambled premium and pay-per-view services without authorization.[FN24]

FN24. Aff. of Joseph Flaim, ¶ 14.

24. On April 21, 1999, Flaim again called Greenleaf and ordered a descrambling device for use on Plaintiff's Long Island, New York cable system.[FN25]

FN25.*Id.* at ¶ 15.

25. On April 23, 1999, Flaim received a Federal Express package from "Chris" at Greenleaf Electronics, Inc., 801 Eagle Drive, Bensenville, Illinois, which contained the device he ordered on April 21, 1999.[FN26]

FN26. Aff. of Joseph Flaim, ¶ 16; Plaintiff's Ex. 3.

26. On April 23, 1999, Flaim tested the device and found it to be capable of permitting a television set attached to Plaintiff's Nassau County, New York system to receive all of Plaintiff's scrambled premium

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 715601 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 715601)**

and pay-per-view services without authorization.[FN27]

> FN27. Aff. of Joseph Flaim, ¶ 17.

27. On March 16, 1999, an Illinois private investigator retained by Cablevision conducted initial surveillance at Greenleaf's address. The structure at this address is a one story brick building, approximately 40' x 120' with a loading dock and garage bay door. It is located within an industrial park. The private investigator observed five vehicles outside the location, including one which was leased by a "Timothy Alonso".[FN28]

> FN28. *Id.* at ¶ 18.

28. On March 18, 1999, Flaim conducted additional surveillance at the Defendants' business location. On that day, he again observed the vehicle leased by Timothy Alonso parked outside the building. While conducting the surveillance, Flaim also inspected Defendants' trash, which had been left outside for pickup. One item he recovered was a United Parcel Service Tracking Summary, used to determine whether a UPS package had been delivered. This document, a copy of which was attached to his affidavit as Exhibit H, showed that a package delivered to Greenleaf was received on March 12, 1999 by "Alonso".[FN29]

> FN29. *Id.* at ¶¶ 19-20.

**\*4** 29. On May 5, 1999, Flaim returned to Greenleaf's business location to conduct additional surveillance. He observed a Federal Express truck driver enter the building and then return to his truck several minutes later carrying a shipping box that was similar in size and shape to those Flaim had received from Greenleaf when he ordered decoding devices. Flaim also observed that the vehicle leased by "Timothy Alonso" was among the vehicles parked outside the business location.[FN30]

> FN30. *Id.* at ¶ 21.

30. On November 8, 1999, Plaintiff sought an *ex parte* temporary restraining order. A temporary restraining order ("TRO") was entered by the Court. The TRO enjoined Defendants' further sales of cable television decoding devices; provided for a freeze of

Defendants' business and personal assets; and allowed expedited discovery. The Court's review of Plaintiff's application indicated that Plaintiff had made out a *prima facie* case for the award of such relief and that the need for each aspect of the relief sought therein was clear. Defendants were subsequently served with copies of the *Summons* and *Complaint,* along with the TRO and Plaintiff's application therefor.

31. After the TRO was entered, Plaintiff learned that Comcast Cablevision ("Comcast"), a cable television operator similar to Plaintiff had been involved in the execution of a search warrant and seizure in 1997 in Las Vegas, Nevada, against a distributor of "pirate" cable television decoding devices known as Teleview Distributors ("Teleview"). Present at the seizure were individuals named Santo LaMantia and Bruce Quacquarini.[FN31]

> FN31. Supp. Aff. of Joseph Flaim, ¶ 2 (Dec. 8, 1999); Aff. of William Bowyer, ¶¶ 2-4 (Nov. 15, 1999).

32. As a result, Plaintiff procured an affidavit from William Bowyer, who is employed by Comcast and was present at the search warrant execution and seizure, describing these events.[FN32]

> FN32. Aff. of Joseph Flaim, ¶ 2.

33. Among the items seized at the search warrant execution and seizure at Teleview were business records, including approximately 8,600 decoding device sales invoices of Defendant Greenleaf Electronics, located at 801 Eagle Drive, Bensenville, Illinois. These invoices cover the time period of December 16, 1996 to September 10, 1997.[FN33]

> FN33. Supp. Aff. of Joseph Flaim, ¶ 3; *see also* Ex. A to Supp. Aff. of Joseph Flaim; Plaintiff's Ex. 4, 5, & 6.

34. An examination of Plaintiff's exhibits 4, 5, and 6 reveals that in addition to Christine Alonso, the following individuals are among those who were either on the payroll of Greenleaf, or signed checks on behalf of Greenleaf: Bruce Quacquarini, Tom LaMantia, Santo LaMantia, James Marx, Violet LaMantia, Pamela LaMantia, and Joann

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 715601 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 715601)

LaMantia.[FN34]

FN34. Plaintiff's Ex. 4, 5, & 6.

35. Plaintiff requested from Comcast the Greenleaf invoices and other records. Comcast sent them to Plaintiff.[FN35]

FN35. Supp. Aff. of Joseph Flaim, ¶ 4.

36. Flaim analyzed the Greenleaf invoices in order to identify the ones that reflect sales to customers who reside in Plaintiff's franchise areas, and to determine whether those invoices reflect sales of "pirate" cable decoding devices.[FN36]

FN36. *Id.* at ¶ 5.

37. Of the invoices Flaim analyzed, 183 of them are Greenleaf invoices to customers who reside in Plaintiff's franchise areas. Those 183 invoices reflect Greenleaf's sales of 224 "pirate" cable television decoding devices.[FN37]

FN37. *Id.* at ¶ 7.

**\*5** 38. The TRO was extended on consent of the parties and a hearing was held on December 9, 1999, at which the parties had the opportunity to offer testimony and evidence and make legal arguments.

39. Due to Defendants' sales of "pirate" decoders, Plaintiff has suffered and will continue a suffer a loss of sales and a loss of goodwill. More specifically, Plaintiff's goodwill loss can be described as damage to the value of its franchise(s) and to the value of Plaintiff's existing customers due to the fact that many of Plaintiff's existing customers can utilize Defendants' "pirate" decoders in order to receive Plaintiff's premium programming without paying for it.

40. The harm done by Defendants' sales of decoders is ongoing and is difficult to stop or ascertain since Plaintiff's ability to detect the use of such devices is limited at best.

41. There is a substantial likelihood that Defendant will continue its operations absent an injunction.

42. Greenleaf is a carefully planned, fraudulent enterprise that has been in operation for several years.

43. There are significant ties between Greenleaf and Teleview. The ties suggest that Defendants' enterprise is large in scope and that Defendants' may easily be able to continue business by moving its business location.

44. Defendants knew or intended that the "pirate" decoders would be used to fraudulently obtain cable services.

CONCLUSIONS OF LAW

1. Any finding of fact which may be deemed a conclusion of law shall be deemed a conclusion of law. Any conclusion of law which may be deemed a finding of fact shall be deemed a finding of fact.

2. This action arises under 47 U.S.C. § 553, *et seq.*, 17 U.S.C. § 1201, *et seq.,* and 720 ILCS 5/16-10, *et seq.* The Court has jurisdiction over this action under 28 U.S.C. § 1331 and has supplemental jurisdiction over the Illinois statute and common law constructive trust claims asserted in the complaint. Venue is properly established in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b).

*I. Plaintiff's Causes of Action*

3. *47 U.S.C. § 553, et seq:* Plaintiff has proprietary rights in the cable programming services offered over its cable systems. It is a "person aggrieved" by violations of the Communications Act and is thereby authorized to institute this action under 47 U.S.C. § 553(c)(1). 47 U.S.C. § 553(a)(1) provides:

No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

Subsection 553(a)(2) defines the prohibition against "assisting" in this activity to include the manufacture or distribution of illegal or "pirate" descrambling devices. "Assisting in intercepting or receiving" includes the manufacture or distribution of equipment

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 715601 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 715601)

Page 6

intended by the manufacturer or distributor of equipment (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).[FN38] Legislative history confirms that subsection 553(a)(2) was "primarily aimed at preventing the manufacture and distribution of so-called 'black boxes' and other unauthorized converters which permit reception of cable service without paying for the service."[FN39]

> FN38.47 U.S.C. § 553(a)(2).

> FN39.H.R.Rep. No. 934, 98th Cong., 2d Sess. 84 (1984), reprinted in U.S.Code Cong. & Admin. News 4655, 4721.

**\*6** The manufacture or sale of modified converter-decoders with specific knowledge or intent that the device will be used for unauthorized interception and decryption of cable television programming is a violation of 47 U.S.C. § 553(a)(1).[FN40]

> FN40.*United States v. Norris,* 88 F.3d 462, 466 (7th Cir.1996); *United States v. Gardner,* 860 F.2d 1391, 1394 (7th Cir.1988).

4. *17 U.S.C. § 1201, et seq:* Plaintiff has proprietary rights in technological measures it uses to effectively control access to works protected under the Copyright Act. 17 U.S.C. § 1201 prohibits the circumvention of technological measures that control access to a copyrighted work. Plaintiff is a person injured by a violation of 17 U.S.C. § 1201(a)(2) and is thereby authorized to bring this action under 17 U.S.C. § 1203(a).[FN41]

> FN41.17 U.S.C. § 1201(a)(2) provides that "No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act]".

5. *720 ILCS 5/16-10, et seq.:* 720 ILCS 5/16-10(a)(3) prohibits the assistance or instruction of another

person to obtain cable. Intent to defraud must also be present. 720 ILCS 5/16-12 prohibits knowingly selling or distributing cable decoders with intent to aid a person seeking unauthorized reception of cable services.

*II. Preliminary Injunctive Relief*

6. *Plaintiff is entitled to an equitable injunction.* A plaintiff seeking a preliminary injunction has the burden of establishing: (1) the plaintiff's likelihood of prevailing on the merits of his claim; (2) that the plaintiff would suffer irreparable harm absent an injunction because the remedy at law would be inadequate; (3) that the harm to the defendant if the injunction were granted is less than the harm to the plaintiff if it were not; and (4) that the injunction is in the public interest.[FN42] Affidavits and other evidence not admissible at trial may be considered at the preliminary injunction stage.[FN43] The Court finds that Plaintiff has made the necessary showing with respect to each of these factors.

> FN42.*MacDonald v. Chicago Park Dist.,* 132 F.3d 355, 357 (7th Cir.1997); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1114 (7th Cir.1997); *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1067 (7th Cir.1994).

> FN43.*Illinois ex rel Hartigan v. Peters,* 871 F.2d 1336, 1342 (7th Cir.1989).

a. *Plaintiff has clearly demonstrated a likelihood of success on the merits of its claims,* both with respect to controlling case law and the undisputed facts regarding Defendants' "pirate" decoding device sales operation. First of all, Plaintiff has demonstrated that Defendants are likely in violation of 47 U.S.C. § 553 which prohibits assisting in the unauthorized reception or interception of cable television programming. Additionally, Plaintiff has demonstrated that Defendants are likely in violation of 17 U.S.C. § 1201 which prohibits the circumvention of technological measures which are designed to control access to a copyrighted work. Finally, Plaintiff has demonstrated that Defendants are likely in violation of 720 ILCS 5/16-10 and 5/16-12, which prohibit the fraudulent assistance of another in obtaining cable and prohibit knowing sale or distribution of "pirate" decoders with intent to aid

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 715601 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 715601)

in unauthorized reception.

b. *Plaintiff has shown irreparable injury.*With respect to irreparable injury, Plaintiff has presented evidence describing the loss of revenue and subscribers resulting from the distribution of decoding devices, and the practical inability of Plaintiff to detect the presence of and eliminate the loss of revenue resulting from "pirate" decoder boxes.

*7 Additionally, a loss of goodwill [FN44] or the loss of sales and the opportunity to maintain and develop relationships with existing customers can constitute irreparable injury.[FN45]Plaintiff has suffered a loss of goodwill and of its ability to maintain sales to certain existing customers. Additionally, without the temporary remedy of an injunction, there is no guarantee that Defendants will not continue to engage in violations of 47 U.S.C. § 553 and 17 U.S.C. § 1201, causing further irreparable harm.

FN44.*Meridian Mut. Ins. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1121 (7th Cir.1997); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1139-40 (7th Cir.1994); *see also Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 16 (7th Cir.1992).

FN45.*Duct-O-Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 509-10 (7th Cir.1994).

c. *Plaintiff has no adequate remedy at law.*Any adequate remedy for Plaintiff would necessarily have to include equitable relief that would prevent Defendants from selling additional "pirate" decoder boxes in the future.

d. *A balancing of the parties' respective hardships reveals* that the injunction means only that Defendants will be enjoined from conducting a business that is prohibited by federal law. Such illegal activities are not worthy of any protection.[FN46]The mere illegality of the production of "pirate" decoders was insufficient to prevent Defendants from successfully selling such decoders for years. The continued sale of such decoders constitutes continuing, largely unquantifiable, irreparable harm upon Plaintiff's business integrity and revenues. Therefore, the balance of hardships in this case leans strongly towards Plaintiff's request for

a preliminary injunction.

FN46.*ON/TV of Chicago v. Julien,* 763 F.2d 839, 844 (7th Cir.1985).

Defendants' illegal modification or distribution of cable television decoding devices acts against the public interest. Conversely, stopping such behavior promotes the public interest by preventing conduct Congress declared illegal in 47 U.S.C. § 553. An injunction would be in the public interest since it would promote the enforcement of federal and state law; reduce costs to law-abiding cable subscribers by reducing their subsidization of cable service theft [FN47]; and would support the protection of intellectual property rights.

FN47.*See*H.R.Rep. No. 934, 98th Cong., 2d Sess. 84 (1984), reprinted in U.S.Code Cong. & Admin. News 4655, 4720.

7. *Plaintiff also meets the requirements for a statutory injunction.*Although we are granting the injunction on equitable grounds, we note that Plaintiff would also meet the requirements for a statutory injunction under either federal or state statutes. If we had not concluded that Plaintiff met the requirements for an equitable injunction, we still would have granted an injunction based on the statutes.

8. *An injunction could be granted on federal statutory grounds.*In an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief.[FN48]The federal statutes under which Plaintiff brings its claim explicitly allow the Court to grant a preliminary injunction to the extent reasonable to prevent or restrain a violation.[FN49]The evidence suggests that there is a reasonable likelihood of future violations, to-wit: continued sales of "pirate" decoders. If we were not granting the preliminary injunction on equitable grounds, we would do so on federal statutory grounds.

FN48.*SEC v. Holschuh,* 694 F.2d 130, 144 (7th Cir.1982); *CFTC v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.1979).

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 715601 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d, 2000 WL 715601)**

FN49.*See*12 U.S.C. § 1203(b)(1); 47 U.S.C. § 553(C)(2)(A).

**\*8** 9. *An injunction could be granted as provided for in the Illinois statutes.*We are granting the preliminary injunction on equitable grounds, but if we were not doing so, we would grant a preliminary injunction as provided for in the Illinois statute, 720 ILCS 5/16-13(c). 720 ILCS 5/16-13 provides for an injunction for any violation of 720 ILCS 5/16-10, 5/16-11, or 5/16-12. Plaintiff has demonstrated a likelihood of success under both 5/16-10 and 5/16-12. Consequently, 720 ILCS 5/16-13 would allow for an injunction *without* special damages, irreparable harm, or inadequate legal remedies.

10. *Continuing the asset freeze is appropriate.*A court has no authority to issue a preliminary injunction preventing a party from disposing its assets pending adjudication of a claim *for money damages.*FN50However, a court still has the equitable power to freeze a party's assets where injunctive relief is sought.FN51The power to freeze assets includes cases where a combination of monetary and equitable relief is sought.FN52Plaintiff's *Amended Complaint* includes claims for both monetary damages and equitable relief. Plaintiff seeks equitable relief which includes an injunction to prevent Defendants' sale or distribution of "pirate" decoders; impoundment and destruction of existing illegal decoders; and a constructive trust on the illicit revenue from the sales of such decoders.FN53Plaintiff seeks monetary relief which includes actual or statutory damages and punitive damages.FN54

FN50.*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 333 (1999).

FN51.*Deckert v. Independence Shares Corp.,* 311 U.S. 282, 289-90 (1940); *United States ex rel Rahman v. Oncology Assoc., P.C.,* 198 F.3d 489, 496-97 (4th Cir.1999).

FN52.*Rahman, 198 F.3d at 498* (citing *Deckert,* 311 U.S. at 289-90).

FN53. Plaintiff's *Amended Complaint,* at 15-17.

FN54.*Id.*

Continuing the asset freeze is appropriate because it would preserve the availability of a constructive trust as a remedy; make it easier to impound and destroy existing illegal decoders; and facilitate further equitable relief preventing future sales of "pirate" decoders by making it more difficult for Defendants to simply pick up and move their enterprise to a new location.

*III. Christine Alonso's Motion To Partially Dissolve The Preliminary Injunction is denied.*

11. We are granting leave to intervene in the motion to partially dissolve the preliminary injunction to non-parties Timothy L. Alonso and Anthony Serra. It appears that Timothy L. Alonso and Anthony Serra hold joint accounts (with Christine Alonso) which have been affected by the asset freeze portion of the TRO. Therefore, they should be allowed to intervene in the motion.

12. *Christine Alonso's Motion To Partially Dissolve The Preliminary Injunction* is denied. As detailed throughout the body of this *Order,* the facts and applicable case law support the issuance of a preliminary injunction and a continued asset freeze. Christine Alonso's affidavit and the extremely limited showing by Ms. Alonso at the preliminary injunction hearing do not suggest otherwise.

Additionally, the interveners present no persuasive arguments. The only case cited by the interveners, *United States v. Gotti,* is completely inapplicable to the current case because it specifically addresses whether a post-indictment, pre-trial restraint of substitute assets is allowed *under the RICO statutes.*FN55 Timothy L. Alonso and Anthony Serra have not cited any case law to support their assertions that the bank accounts that they jointly hold with Defendant Christine Alonso should not be subject to an asset freeze.

FN55.155 F.3d 144, 147 (2d. Cir.1998).

**\*9***Accordingly, it is adjudged and recommended as follows:*

1. Plaintiff's *Motion For Preliminary Injunction* is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 715601 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 715601)**

granted.

2. *Motion By Timothy L. Alonso & Anthony Serra To Intervene In The Motion To Partially Dissolve Preliminary Injunction* is granted.

3. *Christine Alonso's Motion To Partially Dissolve Preliminary Injunction* is denied.

4. The relief ordered by the District Judge in the November 8, 1999 *Temporary Restraining Order* is hereby continued until the entry of judgment or dismissal.

5. Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the parties must file their objections to the *Report and Recommendation* with The Honorable James F. Holderman within 10 days after being served with a copy of the Report. Failure to file objections within the specified time period waives the right to appeal the Magistrate Judge's Report.[FN56]

> [FN56.]*Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538 (7th Cir.1986).*See also, The Provident Bank v. Manor Steel Corp.,* 882 F.2d 258, 261 (7th Cir.1989) (when a matter has been referred to a Magistrate Judge, acting as a special master or § 636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the Magistrate Judge's Report).

*So Recommended.*

N.D.Ill.,2000.
CSC Holdings, Inc. v. Greenleaf Electronics, Inc.
Not Reported in F.Supp.2d, 2000 WL 715601 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.