UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS,<br><br>       Plaintiff,<br>  v.<br><br>COMCAST OF ILLINOIS III, INC; COMCAST CORPORATION; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC.,<br><br>       Defendants.<br>_____<br>COMCAST OF ILLINOIS III, INC; COMCAST CORPORATION; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC.,<br><br>       Counterclaimants,<br>  v.<br><br>ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS,<br><br>       Counterdefendant,<br><br>and AT&T, INC.,<br><br>       Third-party Defendant. | Case No.: 08 CV 1680<br><br>**Honorable Elaine E. Bucklo**<br><br>**Magistrate Judge Martin C. Ashman** |

### DECLARATION OF ROBERT B. CURTIS

I, Robert Curtis, declare as follows.

    1.    I am Comcast's Vice President of Engineering for the Greater Chicago region. In that capacity, I oversee and provide direction for all of Comcast's network engineering activities, including maintenance, operations, and new product launches. I have personal knowledge of the

facts stated herein, except those that are stated on information and belief, and can testify competently thereto.

## COMCAST'S CABLE INFRASTRUCTRE

2. Comcast provides video, Internet, and telephone services to customers in Chicago and the surrounding areas through a network of fiber-optic and coaxial cable.

3. At its most basic level, cable technology is a two-way stream of electronic information to and from the home or business address of each Comcast subscriber. Each of the services Comcast provides to customers—video, Internet, and voice—requires not only the receipt of electronic information by the customer from Comcast, but also the return of information from the customer to Comcast.

4. The cable infrastructure in a given market begins with a cable "head end" where the cable system receives programming and other content from other destinations with antennas, satellite dishes, and in some cases through fiber-optic cable. Each Comcast customer is then connected to the head end through a combination of fiber-optic and coaxial cable.

5. Beginning at the head end, fiber-optic cable extends out in various directions to all of the different neighborhoods in the market served by that head end. In or near these different neighborhoods, the fiber-optic cables connect to a "node." Coaxial cable then runs from the node to the individual homes, apartments, businesses, *etc.* in that neighborhood. Coaxial cable is also used within many homes, apartments, and businesses to connect together the various different television outlets. Anywhere from 50 to 1200 customers can be connected by coaxial cable to any given node, which would then be connected to Comcast's head end with fiber-optic cable. Comcast owns the exterior coaxial cable, nodes, and fiber-optic cable that connect its customers to its head end.

6.  Unique electrical signals associated with each of the hundreds of different television channels that are available to Comcast subscribers follow the same pathway from the head end through fiber-optic cable to a node, onto coaxial cable, which then transmits the signals to the customers' home or business. Comcast's television subscribers also send electrical signals back through this same pathway of coaxial and fiber-optic cable to the head end when they wish to watch a movie or television program available through Comcast's On Demand service. This same pathway, to and from the head-end, is used by the electrical signals associated with each different home or business that subscribes to Internet or telephone services available through Comcast.

7.  Given the many hundreds of unique signals that are flying back and forth between Comcast's head end and the neighborhoods where Comcast customers live, it is imperative that strict communication protocols and standards be imposed and adhered to in order for the system to function. One primary rule is that the many different signals receive their own "slot" or frequency spectrum within the overall bandwidth available for the transmission and receipt of information. Certain slots are solely for transmission of Internet, voice, and television signals from the head end to customers, and other slots are set aside for the transmission of Internet, voice, and programming selection signals back to the head end.

8.  Comcast employees under my supervision constantly monitor the signals flowing to and from Comcast customers in the Chicagoland area using, among other things, sophisticated spectrum analyzers. When television, Internet, or telephone service slows or stops in a particular neighborhood, these spectrum analyzers help us to detect whether there is interference with some aspect of the overall signal pathway and the possible nature of the interference. Comcast

technicians then use this information to track down the source of the interference and, if possible, to eliminate it.

### AT&T's INTERFERENCE WITH COMCAST'S CABLE INFRASTRUCTURE

9.  AT&T, on information and belief, began signing up customers in the Chicagoland area to its U-Verse TV service in early 2008. Soon after this began, in early February 2008, Comcast's local cable infrastructure began to experience a series of disruptions that Comcast came to learn are being caused by AT&T's installation of its U-Verse TV service.

10. The disruptions are caused when AT&T installs U-Verse TV in a home or office that is already connected to Comcast for either television, Internet, or voice services. On information and belief, in some of these installations, where the customer wants U-Verse TV in more than one room, AT&T runs its U-Verse TV signal through the home or office's internal coaxial wiring through which Comcast's signal is already running. Some portion of the AT&T signal then exits the home or office with Comcast's return signal and enters into Comcast's proprietary infrastructure where it travels with Comcast's return signal to Comcast's head end.

11. Within Comcast's infrastructure, AT&T's signal acts as noise that prevents Comcast's return signal from operating as intended. The consequences are dramatic and affect not only the customer from whose home or office the interference is originating, but all other Comcast customers who are connected to the same node. In the majority of cases, Comcast's return signal ceases to work altogether resulting in a complete loss of voice and Internet services for all customers connected to the node, as well as an inability to use interactive TV functions. In other cases, the return path continues working but is significantly impaired resulting in slowed Internet service and voice quality problems.

12. From February 9, 2008 through April 17, 2008, Comcast has documented approximately 40 instances where AT&T's U-Verse TV signal has invaded Comcast's cable infrastructure. Collectively, over 17,000 customer homes or offices have had their phone, Internet, and television services cease functioning properly or at all for a period of time because of AT&T's interfering signals.

13. The disruption to Comcast's system caused by AT&T can last anywhere from one to twenty hours depending on when Comcast receives notice of the interference. If the interference results in an outage for a complete neighborhood serviced by a node, Comcast receives notice almost immediately, either through its own internal monitoring system or through phone calls from customers, and goes to work immediately to fix the problem. If, however, the interference does not result in an outage, it takes longer for Comcast to learn that customers' phone, Internet, and television services are not functioning properly. In the meantime, customers suffer degraded service.

14. One of the first things that Comcast does when it detects an outage or disruption in its cable signal is to analyze the signal with sophisticated spectrum analyzers to see whether there is some detectable interference in the signal, and where in the frequency spectrum it is occurring. As it happens, AT&T's interfering signals are all typically in the same frequency spectrum—from 10 to 35 megahertz—and share other signature characteristics that distinguish them from other types of interference Comcast's network experiences from time to time.

15. Once Comcast determines that an AT&T signal has entered and is interfering with its network, it seeks to determine which of its customers connected to the affected node is also subscribing to AT&T so that it disconnect that customer from Comcast's network. Disconnecting a Comcast customer from Comcast's cable infrastructure is far from an ideal

solution for many reasons, but it presently the only practical way to restore service to the other customers connected to the same node. The faster that Comcast can determine which house is connected to both systems, the faster it can disconnect that customer from Comcast's system and restore service to the other customers connected to that node.

16. Not all customers who subscribe to AT&T's U-Verse TV desire to terminate their service with Comcast. Some wish to maintain their phone and Internet service with Comcast. Others wish to utilize both television services, for example, to compare the services on a side-by-side basis. In such cases, the fact that Comcast must sever its connection with this customer's home causes harm to both the customer and Comcast.

## AT&T'S PROPOSED SOLUTION IS INADEQUATE

17. I understand that lawyers for Comcast have been in contact with lawyers for AT&T beginning in March 2008 in an attempt to reach a resolution concerning AT&T's interference with Comcast's cable system. As part of that process, I transmitted a list of approximately 25-30 addresses to AT&T that we determined were sending AT&T interference into Comcast's cable system due to the fact that they were connected to both Comcast and AT&T. Additionally, on April 7, 2008, I participated in a phone call with AT&T technology executives where we described the problems Comcast has experienced, how we determined it was an AT&T signal, the nature of the signal, and the corrective measures Comcast has been forced to take. At no point during that phone call did AT&T deny that its signal was invading Comcast's infrastructure. To the contrary, the AT&T executives seemed to be aware of the problem and blamed their installers for causing it.

18. Later on April 7, 2008, AT&T transmitted to me a proposal for assisting Comcast in addressing the disruptions. A copy of the proposal is attached as **Exhibit A** to this

declaration. Under AT&T's proposal, whenever Comcast detects that its system is being disrupted by AT&T, it would need to call a toll-free number, press option #6, and provide certain information to an AT&T operator. AT&T would then create a U-Verse repair ticket, provide the ticket number to Comcast, notify an AT&T field and control manager of the pending ticket, track the ticket until completion, and then inform Comcast once the problem has been resolved. No assurance was given as to how long this process could or would take.

19. Even if it functioned properly, AT&T's solution is no better than what Comcast is able to achieve on its own. In almost all cases where there is an outage, Comcast is able to scramble a team to the affected neighborhood, determine which home is connected to both AT&T and Comcast, and disconnect that home from Comcast within 1-3 hours. Moreover, the first time that Comcast attempted to use the system that AT&T proposed, AT&T gave Comcast the run around. On April 17, 2008, when Comcast experienced another disruption caused by an interfering signal from AT&T, a Comcast employee under my supervision called AT&T to commence the process AT&T suggested we use. It was reported to me that the AT&T operator answering the phone claimed to be unaware of the process AT&T agreed to implement, refused to open a service ticket or give Comcast a ticket number, and transferred Comcast to AT&T representatives who did not answer their phones. It then took approximately four hours for an AT&T representative to call back, acknowledge the problem, and commit to working with Comcast to resolve it.

20. A better solution would be for AT&T to inform Comcast ahead of time whenever it is installing U-Verse TV in a home that is also connected to Comcast and provide Comcast with a contact number to reach the installers immediately should it detect signal interference from AT&T. Doing so would allow Comcast to monitor its signal while the installation is taking

place and be poised to contact the AT&T installers should a disruption occur. The AT&T installers could then remove or disable its signal and the interference would cease. If this process were put in place, we would be able to detect and address any interference within minutes. Moreover, by giving AT&T's installers notice during the installation process that AT&T's signal is entering Comcast's system, they themselves may be able to take corrective measures that if followed in future installations would prevent this problem from occurring at all.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of April 2008 in Cary, Illinois

_____
Robert B. Curtis

8

# Exhibit A

Comcast Network Referral

- Comcast calls UVDC 866-268-8755, Option #6
- Comcast provides
    - customer name
    - address
    - contact number
    - access information
    - Comcast contact name and number
- Jeopardy team creates U-Verse repair ticket (J1) with information Comcast provides
- Ticket number and commitment to be provided to Comcast
- Field and control manager notified of pending ticket with cc to field MT
- Ticket will be tracked until completion by jeopardy team
- Final ticket status with will be provided to Field MT, Director, VP that includes
    - Receipt Time
    - Clear Time
    - Ban number
    - Action taken
- Closure status to be provided to Comcast