UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| COMCAST OF ILLINOIS III, INC; COMCAST CORPORATION; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., | ) ) ) ) ) | **Case No.: 08 CV 1680** **Honorable Elaine E. Bucklo** |
| Defendants. | ) ) ) | **Magistrate Judge Martin C. Ashman** |
| COMCAST OF ILLINOIS III, INC; COMCAST CORPORATION; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., | ) ) ) ) | |
| Counterclaimants, | ) ) | |
| v. | ) ) | |
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, | ) ) ) | |
| Counterdefendant, | ) ) | |
| and AT&T, INC., | ) ) | |
| Third-party Defendant. | ) ) | |

**DECLARATION OF DOUGLAS N. MASTERS**

I, Douglas N. Masters, Esq., am a partner at Loeb & Loeb, LLP and admitted to practice

in this District. I am directly and actively involved in Loeb's representation of Comcast of

Illinois III, Inc., Comcast Corporation, Comcast Cable Holdings LLC, and Comcast of Chicago,

Inc. (collectively, "Comcast") in *Illinois Bell Telephone d/b/a AT&T Inc. v. Comcast of Illinois*

*III, Inc., et al.*, Case No. 08-cv-1680. I am familiar with the communications between counsel

relating to the subject matter of the litigation and various procedural issues.  I submit this document in support of Comcast's Motion for Temporary Restraining Order and Preliminary Injunction and if called could and would testify to the facts set forth herein.

1.    On March 26, 2007, Time Warner Cable, Inc. filed its Answer and Counterclaim against AT&T in an ongoing litigation in Texas State Court.  In those counterclaims, Time Warner Cable, Inc. alleged, among other things, that AT&T's installation of its U-Verse TV service interfered with Time Warner's cable system by causing service disruptions.  A true and correct copy of Time Warner's Answer and Counterclaim is attached hereto as **Exhibit A.**

2.    On March 12, 2008, Kyle Birch, Comcast's Assistant General Counsel, wrote to Sid White, AT&T's counsel, to report that Comcast had learned of AT&T's practices that were resulting in "service outages affect[ing] approximately 2100 customers for several hours."  Mr. Birch's letter identified the actual dates and locations of certain recent service interruptions.  I received a true and correct copy of Mr. Birch's March 12th letter and attach it hereto as **Exhibit B**.

3.    Mr. Birch sent another letter, this one to Gerry Friederichs, AT&T General Attorney, on March 19th providing details of the service interruptions, as well as reporting two additional service outages that had occurred since Mr. Birch's March 12 correspondence.  I received a true and correct copy of Mr. Birch's March 19th letter and attach it hereto as **Exhibit C**.

4.    Mr. Birch wrote another letter to Sid White on March 24th.  In that letter, Mr. Birch demanded "written confirmation that AT&T has ensured that installation of its U-verse service will no longer result in damage to Comcast's cable infrastructure" and informed AT&T

of two additional outages.  I received a true and correct copy of Mr. Birch's March 24th letter and attach it hereto as **Exhibit D**.

5.    Michael Pratt, Senior Attorney for AT&T, sent a letter on March 26, 2008 to Mr. Birch, blaming AT&T's installers for causing the outages and asking Mr. Birch to provide information of further disruptions, without making any proposals to remedy the ongoing problem.  I received a true and correct copy of Mr. Pratt's March 26th letter and attach it hereto as **Exhibit E**.

6.    Mr. Birch and Mr. Pratt again exchanged letters on March 28th.  Mr. Birch's letter detailed an additional outage that occurred on March 27th.  I received a true and correct copy of Mr. Birch's March 28th letter and attach it hereto as **Exhibit F**.  Mr. Pratt's March 28th letter proposed a meeting between the two parties without any immediate suggestions to fix the continuing outages.  I received a true and correct copy of Mr. Pratt's March 28th letter and attach it hereto as **Exhibit G**.

7.    Mr. White sent a letter to Jeffrey Smith, Comcast Vice President and Deputy General Counsel on April 10, 2008 discussing the parties' ongoing discussions surrounding AT&T's claims against Comcast; in that letter Mr. White did not address Comcast's repeated objections about the continued outages caused by the installation of AT&T's U-Verse TV service.  I received a true and correct copy of Mr. White's April 10th letter and attach it hereto as **Exhibit H**.

8.    Mr. Smith responded to Mr. White's letter the following day, and again raised the issue of continuing disruptions to Comcast's service based on AT&T's installation of its U-Verse TV service.  In that letter, Mr. Smith outlined a detailed proposal that included, among other things, a mechanism for AT&T to notify Comcast of – and avoid – further potential outages.  I

received a true and correct copy of Mr. Smith's April 11th letter, which was dated April 10th, and attach it hereto as **Exhibit I**. I provided another detailed proposal to AT&T's outside counsel on April 16, 2008. A true and correct copy of that April 16th proposal is attached hereto as **Exhibit J**.

9.    On April 18, 2008, Mark Lewis, of AT&T, sent me a letter objecting on multiple grounds to my April 16th proposal but not, however, providing any counter-proposal, other than AT&T's already-offered process of Comcast simply calling AT&T to announce system outages. I received a true and correct copy of Mr. Lewis' April 18th letter and attach it hereto as **Exhibit K**.

10.    Also on April 18th, Mr. Cole and I exchanged a series of emails. At 1:55 p.m., I sent Mr. Cole an email alerting him to a situation I had just learned about where a Comcast employee, following an outage caused by AT&T's installation of its U-Verse TV service, had called the number provided by AT&T. That Comcast employee reported that the AT&T representatives refused to open a ticket number and did not know of any referral process. Mr. Cole responded at 3:20 p.m. asking for additional information regarding that particular outage, which I provided in a further email at 3:26 p.m. True and correct copies of these emails are attached hereto as **Exhibit L**. It is my understanding that Comcast technicians did not receive a call back from AT&T until much later that evening.

11.     I also sent an email to Mr. Cole on April 18th at 2:54 p.m. alerting him that if Comcast's proposals to deal with the outage issues were not accepted, it would seek immediate relief on Monday, April 21st.  A true and correct copy of my 2:54 p.m. email from April 18th is attached hereto as **Exhibit M.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 20th day of April 2008, in Chicago, Illinois.

/s/ Douglas N. Masters
Douglas N. Masters

# Exhibit A

Filed
07 March 26 P1:59
Margaret G. Montemayor
District Clerk
Bexar District

CAUSE NO. 2006CI18629

| | | |
|---|---|---|
| SOUTHWESTERN BELL TELEPHONE, <br> L.P. d/b/a AT&T TEXAS, <br><br> Plaintiff, <br><br> vs. <br><br> TIME WARNER CABLE SAN <br> ANTONIO, L.P. and TIME WARNER <br> CABLE, INC. <br><br> Defendant. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | IN THE DISTRICT COURT <br><br> 288th JUDICIAL DISTRICT <br><br> BEXAR COUNTY, TEXAS |

## DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED PETITION AND APPLICATION FOR INJUNCTIVE RELIEF AND DEFENDANT TIME WARNER CABLE SAN ANTONIO, L.P.'S ORIGINAL COUNTERCLAIM

Defendants Time Warner Cable San Antonio, L.P. and Time Warner Cable, Inc., through their undersigned counsel, herein answer Plaintiff's Amended Petition and Application for Injunctive Relief ("Amended Petition"). The Amended Petition demands relief in connection with supposed injury caused by Time Warner Cable in the course of switching voice-service subscribers of Plaintiff Southwestern Bell Telephone, L.P. d/b/a AT&T Texas ("AT&T") to Time Warner Cable. Meanwhile, however, AT&T itself, in the course of switching video-service subscribers of Time Warner Cable to AT&T, has engaged in conduct indistinguishable from that of which it accuses Time Warner Cable. The parties for some time negotiated a process by which to resolve claims amicably. While negotiations were in full swing, and without any prior warning or provocation, AT&T filed its lawsuit. Time Warner Cable therefore had no choice but to countersue.

### ANSWER

Defendants generally deny each and every, all and singular, the material allegations contained in the Amended Petition, and demand strict proof thereof in accordance with the laws and Constitution of the State of Texas.

### DEFENDANTS' AFFIRMATIVE DEFENSES

1.    The Amended Petition fails to state a claim upon which relief may be granted.

2.    Plaintiff's claims are barred, in whole or in part, because all Plaintiff's claims of damage are speculative and unrealized, and Plaintiff has not suffered actual harm to its business or property.

3.    Plaintiff's claims are barred by the doctrine of unclean hands.

4.    Plaintiff's claims are barred by acquiescence, implied consent, waiver, and estoppel.

5.    Plaintiff's claims are barred by the doctrine of laches.

6.    Plaintiff is barred, in whole or in part, from recovering its alleged damages because of its failure to mitigate those damages.

7.    Plaintiff's claims are barred by the statute of limitations.

### COUNTERCLAIMS

Time Warner Cable San Antonio, L.P. (hereinafter, "Time Warner Cable"), for its counterclaims, alleges as follows:

1.    Time Warner Cable intends to conduct discovery under a Level 3 discovery control plan.

## Introduction

2.    As more fully explained below, Time Warner Cable's claims against AT&T are fourfold: (1) that, when connecting its wires to video customers' inside wiring, AT&T failed to disconnect the inside wiring from Time Warner Cable's wires; (2) that, when AT&T did disconnect Time Warner Cable's wires, AT&T failed to properly "cap" them; (3) that, in connecting its wires to customers' inside wiring, AT&T placed wires and equipment inside Time Warner Cable's network interface devices (or "NIDs"); and (4) that, when connecting its wires to customers' inside wiring, AT&T appropriated Time Warner Cable's ground wires.

3.    AT&T's actions have caused substantial damage to Time Warner Cable's physical plant, disrupted service to Time Warner Cable's customers, and threatened public safety. AT&T has neither provided notice to, nor requested authorization from Time Warner Cable before invading Time Warner Cable's facilities. AT&T has concealed from Time Warner Cable the location and number of incidents in which it has interfered with Time Warner Cable's physical plant. As a result, Time Warner Cable has been unable to determine the full extent of AT&T's damage to its facilities. Despite AT&T's concealment, however, Time Warner Cable has uncovered a consistent and widespread pattern of AT&T damaging Time Warner Cable's facilities.

4.    Upon information and belief, the damage AT&T has caused to Time Warner Cable's plant has resulted from policies and procedures adopted by AT&T. Moreover, AT&T has repeatedly failed to remedy damage to Time Warner Cable's facilities, even after Time Warner Cable has identified specific instances in which AT&T employees or agents damaged its facilities and demanded that AT&T repair the damage. AT&T has disclaimed responsibility for much of the damage it has caused, but even

where it has conceded unauthorized interference with Time Warner Cable's facilities, AT&T has refused to take appropriate remedial measures. Accordingly, Time Warner Cable seeks a permanent injunction compelling AT&T to cease its unlawful conduct, repair the damage it has caused, and refrain from ongoing future violations. Time Warner Cable also seeks damages.

### Time Warner Cable's Facilities

5.      Time Warner Cable provides video, Internet, and telephone service to customers in San Antonio. Time Warner Cable competes with various firms, including AT&T. AT&T has long offered its own telephone and Internet service, and, in 2006, began offering video services under the brand names "U-verse" and "Homezone."

6.      Time Warner Cable serves its customers through cable systems consisting of fiber-optic cable and coaxial wire. Time Warner Cable's fiber cables and coaxial wires run from the "head-end" — the place where the cable system receives programming with antennas and satellite dishes and retransmits it — to the end user. Cable systems consist of both aerial cables strung along utility poles and underground wires that are buried or run through conduits.

7.      Time Warner Cable connects consumers to its facilities through "cable drops," which are coaxial wires that link distribution wires running along streets to an individual home or business. Time Warner Cable's cable drops terminate in network interface devices ("NIDs") located on the property of an individual customer. Generally, these NIDs are plastic or metal boxes located on the side of a customer's building. Inside the NID, the cable drop is connected to the coaxial wiring inside the customer's premises.

That inside wiring is ultimately connected to the customer's video, Internet, and telephone equipment.

8.    At the NID, Time Warner Cable also connects cable drops to "ground wires" — wires that do not transmit video signals but instead provide a path for electric current to divert into the earth in the event of an electrical surge (as would be produced, for example, by a lightning strike). These ground wires may be connected to a metal rod or stake driven into the earth, or they may be connected to a water pipe. When excess current is introduced to an ungrounded cable drop, the result may be damage to the cable system as well as personal injury. That is why ground wires are often required by local building codes.

9.    Live cable drops that are not connected to a customer's inside wiring must be "booted" or "capped" with devices that close off the end of the wire. Coaxial wire that is not properly capped can function as an antenna, transmitting electromagnetic radiation into the atmosphere. Such "signal leaks" may interfere with radio bands that are used in aviation, thereby posing a risk to public safety. Accordingly, failing to cap coaxial wires is prohibited under rules promulgated by the Federal Communications Commission ("FCC"), and can result in fines and other penalties. Failing to cap coaxial wires can also cause weather-related damage, such as water incursion, which can make coaxial wire unusable.

### AT&T's Conduct

10.    AT&T has caused harm to Time Warner Cable in four ways.

11.    *First*, AT&T has connected its wires to Time Warner Cable's. Applicable regulations, industry practices, and common sense dictate that, when a Time Warner

Cable customer elects to switch to a new video service provider like AT&T, the new provider must, before connecting its own video wires to the customer's inside wiring, disconnect Time Warner Cable's cable drop from the inside wiring. Otherwise, the two providers' wires become connected to each other, and their signals will interfere with each other. Nevertheless, AT&T has sometimes attached its wires to customers' inside wiring without first disconnecting Time Warner Cable's cable drop. This has caused signal interference and resulted in service disruptions to Time Warner Cable customers.

12.    *Second*, AT&T has failed to "cap" Time Warner Cable's disconnected cable drops. Applicable regulations, industry practices, and common sense dictate that, in disconnecting a Time Warner Cable cable drop, a new provider must "cap" or "boot" the other provider's wire by attaching a protective covering. AT&T has repeatedly failed to do so: an initial audit of AT&T's U-verse installations revealed that AT&T failed to properly cap Time Warner Cable's cable drops in 83% of installations. As a result, AT&T may have caused signal leakage and interference with radio bands used in aviation, thereby creating an unacceptable risk to public safety. In addition, Time Warner Cable has been left vulnerable to FCC fines, and Time Warner Cable's cable drops have incurred weather-related damage.

13.    *Third*, AT&T has occupied Time Warner Cable's NIDs. Applicable regulations, industry practices, and common sense dictate that, when a service provider like AT&T signs up a Time Warner Cable customer, AT&T should open Time Warner Cable's NID, disconnect the customer's inside wiring from Time Warner Cable's cable drop, connect the inside wiring to AT&T's wiring outside Time Warner Cable's NID, and properly seal Time Warner Cable's wiring and NID. Instead, AT&T has repeatedly

made the connection inside Time Warner Cable's NID. In many of these cases, AT&T installed additional equipment inside Time Warner Cable's NIDs, including connectors and splitters. An initial audit of AT&T's U-verse installations revealed that AT&T installed equipment inside Time Warner Cable's NIDs in connection with 73% of installations.

14.    *Finally*, AT&T has unlawfully appropriated ground wires.    When installing U-verse and Homezone service, AT&T employees and contractors have repeatedly disconnected Time Warner Cable's ground wires from Time Warner Cable's cable drops and connected them to AT&T's wires instead. While AT&T has thereby avoided the expense of installing ground wires of its own, its conduct has left Time Warner Cable's cable drops vulnerable to electrical surges and created a potential threat to public safety. In addition, AT&T's conduct has placed Time Warner Cable at risk of violating local building codes.

15.    Upon information and belief, the conduct described above is the result of AT&T's policies and procedures. AT&T has failed to change its policies, and has not ceased its unlawful conduct, in spite of Time Warner Cable's repeated warnings and protests that AT&T's conduct was unauthorized and unlawful.

### Count One — Trespass

16.    Defendant and counterclaim plaintiff Time Warner Cable repeats and realleges the above as if set forth in full.

17.    Through the actions described above, AT&T has knowingly and intentionally interfered with Time Warner Cable's use and possession of its facilities. AT&T has done so without authorization from Time Warner Cable, even after Time

Warner Cable repeatedly warned AT&T that its actions are prohibited and demanded that AT&T desist from its unlawful conduct. AT&T's acts constitute trespasses.

18.     AT&T's conduct has directly caused harm to Time Warner Cable's facilities and operation and has caused service impairments and disruption. As a result, Time Warner Cable has been forced to deploy its technicians to repair the damage caused by AT&T, at substantial cost to Time Warner Cable. In addition, the reduction in service quality resulting from AT&T's actions has negatively impacted Time Warner Cable's relationships with its customers. Finally, the damage AT&T has caused to Time Warner Cable's facilities leaves Time Warner Cable vulnerable to sanctions and fines for violations of applicable regulations and building codes. AT&T's actions also threaten public safety.

### Count Two — Conversion

19.     Defendant and counterclaim plaintiff Time Warner Cable repeats and realleges the above as if set forth in full.

20.     Time Warner Cable owns and is entitled to exclusive possession of the facilities described above, including its NIDs, and ground wires. Without authorization, AT&T has assumed and exercised control over Time Warner Cable's facilities, to the exclusion of and inconsistent with Time Warner Cable's property rights. Even after repeated requests, AT&T has refused to relinquish control. As a result, AT&T is liable for conversion.

21.     Time Warner Cable has been damaged by AT&T's conversion of its facilities. Time Warner Cable seeks to recover the value of its facilities that have been converted by AT&T, based on their fair market value. Time Warner Cable also seeks the

lost profits that have been caused by AT&T's conversion, and the costs it has incurred in inspecting and repairing the facilities that AT&T has converted.

### Count Three — *Quantum Meruit*

22.    Defendant and counterclaim plaintiff Time Warner Cable repeats and realleges the above as if set forth in full.

23.    By occupying Time Warner Cable's NIDs and ground wires, AT&T has taken valuable services and materials from Time Warner Cable. AT&T accepted these materials and services with knowledge that Time Warner Cable would expect reasonable compensation.

24.    Time Warner Cable seeks, and is entitled to recover, the reasonable value of the services and materials provided under the equitable doctrine of *quantum meruit*. Time Warner Cable also seeks its necessary and reasonable attorney's fees.

### Count Four — Negligence and Gross Negligence

25.    Defendant and counterclaim plaintiff Time Warner Cable repeats and realleges the above as if set forth in full.

26.    In installing its U-verse and Homezone services for existing customers of Time Warner Cable, AT&T owed Time Warner Cable a duty to disconnect and terminate Time Warner Cable's facilities with due care. AT&T breached that duty, proximately causing substantial damages to Time Warner Cable's facilities. In addition, AT&T's failure to follow reasonable standards in installing its U-verse and Homezone services damaged Time Warner Cable's reputation and relationship with customers. AT&T also acted negligently with respect to its hiring, instruction, training, and supervision of the employees and contractors responsible for installing U-verse and Homezone services.

Time Warner Cable seeks, and is entitled to recover, the damages resulting from AT&T's negligence, and that of its employees and contractors, in an amount to be proved at trial.

27.    AT&T's failure to properly cap and ground Time Warner Cable's cable drops posed not only a substantial degree of risk to Time Warner Cable's facilities, but also an extreme risk to public safety. AT&T acted with conscious indifference to the risks its actions entailed, and was aware that its actions would threaten public safety. AT&T therefore acted with gross negligence, and Time Warner Cable seeks, and is entitled to recover, the damages resulting from this gross negligence, in an amount to be proved at trial.

### Count Five — Punitive Damages

28.    Defendant and counterclaim plaintiff Time Warner Cable repeats and realleges the above as if set forth in full.

29.    AT&T's policies and procedures have resulted in AT&T's employees and agents acting with conscious indifference to the extreme risks of harm posed to Time Warner Cable and the public. AT&T's actions have not simply resulted in a remote possibility of harm, but rather, in a likelihood of serious injury. AT&T knew of this risk of harm, having been informed of the consequences of its actions by Time Warner Cable, yet failed to cease its unlawful actions or remedy the damage caused. AT&T was grossly negligent and acted with malice, and Time Warner Cable therefore seeks, and is entitled to, an award of exemplary or punitive damages in an amount to be proved at trial.

### Application for Injunctive Relief

30.     Time Warner Cable seeks a permanent injunction compelling AT&T to repair the damage it has caused to Time Warner Cable's facilities, and enjoining AT&T and its contractors and agents from the conduct described above.

### Jury Demand

31.     Time Warner Cable demands a trial by jury on its counterclaims and tenders the appropriate fee.

**WHEREFORE**, Defendant and Counterclaim Plaintiff Time Warner Cable San Antonio, L.P. and Defendant Time Warner Cable, Inc. respectfully requests that the Court enter judgment:

(i)     dismissing with prejudice the Amended Petition in its entirety;

(ii)    awarding Time Warner Cable San Antonio, L.P. damages in an amount to be determined at trial;

(iii)   awarding Time Warner Cable San Antonio, L.P. punitive and exemplary damages in an amount to be determined at trial;

(iv)    awarding Time Warner Cable San Antonio, L.P. the costs, disbursements, and attorneys fees incurred in this action;

(v)     granting Time Warner Cable San Antonio, L.P. a permanent injunction ordering AT&T to cease its unlawful conduct, repair the damage it has caused, and refrain from future violations; and

(vi)    granting Time Warner Cable San Antonio, L.P. such other relief as the Court deems just and proper.

Dated: March 26, 2007

Respectfully submitted,

_____

Richard D. Milvenan
Bar No. 14171800
Mark Domel
Bar No. 24003636
McGINNIS, LOCHRIDGE & KILGORE, L.L.P.
600 Congress Avenue, Suite 2100
Austin, TX 78701
(512) 495-6005
(512) 505-6305 (fax)

**COUNSEL FOR DEFENDANT AND
COUNTERCLAIM PLAINTIFF
TIME WARNER CABLE SAN ANTONIO,
L.P. AND DEFENDANT TIME WARNER
CABLE, INC.**

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been served on March 26, 2007 on the following by certified mail, return receipt requested:

Len G. Briley, Jr.
Natalie L. Hall
COX SMITH MATTHEWS INCORPORATED
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205

Richard M. Parr
AT&T Services, Inc.
175 E. Houston, 4th Floor
San Antonio, Texas 78205

_____

Mark Domel

# Exhibit B



Comcast Corporation
One Comcast Center
Philadelphia, PA 19103-2838

Kyle T. Birch
Assistant General Counsel
Direct Dial: (215) 286-7714
Direct Fax: (215) 286-5039
Email: kyle_birch@comcast.com

March 12, 2008

**VIA OVERNIGHT DELIVERY**
**AND FACSIMLIE (404) 927-3619**

Sid White, Esquire
AT&T
675 West Peachtree Street N.W.
Suite 4224
Atlanta, GA 30375-0001

Dear Sid:

Comcast has learned of recent AT&T installation and operational practices which have caused significant outages and service interruptions to Comcast's customers. The resulting service outages affected approximately 2100 customers for several hours.

For your information, I have enclosed a list which identifies several service locations which have been a recent source of interruptions and dates of interruptions. Please note that the enclosed information is confidential and we are providing this information for the sole purpose of investigating the issues we are bringing to AT&T's attention. In investigating these interruptions, Comcast technicians have detected leakage and transmission of AT&T's signal on to the return path of Comcast's cable network.

The service outages and interferences have occurred when AT&T installed its U-Verse service at a home which was still connected to Comcast's network. In at least one of those instances, the customer wished to continue to receive Comcast service. At other times, apparently AT&T instructed Comcast customers switching to AT&T, not to request disconnection of Comcast service until AT&T service is connected.

In both scenarios, AT&T's practices have interfered with Comcast's cable service. As you know, it is incumbent upon AT&T to ensure that it and its contractors do not interfere with the signals or services of other providers. Moreover, the incidents appear to be increasing in frequency. Accordingly, Comcast demands that AT&T take all necessary action to prevent future outages and service interruptions to Comcast's service. Please provide written confirmation of the foregoing on or before March 17, 2008.

Sid White, Esquire
March 12, 2008
Page 2

The foregoing is without waiver of any right or remedy available to Comcast, all of which are reserved.

Very truly yours,

Kyle T. Birch
Assistant General Counsel

Sid White, Esquire
March 12, 2008
Page 3

CONFIDENTIAL

**Sample of Known Recent AT&T-Caused Outages**

| Region | Date of Outage | Address of Offending AT&T Install | Size of Outage | No. of Outages |
|--------|---------------|-----------------------------------|----------------|----------------|
| Michigan | 3/7/2008 | 184 Pinewood Dr, Plymouth Michigan 48170 | Entire Node Return Path | 1 |
| Michigan | 2/1/08 to 2/15/08 | Bayview Dr., Hidden Harbor Condos, Chesterfield Michigan | Entire Node Return Path | 3 |
| Chicago | 2/9/2008 | 4057 Pheasant Ct., St Charles, IL | Entire Node Return Path | 1 |
| Chicago | 2/12/2008 | 720 Mosedale, St. Charles, IL | Entire Node Return Path | 1 |
| Chicago | 2/16/2008 | 3003 Pleasant Plain, Dr., St Charles, IL | Entire Node Return Path | 1 |

**Exhibit C**

# Comcast.

Comcast Corporation
One Comcast Center
Philadelphia, PA 19103-2838

Kyle T. Birch
Assistant General Counsel
Direct Dial: (215) 286-7714
Direct Fax: (215) 286-5039
Email: kyle_birch@comcast.com

March 19, 2008

**VIA OVERNIGHT DELIVERY**
**AND FACSIIMLIE (414) 270-4553**

Gerry Friederichs, General Attorney
AT&T Legal Department
14th Floor
722 N. Broadway
Milwaukee, WI 53202

Dear Mr. Friederichs:

This responds to your March 17, 2008 correspondence requesting additional information to investigate issues raised under my March 12, 2008 letter to Mr. Sid White. Comcast is providing the information in this letter solely for the purpose of AT&T's investigation of those issues and this information is confidential and may not be used for any other purpose.

The transmission frequencies that have been the subject of interference are in the 5 to 42 MHz frequency range. The interference has impacted among other things, services which use a return path (sometimes referred to as duplex services) and has affected Comcast High-Speed Internet, Digital Voice and interactive cable programming services. When there is signal interference or "noise" occurring at a specific location, that signal interference is then transmitted to the node, which serves multiple locations – causing service interruptions and outages to all customers served by that node.

Following my March 12, 2008 correspondence, two additional incidents have been identified at the following locations: 1148 Kingsport, Wheeling, Illinois and 95 Ashbrook Court, Grayslake, Illinois and now, at least 6800 customers in the Chicago area have been affected.

The signal interference pattern associated with these incidents has been identical for all of the AT&T caused interruptions. Comcast technicians have identified the source of the problems by driving around the area served by the affected node until they locate an AT&T service vehicle. Upon locating an AT&T installation crew, Comcast technicians have asked the installers if they were installing AT&T U-Verse services. In each case, the Comcast technicians discovered that the AT&T installers had connected

Gerry Friederichs, General Attorney
March 19, 2008
Page 2


AT&T U-Verse services to a customer still connected to Comcast's facilities.  Indeed, customers have informed us that AT&T instructed them to wait until AT&T's service has been installed before disconnecting their Comcast service.  For those customers planning to disconnect their Comcast service in the future, the interference has been removed by isolating AT&T's plant from Comcast's plant (e.g., disconnecting Comcast service).

I trust that the above should further assist AT&T in its investigation of these issues. Ultimately, the outages and interferences caused by AT&T can be avoided simply by ensuring that AT&T does not connect its facilities to active cable wiring. I look forward to receiving AT&T' response and commitment to not connect to Comcast's active cable plant.


Very truly yours,

Kyle T. Birch
Assistant General Counsel

# Exhibit D



Comcast Corporation
One Comcast Center
Philadelphia, PA 19103-2838

Kyle T. Birch
Assistant General Counsel
Direct Dial: (215) 286-7714
Direct Fax: (215) 286-5039
Email: kyle_birch@comcast.com

March 24, 2008

**VIA OVERNIGHT DELIVERY**
**AND FACSIMLIE (404) 927-3619**

Sidney J. White, Jr., Esq.
Senior Counsel
ATT
675 W. Peachtree Street
Suite 4200
Atlanta, Georgia 30342

Dear Sid:

This letter is further to our discussions today regarding your March 21, 2008, letter and the attached Complaint. Our outside counsel has also confirmed this information with Mr. Cole, your counsel. In short, while we disagree with the allegations you have made, Comcast will take the steps outlined below to address your concerns. Having agreed to take these steps, we also reiterate our demand for a satisfactory and prompt resolution of Comcast's concerns regarding damage to its equipment and cable service as outlined below. Given the anticipated resolution of your concerns, we expect that you will direct your counsel to voluntarily dismiss the lawsuit it filed in Chicago last Friday.

First, with respect with the print advertisements attached to your complaint, this confirms that they have run their course and are not scheduled to appear again.

With regard to the Line Up advertisement found on You Tube, this advertisement has not run on television and we are in the process of determining how it came to appear on You Tube. While Comcast determines what plans it has to run this advertisement, we will send a DMCA notice to You Tube requesting that it take the video clip down.

The Curb Appeal advertisement is being pulled from airing, which should be completed no later than by Thursday March 27, 2008. We also will send a DMCA notice to You Tube requesting that it take that video clip down. While we can not commit to what advertisements Comcast will run in the future, Comcast does not concede that the

Sid White, Esquire
March 24, 2008
Page 2


Curb Appeal ad is false or misleading, but will take into account the concerns that AT&T has raised.

Finally, we require by close of business on Wednesday, March 26, 2008, written confirmation that AT&T has ensured that installation of its U-verse service will no longer result in damage to Comcast's cable infrastructure with its resulting outages to blocks of its customers. As you know, this is a serious problem for Comcast and we have had numerous communications in attempting to resolve it. Indeed, the outages are now escalating. Since Friday, at least two additional incidents have been identified at the following locations: 440 Kenilworth, Elmhurst, Illinois and 10254 W. Beach Road, Beach Park, Illinois. If we can not get resolution by Wednesday, we will have no choice but to consider AT&T's actions to be a deliberate attempt to harm Comcast's business, and will take the appropriate steps to protect Comcast's interests.

This letter shall not waive or prejudice any rights or remedies that Comcast may have with respect to the matters set forth in this letter, all of which are expressly reserved.


Very truly yours,

Kyle T. Birch
Assistant General Counsel


cc: Kenneth R. Florin, Esq
    Douglas N. Masters, Esq.
    Christopher A. Cole, Esq.
    Jeffrey E. Smith, Esq.

# Exhibit E

 at&t

Michael Pratt
Senior Attorney

AT&T Services, Inc.
500 McCullough Ave.
Room 11-C-10
San Antonio, TX 78215

T: 210.368.0403
F: 210.886.4383
michael.pratt@att.com
www.att.com

March 26, 2008

<u>VIA FACSIMILE TO 215.286.5039 & USPS CM/RRR # 7004 2510 0003 3161 7701</u>

Kyle T. Birch, *Esq.*
Assistant General Counsel
Comcast Corporation
One Comcast Center
Philadelphia, PA 19103-2838

Re:   Comcast Interference Complaints

Dear Mr. Birch:

Pursuant to your letters of March 12, 2008, March 19, 2008, and March 24, 2008, AT&T Illinois and AT&T Michigan (Collectively "AT&T") investigated the installations at the nine addresses ("Addresses") that you identified in those letters. AT&T appreciates the fact that you provided the Addresses and responded to AT&T's March 17, 2008 email request for additional information. At this time, AT&T representatives have been able to inspect the installations from the exterior, and in some cases from inside the AT&T customer's unit.

I can assure you that AT&T intends to compete fairly for voice, Internet access and video customers, and that any interference with Comcast service is unintentional. Our methods and procedures do not instruct technicians to install AT&T U-verse services at a customer's premises in a manner that results in a connection to Comcast's active cable wiring. However, based on our investigation, it appears that approved methods and procedures were not adhered to in all cases. AT&T has advised, and will continue to advise technicians of our approved methods and procedures in an effort to avoid installations that maintain continuity from our network to Comcast's network.

If Comcast becomes aware of any additional AT&T U-verse installations that result in a connection to Comcast's active network please let me know so that we can take further action. If you wish to discuss this matter further please contact me.

Regards,

Michael Pratt

ajp/MP

Cc:    Sid White, Jr., *Esq*
       Gerry Friederichs, *Esq.*

**Exhibit F**



Comcast Corporation
One Comcast Center
Philadelphia, PA 19103-2838

Kyle T. Birch
Assistant General Counsel
Direct Dial: (215) 286-7714
Direct Fax: (215) 286-5039
Email: kyle_birch@comcast.com

March 28, 2008

**VIA OVERNIGHT DELIVERY**
**AND FACSIIMLIE TO (210) 886-4383**

Michael Pratt, Senior Attorney
AT&T Services, Inc.
500 McCullough Ave.
Room 11-C-10
San Antonio, TX 78215

Dear Mr. Pratt:

This follows your letter of March 26, 2008 and our conversation yesterday.

As I indicated yesterday, AT&T continues to damage Comcast's services and network. On March 27, 2008, in connection with a service installation at 1380 Pauly Dr., Apt. 316, Gurnee, IL., AT&T once again caused network damage affecting approximately 380 customers.

As I also indicated in our conversation, your March 26, 2008 response does not adequately address Comcast's concerns. The response does not provide any technical explanation of what caused the damage, the steps that AT&T has taken to prevent repeat occurrences and confirmation that AT&T will not connect to Comcast's active cable plant.

AT&T's actions continue to disrupt service to numerous Comcast customers and cause harm to Comcast's network and facilities. Comcast cannot allow those actions to continue. Please provide your written response to the information requested above and address the additional incident referenced above no later than close of business on Friday, March 27, 2008.

The foregoing is without waver of any right or remedy available to Comcast, all of which are reserved.

Very truly yours,

Kyle T. Birch
Assistant General Counsel

cc:    Sid White, Esquire

**Exhibit G**

 

| | Michael Pratt | AT&T Services, Inc. | T: 210.368.0403 |
|---|---|---|---|
| | Senior Attorney | 500 McCullough Ave. | F: 210.886.4383 |
| | | Room 11-C-10 | michael.pratt@att.com |
| | | San Antonio, TX 78215 | www.att.com |

March 28, 2008

<u>*VIA ELECTRONIC MAIL TO KYLE_BIRCH@COMCAST.COM*</u>
<u>*& USPS CM/RRR # 7004 2510 0003 3161 7701*</u>

Kyle T. Birch, *Esq.*
Assistant General Counsel
Comcast Corporation
One Comcast Center
Philadelphia, PA 19103-2838

   Re:  **Comcast Interference Complaints**

Dear Mr. Birch:

   Pursuant to our phone conversation yesterday and your follow up letter today, I understand that Comcast has additional questions and concerns regarding interference in Comcast's network that may be the result of certain AT&T U-verse installations. As stated in my letter of March 26, we immediately looked into the instances where Comcast claims that interference occurred.[1] We then took steps to ensure that proper methods and procedures are being followed by AT&T's installation technicians. These methods and procedures are designed to prevent continuity between the AT&T U-verse network and the Comcast network.

   Nevertheless, we would be happy to explore these issues further and I suggest that we convene a meeting and include technical and installation experts from within our respective companies. This will allow us to share information and suggestions to make sure that both companies have implemented practices and procedures that will minimize the risk of any future problems for either company's network. If Comcast is amenable to this proposal please provide a few dates and times and we can begin the scheduling process.

      Regards,

      Michael Pratt

ajp/MP

---

[1] You state in your letter today that there has been an additional instance of interference at a location in Gurnee, Illinois. We obviously have not yet had time to investigate that allegation, and so cannot comment on it in this letter.

U S A

# Exhibit H

 **at&t**

Sidney J. White, Jr.
Senior Counsel            T: 404.927.3565
675 West Peachtree Street  F: 404.614.4054
Suite 4200
Atlanta, Georgia  30342

** CONFIDENTIAL – PREPARED FOR SETTLEMENT PURPOSES ONLY **

April 10, 2008

*VIA EMAIL AND US MAIL*

Jeffrey E. Smith
Vice President and Deputy General Counsel
Comcast Corporation
One Comcast Center
1701 JFK Boulevard
Philadelphia, PA. 19103

Re:    Outline of Demands/Required Commitments for Settlement Discussions

Jeffrey:

   I have outlined below AT&T's demands, and the commitments and actions that AT&T must receive from Comcast in order to resolve the false advertising Complaint pending in the Northern District of Illinois. We will need to make substantial progress today in order to avoid proceeding with the Complaint. Based on our preliminary conversations yesterday, I am encouraged by your receptiveness to most of the demands. I am hopeful that today we can reach agreement on basic settlement terms and conditions in order to show the we have most, if not all issues resolved

### OUTLINE OF DEMANDS/REQUIRED COMMITMENTS:

A.   Comcast must agree in writing ("Settlement Agreement") to the commitments and actions set forth hereafter.  Comcast must agree that it will not disseminate, or cause the dissemination of, claims in any medium, packaging, advertising or other marketing and promotional materials that say, show or imply that:

   1.   The purchase of TV services from AT&T results in the placement, or an increased chance of placement, of a large utility box or VRAD, on or near to the customer's property or home;

   2.   The purchase of TV services from AT&T results in a customer experiencing any adverse impact, or an increased chance of an adverse impact, because of the placement of a utility box or VRAD;

   3.   AT&T and/or a VRAD "blocks", "limits" (or any other words of similar import) HD content or any false statements about the functioning of a VRAD;

708978

USA
Proud Sponsor of the U.S. Olympic Team

Jeffrey E. Smith
April 10, 2008
Page 2 of 2

4. AT&T offers fewer HD television channels than Comcast in markets where the claim is not true;

5. AT&T only allows its customers to view one HD stream or program at a time; and;

6. AT&T does not offer local programming.

7. AT&T TV services are narrowband services.

The above commitments will apply in all AT&T markets.

B.  Comcast must agree to permanently discontinue and commit to not run in any AT&T market the four (4) ads challenged by AT&T ("Block the House" print ad, and "Curb Appeal", "Line-Up" and "Side-by-Side Homes" TV ads).

C.  If Comcast agrees in writing to the above commitments and actions, then AT&T will dismiss the Complaint without prejudice.

D.  Comcast will agree that in the event that Comcast breaches any of the commitments contained in the Settlement Agreement and AT&T prevails in any action to enforce the Settlement Agreement, Comcast will pay AT&T's attorneys' fees incurred in the enforcement of the Settlement Agreement.

Let me know when you want to commence further discussions re: settlement.

Regards,

Sidney J. White, Jr.

SJW/lah

# Exhibit I



Comcast Corporation
One Comcast Center
Philadelphia, PA 19103-2838

April 10, 2008

### CONFIDENTIAL – PREPARED FOR SETTLEMENT PURPOSES ONLY

Sidney J. White, Jr.
Senior Counsel
675 West Peachtree Street
Suite 4200
Atlanta, GA 30342

**Re:  Your letter of April 10, 2008.**

Dear Sid:

I am in receipt of your letter dated April 10, 2008, in which you outline certain demands which we have discussed previously.  I provided you with my initial reaction to your letter last evening.

As you are aware, each of the advertisements you reference in your compliant has ceased running in the form complained of.  Indeed two of them have not been running for over two weeks, and a third ran for only 3 days and has not aired for a week.  The only other advertisement that you have questioned was pulled late Wednesday evening after you called me (although there may have been inadvertent spillage yesterday, as we have discussed).  Comcast does not believe that any of those advertisements were either false or misleading, and certainly does not agree that any expressly false claims were made.  We have cooperated with you in good faith, and are willing to continue cooperating, to address the reasonable concerns of both parties.  Unfortunately, as we discussed last night, the written proposal you submitted contained broad language that we feel represented that effort.  I am heartened by your verbal representations that such was not your intent.

I am particularly troubled that your letter made no reference whatsoever to the far more serious issue of node-wide outages and service impairment suffered by Comcast's customers as a result of AT&T's installation practices.  We believe that AT&T has been aware of the potential for its installations to create larger network outages and impairments to its competitors networks for some time.  Nonetheless AT&T has made no effort to notify its competitors of this potentiality so that their competitors could monitor their networks and AT&T's installation activities in their service areas, and guard against such interference.  Comcast discovered this issue some weeks ago and notified AT&T.  AT&T still has not addressed the problem, and does not appear to have a definitive answer other than "if it happens, call us later."  This is not acceptable.  These are not isolated incidents that inadvertently affect a single home, but routine failures in AT&T's processes that affect hundreds of Comcast customers at a time.  Moreover, even since being notified of the issue by Comcast AT&T seems to have chosen *not* to alert any other cable operators against whom it competes of this issue – instead choosing play "wait and see."

My hope is that AT&T intends to take this matter far more seriously than it has indicated to date. I have set forth a proposal below that will give us visibility to AT&T's installation activities so that we can monitor the impact of your installations on our network. Just as we have respectfully considered your concerns and proposals with respect to advertisements that are not even running currently, we expect you to respectfully consider our concerns and proposals with respect to this far more serious matter.

Our response to the items referenced in your letter is as follows:

A. Based on AT&T's representations of fact, Comcast is prepared to agree not to advertise a direct linkage between the purchase of AT&T U-Verse services by a customer and the placement of a VRAD on that particular customer's property, and will agree not to claim such a direct causal link in its advertisements so long as such is true. Comcast also will agree not to claim a direct causal link between the purchase of AT&T U-Verse services by a customer and an adverse impact to that customer from the placement of a VRAD on that customer's property. The foregoing shall not apply with respect to sizeable MDUs or other large complexes where a single VRAD is more likely to be placed on the property of the apartment building or in the apartment complex to serve those units.

B. Comcast is prepared to acknowledge that individual characteristics of AT&T's U-Verse service (e.g., the limitations on HD viewing) may not apply to the satellite services also offered by AT&T (and vice versa), and that in those instances an appropriate distinction may be required in the advertising copy or disclaimer. AT&T will acknowledge that to the extent it advertises its services under a common brand (e.g., AT&T or AT&T Advanced Services) Comcast is not obligated in all instances to distinguish between the various services covered by such branding.

Subject to the above Comcast responds to the specific items in your letter is as follows:

1. & 2. Addressed above.

3. The advertisements Comcast has run use parody and comedy to characterize the U-Verse service, as represented by the VRAD. Comcast will not agree to any language which inhibits its ability to do so. Comcast notes that AT&T frequently utilizes inanimate objects in its advertising, and gives them characteristics or has them assume functions or activities that they cannot or do not in fact perform for the sole purpose of disparaging cable or an aspect or characteristic of cable service (e.g., a giant cable bill smashing children's piggy banks and vacuuming vacation cash and checks; a cable connection wire formed into a snake). As I have said before, to the extent that AT&T is attempting to use this process to prevent Comcast from associating the VRAD with its delivery of U-Verse services (and any associated deficiencies), we are not going to be able reach a conclusion satisfactory to your clients. Depending upon your response to our other concerns, and so long as it does not affect advertising already produced, we may be willing to consider future use of the term "blocking".

4.  Comcast is not aware of any reference to a comparison of the number of HD television channels in any of the advertisements referenced in your letter.  As such this issue need not be addressed by formal agreement.  As I mentioned last night, over the past year our respective companies have exchanged correspondence and telephone calls on any number of issues.  I do not believe that we should not use this opportunity to formalize our relationship with respect to each of the inadvertent advertising issues that have been raised by our respective companies over the past year.  In any event the broad prohibition you expressed would not be acceptable.

5.  Based on our conversation, I believe this concern is addressed by 2 above.  If, however, AT&T is attempting to prevent Comcast from identifying the limitations of U-Verse service in competitive advertising it is  not acceptable.

6.  To the extent the cadence in the most recent advertisement suggested that AT&T did not offer local programming, it will be corrected.  My understanding is that AT&T does not offer local programming On Demand or in HD, and to the extent that is true Comcast objects to any attempt to limit Comcast's ability to claim as much.  Generally, I view this in a manner similar to that reflected in the response to number 4 above.

7.  You have noted that the FCC's definition of broadband encompasses AT&T's copper facilities.  However, AT&T representatives have given public speeches and presentations in which they have characterized their copper plant as narrowband, and it was those statements that served as the basis for that characterization.  Earlier today I forwarded an email to you with a transcript of statements to that effect by the President of AT&T Illinois made in connection with legislation being considered last year by the Illinois legislature.

Comcast will not agree to permanently discontinue and not run the four advertisements you reference.  Comcast *will* agree not to run them in their current form, and that any future dissemination will be subject to any agreements reached.

Finally, Comcast will only commit to the above based upon satisfactory resolution of certain issues that recently have been brought to AT&T's attention and that will serve as a part of our counterclaim against AT&T should this matter proceed, as follows:

## 1. Background:

In connection with its deployment and installation of U-Verse Service ("U-Verse Service"), AT&T has caused numerous outages and interruptions that have affected the Comcast services delivered multiple Comcast customers served from the same nodes that serve the locations where U-Verse is being installed ("Node Outages").  Despite repeated complaints from Comcast and assurances from AT&T that it has taken steps to prevent Node Outages resulting from AT&T's installation practices, the Node Outages continue to affect numerous Comcast customers.

AT&T is currently engaged in an advertising campaign ("Campaign") which includes several characters attacking Comcast for offering promotional offers.  Comcast has identified a number

of false, misleading and disparaging claims and statements in connection with the Campaign and demanded that AT&T cease advertising such claims.

### (A) <u>Installation Processes/Requirements:</u>

(i)    AT&T will agree that, prior to installing U-Verse Service it will determine whether the installation location also receives any Comcast Service. If the location receives any Comcast Service, AT&T shall notify Comcast at a designated number of the location where installation work will be performed prior to commencing actual installation work in order to permit Comcast to monitor the affect of AT&T's installation activities on Comcast's network. AT&T will implement procedures, including without limitation, as necessary to isolate AT&T's and Comcast's facilities, to prevent any Node Outages. Comcast will monitor its network during the installation. If Comcast notifies AT&T of any Node Outages or other conditions affecting its network and resulting from AT&T's installation activities, AT&T shall immediately cease such installation, and if necessary disconnect its facilities, until the source of the Node Outage is determined and appropriately addressed to prevent a recurrence of the Node Outage.

(ii) AT&T will agree to indemnify and hold harmless Comcast from and against any and all damages, claims, liabilities, and actions, lawsuits, arising from Node Outages caused by AT&T. AT&T shall also reimburse Comcast the amount of any credits Comcast provides to any of its customers affected by a Node Outage.

(iii) AT&T will reimburse Comcast (based on Comcast's standard rates), for Comcast's costs for dispatching service technicians to correct or resolve Node Outages and for Comcast's staffing costs for monitoring the telephone number(s) described above and for performing related follow up tasks to address Node Outages.

### (B) <u>Advertising</u>.

(i) AT&T will agree not to disseminate any advertising through any media which: (a) depicts any Comcast character or caricature representative committing a violent act upon Comcast customers, including without limitation, via fictional or any other characters; (b) falsely claims that only Comcast offers its services via promotional or discounted offers, or which claims that AT&T does not offer its services via promotional or discounted offers, or which falsely exaggerate the difference between promotional and regular rates; (c ) compares AT&T's non-promotional offers to Comcast's promotional offers; or (d) falsely describes Comcast's regular rates as promotional.

(ii) AT&T will agree to discontinue airing the three advertisements referenced under Comcast's April 10, 2008 letter to AT&T in their current form, and to modify those advertisements consistent with (B)(i) above.

Please feel free to contact me should you have any questions regarding the above. As I have indicated, we very much want to work with you to address our respective issues in a reasonable manner. As the advertisements are not running in their current form, there is good reason for us to take the time to resolve all of our respective issues over the next few days. However if AT&T

continues to be unwilling to address Comcast's concerns with respect to its installation practices, this matter will not be resolved quickly.

Sincerely,

Jeffrey E. Smith
Vice President & Deputy General Counsel

# Exhibit J

Michelle Shebesh

| | |
|---|---|
| **From:** | Douglas Masters |
| **Sent:** | Wednesday, April 16, 2008 5:47 PM |
| **To:** | 'Cole, Christopher' |
| **Subject:** | RE: ATT v. Comcast |

**Attachments:**    Microsoft Word - OUTAGE PROCESS _2__DOC.pdf



Microsoft Word -
OUTAGE PROCES...
                    Chris

Comcast has proposed another process to address the disruption of service being caused by
ATT's installation of its U-verse service.  As an accommodation to your stated concerns
about the competitive sensitivity of revealing information about its installations, the
process does require ATT to divulge such information.  Please let me know if it provides a
basis for resolution of that issue.

With regard to the 4 points on which ATT seeks relief by way of its PI motion, Comcast can
certainly agree to refrain from making such explicit claims (subject to the On Demand
issues we discussed) but can not agree that any advertising that associates the VRAD box
with ATT's U-verse service necessarily conveys a causal connection between order the
service and the deployment of the large boxes.

I'll look forward to meeting you tomorrow morning.


Doug


Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828


-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Wednesday, April 16, 2008 11:47 AM
To: Douglas Masters
Subject: RE: ATT v. Comcast

Doug, I apologize for not getting you the papers.  It had been ny understanding they were
messengered to you from local counsel on Monday.  Let's talk later today.  Is there a time
that works for you ?

Christopher A. Cole
Manatt, Phelps & Phillips, LLP
Sent from my Wireless Handheld

 -----Original Message-----
From:      Douglas Masters [mailto:dmasters@loeb.com]
Sent: Wednesday, April 16, 2008 08:30 AM Pacific Standard Time
To:    Cole, Christopher
Subject:    ATT v. Comcast

                                    1

Chris

Sorry we missed each other yesterday.  First, I never received any of the papers you filed by email from you or your local counsel.  I obtained them by hand delivery yesterday morning.  We have filed our appearances, so in the future we will be able to receive what you file real time.

Second, let me know if you have a proposal for briefing on your client's motion.  I'm not sure if you'll be there tomorrow, but if not, I can have the discussion with one of your co-counsel.

Also, I wanted to make sure you have a copy of what was provided to our client as its response to the issues we have raised with the disruption of service caused by ATT's installation of Uverse.  I understand that we have over 30 reported incidents where ATT caused service interruptions.  As you can see, the proposal is not only inadequate but could not but lead our client to understand that ATT is not taking this matter seriously and that it is not prepared to provide any meaningful solution to this very real consumer problem.

Although we still have not received a response from your client to the proposal for addressing this issue that Jeff Smith set forth last week, we plan to make another attempt at resolution today.

Regards

Doug

Douglas N. Masters

Loeb & Loeb LLP

321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828


CONFIDENTIALITY NOTICE:  This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged.  If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.  If you have received this transmission in error, please immediately notify the sender.  Please destroy the original transmission and its attachments without reading or saving in any manner.  Thank you, Loeb & Loeb LLP.
##############################################################################
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued treasury regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written by us, and cannot be used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another person any transaction or matter addressed herein. For information about this legend, go to http://www.manatt.com/circ230
##############################################################################

**Comcast Confidential**

**Processes and Requirements to Resolve Node Outages.**

**1. Background:**

In connection with its deployment and installation of U-Verse Service ("U-Verse Service"), AT&T has caused numerous outages and interruptions to multiple Comcast customers serviced off of the node serving the location that is the subject of the U-Verse Service installation ("Node Outages"). To address Node Outages, AT&T will follow the below processes and requirements, which shall apply to all U-Verse Service installations.

**2. Processes and Requirements:**

**(A) <u>Processes:</u>**

- AT&T claims that the Node Outages result from AT&T personnel and contractors failing to comply with AT&T's established construction and installation procedures. AT&T will immediately notify all of its installation personnel and contractors in writing of the installation procedures to be followed in order to ensure that Node Outages do not occur, and will develop procedures to monitor performance of such installers and contractors. If it is determined that any other acts or omissions by AT&T cause such Node Outages, AT&T will immediately correct the same, create revised procedures and ensure that all of its installation personnel and contractors are familiar with such revised procedures.

- AT&T shall at its own expense maintain a telephone number in each market in which Node Outages have occurred ("Number") dedicated solely for Comcast's use to report Node Outages. The Number shall be staffed on a seven day/twenty-four hour basis by live technicians. In reporting Node Outages, Comcast shall identify the general location of the Node Outage, including the street, general vicinity and city of the affected area (however, Comcast shall not be required to provide a specific customer address or contact information to AT&T).

- AT&T shall create a trouble ticket, including the date, time and location of the reported Node Outage, (each, a "Ticket"), notify Comcast of the Ticket number and dispatch personnel to correct the Node Outage within 30 minutes of receiving the Node Outage report. If the Node Outage is not corrected by AT&T within one hour of its receipt of the Node Outage report, AT&T shall immediately (i) contact and advise Comcast of AT&T's inability to isolate the problem and resolve the Node Outage, and (ii) cease all pending installations in the area of the Node Outage, and disconnect all other installations made in the area of the Node Outage during the 48 hour period preceding its receipt of the Node Outage report, until such time as the Node Outage is corrected, as confirmed by Comcast. [this approach is our concession based on AT&T's unwillingness to identify customers whom they installed]

- Upon resolution of a Ticket, AT&T shall generate and transmit to an AT&T Field MT, Director and Vice President, the Ticket resolution, including at a minimum the following information: Ticket receipt time; clear time; ban number; and action taken. AT&T shall transmit to Comcast a final Ticket (to a facsimile or e-mail address designated by Comcast) confirming resolution of the Ticket. AT&T shall retain all Ticket information for a minimum of one year following the Ticket report.

**(B) <u>Related Activity:</u>**

AT&T agrees not to conduct any direct sales (i.e., door-to-door sales or direct marketing) activity within 2 miles of any Node Outage for two weeks following any Node Outage. AT&T further agrees that it will not in any way disparage or criticize Comcast's service signals or the quality or reliability of Comcast's services through direct sales in any area in which AT&T caused a Node Outage for at least 30 days following any Node Outage.

**(C ) <u>Continuing Node Outages:</u>**

In the event that more than three Node Outages occur in any three calendar month period, AT&T agrees to cooperate with Comcast to establish additional procedures to permit Comcast to immediately detect and prevent further Node Out ages.

**(D) <u>Indemnification:</u>**

AT&T shall reimburse Comcast for Comcast's costs for dispatching service technicians to correct or resolve Node Outages and for the amount of any credits Comcast provides to any of its customers affected by any such Node Outages. AT&T will indemnify and hold harmless Comcast from and against any and all damages, claims, liabilities, actions and lawsuits, arising from Node Outages caused by AT&T.

# Exhibit K

 at&t

AT&T Midwest Services
225 W. Randolph Street
Floor 25A/B
Chicago, IL 60606

April 18, 2008

<u>Via Facsimile (312) 464-3111 and Courier Delivery</u>
Douglas N. Masters
Loeb & Loeb LLP
321 North Clark Street
Suite 2300
Chicago, IL 60610

Re:  *Comcast-AT&T Node Outage Issue*

Dear Mr. Masters:

I am in receipt of a document entitled "Processes and Requirements to Resolve Node Outages," which you forwarded to Chris Cole on the evening of April 16, 2008. As I understand it, the document represents a proposal by Comcast to resolve the allegations made by Comcast that AT&T U-verse installs have caused interference with and disruption of Comcast's network.

AT&T seeks to prevent any disruption of service to Comcast customers and interference in Comcast's network. AT&T's U-verse installation methods and procedures incorporate steps designed to avoid causing any such disruption. The overall effectiveness of the methods and procedures in this regard is demonstrated by the fact that a vast majority of U-verse installations have proceeded without any impact on Comcast customers.

Comcast has reported to AT&T approximately 25-30 instances where it suspects AT&T installations have caused what it believes are "node outages." Because Comcast has provided only limited information regarding these incidents to AT&T, AT&T has not yet been able to determine conclusively whether or not each individual outage or disruption claimed by Comcast actually resulted from a U-verse installation. As your client's network personnel are aware, network problems can have various causes, including causes resulting from Comcast's activities.

That being said, AT&T has taken numerous actions in response to Comcast's concerns. AT&T supervisors have reviewed the potential causes and discussed appropriate procedures to prevent any such outages with AT&T technicians. Where AT&T determines that an individual technician appears to have failed to follow proper procedures, AT&T supervisors cover the procedures on an individual basis.

Additionally, as you know, AT&T has also established a process for Comcast to report trouble. Under the process, Comcast can call in reports of suspected network interference to a dedicated "hotline." AT&T will immediately open a ticket and handle it  on a

 at&t

Douglas N. Masters
Love & Loeb LLP
April 18, 2008
Page 2 of 4

priority basis by the AT&T jeopardy team. The ticket will be tracked until completion and the final status of the ticket will be reported to Comcast.

AT&T believes that this process can work for both parties. Insofar as issues arise concerning the process, AT&T stands willing to address them. In recognition of Comcast's stated concerns about providing AT&T with Comcast customer information, AT&T is willing to revise the offered process such that Comcast will only have to provide AT&T with the general street location of the purported node outage. As you know, AT&T network personnel have met with Comcast network personnel regarding this issue, and would be willing to meet again.

The information available to AT&T at the current time indicates that the foregoing measures will address Comcast's operational concern in a reasonable manner. Nevertheless, Comcast attorneys, including yourself, have reported further recent trouble but have provided very little in the way of detail, making it impossible for AT&T to respond substantively to these reports of recent problems. So that AT&T may respond to Comcast's allegation of more recent trouble, please provide, for each occurrence of suspected "node outage" occurring in Illinois after April 4, the following information:

- The date and location of the outage;
- A description of the nature of the outage and its effect on Comcast customers (i.e., complete service interruption with black screen, pixilation, etc.);
- The number of customers affected;
- The reasons why Comcast believes the outage to have been caused by a U-verse installation;
- The other causes considered by Comcast and the reasons why those explanations were rejected;
- A description of the actions taken by Comcast in response to the outage and the results of those actions;
- A description of any attempts made by Comcast to contact AT&T about the outage;
- The duration of the outage;
- The amount of credits granted by Comcast to customers in response to the Outage;
- Costs incurred by Comcast in responding to the outage, with a specific enumeration of costs that would not otherwise have been incurred by Comcast as a result of the customer's disconnection, and a description of the actions that led to those costs

 at&t

Douglas N. Masters
Love & Loeb LLP
April 18, 2008
Page 3 of 4

If you have additional specific information on these further incidents, please forward it to my attention as soon as possible, so that I can bring it to the attention of the network personnel who could actually address the problem.

As for as Comcast's April 16th proposal, AT&T appreciates Comcast's offer. But it is unacceptable for several reasons:

- Comcast's proposal rests on the assumption that every outage or disruption in Comcast's network has been caused by AT&T, an assertion that Comcast has not sustained through the limited information it has provided AT&T.

- Comcast's proposal posits that every future instance of network trouble that Comcast, in its own discretion, deems to have resulted from an AT&T-prompted "node outage" should automatically imposes variety of onerous obligations upon AT&T, without any opportunity for AT&T to challenge Comcast's unilateral declaration as to the cause, and without regard to the scope or severity of the problem. Under Comcast's proposed procedures, Comcast can cause widespread disruption to AT&T's network operations and U-verse sales efforts simply by calling in instances of supposed "node outages," no matter how those incidents may have actually been caused or how minor the effect of those incidents might actually be.

- The proposal creates a requirement that AT&T "revise" its established procedures in the event of any future node outage. As noted, the large number of U-verse installs that have not caused node outages establish the overall effectiveness of AT&T's procedures. At present, we are not aware of any reason why the established procedures would need to be revised.

- The proposal calls for the assignment of dedicated personnel to field Comcast's calls. Crediting Comcast's own reports, Comcast has identified 26 instances of trouble in Illinois occurring between February 9, 2008 and April 4, 2008, or 55 days. Thus, Comcast proposes that AT&T dedicate round the clock personnel to handle calls that, at their supposed peak, have occurred on an average once every two days and which AT&T anticipates will occur even less frequently in the future.

- The proposal calls for AT&T to take sole responsibility for identifying and fixing the node outage, while Comcast apparently has no obligation to correct problems on its own network or mitigate any damages it may have suffered. As AT&T understands the functioning of Comcast's network, the most direct method for addressing a node outage is for Comcast to disconnect service from the node to the home from which the alleged interference has emanated. It is further AT&T's

 **at&t**

Douglas N. Masters
Love & Loeb LLP
April 18, 2008
Page 4 of 4

understanding that Comcast undertakes such a disconnection in the event a
customer ended his subscription to Comcast service. Moreover, it is Comcast that
best knows it own network and has the ability to address its own network
problems most effectively. Under these circumstances, it is entirely unreasonable
to place the burden for correcting node outages on AT&T.

- The proposal contains the unacceptable requirement that AT&T cease all pending
  installations, disconnect all existing installations, and refrain from selling its
  service in the event of node outage. The unjustified competitive harm that would
  result to AT&T from accepting this proposal is obvious.

- Section C of the Proposal--Continuing Node Outages--is too vague. We ask that
  Comcast specify what additional procedures it has in mind so that we can evaluate
  them.

- AT&T will not agree to an open-ended indemnification arrangement. If Comcast
  believes that AT&T actions have caused it legally cognizable damages in a
  specified amount, it should substantiate that claim factually and legally and make
  a specific demand. AT&T would evaluate and respond to such a demand if and
  when it is received.

Despite our concerns with Comcast's proposal, AT&T remains willing to continue
working with Comcast to resolve any remaining problems that exist. An important
issue in this regard is the continuing incidents you have alleged, as to which AT&T is
concerned but as yet has no detailed knowledge. If you can get the requested
information to me in an expedited matter, I will forward it to the appropriate
personnel as soon as possible, so that we can continue to work toward a resolution.

Very truly yours, (LR)

Mark W. Lewis

Mark W. Lewis

MWL:lmr

 **at&t**    # FACSIMILE TRANSMITTAL SHEET

**DATE:** 4/18/2008

**NUMBER OF PAGES** (including this one): <u>5</u>

| TO: | Douglas N. Masters |
| | Loeb & Loeb LLP |

**FAX#:**    (312) 464-3111

**RE:**    *Comcast-AT&T Node Outage Issue*

**FROM:**    Mark W. Lewis
General Attorney
AT&T Law Department
225 West Randolph Street
Suite 25A/B
Chicago, IL 60606

Phone: 312/727-2345
Fax: 312/845-8976 or 8871

**Message:**

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE MAY BE CONFIDENTIAL AND/OR LEGALLY PRIVILEGED INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY COPYING, DISSEMINATION, OR DISTRIBUTION OF CONFIDENTIAL OR PRIVILEGED INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AT 312-727-3112, AND WE WILL ARRANGE FOR THE RETURN OF THE FACSIMILE. THANK YOU.

# Exhibit L

**REDACTED**

-----Original Message-----
From: Douglas Masters
Sent: Friday, April 18, 2008 1:55 PM
To: 'Cole, Christopher'
Subject: RE: Call today

Chris

I want to share with you Comcast's frustration regarding an attempt to use the phone call process AT&T has asked us to use.  This is the report of one of Comcast's employees who call the number provided.  This is provided as Rule 408 material:

I tried to report this outage using the ATT Comcast Referral Network at the UVDC per ATT. I explained to them I have an outage caused by a Uverse installation and they refused to open a ticket.  I talked to a rep and a Supervisor at 4:15pm on 4/17/08.  The people answering option 6 today:

1) Do not know of any Comcast Referral Process.

2) They are referring me to individual peoples phone numbers where I receive their voice mails.  For the outage below I was referred to Bruce Downey at 734-466-1855 or Jeff Jones 734-466-1783.  I called both numbers left messages and paged Bruce Downey with no reply.

3) They also refuse to provide ticket numbers for outages that we find and disconnect the Comcast customer.  Because we receive the outage at the node level and by the time it is tracked to the customer we quickly do the restoration.  By then it is too late to document the incident with ATT because they refuses to open a ticket on cleared issues.


Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144

fax (312) 464-3111
Direct fax  (312) 577-0828


-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 10:52 AM
To: Douglas Masters
Subject: RE: Call today

Just to let you know, we are preparing a letter on the network issue and
will have it to you this afternoon.

-----Original Message-----
From: Douglas Masters [mailto:dmasters@loeb.com]
Sent: Friday, April 18, 2008 11:45 AM
To: Cole, Christopher
Subject: RE: Call today

That's fine.

Just a head's up, in the absence of an agreement on the interruption issue, we will
probably be filing our pleading today.



Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828


-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 10:24 AM
To: Douglas Masters
Subject: RE: Call today

Let's put off the call until this afternoon.  I am set to speak with them early this
afternoon.  How does 3 PM CST look for you?

-----Original Message-----
From: Douglas Masters [mailto:dmasters@loeb.com]
Sent: Friday, April 18, 2008 10:52 AM
To: Cole, Christopher
Subject: RE: Call today

Sure, also in light of the call between Jeff and Jim, perhaps we should also discuss
settlement.  It appears that once we are able to make progress one way or another on the
interruption of service issue, we have the basis of an agreement on the ad issues.


Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828

-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 9:35 AM
To: Douglas Masters
Subject: Call today

Doug, would you be available at 11 am your time to discuss the discovery requests?

Christopher A. Cole
Manatt, Phelps & Phillips, LLP
Sent from my Wireless Handheld
###################################################################
#####
########
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
###################################################################
#####
########
CONFIDENTIALITY NOTICE:  This e-mail transmission, and any documents, files or previous e-
mail messages attached to it may contain confidential information that is legally
privileged.  If you are not the intended recipient, or a person responsible for delivering
it to the intended recipient, you are hereby notified that any disclosure, copying,
distribution or use of any of the information contained in or attached to this
transmission is STRICTLY PROHIBITED.  If you have received this transmission in error,
please immediately notify the sender.  Please destroy the original transmission and its
attachments without reading or saving in any manner.  Thank you, Loeb & Loeb LLP.

###################################################################
#####
########
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
###################################################################
#####
########
#####################################################################
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
#####################################################################

**REDACTED**

-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 3:20 PM
To: Douglas Masters
Subject: FW: Call today


Doug -- this is the unvarnished reply of Mark Lewis.

Chris

-----Original Message-----
From: LEWIS, MARK W (Legal) [mailto:ml3136@att.com]
Sent: Friday, April 18, 2008 4:02 PM
To: Cole, Christopher; MEZA III, JAMES (Legal)
Subject: RE: Call today

Chris-

Could you ask Doug to provide all the information he can regarding the recent incidents.
I would like to help address the problems and have already forwarded the information
regarding the call to the hotline to the network VP, who in turn has demanded an
explanation.  But I cannot really address it effectively without details of the incidents
they are going to sue us over.

Mark

-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 2:55 PM
To: MEZA III, JAMES (Legal); LEWIS, MARK W (Legal)
Subject: FW: Call today


-----Original Message-----
From: Douglas Masters [mailto:dmasters@loeb.com]
Sent: Friday, April 18, 2008 3:54 PM
To: Cole, Christopher
Subject: RE: Call today

Chris

345 my time is fine.  As you can appreciate, the fact that we are having multiple
incidents over the last few days and problems getting cooperation even through the
"process" suggested by AT&T is magnifying the severity of this issue on our end.  We also
are familiar with AT&T's failure to cooperate to address this issue with other cable
outfits in different markets, which does not bode well for a negotiated resolution here.
You should expect that we will seek immediate relief on Monday if one of our proposals for
resolution is not accepted in the meantime.


Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828


-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 10:52 AM
To: Douglas Masters
Subject: RE: Call today

Just to let you know, we are preparing a letter on the network issue and
will have it to you this afternoon.
-----Original Message-----
From: Douglas Masters [mailto:dmasters@loeb.com]
Sent: Friday, April 18, 2008 11:45 AM
To: Cole, Christopher
Subject: RE: Call today

That's fine.

Just a head's up, in the absence of an agreement on the interruption issue, we will
probably be filing our pleading today.



Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828

-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 10:24 AM
To: Douglas Masters
Subject: RE: Call today

Let's put off the call until this afternoon.  I am set to speak with them early this
afternoon.  How does 3 PM CST look for you?

-----Original Message-----
From: Douglas Masters [mailto:dmasters@loeb.com]
Sent: Friday, April 18, 2008 10:52 AM
To: Cole, Christopher

Subject: RE: Call today

Sure, also in light of the call between Jeff and Jim, perhaps we should also discuss settlement.  It appears that once we are able to make progress one way or another on the interruption of service issue, we have the basis of an agreement on the ad issues.


Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828


-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 9:35 AM
To: Douglas Masters
Subject: Call today

Doug, would you be available at 11 am your time to discuss the discovery requests?

Christopher A. Cole
Manatt, Phelps & Phillips, LLP
Sent from my Wireless Handheld
######################################################################
#####
########
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
######################################################################
#####
########
CONFIDENTIALITY NOTICE:  This e-mail transmission, and any documents, files or previous e-
mail messages attached to it may contain confidential information that is legally
privileged.  If you are not the intended recipient, or a person responsible for delivering
it to the intended recipient, you are hereby notified that any disclosure, copying,
distribution or use of any of the information contained in or attached to this
transmission is STRICTLY PROHIBITED.  If you have received this transmission in error,
please immediately notify the sender.  Please destroy the original transmission and its
attachments without reading or saving in any manner.  Thank you, Loeb & Loeb LLP.


######################################################################
#####
########
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
######################################################################
#####
########
######################################################################
#####
########
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this

communication (including any attachments) is not intended or written by us, and cannot be used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another person any transaction or matter addressed herein. For information about this legend, go to http://www.manatt.com/circ230
####################################################################
#####
########
####################################################################
#############
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued treasury regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written by us, and cannot be used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another person any transaction or matter addressed herein. For information about this legend, go to http://www.manatt.com/circ230
####################################################################
#############
##########################################################################
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued treasury regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written by us, and cannot be used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another person any transaction or matter addressed herein. For information about this legend, go to http://www.manatt.com/circ230
##########################################################################

**REDACTED**

-----Original Message-----
From: Douglas Masters
Sent: Friday, April 18, 2008 3:26 PM
To: 'Cole, Christopher'
Subject: RE: Call today

Chris

The address that was causing this issue was at 150 Schiller Apt 412 Elmhurst Illinois
60126.  AT&T had just completed an install at this location in the morning per the Apt.
Management Company, they also mentioned that Apt. 404 at the same address also had an
install that morning.

Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828

-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 3:20 PM
To: Douglas Masters
Subject: FW: Call today

Doug -- this is the unvarnished reply of Mark Lewis.

Chris

-----Original Message-----
From: LEWIS, MARK W (Legal) [mailto:ml3136@att.com]
Sent: Friday, April 18, 2008 4:02 PM
To: Cole, Christopher; MEZA III, JAMES (Legal)
Subject: RE: Call today

Chris-

1

Could you ask Doug to provide all the information he can regarding the recent incidents.
I would like to help address the problems and have already forwarded the information
regarding the call to the hotline to the network VP, who in turn has demanded an
explanation.  But I cannot really address it effectively without details of the incidents
they are going to sue us over.

Mark

-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 2:55 PM
To: MEZA III, JAMES (Legal); LEWIS, MARK W (Legal)
Subject: FW: Call today


-----Original Message-----
From: Douglas Masters [mailto:dmasters@loeb.com]
Sent: Friday, April 18, 2008 3:54 PM
To: Cole, Christopher
Subject: RE: Call today

Chris

345 my time is fine.  As you can appreciate, the fact that we are having multiple
incidents over the last few days and problems getting cooperation even through the
"process" suggested by AT&T is magnifying the severity of this issue on our end.  We also
are familiar with AT&T's failure to cooperate to address this issue with other cable
outfits in different markets, which does not bode well for a negotiated resolution here.
You should expect that we will seek immediate relief on Monday if one of our proposals for
resolution is not accepted in the meantime.


Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828

-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 10:52 AM
To: Douglas Masters
Subject: RE: Call today

Just to let you know, we are preparing a letter on the network issue and
will have it to you this afternoon.

-----Original Message-----
From: Douglas Masters [mailto:dmasters@loeb.com]
Sent: Friday, April 18, 2008 11:45 AM
To: Cole, Christopher
Subject: RE: Call today

That's fine.

Just a head's up, in the absence of an agreement on the interruption issue, we will
probably be filing our pleading today.

```
Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828
```

-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 10:24 AM
To: Douglas Masters
Subject: RE: Call today

Let's put off the call until this afternoon.  I am set to speak with them early this
afternoon.  How does 3 PM CST look for you?

-----Original Message-----
From: Douglas Masters [mailto:dmasters@loeb.com]
Sent: Friday, April 18, 2008 10:52 AM
To: Cole, Christopher
Subject: RE: Call today

Sure, also in light of the call between Jeff and Jim, perhaps we should also discuss
settlement.  It appears that once we are able to make progress one way or another on the
interruption of service issue, we have the basis of an agreement on the ad issues.

```
Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828
```

-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 9:35 AM
To: Douglas Masters
Subject: Call today

Doug, would you be available at 11 am your time to discuss the discovery requests?

Christopher A. Cole
Manatt, Phelps & Phillips, LLP
Sent from my Wireless Handheld
####################################################################
#####
########
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
####################################################################
#####
########
CONFIDENTIALITY NOTICE:  This e-mail transmission, and any documents, files or previous e-

3

mail messages attached to it may contain confidential information that is legally
privileged.  If you are not the intended recipient, or a person responsible for delivering
it to the intended recipient, you are hereby notified that any disclosure, copying,
distribution or use of any of the information contained in or attached to this
transmission is STRICTLY PROHIBITED.  If you have received this transmission in error,
please immediately notify the sender.  Please destroy the original transmission and its
attachments without reading or saving in any manner.  Thank you, Loeb & Loeb LLP.

```
####################################################################
#####
########
```
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
```
####################################################################
#####
########
####################################################################
#####
########
```
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
```
####################################################################
#####
########
####################################################################
############
```
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
```
####################################################################
############
##############################################################################
```
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
```
##############################################################################
```

# Exhibit M

## Douglas Masters

**From:**     Douglas Masters
**Sent:**     Friday, April 18, 2008 2:54 PM
**To:**       'Cole, Christopher'
**Subject:**  RE: Call today

Chris

345 my time is fine.  As you can appreciate, the fact that we are having multiple
incidents over the last few days and problems getting cooperation even through the
"process" suggested by AT&T is magnifying the severity of this issue on our end.  We also
are familiar with AT&T's failure to cooperate to address this issue with other cable
outfits in different markets, which does not bode well for a negotiated resolution here.
You should expect that we will seek immediate relief on Monday if one of our proposals for
resolution is not accepted in the meantime.

Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828


-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 10:52 AM
To: Douglas Masters
Subject: RE: Call today

Just to let you know, we are preparing a letter on the network issue and
will have it to you this afternoon.

-----Original Message-----
From: Douglas Masters [mailto:dmasters@loeb.com]
Sent: Friday, April 18, 2008 11:45 AM
To: Cole, Christopher
Subject: RE: Call today

That's fine.

Just a head's up, in the absence of an agreement on the interruption issue, we will
probably be filing our pleading today.



Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828


-----Original Message-----

From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 10:24 AM
To: Douglas Masters
Subject: RE: Call today

Let's put off the call until this afternoon.  I am set to speak with them early this
afternoon.  How does 3 PM CST look for you?

-----Original Message-----
From: Douglas Masters [mailto:dmasters@loeb.com]
Sent: Friday, April 18, 2008 10:52 AM
To: Cole, Christopher
Subject: RE: Call today

Sure, also in light of the call between Jeff and Jim, perhaps we should also discuss
settlement.  It appears that once we are able to make progress one way or another on the
interruption of service issue, we have the basis of an agreement on the ad issues.


Douglas N. Masters
Loeb & Loeb LLP
321 N Clark Street
Suite 2300
Chicago, IL  60610
mailto:dmasters@loeb.com
(312) 464-3144
fax (312) 464-3111
Direct fax  (312) 577-0828


-----Original Message-----
From: Cole, Christopher [mailto:CCole@manatt.com]
Sent: Friday, April 18, 2008 9:35 AM
To: Douglas Masters
Subject: Call today

Doug, would you be available at 11 am your time to discuss the discovery requests?

Christopher A. Cole
Manatt, Phelps & Phillips, LLP
Sent from my Wireless Handheld
######################################################################
#####
########
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this
communication (including any attachments) is not intended or written by us, and cannot be
used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another person any transaction or matter
addressed herein. For information about this legend, go to http://www.manatt.com/circ230
######################################################################
#####
########
CONFIDENTIALITY NOTICE:  This e-mail transmission, and any documents, files or previous e-
mail messages attached to it may contain confidential information that is legally
privileged.  If you are not the intended recipient, or a person responsible for delivering
it to the intended recipient, you are hereby notified that any disclosure, copying,
distribution or use of any of the information contained in or attached to this
transmission is STRICTLY PROHIBITED.  If you have received this transmission in error,
please immediately notify the sender.  Please destroy the original transmission and its
attachments without reading or saving in any manner.  Thank you, Loeb & Loeb LLP.


######################################################################
#####
########
IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued
treasury regulations, we inform you that any U.S. tax advice contained in this