## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ILLINOIS BELL TELEPHONE d/b/a AT&T OF ILLINOIS, | |
| Plaintiff, | Civil Action No. 08-CV-1680 |
| v. | Honorable Elaine E. Bucklo |
| COMCAST OF ILLINOIS III, INC., COMCAST CORPORATION, COMCAST CABLE HOLDINGS, LLC, and COMCAST OF CHICAGO, INC., | Magistrate Judge Martin C. Ashman |
| | JURY TRIAL DEMANDED |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL RESPONSE TO DOCUMENT REQUEST NO. 2

Plaintiff Illinois Bell Telephone, d/b/a AT&T Illinois ("AT&T Illinois"), moves to compel Defendants Comcast of Illinois III, Inc., Comcast Corporation, Comcast Cable Holdings, LLC, and Comcast of Chicago, Inc. (collectively, "Comcast") to provide a full and complete response to AT&T Illinois' Request for Production of Documents number 2, pursuant to Rules 34 and 37 of the Federal Rules of Civil Procedure. AT&T Illinois submits this memorandum in support of its Motion.

### I.  INTRODUCTION

On April 18, 2008, AT&T Illinois served on Comcast six document requests that were carefully tailored to the issues in dispute on AT&T Illinois' Motion for Preliminary Injunction. Document Request Number 2 seeks "All Advertisements concerning or relating to VRADs, including but not limited to, planned or future Advertisements pertaining to VRADs."[1] Comcast objected to this Request on the basis that "'future Advertisements pertaining to VRADs' or

---

[1]    Pl.'s 1st Request for Produc. of Docs. (a true and correct copy of which is attached hereto as Ex. A) at p. 5, Request No. 2.

information relating to Advertisements that Comcast never disseminated to the public" are "outside the permissible scope of discovery set forth in Fed. R. Civ. P. 26(b) in that such information is not relevant to any of the claims or defenses of the parties in this action."[2] Accordingly, Comcast agreed only to "produce 'Advertisements concerning or relating to VRADs' that Comcast actually has disseminated to the public."[3]

Comcast's objection is contrary to the defenses it asserted at the Status Conference before the Court, which took place on April 17, 2008, and is in any event inapposite. AT&T Illinois's Motion for Preliminary Injunction seeks not only an injunction against the specific ads that Comcast has previously disseminated to the public, but also an injunction as to the use of five enumerated claims in any *future* packaging, advertising, promotional activities, or other promotional materials.[4]

Comcast's defense of AT&T Illinois' Motion makes the future advertisements even more relevant. Comcast has asserted not only that the ads AT&T Illinois has challenged will not be run again, but that it is "modifying" those ads in an unspecified manner, such that AT&T Illinois' concerns will be addressed.[5] Nevertheless, Comcast also maintains that it is developing, and should be entitled to develop, future executions featuring the video ready access devices ("VRADs") used by AT&T Illinois.[6] Comcast's counsel specifically put such future Comcast advertisements at issue during the April 17, 2008 hearing in an effort to argue that the request for

---

[2] Def.'s Responses to Pl.'s 1st Request for Produc. of Docs. (a true and correct copy of which is attached hereto as Ex. B) at p. 4, Response to Request No. 2.

[3] *Id.*

[4] *See* proposed Order attached to Pl.'s Mot. for Prelim. Inj.

[5] *See, e.g.,* April. 17, 2008 Hr'g Tr. (a true and correct copy of which is attached hereto as Ex. C) at 36:16-41:11.

[6] *See, e.g, id.* at 11:11-13 ("He [sic] are going to run modified ads. We are going to continue to make a claim, Your Honor, that this VRAD box is associated with their service.").

injunction was moot, and that future claims and executions would somehow be different.[7]
Indeed, Comcast admitted at the hearing that it intends to continue airing ads using the VRAD
themes.[8] Comcast's attorney also agreed that the *claims*, not just the present advertisements,
were at issue.[9]

Because Comcast clearly acknowledged the relevance of future advertisements
containing the disputed claims during the April 17, 2008 hearing, its refusal to produce the
requested documents is not substantially justified, and AT&T Illinois should be reimbursed its
reasonable expenses incurred in opposing this motion, including attorneys' fees. *See* Fed. R.
Civ. P. 37(a)(5)(A).

## II.     ARGUMENT

### A.     The Court Should Order Comcast To Produce Its "Planned Or Future Advertisements Pertaining To VRADs"

Federal Rule of Civil Procedure 26(b)(1) provides parties with the freedom to obtain
discovery regarding any matter, not privileged, which is relevant to the claim or defense of any
party.[10] When there is an objection that the discovery goes beyond material relevant to the
parties' claims or defenses, the Court should "determine whether the discovery is relevant to the
claims or defenses and, if not, whether good cause exists for authorizing it so long as it is

---

[7]     *Id.* at 36:16-41:11.
[8]     *See, e.g., id.* at 30:9-19 (". . .we are not going to agree not to advertise based on the existence of these boxes. . . .").
[9]     *Id.* at 36:16-41:11.
[10]    *See Petersen v. Union Pacific R.R. Co.*, Nos. 06-CV-3084, 06-CV-3101, 06-CV-3102, 06-CV-3107, 2007 WL 1847129, at *1 (C.D. Ill. June 22, 2007) (granting motion to compel production of documents); *see also Modern Eng'g, Inc. v. Peterson*, No. 07-CV-1055, 2007 WL 2680563 (C.D. Ill. July 16, 2007) (granting motion to compel production of documents).

relevant to the subject matter of the action."[11]  Comcast "has the burden of proving that the requested discovery should be disallowed."[12]

AT&T Illinois' Motion for Preliminary Injunction makes the documents requested by AT&T Illinois directly relevant to AT&T Illinois' claims.  In its Motion for Preliminary Injunction, AT&T Illinois sought to enjoin Comcast "from disseminating or causing the dissemination of the advertisements identified in the Amended Complaint[.]"[13]  In addition, the Motion also sought to enjoin Comcast from disseminating the claims that:

> expressly or impliedly state that: (1) AT&T Illinois "blocks" consumers' homes through any means, including the placement of utility boxes on or near to the consumer's property; (2) a consumer's purchase of AT&T Illinois' subscription service will result in the placement of a utility box or other similar facility on or near the consumer's property; (3) the purchase of AT&T Illinois' television service offerings result in a consumer being adversely affected by AT&T Illinois subsequently installing a utility box or similar structure; (4) there is any causal connection between a consumer's purchase of AT&T Illinois television service offerings and the placement of a utility box or similar structure at a home or neighborhood; or (5) AT&T Illinois' television service offerings do not offer local programming[.][14]

Thus, AT&T Illinois not only sought to enjoin the four specific ads that had run prior to AT&T Illinois' filing of the Motion, but also the continued use of those literally false claims, whether expressed or implied, in future ads.

This became crystal clear during the April 17, 2008 hearing held before this Court. Several times throughout that hearing the parties and the Court acknowledged that the pending Motion for Preliminary Injunction extended beyond just the specific advertisements described in

---

[11]   *Id.* (citing Fed. R. Civ. P. 26(b)(1) Advisory Committee Notes, 2000 Amendment); *see also Modern Eng'g, Inc.*, 2007 WL 2680563 at *1.

[12]   *Petersen*, 2007 WL 1847129, at *1 (citations omitted); *see also Modern Eng'g, Inc.*, 2007 WL 2680563 at *1.

[13]   *See* proposed Order.

[14]   *See id.*

detail in the Motion for Preliminary Injunction.  For instance, the following exchange plainly

makes future executions of the same claims relevant:

> MR. MASTERS: . . . But, you know, Mr. Cole's point is the one
> that I started out with, which is why don't we have a hearing about
> the ads that we actually care about and want to continue to run?
> So, I mean, why, why don't we let him see the ads and his client
> see the ads in the beginning of May, decide whether they are still --

> \*　　　\*　　　\*

> MR. MASTERS:  *But, Your Honor, we are going to be briefing*
> *on the 9th the original ads.*

> THE COURT:  *No.*  Well --

> MR. MASTERS:  *They wrote a brief about ads that we're not*
> *running, and we are going to brief it on the 9th about ads that we*
> *are not running.*

> THE COURT:  *Well, I think you'd better brief --*

> MR. MASTERS:  Well, we can't brief --

> THE COURT:  *-- more extensively.*

> \*　　　\*　　　\*

> MR. MASTERS:  . . . But, I mean, Your Honor, *if you want us to*
> *brief on the 9th the ads that they complained about in their brief,*
> *we will, but I'm not sure that that gets us to where we need to be.*
> 　　　*And it doesn't sound like it gets him where he wants to be.*
> *He wants to brief the ads that, I presume that we actually want to*
> *run that we want to stand up here and defend.*

> \*　　　\*　　　\*

> THE COURT:  *Well, I assume in part what you're briefing is,*
> *what should be more extensive is the order you want, and that's*
> *what you should probably respond to.  But clearly the ads that*
> *are going to be proposed to be run would be, in terms of a*
> *preliminary injunction, are at this point what you people should*
> *be dealing with, I guess.  I don't guess.  You should.*

> MR. COLE:  *It's the claims, Your Honor.  We should be briefing*

*the claims, and the claims that we are attacking are in our order.*
*There can be myriad variations.*

THE COURT: *I agree. It's the claims.*

MR. MASTERS: *Yes. . . .*

\*        \*        \*

THE COURT: Okay. *If you aren't willing to show them what*
*those are, then, you know, you take the chance that I will issue a*
*broader injunction.*

MR. MASTERS: *I understand that.*

\*        \*        \*

THE COURT: *Well, I think the issues being briefed should deal*
*with whatever you think will be in the new ads. . . .*

\*        \*        \*

THE COURT: But you have no idea what the new ads will say.

MR. MASTERS: Oh, I've seen some iterations of them. . . .[15]

\*        \*        \*

MR. COLE: *Your Honor, we've given them 26 pages of why we*
*think the ads are false and the claims are false, not just those*
*particular execution, but the claims. . . .*

THE COURT: *His claims are in his proposed order.*

MR. COLE: *Yes.* There's no need to unduly complicate this and
try to make it a moving target.
        Your Honor, under the preliminary injunction standard in
this circuit, it's up to you to decide whether the conduct that we are
complaining about is likely to recur without an injunction. That's
the relevant standard.
        Now, *they say they have stopped the executions that*
*contain the claims, but they haven't agreed to not make the*

---

[15]    This exchange leaves no doubt that there are indeed documents in existence responsive to AT&T
Illinois' request for "All Advertisements concerning or relating to VRADs, including but not limited to,
planned or future Advertisements pertaining to VRADs."

*claims anymore. So, Your Honor, the issue is are they likely to*
*make those claims again, and if so, an injunction should issue.*
    And I can cite you case law, Your Honor, where parties had
agreed voluntarily to stop the ads prior to a preliminary injunction
hearing, but the Court nevertheless issued an injunction because
they were convinced that the conduct might recur.

THE COURT:  All right.[16]

Coupled with the language of the proposed Order submitted with AT&T Illinois' Motion

for Preliminary Injunction, the above-quoted colloquy from the April 17, 2008 hearing leaves no

doubt but that the documents requested by AT&T Illinois in Request for Production number 2

are directly relevant and should be produced.  During the April 17 hearing, counsel for Comcast

asked the Court to focus on the future advertisements rather than the executions discussed at

length in Plaintiff's Motion for Preliminary Injunction.  Therefore, this Court should order

Comcast to produce "All Advertisements concerning or relating to VRADs, including but not

limited to, planned or future Advertisements pertaining to VRADs."

**B.**    **The Court Should Order Comcast To Reimburse AT&T**
    **Illinois For The Expenses Incurred In Making This Motion**

If the Court grants this Motion to Compel, then Rule 37(a)(5)(A) provides that: "the court

must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated

the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable

expenses incurred in making the motion, including attorney's fees."  The only exceptions to this

requirement are if: (1) the movant failed to attempt in good faith to obtain the production without

court action; (2) the opposition to the production was "substantially justified"; or (3) "other

circumstances make an award of expenses unjust."[17]

---

[16]    April. 17, 2008 Hr'g Tr. at 36:16-41:11 (emphasis added).
[17]    Fed. R. Civ. P. 37(a)(5)(A); *see also Arrington v. La Rabida Children's Hosp.*, No. 06 C 5129,
2007 WL 1238998 (N.D Il.. April 25, 2007) (granting an award of fees under Rule 37); *Rickels v. City of*

Given the extended colloquy at the April 17, 2008 hearing quoted above, Comcast's objection to AT&T Illinois' Request for Production of Documents number 2 is not "substantially justified." Therefore, this Court should order Comcast to pay AT&T Illinois' reasonable expenses incurred in making this Motion, including attorneys' fees.

## III.     **CONCLUSION**

For the foregoing reasons, AT&T Illinois respectfully requests that the Court issue an Order compelling Comcast to: (1) produce "All Advertisements concerning or relating to VRADs, including but not limited to, planned or future Advertisements pertaining to VRADs"; and (2) pay AT&T Illinois' reasonable expenses incurred in making this Motion, including attorneys' fees.

DATED:  April 24, 2008                        Respectfully submitted,

                                              ILLINOIS BELL TELEPHONE, D/B/A
                                              AT&T ILLINOIS


                                              By: /s/ Brian L. Crowe
                                                    One of Its Attorneys

Brian L. Crowe (ARDC #0549584)
bcrowe@shefskylaw.com
John F. Kennedy (ARDC #6196185)
jkennedy@shefskylaw.com
Lynn A. Ellenberger (ARDC #6244188)
lellenberger@shefskylaw.com
SHEFSKY & FROELICH LTD.
111 E. Wacker Drive, Suite 2800
Chicago, IL  60601
Telephone:  (312) 527-4000
Facsimile:    (312) 527-4011

---

*South Bend, Ind.*, 33 F.3d 785, 786 (7th Cir. 1994) ("Fee shifting when the judge must rule on discovery disputes encourages their voluntary resolution and curtails the ability of litigants to use legal processes to heap detriments on adversaries (or third parties) without regard to the merits of their claims."); CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 8 FEDERAL PRACTICE & PROCEDURE § 2288 at 287 (1970).

and

Christopher A. Cole
ccole@manatt.com
Manatt Phelps Phillips, LLP
700 12th Street, N.W., Suite 1100
Washington, D.C.  20005
Telephone:  (202) 585-6524
Facsimile:   (202) 637-1535

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

ILLINOIS BELL TELEPHONE, d/b/a AT&T
ILLINOIS,

               Plaintiff,

      v.

COMCAST OF ILLINOIS III, INC.,
COMCAST CORPORATION,
COMCAST CABLE HOLDINGS LLC, and
COMCAST OF CHICAGO, INC.

               Defendants.

Case No.:  08-CV-1680  EDA

### PLAINTIFF'S FIRST REQUEST FOR
### PRODUCTION OF DOCUMENTS

       Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Illinois Bell

Telephone, d/b/a AT&T of Illinois ("AT&T Illinois" or "plaintiff"), hereby requests that

Defendants Comcast of Illinois III, Inc., Comcast Corporation, Comcast Cable Holdings LLC,

and Comcast of Chicago, Inc. (collectively "Comcast" or "defendants")  produce for inspection

and copying the following documents in its possession, custody or control, on **April 22, 2008**, at

the offices of Christopher A. Cole, Esq., Manatt, Phelps & Phillips, 700 12th Street, NW, Suite

1100, Washington DC, 20005, or at such other place and time as may be mutually agreed

between the parties.

### DEFINITIONS

      1.    "Advertising" or "Advertisements" shall mean and refer to all advertising,

packaging, promotional, and marketing materials in or on (i) any and all media; (ii) point-of-sale

materials; (iii) product packaging; (iv) the Internet; (v) trade presentations; (vi) promotional

materials and/or (vii) press releases.

2.    "Advertising Agency" shall mean and refer to a business or entity that assists in the creation, development, distribution and/or placement of advertising, and/or marketing or promotion of goods or services.

3.    "AT&T Illinois" shall mean and refer to plaintiff Illinois Bell Telephone, d/b/a AT&T of Illinois and all of its parents, subsidiaries, and affiliates, and includes all officers, employees, agents, representatives, contractors or consultants of those entities.

4.    "Challenged Claims" shall mean and refer to Comcast's advertising claims referenced in the proposed Order on Preliminary Injunction filed by AT&T Illinois in this lawsuit, including: (i) AT&T Illinois "blocks" consumers' homes through any means, including the placement of utility boxes on or near to the consumer's property; (ii) a consumer's purchase of AT&T Illinois' subscription service will result in the placement of a utility box or other similar facility on or near the consumer's property; (iii) the purchase of AT&T Illinois' television service offerings result in a consumer being adversely affected by AT&T Illinois subsequently installing a utility box or similar structure; (iv) there is any causal connection between a consumer's purchase of AT&T Illinois television service offerings and the placement of a utility box or similar structure at a home or neighborhood; or (v) AT&T Illinois' television service offerings do not offer local programming.

5.    "Challenged Advertisements" shall mean and refer to Comcast's advertisements referenced in the Amended Complaint filed by AT&T Illinois in this lawsuit.

6.    "Comcast" shall mean and refer to the defendants Comcast of Illinois III, Inc., Comcast Corporation, Comcast Cable Holdings LLC, and Comcast of Chicago, Inc and all of its subsidiaries, affiliates, divisions and joint ventures, and includes all officers, employees, agents,

representatives, contractors or consultants of those entities, as well as all advertising agencies and testing or research firms retained by Comcast.

7.      "Communication" shall mean any transmission of information from one person, group or entity to another, including, without limitation, by personal meeting, telephone, facsimile, electronic mail and/or teleconference or videoconference, for any purpose, whether or not planned.

8.      "Documents(s)" shall have the same meaning herein as used in Rule 34(a) of the Federal Rules of Civil Procedure, and shall be construed in its broadest sense to include, without limitation, any written, printed, typed, recorded, magnetic, punched, copied, graphic, or other tangible thing in, through, or from which information is embodied, translated, conveyed, or stored.  Different versions of the same document(s), including, but not limited to, drafts, revisions or documents with handwritten notations or marks not found in the original or on other copies are different documents and must be produced.

9.      "Pertain," "Pertains" or Pertaining" to a given subject matter means analyzing, addressing, concerning, consisting of, regarding, referring to, refuting, relating to, discussing, describing, embodying, evidencing, constituting, comprising, containing, stating, setting forth, showing, disclosing, explaining, summarizing, memorializing, reflecting, commenting on, or otherwise having any logical or factual connection to the subject matter of the discovery request.

10.     "VRAD'" refers to a video ready access device including the cabinet and any other components thereof, both individually and collectively.

11.     "You," "Your" or "Yours" shall mean and refer to Comcast.

# INSTRUCTIONS

1.      Each document produced pursuant to this Request shall be identified by the number of the Request in response to which the document is produced. If, after a good faith, diligent search for the documents requested herein, you conclude that there have never been any documents in existence responsive to a particular Request, so state.

2.      Computer files, databases, and similar electronic records shall be produced in a readable and accessible, industry standard format.

3.      Each Request shall be answered fully unless it is in good faith objected to, in which event the reasons for your objection shall be stated in accordance with Paragraph 7 of these Instructions. If an objection pertains to only a portion of a Request, or a word, phrase or clause contained within it, you are required to state your objection to that portion only. All portions of the Request that are not objected to must be produced.

4.      If any document requested herein has been lost, discarded, or destroyed, identify such document. State the type of document, its date, the approximate date it was lost, discarded, or destroyed, the reason it was lost, discarded or destroyed, a summary of its substance, and the identity of each person having knowledge of the contents thereof.

5.      Documents not otherwise responsive to these Requests, including, but not limited to, routing slips, transmittal memoranda, letters, comments, evaluations, or email, are to be produced if they are attached to, enclosed with, or electronically forwarded with, any document that is responsive.

6.      Where a Request calls for any document as to which you would claim any privilege or protection as a grounds of non production, you shall provide a privilege log identifying the document, its author, recipients, its date of creation and subject matter, as well as

4

any information required by the Federal Rules of Civil Procedure and the Federal Rules of Evidence, as interpreted by this Court and the Seventh Circuit Court of Appeals.

7.    No ambiguity claimed with respect to any of the instructions, definitions or requests herein shall be used as a basis for refusing to respond to these Requests.  In the event of any such claim, set forth (i) the purportedly ambiguous language; and (ii) the interpretation of the language relied upon in such response(s).

8.    All documents are to be produced as kept in the usual course of business or organized and labeled to correspond with the categories in these Requests pursuant to Rule 34(b) of the Federal Rules.

9.    To the extent you possess any documents in machine readable electronic formats, such documents should be produced in such formats.

## DOCUMENTS REQUESTED

1.    All documents and communications between You and any Advertising Agency pertaining to the Challenged Claims, Challenged Advertising, or VRADs.

2.    All Advertisements concerning or relating to VRADs, including but not limited to, planned or future Advertisements pertaining to VRADs.

3.    All documents and communications pertaining to the perception or understanding of actual or potential consumers of subscription television services of the Challenged Claims and Challenged Advertising, including, but not limited to consumer perception studies, surveys, focus groups, questionnaires, tests, investigations, examinations, analysis, assessment, reports or research used to determine what information, claims or messages are being conveyed to consumers by the Challenged Claims and Challenged Advertising.

4.      Documents sufficient to show Comcast's marketing and business strategies and intent pertaining to its use and/or depiction of VRADs in the Challenged Claims and Challenged Advertising.

5.      Any and all photographs of VRADs that Comcast intends to rely on in opposition to plaintiff's Motion for Preliminary Injunction, including the address (street address, city, state and zip code) depicted in the photograph and information sufficient to show Comcast's understanding as to each such location depicted whether the depiction shows an AT&T customer's home.

6.      Documents sufficient to substantiate the Challenged Claims including, but not limited to, documents and communications in Comcast's possession prior to dissemination of the Challenged Claims.

DATED:  April 18, 2008                          Respectfully submitted,

                                                ILLINOIS BELL TELEPHONE, D/B/A
                                                AT&T ILLINOIS

                                                By: _____
                                                    One of Its Attorneys

Brian L. Crowe (ARDC #0549584)
bcrowe@shefskylaw.com
John F. Kennedy (ARDC #6196185)
jkennedy@shefskylaw.com
Lynn A. Ellenberger (ARDC #6244188)
lellenberger@shefskylaw.com
SHEFSKY & FROELICH LTD.
111 E. Wacker Drive, Suite 2800
Chicago, IL  60601
Telephone:  (312) 527-4000
Facsimile    (312) 527-4011

and

Christopher A. Cole
ccole@manatt.com
Manatt Phelps Phillips, LLP
700 12th Street, N.W., Suite 1100
Washington, D.C.  20005
Telephone:  (202) 585-6524
Facsimile:   (202) 637-1535

## CERTIFICATE OF SERVICE

Kathleen M. Mckay, pursuant to the provisions of 28 U.S.C. 1746, hereby certifies and affirms that on this 18th day of April, 2008, a copy of the foregoing Plaintiff's First Set of Document Requests was served by e-mail and hand delivery upon:

Douglas N. Masters, Esq.
LOEB & LOEB, LLP
321 N. Clark Street
Suite 2300
Chicago, IL 60610
dmasters@loeb.com

*Counsel for Defendants*

30207809.2

8

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ILLINOIS BELL TELEPHONE d/b/a
AT&T ILLINOIS,

|                                          |   |                                        |
|------------------------------------------|---|----------------------------------------|
|                                          | ) |                                        |
| Plaintiff,                               | ) |                                        |
|                                          | ) | Case No. 08 CV 1680                    |
| v.                                       | ) |                                        |
|                                          | ) | Honorable Elaine E. Bucklo             |
| COMCAST OF ILLINOIS III, INC.,           | ) |                                        |
| COMCAST CORPORATION, COMCAST             | ) | Magistrate Judge Martin C. Ashman      |
| CABLE HOLDINGS LLC, and                  | ) |                                        |
| COMCAST OF CHICAGO, INC.                 | ) |                                        |
|                                          | ) |                                        |
| Defendants.                              | ) |                                        |

**DEFENDANT'S RESPONSES TO PLAINTIFF'S**
**FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

Comcast of Illinois III, Inc., Comcast Corporation, Comcast Cable Holdings LLC, and
Comcast of Chicago, Inc. ( "Comcast") make the following objections and provide the following
responses to Plaintiff's First Request for Production of Documents (the "Requests"), as follows:

**GENERAL OBJECTIONS**

1.      Comcast objects to Plaintiff Illinois Bell Telephone d/b/a AT&T Illinois'
("AT&T") requests to the extent they purport to impose upon Comcast duties and/or obligations
broader than those imposed by the Court at the April 17, 2008 hearing in this case, or the Federal
Rules of Civil Procedure or other rules or orders of this Court including, without limitation, to
the extent they purport to require Comcast to respond to document requests in a time shorter than
permitted under Fed. R. Civ. P. 34(2)(A) in the absence of a court order.  In submitting this
response and producing documents subject to this response, Comcast is not and expressly
disclaims any intent to stipulate to a shorter response period under Fed. R. Civ. P. 29.  Comcast
submits this response and produces documents subject to this response in a good faith effort to
search and locate documents responsive and relevant to the issues raised in Plaintiff's Motion for
a Preliminary Injunction given the time constraints imposed by the current procedural posture of
this case.

2.    Comcast objects to the extent that the Requests purport to require Comcast to undertake an extraordinary and unreasonable search of and inquiry with respect documents within its possession, custody, and control to comply with the literal scope of the requests, especially those requests that seek "all" documents and things relating or referring to a specific subject area.

3.    Comcast object to the Plaintiff's definition of "Comcast" as including, "all of its subsidiaries, affiliates, divisions and joint ventures, . . . officers, employees, agents representatives, contractors, or consultants of those entities, as well as all advertising agencies and testing or research firms retained by Comcast." Given the time constraints imposed by the procedural posture of this case, Comcast has not endeavored to search the files of any third parties to this action.

4.    Comcast objects to AT&T's requests to the extent they seek the production of documents or information that is not relevant, material, or reasonably calculated to lead to the discovery of relevant, material, or admissible evidence.

5.    Comcast objects to these requests to the extent they purport to require production of all responsive documents contemporaneously with the service of these responses and objections as unduly burdensome.

6.    Comcast objects to AT&T's requests as overbroad and unduly burdensome to the extent they purport to require production of documents that have already been produced by Comcast, third parties, or that are publicly available and thus equally available to AT&T.

7.    Comcast objects to AT&T's requests on the grounds, and to the extent, that they seek information that is protected from disclosure by the attorney-client privilege, the work product doctrine, or other applicable privileges or protections from discovery.

8.    Comcast objects to AT&T's requests on the grounds, and to the extent, they seek information which constitutes proprietary information, trade secrets, or other highly confidential research, development, or commercial information of Comcast.

9.    Comcast objects to AT&T's requests on the grounds, and to the extent, they seek information in which it or other individuals or entities who are not party to this action may have a legitimate expectation or right to privacy pursuant to constitutional authority, statute, or case

CH41844.1
207716-10034

law, or on any other basis, including, without limitation, the names or other identifying information with respect to any survey participants.

      10.    Comcast objects to AT&T's requests to the extent they call for an interpretation of any term or terms not defined, on the grounds that Comcast's interpretation of such term or terms may not be consistent with that intended by AT&T.

      11.    Comcast has not completed its investigation and discovery relating to this case. The specific responses set forth below and any production made pursuant to the responses are based upon, and necessarily limited by, information now available to Comcast, and in light of the present procedural posture. Comcast reserves the right to revise, correct, and to supplement, modify, or clarify the specific responses set forth below or the information disclosed therein or by subsequent changes in the procedural posture of this action. By this reservation, Comcast does not, however, assume a continuing responsibility to update its responses beyond the requirements imposed by the Federal Rules of Civil Procedure and the local rules of this Court.

      12.    The responses and objections contained herein are based only upon such information and documents currently and reasonably available to Comcast. In the responses that follow, a statement that responsive documents will be produced does not mean that: (a) any documents exist or ever existed, or (b) any such documents are in Comcast's possession, custody, or control.

      13.    Comcast expressly incorporates these General Objections into each specific response to the requests set forth below as if set forth in full therein. The response to a request shall not operate as a waiver of any applicable Specific of General Objection to a Request.

## SPECIFIC RESPONSES TO PLAINTIFF'S PRODUCTION REQUESTS

**REQUEST NO. 1**:

      All documents and communications between You and any Advertising Agency pertaining to the Challenged Claims, Challenged Advertising, or VRADs.

**RESPONSE TO REQUEST NO. 1**:

In addition to its General Objections, Comcast objects to this request to the extent it inappropriately assumes that Comcast actually made any of the claims enumerated by AT&T as "Challenged Claims." To the contrary, Comcast expressly denies that the Challenged Advertising makes any of the "Challenged Claims." Subject to the foregoing objections, Comcast will produce documents and communications in its possession or control, if any, pertaining to the Challenged Claims, Challenged Advertising, or VRADs.

**REQUEST NO. 2**:

All Advertisements concerning or relating to VRADs, including but not limited to, planned or future Advertisements pertaining to VRADs.

**RESPONSE TO REQUEST NO. 2**:

In addition to its General Objections, Comcast objects to this request to the extent it seeks information relating to "future Advertisements pertaining to VRADs" or information relating to Advertisements that Comcast never disseminated to the public as outside the permissible scope of discovery set forth in Fed. R. Civ. P. 26(b) in that such information is not relevant to any of the claims or defenses of the parties in this action. Subject to the foregoing objections, Comcast will produce "Advertisements concerning or relating to VRADs" that Comcast actually has disseminated to the public.

**REQUEST NO. 3**:

All documents and communications pertaining to the perception or understanding of actual or potential consumers of subscription television services of the Challenged Claims and Challenged Advertising, including, but not limited to consumer perception studies, surveys, focus groups, questionnaires, tests, investigations, examinations, analysis, assessment, reports or

CH41844.1
207716-10034

research used to determine what information, claims or messages are being conveyed to

consumers by the Challenged Claims and Challenged Advertising.

**RESPONSE TO REQUEST NO. 3**:

Subject to the General Objections set forth above, Comcast is unaware of the existence of

any documents responsive to this request.  Comcast reserves all rights to supplement its response

to this request, including the right to assert any appropriate objections, should Comcast discover

any otherwise responsive documents.

**REQUEST NO. 4**:

Documents sufficient to show Comcast's marketing and business strategies and intent

pertaining to its use and/or depiction of VRADs in the Challenged Claims and Challenged

Advertising.

**RESPONSE TO REQUEST NO. 4**:

In addition to its General Objections, Comcast objects to this request to the extent it

inappropriately assumes that Comcast actually made any of the claims enumerated by AT&T as

"Challenged Claims."  To the contrary, Comcast expressly denies that the Challenged

Advertising makes any of the "Challenged Claims."  Comcast objects to this request to the extent

it is duplicative of information sought in Request No. 1.  Comcast further objects to this request

to the extent it seeks highly confidential information relating to business strategies pertaining to

Comcast's uses and/or depiction of VRADs in the Challenged Advertisements, before the parties

have had the opportunity to enter into an appropriate protective order.  Subject to the forgoing

objections, Comcast will produce documents sufficient to show Comcast's marketing strategies

pertaining to its use and/or depiction of VRADs in the Challenged Advertising.

**REQUEST NO. 5**:

Any and all photographs of VRADs that Comcast intends to rely on in opposition to plaintiffs Motion for Preliminary Injunction, including the address (street address, city, state and zip code) depicted in the photograph and information sufficient to show Comcast's understanding as to each such location depicted whether the depiction shows an AT&T customer's home.

**RESPONSE TO REQUEST NO. 5**:

In addition to its General Objections, Comcast objects to this request as premature in that Comcast as not formed any intent as to what it will rely on in opposition to AT&T's Motion for Preliminary Injunction. Subject to the foregoing objections, Comcast will produce the requested photographs of VRADs subject to an agreement among the parties as to a timeframe for mutually exchanging exhibits that each party intends to use at a hearing on the Plaintiff's motion.

**REQUEST NO. 6**:

Documents sufficient to substantiate the Challenged Claims including, but not limited to, documents and communications in Comcast's possession prior to dissemination of the Challenged Claims.

**RESPONSE TO REQUEST NO. 6**:

In addition to its General Objections, Comcast objects to this request to the extent it inappropriately assumes that Comcast actually made any of the claims enumerated by AT&T as "Challenged Claims." To the contrary, Comcast expressly denies that the Challenged Advertising makes any of the "Challenged Claims." Comcast further objects to this request to the extent it requires Comcast to determine what documents it had in its possession at some time prior to any obligation to retain documents existed. Subject to the foregoing objections, Comcast

will produce documents in its possession or control, if any, sufficient to substantiate the

Challenged Claims..

Date:    April 22, 2008                        LOEB & LOEB LLP

                              By:    /s/ Douglas N. Masters
                                     Douglas N. Masters
                                     Thomas P. Jirgal
                                     Julie P. Samuels
                                     321 North Clark Street, Suite 2300
                                     Chicago, Illinois 60610
                                     Telephone:  (312) 464-3100
                                     Fax:  (312) 464-3111

                                     *Attorneys for Comcast of Illinois III, Inc.,*
                                     *Comcast Corporation, Comcast Holdings LLC,*
                                     *and Comcast of Chicago, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the forgoing, **DEFENDANT'S RESPONSES TO**

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**, was served

upon:

> Brian L. Crowe, Esq.
> James D. Wilson, Esq.
> John F. Kennedy, Esq.
> Lynn A. Ellenberger, Esq.
> Shefsky & Froelich Ltd.
> 111 E. Wacker Drive, Suite 2800
> Chicago, IL 60601
>
> and
>
> Christopher A. Cole, Esq.
> Manatt, Phelps & Phillips, LLP
> 700 12th Street, N.W., Suite 1100
> Washington, District of Columbia 20005

via electronic mail this 22nd day of April, 2008.

/s/ Blair R. Zanzig

CH41844.1
207716-10034

# EXHIBIT C

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   ILLINOIS BELL TELEPHONE,          )
                                       )
 4              Plaintiff,             )
                                       )   No. 2008 C 1680
 5         v.                          )   Chicago, Illinois
                                       )
 6   COMCAST OF ILLINOIS, INC., et al.,)   April 17, 2008
                                       )   9:50 a.m.
 7              Defendants.            )

 8              TRANSCRIPT OF PROCEEDINGS - MOTION

 9          BEFORE THE HONORABLE ELAINE E. BUCKLO

10   APPEARANCES:

11   For the Plaintiff:   MR. CHRISTOPHER A. COLE
                          MANATT, PHELPS & PHILLIPS, LLP
12                        700 12TH Street, N.W, Suite 1100
                          Washington, D.C. 20005
13                        (202) 585-6524

14                        MR. JAMES D. WILSON
                          SHEFSKY & FROELICH, Ltd.
15                        111 East Wacker Drive, Suite 2800
                          Chicago, Illinois 60601
16                        (312) 527-4000

17   For the Defendant:   MR. DOUGLAS N. MASTERS
                          LOEB & LOEB
18                        321 North Clark Street, Suite 2300
                          Chicago, Illinois 60606
19                        (312) 464-3100

20

21              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
22                 TRANSCRIPT PREPARED BY COMPUTER

23                        MICHAEL P. SNYDER
                          Official Reporter
24                   United States District Court
                219 South Dearborn Street, Room 1432
25                     Chicago, Illinois 60604
                    Telephone (312) 435-5563
```

2

1          THE CLERK:  2008 C 1680, Illinois Bell Telephone

2    Company versus Comcast; for motion.

3          THE COURT:  Good morning.

4          MR. WILSON:  Good morning, Your Honor.  James Wilson

5    on behalf of the plaintiff Illinois Bell, doing business as

6    AT&T Illinois.

7          I have with me today Christopher Cole, who has filed

8    an application for admission pro hac vice.

9          THE COURT:  I haven't seen that, but okay.

10         MR. MASTERS:  Douglas Masters on behalf of the

11   defendant.

12         THE COURT:  Good morning.

13         All right.  So how do you people want to proceed?

14   Have you discussed this?

15         MR. MASTERS:  We --

16         THE COURT:  I've been looking to see if there was any

17   response.  There hadn't been one.

18         MR. MASTERS:  We haven't come to an agreement.

19         I'd ask, if you may, we've got I guess two, in terms

20   of the response, two things to say.

21         One, we are prepared, if this is what Your Honor

22   wants to do, to proceed at this point.  We would like to take

23   the deposition of the declarants.  One of them has left the

24   employment it appears at the end of March, there may be a third

25   person who is now in that job, along with some of the relevant

3

1   documents, and we'd be prepared to respond, you know, within 14

2   days after we are able to complete that deposition.

3          THE COURT:  What is the issue on the dep?  Why do you

4   want the deposition of the declarant?

5          MR. MASTERS:  Well, the issue has to do with

6   advertising regarding competitive cable television services,

7   and these declarants are providing the facts that relate to the

8   marketing and deployment of the large boxes that are the

9   cornerstone of the --

10         THE COURT:  So you are saying whether they really put

11  them in people's yards?

12         MR. MASTERS:  No, no.

13         THE COURT:  That's really the issue, I suppose.

14         MR. MASTERS:  The claim that they are making is that

15  our ads create an inference that there's a relationship between

16  ordering the service and the placement of the boxes.

17         THE COURT:  Oh, it sure does.  I looked at it.

18         MR. MASTERS:  And --

19         THE COURT:  If it's, if it's true, it's I'm sure a

20  powerful ad.

21         MR. MASTERS:  Yes.  So in order to understand the

22  veracity of their position, we need to understand how the

23  marketing of the services in the various community dovetails

24  with the positioning and decisions to deploy the boxes in the

25  various locations.

4

```
1              THE COURT:  Well, they say the boxes never go in
2    somebody's yard; they go off in some neutral spot.  I gather,
3    at least my understanding of it is that basically you're saying
4    it's like a -- I'm not sure I even know the correct word for
5    it, but like a cell tower type thing.
6              MR. MASTERS:  Your Honor, I have, if I could hand up
7    a couple pictures.  These are pictures of installations in the
8    Chicagoland area --
9              THE COURT:  Okay.  Well, it's like I said.
10             MR. MASTERS:  -- that are, that show the
11   juxtaposition of the boxes to a residence.
12             I think, though, the alternative I think to this --
13             THE COURT:  That's accurate?  Well, I mean, if that's
14   all we are getting to is --
15             MR. COLE:  Your Honor, I am not going to be able to
16   deny that those are actual photos, but the point that is being
17   made is a little misleading, Your Honor.  We are not arguing
18   that boxes don't sometimes wind up near a house.  The inference
19   in the ads, the direct literal claim in the ads is that when
20   somebody buys AT&T's U-verse service or a dish, that they will
21   have a box installed in their yard, and that is utterly false,
22   Your Honor.  It's the linkage between the purchase of the
23   product and the location of the box.
24             The boxes are located well in advance of any
25   particular customer's order, they are part of the network
```

MICHAEL P. SNYDER, Official Reporter

5

1  infrastructure upgrade that is planned well in advance, and

2  Comcast I believe does not dispute this.

3           THE COURT:  Where are the boxes going?

4           MR. COLE:  They go in public rights of way, existing

5  utility areas, on very rare occasions they go on private

6  easements, but only with the consent of the homeowner that the

7  easement runs through.

8           But it is our -- it is not true that the location of

9  the box, and this is the claim in the ads that we are

10  challenging, is driven by any individual's purchase of the

11  product.  It's just like cable trenching, Your Honor.  They

12  will dig a trench to build a cable out in a neighborhood well

13  in advance of any consumer ordering it.  It's part of an

14  advance plan process.

15           What they are trying to do through these ads, and

16  Your Honor saw it very well, is convince consumers that if they

17  don't order AT&T, they won't have a box in their neighborhood

18  or they won't have a box in their front yard.

19           THE COURT:  Well, I suppose it could be a backyard.

20           MR. COLE:  Or backyard, Your Honor.

21           MR. MASTERS:  Well, Your Honor I think you'll see

22  from the ads, there's no express statement in that regard.

23  What their claim is is that the context of the ad creates this

24  takeaway of this inference.

25           These ads that they are complaining about have

MICHAEL P. SNYDER, Official Reporter

6

1  stopped running, and we have told them they have stopped
2  running.  They haven't run for two or three weeks in some
3  cases, one I think --
4        THE COURT:  I was looking for one.
5        MR. MASTERS:  So we are in the process of revising
6  them to try to take into account some of the issues that
7  they've raised, and there has been a lot of ongoing dialogue
8  where we have been trying to see if we can reach accommodation.
9        THE COURT:  How long did the ads run?
10       MR. MASTERS:  How long did they run when they ran?
11       THE COURT:  I don't mean how many seconds.  I mean,
12  how long were the ads on?
13       MR. MASTERS:  One ran for three days, and the other
14  two, the print ad I think ran maybe only one time.  The
15  television ads, one ran for three days, and one of them I think
16  was pulled, the other two I think were pulled after maybe a
17  week.  So a very short period of time.
18       MR. COLE:  Your Honor, maybe I could just briefly go
19  through the time line, which might give you a little insight as
20  to why we are here, because we actually tried to avoid being
21  here.
22       And he's correct, we've had many conversations with
23  them.  Unfortunately, every time we thought we had reached an
24  agreement, a new ad would start running.
25       The first print ads started running around mid-March.

7

1   We immediately complained.  A print ad ran again after we

2   complained.  Then we wrote a formal letter that I wrote

3   actually on March 19th.  March 20th the print ad ran again.

4        We filed the complaint but did not serve it on March

5   24th.  They wrote a letter back saying none of the ads are

6   running.  Everybody agreed to stand down.  We agreed not to

7   serve the complaint for a while.  They told us at that time the

8   print ads had run their course and are not scheduled to run

9   again.  They told us that this lineup ad has not run on

10  television, and they were trying to figure out how it got up on

11  YouTube in the first place.  YouTube is the web video sharing

12  site.  It had been put up there by their ad agency, it was

13  quite clear.

14       They told us that curb appeal was being pulled.

15       THE COURT:  Well, then it never comes off, right?

16       MR. MASTERS:  Pardon me?

17       THE COURT:  Once it's on YouTube, it's permanent, is

18  that right.

19       MR. MASTERS:  Well, it never ran on television.  It

20  was available to be seen on YouTube but got taken down off of

21  YouTube.  So things aren't forever on YouTube.  But it never

22  aired on television, but a clip of it was available to be seen

23  on YouTube, that is correct.

24       MR. COLE:  In this same letter, and this all, Your

25  Honor, is submitted along with our preliminary injunction

8

1  papers, my declaration Exhibit H, they also said Comcast can't

2  commit to future ads -- okay, we understand that -- and doesn't

3  concede that any of the claims made in any of these ads are

4  false or misleading.

5         Then on April 7th, Your Honor, we saw this new ad

6  split screen. And, Your Honor, I actually have some story

7  boards of all these to help you see what they look like.

8         THE COURT:  Okay.

9         MR. COLE:  Which weren't available earlier.

10         The split screen ad, Your Honor, ran after we filed

11  the complaint, after we thought we had resolved everything, and

12  that is at Exhibit C of these demonstratives, Your Honor.

13         And the key claim there occurs at the bottom of the

14  page where they are comparing two different houses.  The house

15  on the left is AT&T, the one on the right is Comcast.  They

16  say, the announcer closes by saying:  Oh, yeah, one other big

17  difference, one home may get -- boom, and then the VRAD

18  appears -- some free landscaping.

19         THE COURT:  Yes, we saw that.  That was on the --

20         MR. COLE:  Right.

21         THE COURT:  -- the video.

22         MR. COLE:  So, Your Honor, we then wrote a letter

23  immediately demanding that that be pulled down, and we received

24  the following response from counsel which suggested that not

25  only did they defend every single claim in there, but that they

9

1 would reserve the right to run similar ads in the future,

2 perhaps modifying them.

3          Now, in the last week they've suggested we'll agree

4 not to run the quote explicit claims, but we are not going to

5 go any further than that.

6          Your Honor, the risk of error here, we'd be happy if

7 they would agree not to say the things that I believe they

8 conceded are false:  One, when you order AT&T, you are going to

9 get a VRAD somewhere near your home or in front of your house

10 or in back of your house; and, two -- that's all set out in our

11 order, Your Honor -- that there's any linkage at all between

12 the purchase of AT&T's service, whether dish or U-verse, and

13 the location of these VRADs.

14          Now, if they would agree to that, Your Honor, we

15 could end it here.  Now, he says he needs to depose the

16 declarants, Your Honor.  None of these declarants says anything

17 about the implied messages in these ads.  They are not

18 testifying about that.  One testifies about how these things

19 get located, and one testifies about the tremendous harm that

20 these ads are causing AT&T.

21          So if we give them a license, Your Honor, to continue

22 to make, to refrain from the explicit claims but to make

23 perhaps implied claims that are just as false, the risk of

24 damage and error on AT&T is far more severe than the risk on

25 Comcast.  Comcast could stop these VRAD ads pending a

10

1    preliminary injunction hearing very easily, Your Honor.  But if

2    they run a false one, we have to come back into court and

3    complain about it, and it could be a week before we get any

4    resolution.  My client is irreparably harmed in the meantime.

5            THE COURT:  Well, I think you're either going to have

6    to show they are true or somehow show that it's okay, which I

7    doubt if you can if it isn't true.

8            MR. MASTERS:  Well, Your Honor, there are no explicit

9    claims.  The ads don't say "You order this; you get this."

10            What their claim is is that even though our ads are

11   humorous there's a, the one --

12            THE COURT:  They are not humorous to AT&T.

13            MR. MASTERS:  Well, there's a VRAD box --

14            THE COURT:  -- funny if they are true.

15            MR. MASTERS:  Well, someone dressed as a VRAD box on

16   the lawn roasting marshmallows hardly is an explicit claim that

17   you're going to get a box on your lawn.  It's a humorous poke

18   of fun at the fact that they have enormous boxes that are being

19   put in people's front areas and side areas, back areas, all

20   over their neighborhood.

21            So the problem we have here is that the ads aren't

22   running.  It's going to take about two weeks before they are

23   going to see any new television ads because, as we've told

24   them, we are going back, we are modifying the ads.  So in the

25   rest of April you are not going to be seeing any ads about the

11

1   VRAD boxes on television.

2          THE COURT: All right. Well, all that tells me is I

3   don't have to have an evidentiary hearing; if I have to have

4   one, I don't have to have it today. Good.

5          MR. MASTERS: But the problem, Your Honor, is that if

6   we go ahead and try to have a preliminary injunction hearing

7   with the ads that they've complained about not running and

8   there's no, you know, there's an agreement, we will not run

9   them in that form --

10         THE COURT: Yes, but what are you going to run?

11         MR. MASTERS: We are going to run modified ads. We

12  are going to continue to make a claim, Your Honor, that this

13  VRAD box is associated with their service. This is what they

14  are doing. They are deploying these large boxes that are low

15  tech to complete with us and provide inferior service.

16         And these boxes have been the subject of lots of

17  controversy within the communities they have been set up in.

18  They have had problems that have caused them to explode and get

19  set on fire. These are controversial boxes.

20         And there's nothing improper at all about Comcast

21  coming in the market and saying: This is what AT&T is doing;

22  they are offering you a service that requires these big boxes

23  to be put in the neighborhood, and here's the limitations on

24  services that they offer.

25         There's no issue about explicit claims. We are not

1  going and advertising if you order, you get a box.

2          THE COURT:  That isn't exactly what that says.

3          MR. MASTERS:  So there's no explicit claims at all.

4          THE COURT:  It pretty much says --

5          MR. MASTERS:  They are all contextual.

6          THE COURT:  -- or implies that, was certainly my

7  interpretation.  I think those of the others who --

8          MR. MASTERS:  Your Honor, it's going to need to be

9  interpreted.  I respectfully disagree that we know what the

10 takeaway is to consumers without any evidence about what

11 consumers take away.

12         THE COURT:  All right.  Well, you can try and show

13 that it is.  I think that you're not going to find that, if the

14 ads are like the ones there, that anyone would draw any

15 other -- it's certainly a reasonable conclusion, which I think

16 is probably the intended conclusion, that if you order AT&T,

17 you're going to get one of these boxes, or at least that you

18 may get one of these boxes along with it, which are certainly

19 unsightly.

20         MR. MASTERS:  Well, Your Honor, I don't know how

21 you're going to conduct a hearing and determine what relief is

22 appropriate when we don't know what the context of the claims

23 is, what the ads say.

24         THE COURT:  All right.  But what I'm trying to find

25 out right now -- I don't know, maybe you want some discovery.

13

1          MR. COLE:  No, Your Honor.  We don't need discovery.
2     In fact, we think you could rule on the papers.
3          THE COURT:  Well, they are not running these, so, I
4     mean, the issue is --
5          MR. MASTERS:  Well, what are you going to enjoin?
6          MR. COLE:  The issue is the scope of the injunction.
7     And we thought long and hard about it when we put in that
8     order.
9          THE COURT:  Well, that part could be hard because,
10    yes, I think in general competitors can say "Our product is
11    better than your product."  That part is not going to happen.
12         MR. COLE:  Certainly, Your Honor.  And I believe our
13    injunction doesn't prohibit them from saying that in any
14    respect.  It prohibits them from making false claims, Your
15    Honor.
16         THE COURT:  Let's see.  Who's got the papers?
17         MR. COLE:  I have the extra copies of the proposed
18    injunction order, Your Honor.
19         THE COURT:  Let me have that, and, you know, I have
20    something that is just going to take a minute.  Why don't you
21    people just be seated.  I'll just take care of this.
22         (Recess.)
23         MR. MASTERS:  So, Your Honor, I think there's a real
24    issue as to what we are going to be able to accomplish by
25    running ads that aren't running and won't run again.

14

```
 1          THE COURT:  That doesn't mean they don't have a right
 2   to proceed when you're not conceding, but you people need to
 3   get more precise about what the issues are.  Let me just see
 4   what his proposed order says, though.
 5          Well, while I'm dealing with them, maybe you could
 6   just see which parts of these you don't agree with.
 7          MR. MASTERS:  By these, you mean the requested
 8   relief?
 9          THE COURT:  In the proposed order, yes.
10          MR. MASTERS:  Okay.
11          THE COURT:  Okay.  This should only take a couple
12   minutes.
13       (Recess.)
14          THE CLERK:  2008 C 1680, Illinois Bell Telephone
15   versus Comcast.
16          MR. WILSON:  Good morning again, Your Honor.  James
17   Wilson and Christopher Cole on behalf of Illinois Bell.
18          MR. MASTERS:  Douglas Masters on behalf of the
19   defendant.
20          THE COURT:  Okay.  So what have you figured out?
21          MR. MASTERS:  Well, Your Honor, we have an issue
22   expressly, which we are not doing and haven't done, is not a
23   problem.  Impliedly is a problem.  The other, the only other
24   issue, the impliedly is a big issue.
25          Point five of the local programming, again, this is
```

MICHAEL P. SNYDER, Official Reporter

15

1  not an explicit issue.  We had advertised that there's no local

2  programming on On Demand service where you can call it up when

3  you want.  They didn't like the way we did that in a particular

4  ad.  We've agreed to relook at that and do that again.  We need

5  to be able to remain free to say they don't have local

6  programming on On Demand, because that is a service feature

7  that distinguishes the services.  We would not say, period,

8  they don't have local programming because we know they do have

9  some local programming, and we are not -- we haven't and would

10 not do that.

11      But we can't agree on impliedly.  It appears that

12 their position is if we advertise using animated boxes or

13 making the boxes the feature of the ads, it necessarily is

14 going to tell people that if they order, they get a box.  And

15 we don't accept that.  We think that that is a fair vehicle to

16 use to associate their service with these boxes and make other

17 claims about their service.

18      THE COURT:  Okay.  Let's start with the first one,

19 that impliedly would state that AT&T blocks consumers' homes

20 through any means including the placement of utility boxes on

21 or near the consumers' property.

22      And you're saying that you won't agree -- well, do

23 you agree that the ads that they attached in their motion plus

24 the one -- well, that's really the same one, I think -- that

25 that expressly or impliedly does do that?

16

1    MR. MASTERS: Well, there was a print ad that had

2  that word in it, "blocks," and so there was explicit claims in

3  a print ad.

4    THE COURT: Well, without the word "blocks," how

5  about the one that shows that you may get unexpected

6  landscaping?

7    MR. MASTERS: That doesn't, that doesn't expressly or

8  impliedly say that you're going to get blocked. It's a --

9    THE COURT: Well, it does say may, I guess.

10    MR. MASTERS: Well, and it shows an animated -- in

11  the context of that ad, it shows an animated box hopping up in

12  the middle of someone's lawn talking about landscaping. It's a

13  parodic, comic way of making a point about these boxes being in

14  people's neighborhoods. Nobody thinks they are going to get a

15  box in the center of their lawn.

16    THE COURT: I did.

17    MR. MASTERS: Well --

18    THE COURT: When I saw that. I mean --

19    MR. MASTERS: Maybe if you hadn't seen the story

20  board and you had seen it in the context, you would have --

21    THE COURT: No, we just, I just watched the video

22  clip.

23    MR. MASTERS: Did you see the one with the roasting

24  the marshmallows? There's an ad where a box, a giant box, the

25  guy dressed in a box costume roasts marshmallows in the middle

MICHAEL P. SNYDER, Official Reporter

17

1  of somebody's lawn.

2            THE COURT:  I think there were three.

3            MR. COLE:  It's Exhibit D to the demonstratives.

4            MR. MASTERS:  And I would suggest, Your Honor, that

5  without some survey evidence, I don't think that we would

6  certainly believe that consumers think that there's going to be

7  a giant box in their lawn, and the box is going to be roasting

8  marshmallows, that dogs are going to relieve themselves on the

9  box.  These are all things that happened in the ad.  These are

10  humorous ads.

11           MR. COLE:  Your Honor can, I respond?  First of all,

12  it's well established under the Lanham Act that humor does not

13  otherwise excuse a false claim.

14           And it's also well established that claims could be

15  made both through words and through images.

16           This one I think is pretty darn clear:  We got AT&T,

17  and look what we got.

18           He looks out the window crying, and he sees the VRAD

19  box in his front yard.  There's no doubt about that.

20           So the explicit claim through words and images, the

21  net impression of that ad, the explicit literal claim being

22  made is:  We got AT&T, we bought AT&T, we got the box on our

23  front yard.

24           And then, of course, to add to injury, the dog

25  urinates on the VRAD at the end.  All of these ads make the

1 same claim.

2      Now, I don't see, Your Honor, that they dispute that
3 that literal assertion is false.  There's no argument, I don't
4 think, about the facts that if you buy AT&T, you don't get a
5 box at or near your house.  I don't think they are arguing
6 about that, and I'm not sure why we would do discovery on that
7 point.

8      In fact, if they believe it, they should have that
9 substantiation in their pocket already before they run the ads,
10 and they would provide it to you with their opening submission.

11      So I'm not sure what we are arguing about.  If they
12 agree that they won't explicitly make the claim, then why
13 should they be permitted to make it by implication?

14      MR. MASTERS:  Well, the point, Your Honor, is they
15 think any time we put a box in an ad, we are implying that if
16 you order the service, you get a box.  We had a box in an ad
17 that said:  My neighbors got AT&T, and look what happened to
18 our neighborhood.  And then you see boxes in the neighborhood.

19      Well, does that mean I ordered the service, somebody
20 ordered the service, they got it on their lawn?  Of course it
21 doesn't.  There are boxes in the neighborhood.  Why are they
22 there?  They are there because they want to be able to provide
23 this service to people.  If they weren't going to provide the
24 service to people, they wouldn't need the boxes.  The boxes
25 aren't labeled AT&T.  The consumers don't even know why these

19

1   boxes are showing up.

2          So we, we are not going to be in a position to agree

3   to a position that's going to force us to be before Your Honor

4   every time we run an ad that has a box in it, because their

5   client's position is they don't want us showing people these

6   boxes.  As Your Honor said, they are pretty unsightly, and this

7   is apparently a sore point for them that they have to use these

8   giant boxes to deliver a service that doesn't have all the

9   features that we do, but it's a fair game for competition.

10          MR. COLE:  Well, Your Honor, just to respond, I think

11  the risk of error here falls much more severely on AT&T.   And

12  in fact, I think if you issued an order enjoining their

13  impliedly making these absolutely false factual statements --

14          THE COURT:  Well, the problem is I need to know what

15  is absolutely false factual statements.

16          MR. COLE:  Well, our order I think sets forth the

17  statements that we believe are factually false.

18          THE COURT:  That it blocks consumers' homes, okay.

19          That their purchase will result in the placement of a

20  box on or near the property.  But I suppose --

21          Okay, the third one, purchase of their service

22  results --

23          MR. COLE:  Really, 1 through 4 are really variations

24  on the same exact theme that buying AT&T, whether dish or

25  U-verse, will result in you being, you having a box or being

20

1    more likely to have a box at or near your home.

2            THE COURT:  And you're saying, you're saying there's

3    utterly no relationship, and I take it that they are saying,

4    well, there is relationship if people -- but I don't -- I mean,

5    I don't know whether it's --

6            There's two ways, I suppose.  I think what these ads

7    imply, and if you want to come in with some survey that says

8    otherwise, fine, but I don't, I think you'd be hard pressed to

9    do it.  The ads certainly seem to indicate that you are likely

10    to end up with one of these boxes in your yard.

11            Now, if you're saying something a little bit

12    different, that you want to be able to tell consumers that

13    unlike Comcast, AT&T is putting up these unsightly boxes and

14    you want to run a, you want to say nobody should be buying

15    AT&T, then if it goes out of business, we won't have all these

16    unsightly boxes or something; I suppose to the extent it's true

17    you have a right to run some sort of thing, but I think that's

18    a little bit -- it's more than a little bit different.  It's

19    quite a bit different.

20            MR. MASTERS:  Your Honor, first of all, they have the

21    burden to show that these ads are false.  If they are not

22    literally false, and they believe they are impliedly false,

23    they have to come in with consumer evidence.  So I don't want

24    to leave the statement that we somehow have a burden here to go

25    unstated.  They are claiming that when people see these ads,

MICHAEL P. SNYDER, Official Reporter

21

1    they have a particular takeaway.

2              THE COURT:  And you're saying that under Seventh

3    Circuit law they are required to have a survey?  I don't know

4    that that's always the case.

5              MR. MASTERS:  Well, if it's an impliedly false claim,

6    they have to have evidence of consumer perception.  It doesn't

7    have to be a survey, but it's not enough for them to just write

8    in a brief we think this is what consumers' takeaway will be.

9    So that's the first point.

10             The second point is, Your Honor, these boxes are in

11   the neighborhoods to deliver the service.  So there's no --

12             THE COURT:  Well, how many of them are?  Where are

13   they?  What are you talking about?

14             MR. MASTERS:  Well, they serve, I mean, we've got

15   maps of several communities where there's, I don't know,

16   several dozen of these boxes let's say in Evanston, for

17   example.  They serve 300 to 700 homes.  So depending on how the

18   layout of the homes is and infrastructure issues, they are

19   going to have to put them in proximity to -- these are part of

20   the issues, what marketing decisions are they making?  When

21   they go to Evanston, how many people are they going to assume

22   are signing up?  Do they assume everybody signs up so they put

23   enough boxes in there in the neighborhood to support every

24   single home, every fifth home?  Are they putting them, you

25   know, in particular concentrations in particular areas so that

22

1   if we wanted to target an area, you know, along the northwest

2   part of Evanston, we could say:  Well, look, these people have,

3   there is a causal relationship.  They have made a marketing

4   decision that they believe that they are going to be able to

5   sell more service in this area, so they put more boxes here.

6          So, I mean, these are issues that are, you know,

7   subsumed by this implied issue, and I think there's really a

8   prior restraint issue here.  I mean, this is commercial speech.

9   Commercial speech is entitled to some protection here, truthful

10  commercial speech.  We've got a Rule 65 ambiguity issue.

11         What I don't want to do is modify these ads to take

12  into account the concerns we've raised, which we've done in

13  good faith and are continuing to do, and then come back here

14  because they believe that, you know, if we say in the

15  neighborhood, that means that people are going to think it's on

16  their lawn when we say, no, we say in the neighborhood or

17  whatever.

18         So, you know, we don't have a problem trying to work

19  this out.  We don't have a problem staying away from explicitly

20  false claims.  We just don't believe that this can be done in

21  the abstract.

22         And we have a series of ads that haven't run, aren't

23  running and won't run.  We have a new set of ads that are going

24  to come out that are going to take into account the discussions

25  that we've had and presumably will continue to have.  So I'm

23

 1   concerned about going down a process that's ultimately not
 2   going to make a lot of sense at the end of the day.
 3          MR. COLE:  Your Honor, can I just respond to a couple
 4   points?
 5          One is I think we are conflating two issues.  One is
 6   what claim is being conveyed by the ad, and, two, whether that
 7   claim is true or false.  We've argued in our briefs extensively
 8   that the claims we are challenging are literally stated in the
 9   ad, they can be stated literally or literally by necessary
10   implication.  Both of those are Your Honor's decision.  That's
11   a finding of fact that Your Honor makes, and you have complete
12   discretion to determine whether the claim is literally made or
13   not in the ads.
14          And in fact, it would be error, legal error to accept
15   consumer survey evidence under the Mead Johnson versus Abbott
16   Labs case in this circuit, Your Honor, to consider consumer
17   survey evidence relating to an ad that you've concluded or is
18   literally stating a false claim.  You can't use consumer survey
19   evidence to vary the literal meaning of an ad.  That's black
20   letter law in this circuit.
21          The second issue, however, the false claims, I hear
22   the argument ably stated, but I think he's unduly complicating
23   what is a pretty straightforward issue.  The ads at issue are
24   proposing a commercial transaction one-on-one with a consumer.
25   There's no doubt that those ads are saying don't buy this

24

1  product because you're going to have a VRAD.  It's plain as
2  day.
3         Now, we could try to backtrack and construct some
4  sort of a complicated argument that maybe it's more likely if
5  700 consumers in your community all get together and they might
6  locate another VRAD.  That issue I don't think is before you.
7  I think it's a stretch in the extreme, and it's just an effort
8  to delay resolution, and I think if we don't get a clear order,
9  what's going to happen is we are going to end up before you
10 more often.  I think the exact reverse of what he's suggesting,
11 that if you don't issue an order, we'll be more likely to stay
12 away; I think it's exactly the opposite is true, if we don't
13 have clear guidelines, and they have already said they are
14 doing more VRAD ads, if there aren't clear guidelines, we are
15 going to be back here as soon as they run any VRAD ad.
16         THE COURT:  All right.  But I need to know what part
17 you're challenging as being --
18         Well, if I understand it, in the first place, you're
19 saying the ads that were there are either true, factually true
20 or no one would believe it was true.  Which or both are you
21 saying?
22         MR. MASTERS:  Well, the ads that we've taken down?
23         THE COURT:  Yes.
24         MR. MASTERS:  Our position on those is that they are
25 not literally false, they don't make literally false claims,

MICHAEL P. SNYDER, Official Reporter

25

1   and there is no evidence of consumer perception that would show

2   that those ads misconvey the message.   The message is a

3   parodic, humorous message.

4           THE COURT:  Okay.  You can give me a brief that says

5   both of those and tells me why I can't make that decision.  My

6   concern is --

7           MR. MASTERS:  But we are not going to run those ads.

8   We will tell you, and we have told them, we will not run those

9   ads in that form.

10          THE COURT:  But I can't tell what you're going to

11  run.  See, if you won't concede that there is a problem with

12  those, then it's very hard to talk about the ones in the

13  future, about what you may be going to do.

14          MR. MASTERS:  Well, I mean, at best, Your Honor,

15  their argument is, as I said, a contextual one.  Nobody in the

16  ad stands up and says:  Order the service, you get a box.

17          At best they are saying, if you look at the whole

18  context, that's the takeaway, okay.  So if you start with that

19  premise, you can't know whether an ad is false unless you look

20  at the context.  If you want to tell us, you know, Comcast,

21  don't explicitly tell people this message, don't say this

22  message, that's fine.

23          THE COURT:  But what you're saying we've got a

24  language problem.

25          MR. MASTERS:  They are not saying we are saying the

MICHAEL P. SNYDER, Official Reporter

26

1   message.  What they are saying is --

2        THE COURT:  Well, they are saying it's quite

3   explicit.  From my looking at it, I only looked at it once, but

4   it looked pretty explicit to me.

5        MR. MASTERS:  If you look at their brief, Your Honor,

6   they go to a doctrine and cite to a number of Second Circuit

7   cases that say it's literally false by necessary implication.

8   They don't say there's a literally false statement in this ad.

9   What they say is the only reasonable takeaway, the only

10  reasonable interpretation is a literally false message that

11  requires an interpretation of the context in which certain

12  statement are made, visually and the rest of it.  And that,

13  that's their position, and that's fine.

14       But what that tells us is this isn't a case where an

15  ad says our service costs twice as much, you know, your service

16  costs twice as much as mine, and then you can tell the parties

17  don't advertise a price claim that is based on X.  Okay,

18  everybody could understand that.

19       That's not what's going on here.  I mean, if you want

20  us to brief the issues on these ads that we have that we are

21  not running and won't run, that's fine.  I'm not sure that's

22  going to get us to where we need to go.

23       THE COURT:  It doesn't sound like it is.

24       And my problem with the proposed order right now is

25  I'm not sure what that, what that would mean.  Let me just see.

MICHAEL P. SNYDER, Official Reporter

27

1        I mean, I suppose he's right, it is your burden that
2   you have to show -- I can't imagine that I can't make a finding
3   without expert testimony if I don't need expert testimony, that
4   as to what that shows if it's utterly clear.  I mean, if
5   somebody comes in with a, if something is just going to be so
6   explicit, I could be wrong, I haven't looked at Seventh Circuit
7   law on this recently, but I don't think that.
8        On the other hand, it is certainly your burden to
9   show that everything you want in here, that this would, if they
10  did it, that this would be false.
11        MR. COLE:  Your Honor, we believe we have extensively
12  briefed that already, and it's in the declarations.
13        THE COURT:  Then I suppose if you -- and you're
14  saying in order to disprove his statements, you need discovery?
15        MR. MASTERS:  Well, they've got two declarants that
16  are supporting the factual assertions that underlie their
17  claim.  We don't have any -- I mean, we want the relevant
18  documents.  We want to depose those two declarants.  And as I
19  said, one of them that they are relying on I believe has left
20  the company.
21        MR. COLE:  No, he's still at the company.
22        MR. MASTERS:  He's still with the company.  He's left
23  his position that he speaks to I think as of April.  So I
24  believe now in this regime that there's another person who is
25  responsible for these decisions or these decisions going

28

1  forward or maybe has the company's position.

2        THE COURT:  Okay.  These are quite factual as to

3  whether the purchase of AT&T Illinois television service is

4  going to result in a consumer -- it's going to result in AT&T

5  subsequently installing a utility box or similar structure.  I

6  mean, I don't know what, I don't know what could possibly be

7  meant by the little clause in there of being adversely

8  affected.  I mean, that gets pretty subjective.

9        MR. MASTERS:  If they underestimate, let's say, Your

10 Honor, they underestimate how many people are going to sign up

11 for the service in the community, and then people start signing

12 up for the service, they may actually have to put more boxes

13 out.  I don't know the answer to that question.

14       THE COURT:  Well, I suppose it depends where they put

15 the boxes.

16       MR. MASTERS:  And they haven't -- I mean, there is

17 maps.  We could look and see where they put the boxes.

18       THE COURT:  But then you get into I suppose issues

19 of, you know, it's really up to Evanston, for instance, to

20 decide whether it's appropriate where they are put, and

21 Evanston is run by people.  If they start making really bad

22 decisions, people may decide they don't like what they are

23 doing.

24       Now, true, that's a long term thing, but it seems to

25 me to be one thing whether something is put in somebody's front

MICHAEL P. SNYDER, Official Reporter

29

1  yard or in the front walkway, and it's another whether it's put

2  wherever they put those television towers.

3          MR. MASTERS:  Well, I think they are saying not only

4  that it's in their yard, but there's a causal connection

5  between ordering the service and having boxes anywhere.  And it

6  may be in fact the case that the more people that order, the

7  more boxes there are.  I mean, that's an assertion that they

8  made, and we are entitled to test that because they are basing

9  the literal falsity of our ads on that proposition based on a

10  declaration of somebody we've never had a chance to talk to and

11  documents we haven't seen.  So I mean --

12          THE COURT:  Well, I tend to -- if you want it this

13  broad, I tend to agree that, okay, so take the depositions next

14  week.

15          MR. MASTERS:  Well, that's fine.

16          THE COURT:  Do you want any depositions?  Do you want

17  to know -- you probably want to know what they are proposing.

18  That might be helpful actually.

19          MR. COLE:  Your Honor, we'll make the witnesses

20  available next week if we need to.

21          THE COURT:  Okay.

22          MR. MASTERS:  We can give them a dep notice and

23  document request today, and if we could take the depositions

24  and have a couple weeks after that.  I mean they filed a

25  26-page oversize brief.  I think giving us two weeks or more to

30

1  respond is not unreasonable.

2          THE COURT:  No, I can't do that.

3          MR. COLE:  And, Your Honor, the problem is that

4  during the pendency of this process, then these ads are still

5  running.

6          THE COURT:  Unless you are going to agree that you

7  are not going to put up more ads, or you're willing to, you

8  know --

9          MR. MASTERS:  Well, first of all, the ads that they

10 have complained about are not running.  And it's going to take

11 us in the neighborhood of about two weeks before the modified

12 ads will be able to hit the television air waves again.  So we

13 have a window of time in any event with regard to this.

14          So, I mean, beyond that, we are not -- I mean, we are

15 not going to agree not to advertise, we are not going to agree

16 not to advertise based on the existence of these boxes, and

17 whether the ads are even objectionable to them we won't know

18 until they see them, or objectionable to you, probably more

19 important.

20          But, you know, so we have a window here.  But in the

21 meantime, Your Honor, we are entitled to be in a position to

22 defend ourselves.  They want Your Honor to believe this is

23 simple, but yet somehow they needed 26 pages to explain it.  I

24 mean, we do need a little bit of time to get a response

25 together.

31

```
 1              THE COURT:  All right, but it isn't like you're
 2    starting today.  You've had, this was filed when?
 3              MR. MASTERS:  Monday.
 4              MR. COLE:  Filed Monday, although the issue,
 5    obviously, Your Honor, has been discussed for quite some time
 6    between the companies.
 7              THE COURT:  Well, go do whatever depositions you want
 8    next week.  My problem is that we could be getting into a time
 9    when I have a problem.
10              MR. MASTERS:  Does Your Honor want to refer it down
11    to the magistrate judge?
12              THE COURT:  That won't get anything done very fast,
13    probably.  Who is it?
14              MR. MASTERS:  I believe it's Judge Ashman.
15              THE COURT:  Well, it's conceivable, we'll see, if it
16    ends up having to.  I guess I'll give you until the 9th to file
17    your response, and come back here on the 13th and we'll decide
18    whether we have to, what to do.
19              Now, if you start running new ads, and they may come
20    running back --
21              MR. COLE:  Your Honor, we would --
22              THE COURT:  And I'm, I'm doing this on the agreement
23    that you're not, your say-so that you're not running these same
24    ads.
25              MR. MASTERS:  Yes, Your Honor.  I'm representing that
```

32

1   we are not running these ads, and we will not run them in this
2   form.  They are going to be modified or there's going to be
3   different ads.  And if they have an issue with them --
4          THE COURT:  Well, I'll tell you that if it turns out,
5   unless, of course, I mean, if it is false, that these boxes are
6   going to start appearing in somebody's yard or otherwise
7   disturbing either these people or, you know, or I suppose their
8   immediate neighbors, people have to deal with neighbors too,
9   then probably your ads shouldn't make that -- it shouldn't be a
10  fair reading of it that that's what they do, which clearly is
11  what the intent was of those ads.  I don't know how they could
12  say that they intended to convey any other meaning.  Are you
13  saying they were intended to convey some other meaning?
14         MR. MASTERS:  Well, you know, I could tell you that
15  our, when our client was having the boxes dancing on the lawn
16  and that sort of thing, they weren't intending to tell people
17  that the box was going to be literally on their lawn.  Boxes
18  are in front of people's houses, behind people's houses, next
19  to people's houses.  But I guess we didn't think --
20         THE COURT:  Really?  I mean, somebody orders this and
21  they end up with a box?
22         MR. MASTERS:  Well, not that they, not that one day
23  they order it, the next day they get a box.  But I handed Your
24  Honor a photograph that shows a house.  In front of the house
25  it shows a box, and that box shows up in front of somebody's

MICHAEL P. SNYDER, Official Reporter

33

1  house for the purpose of --

2          THE COURT:  But you can't do that unless somebody

3  agrees to that.

4          MR. MASTERS:  No, that's public right of way.  They

5  don't have to agree to that.  That's --

6          THE COURT:  Well, then the public would have to -- I

7  mean the public, whoever, Evanston would have to agree.

8          MR. MASTERS:  There's a State of Illinois law that

9  they got that they worked under so that they didn't have to go

10  municipality by municipality.  There's a law that allowed this

11  roll-out, and then they have to go to the municipalities and

12  work with them on the implementation of it.  But the

13  municipalities don't get to block and decide whether they could

14  roll these things out.

15          And there's been lots of controversy.  Some

16  municipalities have sought moratoriums, some municipalities

17  have fought it very hard because they are unsightly, some of

18  them have, as I said, have exploded.  I mean, there's been a

19  lot of issues.  And the blogosphere, you go on, you'll see lots

20  of controversy about these boxes.

21          But it's a statewide issue because they are investing

22  a lot of money to deploy these things out, and they don't want

23  to be shut down municipality by municipality.  And I guess as

24  you've, I guess, intimated, a lot of municipalities might have

25  an issue with them or have people in the municipality raise

34

1   issues with them.

2           So the person who owns that house, whose parkway was

3   visited by one of those boxes didn't get a voice.

4           MR. COLE:  The open question, Your Honor, is whether

5   the person in that house purchased the AT&T service.  They

6   could be a Comcast customer, they could be somebody who doesn't

7   have cable TV.  The fact that the box is next to the house has

8   nothing to do with somebody's purchase.

9           THE COURT:  Well, I was trying to imply, although

10  maybe not very well, that while I don't think that's what these

11  ads convey, that if an ad was intending to convey that you're

12  being a bad neighbor by purchasing AT&T services because this

13  is what AT&T is doing, and if that was true, that just having

14  AT&T is going to result in exploding boxes or unsightly parkway

15  things, there might by an appropriate ad that could convey

16  that.

17          MR. COLE:  I can't engage in speculation about what

18  they might say, Your Honor.

19          THE COURT:  Right.

20          MR. COLE:  But what I do know is that the neighbor

21  hypothetical you propose I think would also be false in our

22  view because any neighbor who buys U-verse is no more likely to

23  cause his neighbor to have his VRAD installed than anybody

24  else.

25          THE COURT:  What about if everybody in the

35

1    neighborhood bought Comcast?

2         MR. COLE:  The VRADs will be there, Your Honor.  Then

3    AT&T made a bad decision about rolling out the service to that

4    neighborhood months or years earlier, and they didn't succeed

5    in selling their service, but unfortunately the VRADs are going

6    to be there.

7         THE COURT:  All right.  Obviously I'll give you a

8    chance to find out what you want.  You're going to have to work

9    on a very expedited schedule at the moment, and we'll see where

10   it goes.  So I'll see you back here at 10 o'clock on May 13th,

11   and we'll decide what to do.

12        MR. COLE:  Your Honor, can I ask, if they are going

13   to be permitted to take depositions, we would like the

14   opportunity to take at least a 30(b)(6) deposition which deals

15   with the issue of what they intend to communicate by these ads.

16        THE COURT:  Sure.

17        MR. COLE:  Since that's relevant.

18        And then I presume, Your Honor, if they come out with

19   a consumer survey, that we might have the opportunity to depose

20   the expert prior to any hearing you might have on this matter.

21        THE COURT:  I'm not going to hold a hearing on the

22   13th.  On the other hand, we'll have to figure out at that time

23   what to do.

24        MR. COLE:  Your Honor, is it possible that the

25   parties, that you help us reach some sort of a standstill

MICHAEL P. SNYDER, Official Reporter

36

1  between now and the time of the 9th, which is several weeks

2  away still?  I am concerned, given the looming possibility of

3  more VRAD ads, that we are going have a moving target, number

4  one, in terms of what we are dealing with, and this is going to

5  greatly complicate it because we may have to brief a whole set

6  of new ads by the time we consolidate it, and then we are going

7  to just keeping moving the ball backwards.  If they would

8  simply agree to stand down from VRADs for the three weeks or

9  so, that would make life a lot easier for everybody.

10         MR. MASTERS:  That would be to concede the motion,

11  Your Honor, and give them their relief.  This is the campaign

12  that we, that Comcast has chosen to do.  These are the ads that

13  they've cut.  There's modifications that can be made, new ads

14  that can be run over time, but we are not in a position to

15  agree to embark on an entirely new campaign.

16         But, you know, Mr. Cole's point is the one that I

17  started out with, which is why don't we have a hearing about

18  the ads that we actually care about and want to continue to

19  run?  So, I mean, why, why don't we let him see the ads and his

20  client see the ads in the beginning of May, decide whether they

21  are still --

22         THE COURT:  Well, I assume that's what you want to

23  do, among of other things.

24         MR. COLE:  If they are willing to give us the ads and

25  say we won't run these until Your Honor decides --

37

```
 1          THE COURT:  Well, see the ads, and if you want to

 2   come running back in the next day, we'll talk about it.

 3          MR. MASTERS:  But, Your Honor, we are going to be

 4   briefing on the 9th the original ads.

 5          THE COURT:  No.  Well --

 6          MR. MASTERS:  They wrote a brief about ads that we're

 7   not running, and we are going to brief it on the 9th about ads

 8   that we are not running.

 9          THE COURT:  Well, I think you'd better brief --

10          MR. MASTERS:  Well, we can't brief --

11          THE COURT:  -- more extensively.

12          MR. MASTERS:  We can't brief on the 9th the ads we

13   ran.

14          THE COURT:  When are you going to have the ads you're

15   thinking about running?

16          MR. MASTERS:  My understanding is that they are going

17   to be in the beginning of May.  I don't have the specifics.  I

18   can certainly try to get that from the ad agencies and whatnot,

19   but we've been discussing modifications, and once that's set,

20   then they go and get reshot or retooled in certain ways, and it

21   takes a certain amount of time with production.

22          But, I mean, Your Honor, if you want us to brief on

23   the 9th the ads that they complained about in their brief, we

24   will, but I'm not sure that that gets us where we need to be.

25          And it doesn't sound like it gets him where he wants
```

38

1   to be.  He wants to brief the ads that, I presume that we

2   actually want to run that we want to stand up here and defend.

3              MR. COLE:  I briefed the ads I had, Your Honor.

4              MR. MASTERS:  That we told you we weren't going to

5   run.  So, I mean --

6              THE COURT:  Well, I assume in part what you're

7   briefing is, what should be more extensive is the order you

8   want, and that's what you should probably respond to.  But

9   clearly the ads that are going to be proposed to be run would

10  be, in terms of a preliminary injunction, are at this point

11  what you people should be dealing with, I guess.  I don't

12  guess.  You should.

13             MR. COLE:  It's the claims, Your Honor.  We should be

14  briefing the claims, and the claims that we are attacking are

15  in our order.  There can be myriad variations.

16             THE COURT:  I agree.  It's the claims.

17             MR. MASTERS:  Yes.  So you issue an order saying

18  "Don't imply X," how do we know whether the ad that we've run

19  addresses that or not if all we know is that you think a

20  particular ad does that?  This is back to the point we are not

21  talking about explicit claims.  This is half price.

22             THE COURT:  Well, you can if you want spend time

23  arguing about, since I take it you agree that the ads would be

24  literally false, the ones that have been run, if they were

25  interpreted by consumers as saying this is what will happen.

39

1          MR. MASTERS:  They would be impliedly false if their

2   factual premise is true, which we are willing to concede for

3   purposes of this discussion.

4          THE COURT:  Okay.  So we don't really have anything

5   to argue about those.  You are saying there are broader things

6   that happen, and so I guess that's what you need to focus on.

7   You're apparently saying you have proposed ads that you think

8   wouldn't be a problem because they are true?

9          MR. MASTERS:  The client is working on modifying ads

10  taking into account the conversations that -- there's

11  conversations going on internally between Comcast and AT&T and

12  also between us.  There have been modifications that have been

13  made and continue to be made.  Whether they are satisfactory,

14  you know, we don't know.  But we are prepared to undertake some

15  changes.

16         THE COURT:  Okay.  If you aren't willing to show them

17  what those are, then, you know, you take the chance that I will

18  issue a broader injunction.

19         MR. MASTERS:  I understand that.

20         THE COURT:  Unless, of course, you can show me that

21  it's either true or that somehow what it looked to me like I

22  was seeing nobody else would see.

23         MR. MASTERS:  I guess the question, though, is in the

24  briefs that you will have, you will have two sets of briefs

25  about these ads that have stopped running.

40

1         THE COURT:  Well, I don't want to --

2         MR. MASTERS:  And then you'll have new ads that you

3    won't have briefs on.

4         THE COURT:  Well, I think the issues being briefed

5    should deal with whatever you think will be in the new ads.

6    Now, if have you no idea I don't know what we will do it about.

7         MR. MASTERS:  We'll file our brief on the 9th.

8         THE COURT:  But you have no idea what the new adds

9    will say.

10        MR. MASTERS:  Oh, I've seen some iterations of them.

11   But I think we are entitled to have their arguments about why

12   these ads are false before we respond.  We don't think there is

13   any problems with the ads.

14        THE COURT:  They have.

15        MR. COLE:  Your Honor, we've given them 26 pages of

16   why we think the ads are false and the claims are false, not

17   just those particular execution, but the claims.

18        Now, on preliminary injunction --

19        THE COURT:  His claims are in his proposed order.

20        MR. COLE:  Yes.  There's no need to unduly complicate

21   this and try to make it a moving target.

22        Your Honor, under the preliminary injunction standard

23   in this circuit, it's up to you to decide whether the conduct

24   that we are complaining about is likely to recur without an

25   injunction.  That's the relevant standard.

1          Now, they say they have stopped the executions that

2   contain the claims, but they haven't agreed to not make the

3   claims anymore.  So, Your Honor, the issue is are they likely

4   to make those claims again, and if so, an injunction should

5   issue.

6          And I can cite you case law, Your Honor, where

7   parties had agreed voluntarily to stop the ads prior to a

8   preliminary injunction hearing, but the Court nevertheless

9   issued an injunction because they were convinced that the

10  conduct might recur.

11         THE COURT:  All right.

12         MR. MASTERS:  Your Honor, I know that we've used up a

13  lot of time up here.  I do want to mention one thing before we

14  pass, which is in addition to all the other problems that we

15  have with these boxes, there's another one of which we are

16  going to be bringing a counterclaim and probably a motion, and

17  that is the installation of these boxes has resulted -- the

18  installation of the service, I'm sorry -- has resulted in

19  disruption of Comcast service to our customers.  What it turns

20  out happens is sometimes when a Comcast customer chooses AT&T,

21  U-verse, and the AT&T people go and switch it out, it shuts

22  down the Comcast service not only to that home but to 300 to

23  1200 people in that neighborhood.  This has happened over 30

24  times, and we've had quite a bit of difficulty, although we've

25  complained, getting cooperation from AT&T on this.  They have

MICHAEL P. SNYDER, Official Reporter

42

1   some sensitivity about sharing information and giving us

2   guidance on how to deal with this.

3       We've set forth a couple of proposals to them, one

4   that would have them share information, one that would allow

5   them to keep all their information secret, but we are not going

6   to sit by and allow this ongoing damage to our reputation and

7   our customer service to go on.  So if we can't come to some

8   resolution, and one of the proposals I just gave to counsel

9   yesterday, so we haven't had a chance to talk about it, if we

10  can't come to a resolution on that, we are going to bring that

11  forward as an issue that we think you need to resolve, because

12  as these things get rolled out, you know, it's affecting the

13  neighborhood and adversely affecting the Comcast service.  So

14  I, just so when we do file that, if we file that next week, you

15  understand why we are doing it.

16      MR. COLE:  Your Honor, a few responses.

17      Number one, that issue is not before you.  There's no

18  counterclaim.  At best that's a permissive counterclaim.  I'm

19  not even sure there's federal jurisdiction for that

20  counterclaim, so I'm not sure why you need to consider that

21  issue or even the timing of that issue right now.

22      Secondly, they both deal with installation.  The

23  advertising issues really have nothing to do with whether

24  outages occur on Comcast's network.

25      And, three, which Mr. Masters already mentioned, the

MICHAEL P. SNYDER, Official Reporter

43

1  parties are discussing it, negotiating it.  Hopefully they will

2  reach a resolution.  So I don't think there's any reason to

3  waste time about that here now.

4        MR. MASTERS:  I didn't know I was wasting time.  I

5  just thought it was appropriate and courteous to let you know

6  what we were planning on doing.

7        THE COURT:  Okay.  I'll see you on the 13th.

8        (End of proceedings.)

9                C E R T I F I C A T E

10       I, Michael P. Snyder, do hereby certify that the

11  forgoing is a complete true, and accurate transcript of the

12  proceedings had in the above-entitled case before the Honorable

13  ELAINE E. BUCKLO, one of the judges of said Court, at Chicago,

14  Illinois, on April 17, 2008.

15

16

17                      _____

17                      Official Court Reporter

18                      United States District Court

19                      Northern District of Illinois

20                      Eastern Division

21

22

23

24

25

MICHAEL P. SNYDER, Official Reporter