# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| COMCAST OF ILLINOIS III, INC; COMCAST CORPORATION; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., | ) ) ) ) | **Case No.: 08 CV 1680** <br><br> **Honorable Elaine E. Bucklo** <br><br> **Magistrate Judge Martin C. Ashman** |
| Defendants. | ) | |
| ──────────────────────────── | ) | |
| COMCAST OF ILLINOIS III, INC; COMCAST CORPORATION; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., | ) ) ) ) | |
| | ) | |
| Counterclaimants, | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, | ) ) | |
| | ) | |
| Counterdefendant, | ) | |
| | ) | |
| and AT&T, INC., | ) | |
| | ) | |
| Third-party Defendant. | ) | |

## COMCAST'S MEMORANDUM IN OPPOSITION TO AT&T's MOTION TO DISMISS COMCAST'S COUNTERCLAIMS

Defendants / Counterclaimants Comcast of Illinois III, Inc, Comcast Corporation, Comcast Cable Holdings LLC, and Comcast of Chicago, Inc. (collectively "Comcast") submit this memorandum in opposition to Plaintiff Illinois Bell Telephone, d/b/a AT&T Illinois's (together with Third-party Defendant AT&T, Inc., "AT&T") motion to dismiss Comcast's Counterclaims and Third-party Claims.

## BACKGROUND

AT&T's roll out of its U-verse service has caused wide-spread and prolonged disruptions to customers of Comcast's cable television, Internet and telephone services on at least 40 occasions over just the past few months. (Curtis Decl. ¶¶ 12-13.) Comcast has asked AT&T to implement procedures that would prevent these service disruptions, or at least allow Comcast to quickly identify and correct them, but AT&T has refused. (*Id.* at ¶¶ 18-20, Ex. A; *see also* Masters Decl.) This disruption occurs when AT&T installs U-verse in a home already serviced by Comcast. (Curtis Decl. ¶ 11.) Inside customers' homes, AT&T's U-verse service travels over the existing coaxial cable, through which Comcast's services also flow. (*Id.* ¶ 10.) As a result, AT&T injects incompatible information into Comcast's proprietary network, which interrupts the flow of services to hundreds of Comcast's customers at a time, and over 17,000 customers since February 2008. (*Id.* at ¶ 11.)

Although AT&T is aware that it is causing these service outages (Curtis Decl. ¶ 17; Apr. 21, 2008 Hrg. Tr. 7:25-8:6), AT&T now moves to dismiss Comcast's claims, contending that this Court is powerless to grant the relief Comcast and its customers deserve. AT&T's motion is an obvious attempt to delay resolution of the widespread and repeated damage it is causing. First, advocating a constricted reading of the Federal Cable Communications Policy Act ("Cable Act"), 47 U.S.C. § 553(a) ("Section 553(a)"), and citing inapplicable cases, AT&T argues that its

interruption of Comcast's cable service to thousands of customers does not constitute interception of cable services under Section 553(a).  AT&T's argument, however, conflicts with the plain meaning of Section 553(a) and has been squarely rejected by the only court that has addressed it.

Second, AT&T argues that the Court lacks subject matter jurisdiction over Comcast's related state-law claims based on AT&T's interruption of Comcast's cable service because they do not form part of the same "case or controversy" as AT&T's federal false advertising claim. However, Comcast's claims easily satisfy the Seventh Circuit's requirement that there be a "loose factual connection" between federal and state-law claims to confer supplemental jurisdiction on the state claims.  Comcast's counterclaims and the advertising claims underlying AT&T's federal claim both involve technical aspects of AT&T's U-verse equipment and infrastructure.  Because of the factual overlap between Comcast's counterclaims and AT&T's false advertising claim, trying the claims in different fora would be a waste of judicial and party resources.

## ARGUMENT

### I.  COMCAST STATES A CLAIM UNDER SECTION 553(a) OF THE FEDERAL CABLE COMMUNICATIONS POLICY ACT

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See McMillan v. Collection Professionals Inc.*, 455 F.3d 754, 758 (7th Cir. 2006).  A court may dismiss a claim "only if the complaint fails to set forth 'enough facts to state a claim to relief that is plausible on its face.'"  *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955,

1974 (2007)).  The motion should be denied if "relief could be granted under any set of facts that could be proved consistent with the allegations."  *McMillan*, 455 F.3d at 758.

Accepting the allegations in Comcast's Counterclaims and Third-party Complaint as true, Comcast states a claim under the plain language of Section 553(a).

Section 553(c) of the Cable Act creates a federal cause of action for anyone injured by a violation of Section 553(a)(1), and provides for various remedies, including injunctive relief, disgorgement of profits, actual damages, and statutory damages.  Section 553(a)(1), in turn, provides that:

> No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

47 U.S.C. § 553(a)(1).

AT&T argues that Section 553(a) is applicable only to theft of cable services, and not interruption of cable services, because, AT&T asserts, the statute was enacted solely to deter cable theft.  Had Congress intended to limit Section 553(a) to interception for the purpose of stealing cable, however, it could have easily done so.  The fact that it did not is strong evidence that Congress intended Section 553(a) to be applied broadly, and not in the limited manner urged by AT&T.  It is therefore no surprise that AT&T does not cite a single case holding that Section 553(a) is applicable only to cable theft and not to other interruption of cable service.  There is no authority for AT&T's proposition that "Comcast cannot state a cause of action under § 553 on allegations unrelated to the theft of cable services."  (AT&T's Br. at 8.)[1]  To accept AT&T's

---

[1] AT&T does cite numerous cases that apply Section 553(a) to theft of cable services. (AT&T's Br. 4-5.)  But all of those cases are inapposite.  Comcast is not claiming that Section 553(a) does not prohibit cable theft, merely that Section 553(a)'s broad language also proscribes interruption of cable services.  None of the cases cited by AT&T addressed the situation where

argument the Court would have to graft judicial limitation onto Section 553(a) that Congress chose not to include in the statute, and no court has ever applied.[2]

Indeed, the only case to address this issue is *CSC Holdings, Inc. v. Westchester Terrace at Cristfield Condominium*, 235 F. Supp. 2d 243 (S.D.N.Y. 2002), which rejected AT&T's argument on virtually the same set of facts present here.  In that case, DirecTV, a satellite television provider, began offering its satellite television service to residents in a building that was already wired and serviced by Cablevision, a cable television operator.  *Id.* at 250-51.  DirecTV installed its satellite dish on the building's roof and ran its cable wires down into the building.  *Id.* at 252.  When DirecTV's wiring reached the outside of each apartment, DirecTV installed devices that allowed it to deliver its television signal over Cablevision's existing wires.  *Id.*  Cablevision contended that DirecTV's unauthorized actions resulted in "signal leaks that were interfering with [Cablevision's] service to many continuing customers in the building" *id.* at 253, and asserted a claim against DirecTV for violation of Section 553(a).

In denying DirecTV's motion for summary judgment, the court first quoted Section 553(a).  *Id.* at 263.  It then noted that Cablevision alleged that DirecTV had "interrupted Cablevision's communication service by splicing into its wiring without authorization.  [Cablevision] points to the detection of signal leakage as evidence of this interruption."  *Id.* at 263.  DirecTV argued – just as AT&T argues here – that the Section 553(a) claim should be dismissed because that statute "was enacted to deter theft of cable service [and] there has been no

---

the interception of cable services was alleged without the intent to steal cable.  Moreover, the fact that Comcast was a plaintiff in some of the cable theft cases AT&T cites is irrelevant. AT&T does not argue that any of those cases held that interruption of cable service is not cognizable under Section 553(a), much less that Comcast advocated such a position.

[2] Independently, federal jurisdiction, and indeed injunctive relief, are expressly contemplated by the FCC's "inside wiring" rules, which concern the displacement of a cable service provider by a competitor.  *See* 47 C.F.R. § 76.804(c).

evidence that defendants have been stealing [Cablevision's] service[.]" *Id.* at 263.  The court

squarely rejected DirecTV's argument and denied its motion for summary judgment, following

the well-settled rule that a statute's text governs its intent:

> I cannot agree with [DirecTV] that, as a matter of law, § 553 does
> not apply to their conduct.  While the legislative history of the Act
> evidences Congress's interest in deterring theft of cable services,
> the language of the statute (to which I must first resort) proscribes
> any sort of interception of a cable television signal.

*Id.*

*CSC Holdings* is directly applicable here because, like Cablevision in *CSC Holdings*,

Comcast alleges that a competing television service provider has interrupted (but not stolen) its

cable signal.  In fact, the *CSC Holdings* court specifically noted that Cablevision claimed

"'interruption' of its signal [and did] not use the statutory word 'interception.'" *Id.* at 263 n.7.

Nevertheless, the court recognized that Section 553(a)'s broad language "proscribes any sort of

interception of a cable television signal," including interruption of that signal, and upheld

Cablevision's Section 553(a) claim.  *Id.* at 263.[3]

*CSC Holdings*'s holding also is supported by well-settled cannons of statutory

construction.  "'When interpreting the meaning of a statute, we look first to the text; the text is

the law, and it is the text to which we must adhere.'" *Carmichael v. The Payment Center, Inc.*,

336 F.3d 636, 639 (7th Cir. 2003) (quoting *United States ex rel. Feingold v. AdminaStar Fed.*,

*Inc.*, 324 F.3d 492, 495 (7th Cir. 2003)).  When interpreting a word in the statutory text that is

---

[3] AT&T also argues that "[s]ignal leakage from [AT&T] into Comcast's infrastructure is not an 'intercept[ion]' or 'rece[ption]' of Comcast's communication services by [AT&T]." (AT&T's Br. 4.)  That argument, however, was also rejected by *CSC Holdings*.  The court upheld Cablevision's claim, stating that Cablevision "points to the detection of signal leakage as evidence of this interruption." 235 F. Supp. 2d at 263.  Hence, the court recognized that the applicability of Section 553(a) does not turn on the precise manner in which cable is intercepted, and that the statute therefore covers signal leakage from a competing television service provider so long as such leakage results in an interruption of a cable service.

not defined in the statute, courts "construe a statutory term in accordance with its ordinary or natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476, 114 S. Ct. 996, 1001 (1994); *see also Microsoft Corp. v. AT&T Corp.*, 127 S. Ct. 1746, 1755 (2007) (quoting *Meyer*, 501 U.S. at 476); *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 376, 126 S. Ct. 1843, 1847 (2006) (same); *Carmichael,* 336 F.3d at 640 (same); *Lopez v. Gonzales,* 549 U.S. 47, 127 S. Ct. 625, 630 (2006) ("The everyday understanding of 'trafficking' should count for a lot here, for the statutes in play do not define the term, and so remit us to regular usage to see what Congress probably meant.") (citing *Meyer*, 510 U.S. at 476).

The Supreme Court routinely looks to dictionaries to determine the ordinary meaning of words that are not terms of art and are not defined by statute. *See, e.g., Meyer*, 510 U.S. at 476, 114 S. Ct. at 1001 (adopting Black's Law Dictionary's definition of "cognizable" in construing the Federal Torts Claims Act); *AT&T Corp.*, 127 S. Ct. at 1755 n.11 (citing Webster's Third New International Dictionary for the common definition of "component" in construing the Patent Act); *Lopez,* 127 S. Ct. at 630 (citing Black's Law Dictionary for the definition of "trafficking" in construing the Controlled Substances Act); *S.D. Warren Co.*, 547 U.S. at 376 (adopting Webster's New International Dictionary definition of "discharge" in construing the Clean Water Act). Accordingly, the Seventh Circuit has recognized "'the cardinal rule is that words used in statutes must be given their ordinary and plain meaning' and that we will 'frequently look to dictionaries to determine the plain meaning of words.'" *Cler v. Illinois Educ. Ass'n*, 423 F.3d 726, 731 (7th Cir. 2005) (quoting *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000)).[4]

---

[4] Indeed, the *Cler* court was particularly willing to accepting a dictionary definition on a motion to dismiss. *See* 423 F.3d at 731 ("For purposes of the present case, coming to us in the posture of a motion to dismiss, this definition [from Black's Law Dictionary] will suffice.").

AT&T conclusorily argues that "[b]y its plain language § 553 is clearly inapplicable to the allegations at issue" (AT&T's Br. 4), yet cites no dictionary or judicial definition of "intercept." In fact, the word "intercept" is widely defined to include "interrupt," "obstruct" and "stop," which is precisely what AT&T is repeatedly doing to Comcast's cable system. *See* AMERICAN HERITAGE COLLEGE DICTIONARY 708 (3d ed. 2000) ("to stop, deflect, or interrupt the progress or intended course of."); OXFORD ENGLISH DICTIONARY 1391 (1993) ("Put an end to, check, (an action, effect, etc.) . . . Prevent, hinder, (a person or thing) . . . Obstruct so as to prevent from continuing to a destination; stop in the course of a journey"); WEBSTER'S NINTH NEW COLLEGE DICTIONARY 630 (1988) ("to stop, seize, or interrupt in progress or course before arrival"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1176 (1986) ("1: to take, seize, or stop by the way or before arrival at the destined place . . . 2 [] : to stop or prevent from doing something : HINDER"). Because Comcast alleges that AT&T interrupts Comcast's cable service when it installs U-verse in the homes of certain Comcast customers, Comcast states a claim under Section 553(a).

The language surrounding "intercept" in Section 553(a) reinforces the conclusion that "intercept" means not only unauthorized taking of cable service, but also interruption of cable service. The statute provides that "[n]o person shall intercept *or receive* or assist in intercepting *or receiving* any communications service offered over a cable system" without authorization. 47 U.S.C. § 553(a)(1) (emphasis added). "Receive" means to take into one's possession – not to interrupt, obstruct or stop.[5] But if the Court interprets Section 553(a) in the manner AT&T urges

---

[5] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1894 (1986) ("to take possession or delivery of . . . "to knowingly accept (stolen goods)"); http://dictionary.reference.com/browse/receive ("to take into one's possession (something offered or delivered)")

(*i.e.*, that "intercept" means only unauthorized taking, and not interruption, of cable service), the word "receive" in Section 553(a) would be rendered superfluous because it would have the same meaning as "intercept." "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 449 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S. Ct. 2120 (2001)); *see United States v. Alvarenga-Silva*, 324 F.3d 884, 887 (7th Cir. 2003) ("Courts should avoid statutory constructions that render another part of the same provision superfluous."). Thus, to give effect to every word in Section 553(a), the word "intercept" must be interpreted to include interrupt.

"When a statute is clear, any consideration of legislative history is improper." *United States v. Rand*, 482 F.3d 943, 947 (7th Cir. 2007) (citing *Holder v. Hall*, 512 U.S. 874, 932 n.28, 114 S. Ct. 2581 (1994) for the proposition that "Resort to legislative history is only justified where the face of the [statute] is inescapably ambiguous."); *see also Cler*, 423 F.3d at 730 ("It is a common rule of statutory construction that when the plain language of a statute is clear, courts need look no farther than those words in interpreting the statute."). Although AT&T argues that Section 553(a)'s plain language is clear (AT&T's Br. 4), it contradicts that assertion by relying on elements of Section 553(a)'s legislative history, including a strained reading of an entirely different and wholly inapplicable code section, 47 U.S.C. § 605(a), governing radio and wire communications. (AT&T's Br. 6-8.) Because Section 553(a)'s plain language is clear, resorting to legislative history to interpret its meaning would be in error. In any event, nothing AT&T

cites defines the term "intercept," or indicates that Congress intended to limit Section 553(a) *only* to cable theft.[6]

AT&T's motion to dismiss Comcast's Section 553(a) claim based on AT&T's interruption of Comcast's cable system should therefore be denied.

## II.    THE COURT HAS SUPPLEMENTAL JURISDICTION OVER COMCAST'S STATE-LAW CLAIMS

AT&T implicitly concedes, as it must, that if the Court rejects its challenge to Comcast's Section 553(a) claim, the Court would also have supplemental jurisdiction over Comcast's related state-law claims.  However, even had Comcast not included a claim under the Cable Act, the Court would have jurisdiction over Comcast's state-law claims.  These claims, which arise from damage to Comcast caused by signal interference from AT&T's U-verse service, are part of the same case or controversy as AT&T's federal Lanham Act claim, which accuses Comcast of misrepresenting technological aspects of the very same U-verse service.  Consequently, the Court has supplemental jurisdiction over Comcast's claims.

Under 28 U.S.C. § 1367, courts have supplemental jurisdiction over state-law claims that "form part of the same case or controversy under Article III of the United States Constitution" as a pending federal claim.  28 U.S.C. § 1367(a).  The Seventh Circuit has repeatedly held that the "same case or controversy" requirement is satisfied by a "loose factual connection" between the federal and state-law claims.  *See Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995) ("[J]udicial power to hear both state and federal claims exists where the federal claim has sufficient substance to confer subject matter jurisdiction on the court, and the state and federal

---

[6] *United States v. Norris*, 88 F.3d 462 (7th Cir. 1996) is particularly inapplicable because the issue before that court was whether cable television programming constitutes "communication by radio" as defined in 47 U.S.C. § 153(b), *Norris*, 88 F.3d at 464, not the definition of "intercept" in Section 553(a).

claims derive from a common nucleus of operative facts.  A loose factual connection between the claims is generally sufficient.") (internal citations omitted);[7] *Channell v. Citicorp. Nat'l Servs., Inc.*, 89 F.3d 379, 385 (7th Cir. 1996) ("[Section] 1367 has extended the scope of supplemental jurisdiction, as the statute's language says, to the limits of Article III – which means that 'a loose factual connection between the claims' can be enough.") (quoting *Ammerman*); *Sanchez & Daniels v. Koresko*, 503 F.3d 610, 614 (7th Cir. 2007).

Relying on this standard, courts in this Circuit routinely exercise supplemental jurisdiction where both sets of claims involve the same parties and there is a "slight factual overlap" between the state and federal claims.  *Crawford v. Equifax Payment Servs., Inc.*, No. 97 C 4240, 1998 WL 704050, at *6 (N.D. Ill. Sept. 30, 1998) ("The existence of a debt is relevant to both claims.  Under the *Channell* court's reasoning, this slight factual overlap satisfies the requirement that the two actions must be 'loosely factually connected' before the court may exercise jurisdiction.").  Thus, in *Spaulding Moving and Storage, Inc. v. Nat'l Forwarding Co.*, No. 07 C 4095, 2008 WL 781929 (N.D. Ill. Mar. 20, 2008), an action brought under the Class Action Fairness Act for breach of contract, the court exercised supplemental jurisdiction over a state law counterclaim for the breach of an unrelated clause in an entirely different contract, explaining:

> The Seventh Circuit … views the case or controversy language of the supplemental jurisdiction statute as being broader than the transaction or occurrence provisions that define compulsory and permissive counterclaims….
>
> Both sets of claims concern payments for transportation services and arise during the same time period.  Both sets of claims involve the same parties.  Although the central legal issue in each set of claims focuses on different clauses of two contracts, there is sufficient factual overlap to support supplemental jurisdiction.

---

[7] AT&T quotes from *Ammerman*, but noticeably omits the critical final sentence. (AT&T's Br. 9.)

*Id.* at *2.

In the instant action, even a cursory inspection of the parties' allegations exposes far more than the requisite "loose factual connection" and "slight factual overlap" between Comcast's state-law claims and AT&T's Lanham Act claim. AT&T contends that Comcast has disseminated false advertising related to AT&T's slower Internet service, less HD, and its installation of VRAD boxes in close proximity to consumers' homes. (AT&T's Am. Compl. ¶¶ 21-35.) Comcast has reason to believe that each of these attributes result from technical limitations on the U-Verse infrastructure, including the bandwidth limitations imposed by AT&T's use of copper wiring to connect its customers to the VRADs featured in Comcast's advertisements. (Comcast's Countercl. and Third-party Compl. ¶¶ 17-18.) Thus, the truth or falsity of Comcast's advertisements depends heavily on the technology underlying AT&T's U-verse service, and will be informed by technical evidence relating to the U-verse infrastructure, how people are connected to that infrastructure, and the quality of services that AT&T's customers receive once they are connected to that infrastructure.

Comcast's counterclaims likewise implicate the technical aspects of AT&T's U-verse service, most notably, how the deployment and configuration of the U-verse infrastructure results in the commingling of AT&T's signal with Comcast's cable signal, and how the technical attributes of AT&T's signals impede the flow of Comcast's cable, Internet and telephone services to its customers. (*Id.* at ¶¶ 24-29.) Although the legal theories may be distinct, the proof required for both sets of claims will significantly overlap.

The parties' filings to date demonstrate the factual overlap between their claims. For example, because their claims depend on it, AT&T spend pages in its preliminary injunction motion describing the infrastructure that it put in place to deliver U-verse to customers in the

Northern District.  (AT&T's Prelim. Injunc. Br. 2, 6-9.)  AT&T explains how the U-verse signal is delivered from a central office, through fiber optic cables, to a VRAD, then by copper wire connections, to a customer's home.  (Blakeman Decl. ¶ 19, Ex. B.)  It then explains the scope of services that a household receives when connected to the U-verse infrastructure, which is a point of contention between the parties.  (Mitchell Decl. ¶ 4, 6, 9.)

Comcast's claims relate to the very same infrastructure and specifically to the effect on Comcast when AT&T connects one of Comcast's customers to AT&T's infrastructure.  It makes no sense to say that this Court lacks supplemental jurisdiction over a claim arising from the secondary effects of subscribing to U-verse (*i.e.*, disruption to Comcast's service) when the federal claims on which the Court's subject matter are based implicate the primary effect of subscribing to U-verse (*i.e.*, the scope of services received).  Given the technological issues that underlie each side's claims, and other factual overlaps, it would be an enormous waste of judicial resources for two different courts to separately hear the claims.

Given the extent of this factual overlap, it is not surprising that AT&T is reduced to erroneously arguing that supplemental jurisdiction exists only where the outcome of the state claim "affects" the outcome of the pending federal claims (AT&T's Br. 11), a far more burdensome standard than the "loose factual connection" required by the Seventh Circuit.  The supplemental jurisdiction statute, however, does not limit jurisdiction to state claims that affect the outcome of pending federal claims, but rather is designed to allow a single court to efficiently decide claims that involve some factual overlap.  *See Miller Aviation v. Milwaukee County Bd. of Supervisors*, 273 F.3d 722, 732 (7th Cir. 2001) ("remand of the remaining supplemental claims would require a 'duplication of effort' by the state court that undermines the very purpose of supplemental jurisdiction – judicial efficiency").  AT&T's constrained interpretation of § 1367

would lead to supplemental jurisdiction only when state counterclaims are essentially an affirmative defense to the federal claims, which is why courts in this Circuit do not follow that narrow outcome-determinative approach. *See, e.g., Spaulding Moving*, 2008 WL 781929, at *2 ("Although the central legal issue in each set of claims focuses on different clauses of two contracts, there is sufficient factual overlap to support supplemental jurisdiction.").

Nor do any of the cases cited by AT&T support its constrictive approach to supplemental jurisdiction. Significantly, each case AT&T cites where supplemental jurisdiction was not exercised involved different sets of parties. (AT&T's Br. 9-10.)[8] Because the fundamental purpose of enhancing efficiency is absent under these circumstances, these cases are easily distinguished. *Compare White v. Addante*, 498 F. Supp. 2d 1109 (N.D. Ill. 2007) (framing issue as "whether § 1367 allows one plaintiff to gain supplemental jurisdiction over his or her state law claim based on another plaintiff's federal claim," and holding wife's claim for unconstitutional arrest insufficient to create federal jurisdiction for husband's state law assault claim); *Hackman v. Dickerson Realtors*, 520 F. Supp. 2d 954 (N.D. Ill. 2005) (no supplemental jurisdiction over state-law claim where only remaining federal claims were against other defendants); *Berg v. BCS Fin'l Corp.*, 372 F. Supp. 2d 1080 (N.D. Ill. 2005) (same), *with Int'l Sports Mgmt., Inc. v. Stirling Bridge Group, Inc.*, No. 03 C 9027, 2004 WL 1114760, at *4 (N.D. Ill. May 17, 2004) (exercising supplemental jurisdiction over state-law claims in Lanham Act false advertising case where all claims involved the same parties; "It would neither be efficient nor convenient to require the parties to litigate the same issues relating to the same alleged scheme before two

---

[8] The one exception is *Oak Park Trust and Sav. Bank v. Therkildsen*, 209 F.3d 648 (7th Cir. 2000). That case, however, is likewise inapposite because the claims were so unrelated that there was no factual overlap whatsoever. *See id.* (where a development company sued a village and its trustees for failing to compensate it for providing water and sewer facilities to residents, no supplemental jurisdiction over counterclaim filed by village trustee against development company over personal housing dispute).

different judges . . . .  There seems little reason to burden the judicial systems of both state and federal courts with a piecemeal litigation of this case, as it can most economically and conveniently be litigated here.").

## **CONCLUSION**

For all of the foregoing reasons, Comcast respectfully asks the Court to deny AT&T's motion to dismiss Comcast's Counterclaims and Third-party Complaint.

Dated: April 30, 2008

LOEB & LOEB LLP

By: s/ Douglas N. Masters
    Douglas N. Masters
    Thomas P. Jirgal
    Julie P. Samuels
    321 N. Clark Street, Suite 230 0
    Chicago, Illinois  60610
    (312) 464-3100

    *Attorneys for Defendants and Counterclaimants
    Comcast of Illinois III, Inc., Comcast
    Corporation, Comcast Cable Holdings LLC,
    and Comcast of Chicago, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of April, 2008, a copy of the foregoing Comcast's Memorandum in Opposition to AT&T's Motion to Dismiss Comcast's Counterclaims was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Michael J. Gill
Ranjit J. Hakim
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL  606060

LOEB & LOEB LLP


By:    __s/ Julie P. Samuels_____
Douglas N. Masters
Thomas P. Jirgal
Julie P. Samuels
321 North Clark Street, Suite 2300
Chicago, Illinois 60610
Telephone:  (312) 464-3100
Fax:  (312) 464-3111

Attorneys for Comcast of Illinois III, Inc., Comcast Corporation, Comcast Holdings LLC, and Comcast of Chicago, Inc.

# Exhibit
# A

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)**

H
Crawford v. Equifax Payment Services Inc.
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Lawrence CRAWFORD, on behalf of himself and
all others similarly situated, Plaintiff,
v.
EQUIFAX PAYMENT SERVICES, INC., and
Equifax Check Services, Inc., Defendants.
**No. 97 C 4240.**

Sept. 30, 1998.

*MEMORANDUM OPINION AND ORDER*

ANDERSEN, J.
**\*1** Plaintiff, Lawrence Crawford, ("plaintiff")
brings this putative class action against defendants
Equifax Payment Services, Inc. ("EPS") and
Equifax Check Services, Inc. ("ESC") alleging vi-
olations of the Fair Debt Collection Practices Act,
15 U.S.C. § 1692, *et. seq.* ("FDCPA"). Plaintiff al-
leges that a series of letters which ECS sent to him
in an effort to collect on a dishonored check viol-
ated several different provisions of the FDCPA.
Plaintiff brings parallel allegations on behalf of a
class of consumers which allegedly have received
similar letters from ECS. The court has not certified
this class yet. Defendant ECS has filed a counter-
claim against plaintiff individually seeking payment
of the underlying debts as well as a counterclaim
against members of the putative class requesting
similar relief.

Plaintiff has moved to dismiss ECS' counterclaims
contending that the court should not exercise juris-
diction over this state law claim in the context of an
FDCPA lawsuit. Plaintiff also has moved to strike
ECS' affirmative defenses pursuant to Fed.R.Civ.P.
12(f). Defendant EPS originally moved to dismiss
plaintiff's allegations against it for failure to state a
claim upon which relief can be granted pursuant to

Fed.R.Civ.P. 12(b)(6). However, both parties
agreed to submit evidentiary material in connection
with that motion and Magistrate Judge Rebecca R.
Pallmeyer converted the motion to a motion for
summary judgment.

On September 1, 1998, the Magistrate Judge filed
and served upon the parties her Report and Recom-
mendation which denied plaintiff's motion to dis-
miss ECS' counterclaim, granted plaintiff's motion
to strike certain of defendant's affirmative defenses
and denied his motion to strike others, and granted
EPS' motion for summary judgment. After careful
consideration of the motions before the court, the
applicable memorandum of law, other relevant
pleadings, the Magistrate Judge's Report and Re-
commendation, plaintiff's objections to this report
and the defendants' response thereto, this court
hereby declines to adopt the Magistrate Judge's Re-
port and Recommendation concerning the pending
motion to dismiss, adopts the Report and Recom-
mendation concerning the motion for summary
judgment, and adopts in part the Report and Re-
commendation concerning the motion to strike af-
firmative defenses.

BACKGROUND

Plaintiff Lawrence Crawford is a citizen of Illinois
who resides in Chicago. (Plaintiff's Complaint
("Compl.") at ¶ 4.) Defendant ECS allegedly is a
debt-collector that purchases "bad debt" from oth-
ers and attempts to collect that debt. Plaintiff fur-
ther alleges that defendant EPS also is a debt-
collector within the meaning of FDCPA because it
controls and operates ECS' collection of debts. Both
ECS and EPS are wholly-owned subsidiaries of
Equifax, Inc. and are headquartered in Atlanta,
Georgia. (*Id.* at ¶¶ 6-9.)

Plaintiff's Complaint centers on a series of collec-
tion letters which he received from ECS after he al-
legedly wrote a bad check in the amount of $75.00

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 2
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)

to Hollywood Casino in Aurora, Illinois. (*Id.* at ¶ 11.)According to the Complaint, plaintiff received a total of seven letters from ECS from September 6, 1996 and October 18, 1996. Plaintiff alleges that each of these letters "upon information and belief" is a "computer generated form letter which is sent to hundreds of persons."(*Id.* at ¶¶ 13, 14, 15, 16, 17, 18, and 19.)In the first letter, dated September 6, 1996, ECS informed plaintiff that he was required promptly "to make full restitution" of not only the $75.00 allegedly owed, but also of an additional $25.00 "service charge," and suggested that plaintiff use an express mail or other "same day service" to expedite payment. ECS informed plaintiff on the back of this letter that he had thirty days from the date that he received the letter to dispute the validity of the debt. (Compl., Ex. B-1 and Ex. B-2.)

*2 ECS' second letter to plaintiff, dated September 20, 1996, warned Plaintiff that ECS would determine whether the check should be assigned to an investigator or to a collection agency should plaintiff fail to pay the debt. (Compl., Ex. C.) This letter also warned plaintiff in boldfaced type that "continued refusal to honor [the] returned check w[ould] result in [his] credit file being impacted with a negative reference which may impact future credit granting decisions."(*Id.*) Plaintiff further was told that he could stop the collection effort by sending payment in full plus the service charge to ECS.(*Id.*) Plaintiff's third letter from ECS was dated October 4, 1998 and informed plaintiff that ECS had begun an investigation to determine whether civil litigation was possible on the dishonored check. (Compl., Ex. D.) The letter told plaintiff to contact an unnamed investigator though an identified phone number and warned plaintiff that a check writer who wrote a bad check and did not pay the check could be subject to civil litigation and further (and in boldfaced type) that an ensuing bad judgment against the check writer could result in "possible damages of $25 or all costs incurred in collecting the check including reasonable attorneys' fees, interest, and court expenses" or "full restitu-

tion." (*Id.*)

ECS sent plaintiff a fourth letter which was dated October 4, 1996. According to plaintiff's complaint, ECS intended this letter to resemble a telegram or other high priority message because it was printed on yellow paper and sent in a corresponding yellow envelope with the label "ECS MESSAGE SERVICE." (Compl. at Par. 5; Ex. F-1 and Ex. F-2.) The amount of the debt listed in this letter, however, was $100.00, not the $75.00 referred to in previous correspondence. Except for these differences, this letter was identical to ECS' second letter to plaintiff. (ECS stated in its Answer to plaintiff's Complaint that this letter actually was written to obtain payment on another bad check which plaintiff allegedly had written to Hollywood Casino in this amount This court need not make any findings on this issue to resolve the motions before it.)

Two letters, both dated October 17, 1996, again referred to the amount of the check as $100.00, but in all other respects were identical to the third letter dated October 4, 1998. (Compl., Ex. E and Ex. G.) ECS' seventh and final letter to plaintiff, dated October 18, 1998, informed plaintiff that "the law provides that a check writer who writes a check with an intent to defraud or prior knowledge that the check will be dishonored can be criminally prosecuted [.]" (Compl., Ex. H.) This letter also contained, again in boldfaced type, a list of potential criminal penalties which might follow such a prosecution including probation, imprisonment and/or fines, and full restitution. (*Id.*) Plaintiff furthers states in his Complaint that despite these "threats," ECS has not been subject to any criminal prosecution concerning the $75.00 check. (Compl. at ¶ 20.)

*3 Plaintiff's class action names five putative classes of consumer debtors identified as Classes A, B, C, D and E:

*Class A*

Plaintiff alleges that Class A consists of all con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)**

sumer debtors in the United States who wrote a bad check and received a letter from ECS which assessed a "service charge" over and above the amount of the check. As to this class, plaintiff charges that ECS violated Section 1692(e)(2) and Section 1692(f)(1) of the FDCPA. (*Id.* at ¶¶ 22, 33 and 34.)Specifically, plaintiff alleges that the "service charge" effectively misrepresented the "amount due" and also sought to collect an amount of money not authorized by the original agreement.

*Class B*

As to Class B, alleged to consist of all consumers who wrote a bad check and to whom ECS wrote and implied that such an action might result in criminal prosecution, plaintiff alleges that ECS violated Sections 1692(e)(7) and 1692(e)(5) of the FDCPA respectively by creating the false impression that the consumer committed a crime and threatening legal action that ECS did not intend to take. (*Id.* at ¶¶ 24, 35 and 36.)

*Class C*

Plaintiff alleges that Class C consists of all Illinois residents who wrote a bad check and then received a letter from ECS which resembled a "high priority communication." (*Id.* at ¶ 25.)As to Class C, plaintiff alleges that ECS violated both the preface to Section 1692(e) and Section 1692(e)(10) because this type of communication allegedly misrepresented the urgency of the debt and, therefore, attempted to deceive and mislead consumers. (*Id.* at ¶ 37.)

*Class D*

Class D allegedly consists of all Illinois residents who wrote a bad check and then received a letter containing language which contained a notice which informed consumers that they had thirty days in which to dispute the debt, but also contained language similar to that in Ex. B to the Complaint which demanded immediate payment. (*Id.* at ¶

26.)Plaintiff alleges that this type of language violates Section 1692(g) because it overshadows a consumer's validation right. (*Id.* at ¶ 37.)

*Class E*

Finally, plaintiff alleges that Class E consists of all Illinois residents who wrote a bad check and were sent communications following an initial demand letter which "effectively overshadowed the congressionally mandated validation notice."Plaintiff alleges that these communications violated Section 1692(g).(*Id.* at ¶ 39.)

Defendant ECS answered plaintiff's complaint on August 29, 1997 and included in its answer two counterclaims. In one of these counterclaims, ECS seeks to recover from plaintiff $175.00 for several bad checks which plaintiff allegedly wrote to Hollywood Casino. (ECS Answer at p. 16) In the other counterclaim, ECS seeks to recover the underlying debts owed to it by all of the putative classes of consumers. ECS also raised five affirmative defenses against plaintiff individually: (1) plaintiff has failed to state a claim upon which relief can be granted; (2) subject matter is lacking in this case because the defendants are not "debt collectors" within the meaning of the FDCPA; (3) subject matter jurisdiction is lacking in this case because plaintiff's bad checks were used for gambling purposes and not for personal, family or household uses as required by the FDCPA; (4) plaintiff has not suffered any damages; and (5) plaintiff's claim is barred, in whole or in part, by a set-off equaling the amount of several dishonored checks that were never paid to ECS.(*Id.* at p. 15.)

*\*4 Plaintiff moved to dismiss the two counterclaims on October 16, 1997 and to strike the affirmative defenses. For its part, defendant EPS moved to dismiss plaintiff's complaint against it contending that plaintiff had not made sufficient allegations against it to warrant its inclusion in the lawsuit. On October 17, 1997, the court referred the case to Magistrate Judge Pallmeyer pursuant to Local General Rule

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)**

2.41(b) to conduct the necessary proceedings and to enter an appropriate report and recommendation on these motions. Both parties agreed to submit evidentiary materials concerning EPS' motion to dismiss and, therefore, the Magistrate Judge converted that motion to a motion for summary judgment. On September 1, 1998, the Magistrate Judge issued her Report and Recommendation on the pending motions, denying plaintiff's motion to dismiss ECS' counterclaims, granting his motion to strike ECS' affirmative defenses in part, and denying it in part and granting ECS' motion for summary judgment. Plaintiff filed objections to that part of the Report and Recommendation which denied his motion to dismiss ECS' counterclaim and granted ECS' motion for summary judgment.

## DISCUSSION

In reviewing a magistrate judge's report and recommendation, the district court generally must "make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which a specific written objection has been made." Fed.R.Civ.P. 72(b).

### I. *Plaintiff's Motion to Dismiss ECS' Counterclaim*

The court should dismiss ECS's counterclaim if it finds no set of facts consistent with the allegations which would support a claim for relief. *Cushing v. City of Chicago,* 3 F.3d 1156, 1159 (7th Cir.1993)(quoting *Hishon v. King and Spaulding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Defendant's counterclaims are state law claims. The first seeks recovery on three allegedly bad checks which plaintiff tendered to Hollywood Casino. The second seeks similar relief against all putative class members. Although diversity of citizenship probably exists between the parties, plaintiff contends that the court does not have subject matter jurisdiction over defendant's counterclaim because the amount in controversy does not exceed the jurisdictional minimum of $75,000. The

issue before the court is whether we should exercise supplemental jurisdiction over ECS's counterclaims in a federal lawsuit alleging violations of the FDCPA. The court may do so if it finds that ECS' counterclaims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1298 (7th Cir.1995).

Relying on a long line of cases in which courts have declined to exercise jurisdiction over similar counterclaims in FDCPA cases, plaintiff argues that the court should not exercise supplemental jurisdiction here. Plaintiff contends that ECS' counterclaims, which turn on the validity of the underlying debts, are not part of the same case or controversy as his FDCPA claims which turn on the fairness of ECS' collection practices and procedures. (Plaintiff's Memorandum in Support of His Motion to Dismiss Counterclaims Brought by Defendant ECS ("Pl.Mem.") at 2-3.) Defendant responds that the two counterclaims bear enough of a "loose factual connection" to the underlying FDCPA claims to warrant their presentation in this lawsuit, citing the Seventh Circuit's decision in *Channell v. Citicorp Nat'l Servs., Inc.,* 89 F.3d 379 (7th Cir.1996)

**\*5** Relying on *Channell,* the Magistrate Judge declined to dismiss ECS' counterclaim against plaintiff individually, and ruled that there is enough of a "loose factual connection" between the class FDCPA claims and ECS' counterclaim for the debt to warrant the exercise the jurisdiction, although she conceded that this connection "is not a terribly strong one."(Report and Recommendation at 12.) The Magistrate Judge further found that the motion to dismiss the counterclaims against the putative class was premature because the class has not been certified.

As the Magistrate Judge correctly noted, until the promulgation of 28 U.S.C. § 1367(a) in 1990, the court had to find that a counterclaim grounded in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)**

state law was compulsory to exercise jurisdiction over that counterclaim in the federal case. (Report and Recommendation at 14.) That is, the counterclaim had to arise out of the same transaction or occurrence that is the subject matter of the opposing party's claim. Fed.R.Civ.P. 13(a). If the counterclaim was instead a permissive counterclaim, the court needed an independent basis for the exercise of jurisdiction. See *Channell v. Citicorp. Nat'l Servs., Inc.,* 89 F.3d 379, 384 (7th Cir.1996) (citing *Baker v. Gold Seal Liquors,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974)). However, as the *Channell* court found, the distinction between permissive and compulsory counterclaims is no longer meaningful. Section 1367(a) extends the scope of supplemental jurisdiction to the limits of Article III of the Constitution requiring only a "loose factual connection" between the claims. *Channell,* 89 F.3d at 384, citing *Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1298-1301 (7th Cir.1995).

In *Channell,* the district court faced a class action premised on alleged violations under the Consumer Leasing Act, 15 U.S.C. §§ 1667-1667e. 89 F.3d at 380. The court in *Channell* interpreted an early termination clause in an automobile lease to determine whether it complied with the Act's requirements. Defendant Citicorp, which as a result of the class action found itself with a class of lessees which terminated leases early, filed a counterclaim seeking judgment for the contractual termination payments. *Id.* at 383.Like the federal question presented in the class action complaint, the counterclaim also turned on the language in the automobile lease. The Seventh Circuit, therefore, reversed the district court's holding that it could not exercise jurisdiction over what it had deemed a permissive counterclaim and held that supplemental jurisdiction could be exercised. *Id.* at 385.The court found that although the acts which created the claims were different, one arose from the signing of the lease, the other arose from the early termination of the lease, "the parties, the lease, the clause, and even the terminations are constants", noting further that the identical clause

of the automobile lease was at issue in both actions. *Id.*

*\*6* Applying the liberal interpretation of § 1367(a) recognized in *Channell,* we agree with the Magistrate Judge that we may exercise supplemental jurisdiction here. The counterclaim in *Channell* and the underlying federal question both turned on the interpretation of the same automobile lease-albeit for different issues. *Id.* For this reason, the Seventh Circuit found that these claims were at least loosely factually connected. The counterclaim here involves the validity of the underlying debt. Although the evidence which would establish or defeat the debt is different from that which the plaintiff must adduce to prove his FDCPA case, *Whitaker v. Ameritech,* 129 F.3d 952, 957-58 (7th Cir.1998), plaintiff must prove the existence of a debt as that term is defined in the FDCPA to prevail here.*Kang v. Eisenstein,* 962 F.Supp. 112, 114 (N.D.Ill.1997). The existence of a debt is relevant to both claims Under the *Channell* court's reasoning, this slight factual overlap satisfies the requirement that the two actions must be "loosely factually connected" before the court may exercise jurisdiction.

It is true as plaintiff argues that several courts have refused to exercise jurisdiction because they have reasoned that the underlying debt has no relevance to the fairness of the collection procedures. See *Berrios v. Sprint Corp.,* No. CV-97-0081, 1998 WL 199842, 9 (E.D.N.Y. March 16, 1998); *Hart v. Clayton-Parker and Assocs. Inc.,* 869 F.Supp. 774, 777-78 (D. Arizona 1994); *Ayres v. Nat'l Credit Management Corp.,* No. Civ. A. 90-5535, 1991 WL 66845, at *1-4 (E.D.Penn. April 25, 1991); *Gutshall v. Bailey & Assocs.,* No. 90 C 20182, 1991 WL 166963, at *2 (N.D.Ill. February 11, 1991); *Leatherwood v. Universal Bus. Serv. Co.,* 115 F.R.D. 48, 49-50 (W.D.N.Y.1987); *Peterson v. United Accounts, Inc.,* 638 F.2d 1134, 1137 (8th Cir.1981). However, as the Magistrate Judge pointed out, these courts focused unnecessarily on whether the counterclaim was compulsory or permissive, a distinction no longer relevant after the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 6
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)

promulgation of Section 1367(a) and one that the *Channell* court rejected. Surprisingly, this focus remains in decisions which post-date the promulgation of Section 1367(a). Their analysis is therefore based on a different inquiry than the one that *Channell* adopted. Similarly, those cases cited by plaintiff in which courts have refused to bar as *res judicata* FDCPA actions following a state court action to collect the debt are factually inapposite. A *res judicata* analysis focuses on whether the two claims rise from the same transaction. *See Blakemore v. Pekay,* 895 F.Supp. 972, 983 (N.D.Ill.1995); *Azar v. Hayter,* 874 F.Supp. 1314, 1317 (N.D.Fla.), *aff'd,* 66 F.3d 342 (11th Cir.1995), *cert. denied,* 516 U.S. 1048, 116 S.Ct. 712, 133 L.Ed.2d 666 (1996). *Channell* clearly requires much less of a factual connection for jurisdictional purposes.

However, the court's conclusion that we may exercise supplemental jurisdiction does not end our inquiry. Section 1367(c) empowers district courts to decline to exercise jurisdiction over a claim in four situations:

*7 (1) the claim raises a novel or complex issue of state law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Plaintiff argues that permitting the counterclaim to proceed would contravene the public policy embodied by the FDCPA, relying on § 1367(c)(4). (Pl. Mem. at 4.) In *Leatherwood v. Universal Business Service Co.,* the court observed just that:

[T]o allow a debt collector defendant to seek to collect the debt in the federal action to enforce the FDCPA might well have a chilling effect on persons who otherwise might and should bring suits such as this....Given the remedial nature of the FDCPA and the broad public policy it serves, federal courts should be loath to become immersed in the debt collection suits [brought by] the target of the very legislation under which a FDCPA plaintiff states a cause of action.

115 F.D.R. at 50. The Magistrate Judge declined to follow the *Leatherwood* reasoning because she concluded that "the FDCPA was enacted to eliminate abusive debt collection practices, not to permit debtors to shirk their financial obligations."(Report and Recommendation at 17.) However, dismissing the counterclaim here does not allow the debtor to shirk his alleged debt; it simply does not grant the debt collector a federal forum in which to pursue the counterclaim. This especially makes sense because the debt collector may pursue the claim easily in state court. Therefore, any chilling effect on the bringing of actions under FDCPA is avoided, while still enabling the debt collector to pursue his just remedies in state court. Under *Channell,* the court's decision not to exercise supplemental jurisdiction over ECS' counterclaims is clearly within its discretion. 89 F.3d at 386. Therefore, we will decline to exercise jurisdiction over the counterclaim against plaintiff.

The court also is concerned that should the class be certified and such counterclaims against the debtor classes proceed, the court would be overwhelmed with claims which will predominate the underlying federal claim. Under § 1367(c)(2), this is another reason to decline to exercise jurisdiction. Although the Magistrate Judge did not reach plaintiff's motion to dismiss the counterclaim as to the putative class members, she recognized that should the class be certified, an "adjudication of ECS' class counterclaims against a class might generate a large administrative burden."(Report and Recommendation at 17, n. 11 citing *Channell,* 89 F.3d at 386-87.) Moreover, federal courts are ill-equipped to handle such state collection claims while "our sister state courts have set up special small claims courts that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)

Page 7

have streamlined and cost-effective procedures designed to handle these types of small individual contract actions."*Channell v. Citicorp Nat'l Servs. Inc.,* No. 91 C 3428, 1996 WL 563536, at *2 (N.D.Ill.1996). For this reason, too, we decline to exercise supplemental jurisdiction over the counterclaim asserted against the putative classes.

II. *Defendant EPS' Motion For Summary Judgment*

*8 Defendant EPS originally moved to dismiss itself from this lawsuit arguing that the plaintiff had failed to make any allegations against it directly under the FDCPA. The parties agreed to take discovery on this motion and submitted evidentiary material to the Magistrate Judge who then converted it to a motion for summary judgment.

The court should grant summary judgment if EPS demonstrates that the pleadings, depositions and other evidentiary materials fail to raise a "genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). The court must accept as true all facts set forth by the non-movant and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of demonstrating the absence of evidence to support the position of the nonmoving party. *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir.1994).

Plaintiff made no direct allegations against EPS in its Complaint. Its case for liability instead rests on its allegation that EPS, "as the entity that controls and operates defendant ECS, it is indirectly involved in the collection of debts."(Compl. at ¶ 8.) The evidence submitted by the parties on this point consists of the deposition of Ronnie Garmon, Vice-President of Operations for ECS and Stephen Cook, in-house counsel for EPS. Garmon testified that ECS has two sets of collection letters from ECS which it sends to consumers depending on the circumstances. (Deposition of Ronnie Garmon

("Garmon Dep.") at 23.) Cook, together with ECS personnel, determines the "content" of each of these two sets of letters. (*Id.* at 26.) According to Garmon, Cook also is involved in the timing of the letters, again working with ECS collection personnel. ((*Id.* at 27.) Garmon finally testified that Cook participates in the drafting of the letters to a limited degree because he reviews the drafts and decides on "final and appropriate verbiage" consistent with the appropriate laws. (*Id.* at 29-30.) Cook himself also stated that he provides legal services to ECS, for which ECS is billed, and that those services include "consultation with the collection team when a change is considered to the language of a collection letter."(Affidavit of Stephen Cook ("Cook Aff.") at ¶ 3.) Cook further stated that he reviews ECS' draft letters for compliance with applicable laws which sometimes entails making changes to the letters. (*Id.*) He disclaimed any day-to-day involvement with ECS' collection efforts, stated that he is not consulted on which letters to send a particular consumer or what particular strategy is pursued in the collection of the check and further stated that "his only involvement in the policies of ECS relate to insuring compliance with the applicable laws, including the FDCPA."(*Id.*) According to both Garmon and Cook, then, Cook's involvement is limited to reviewing ECS' draft letters and making changes to comply with applicable laws. Garmon additionally stated that Cook had something to do with the "timing" of the letters, although neither party explained exactly what that was. However, this slight difference in the evidence is not dispositive for purposes of this motion.

*9 The evidence presented demonstrates that EPS had no direct contact with plaintiff. The parties agree that EPS' only involvement was its lawyer's limited review of the draft collection letters. Nevertheless, plaintiff argues that EPS is an indirect debt collector under § 1692(a)(6). We agree with the Magistrate Judge that plaintiff misinterprets the language of the statute to impute liability to a subsidiary, EPS, without first demonstrating the special circumstances which demonstrate that the direct

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 8
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)**

collector of the debt, ECS, and EPS should be deemed a single economic enterprise. *See United States v. ACB Sales & Servs., Inc.,* 590 F.Supp. 561, 574 (D.Az.1984).

As the Magistrate Judge correctly found, plaintiff's reliance on a series of cases involving the actions of corporate personnel in the activities of the debt collector is misplaced. In each of these cases, the allegations of indirect involvement were aimed at personnel who were employed by the entity which was directly collecting the debt from plaintiff. In *West v. Costen,* 558 F.Supp. 564, 584 (W.D.1983), the allegations of indirect involvement were aimed at the president of the debt collection agency who personally "obtained new collection accounts" and received a commission on those accounts. Similarly, in *Teng v. Metropolitan Retail Recovery, Inc.,* 851 F.Supp. 61, 67 (E.D.N.Y.1994), the president and manager of the collection agency were held to be indirect debt collectors because both men personally called and harassed plaintiff to pay his debt. In *Drennan v. Van Ru Credit Corp.,* 950 F.Supp. 858, 861 (N.D.Ill.1996), the principal sued created the debt collection letters himself.

We agree with the Magistrate Judge that Judge Kocoras' opinion in *Pope v. Vogel,* No. 97 C 1835, 1998 WL 111576 (N.D.Ill. March 5, 1998), also is distinguishable from this case. The court in that case held that the president of the debt collection agency was an "indirect debt collector" because the complaint alleged that the president "directed, authorized, controlled, and participated in" the debt collection agency's activities even though he did not have any direct contact with the plaintiff. *Pope,* 1998 WL 111576, at *5. However, the court in *Pope* stressed the fact that the president was the only employee of one of two entities which had contacted the plaintiff about the debt and one of two employees of the other entity. *Id.* Although *Pope* can be read to define "indirectly" as denoting a degree of involvement short of but equally as culpable as direct involvement, that definition is confined by the facts in *Pope* to the activities of a principal of the debt collector which has the direct contact with plaintiff. Nothing in *Pope* suggests this court should impute liability to another corporate entity which did not have direct involvement with the plaintiff without evidence that the two corporations are in fact a single entity. The undisputed facts presented here, which demonstrate only the limited involvement of EPS' general counsel, certainly do not suggest that EPS and ECS are a single entity.

*10 The cases cited in plaintiff's Objections to the Report and Recommendation ("Objections" ') are equally inapposite. (Objections at 7-10.) In each of these cases, plaintiff sued an officer or principal of the debt collection agency which was responsible for collecting the debt under an indirect theory of liability because that officer or principal had direct contact with plaintiff in an effort to collect the debt. *See Pikes v. Riddle,* No. 98 C 568, 1998 WL 483601 (N.D.Ill. Aug.12, 1998) (holding sole equity owner who approved collection letter sent to plaintiff by debt collector could be personally liable under FDCPA if personally involved in the debt collection practices); *Egli v. Bass,* No. 98 C 2001, 1998 WL 560270 (N.D.Ill. August 26, 1998) (holding principal of debt collector could be liable if involved in debt collection practices); *Calabrales v. Dymacol,* No. 98 C 2109 (N.D. Ill. June 17, 1998) (order denying motion to dismiss sole owners of debt collector could be personally liable if they personally directed the unauthorized mailing).

Courts consistently have held that when two corporate entities are involved, only one of which directly attempted to collect the alleged debt, the plaintiff must allege facts sufficient if proved to pierce the corporate veil to prevail. *See Stepney v. Outsourcing Solutions,* No. 97 C 5288, 1997 WL 722972 (N.D.Ill. November 13, 1997); *Jenkins v. Union Corp.,* 999 F.Supp. 1120 (N.D.Ill.1998); *Harrison v. NBD Inc.,* 968 F.Supp. 837 (E.D.N.Y.1997) In other words, plaintiff must show that EPS and ECS "share an interdependence that renders them a 'single economic enterprise.' ' *Jen-*

Not Reported in F.Supp.2d                                                        Page 9
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)**

kins, 999 F.Supp. at 1142.citingHarrison, 968 F.Supp. at 845. We agree with the Magistrate Judge that proof that corporate counsel of one entity reviewed the form of letters sent by the other does not meet this standard.

In his Objections, plaintiff makes other arguments concerning statutory construction which are unpersuasive. These arguments were not presented to the Magistrate Judge, but we can consider them as part of our *de novo* review. He argues that an interpretation of "indirectly" which would require plaintiff allege facts showing vicarious liability to impute liability to a corporate entity which does not have direct contact with the debtor is contrary to the plain meaning of the statute. (Objections at 10-12.) We disagree. As the cases cited by plaintiff himself demonstrate, it is clear that those individuals who are employed by the entity can be liable under an indirect theory of liability if they have personal contact with the debtor or play some critical role in directing that entity's debt collection activities. Plaintiff's argument that this interpretation is inconsistent with the broad remedial purpose of the act also is unconvincing. (Objections at 12-13.) Plaintiff erroneously suggests that this interpretation will restrict unduly liability to the corporate vehicle which is actually collecting the debt. On the contrary, it is clear that different corporations which are actually a single entity as well as corporate officers who are personally involved with debt collection practices are covered within this interpretation.

**\*11** Accordingly, we agree that summary judgment be entered in EPS' favor and that EPS be dismissed from the case.

### III. *Plaintiff's Motion to Strike Affirmative Defenses*

Defendant ECS originally filed six affirmative defenses. ECS has since dismissed its fourth affirmative defense. Plaintiff has moved to strike all five of ECS' remaining affirmative defenses pursuant to Fed.R.Civ.P. 12(f).Rule 12(f) allows district courts

to strike "any insufficient defense" from any pleading. Motions to strike are disfavored and should be granted where the affirmative defenses are "patently defective and could not succeed under any circumstances."*Mobley v. Kelly Kean Nissan, Inc.,* 864 F.Supp. 726, 732 (N.D.Ill.1993). A defense is affirmative only if (1) it is specifically listed in Fed.R.Civ.P. 8(c) or (2) it raises factual or legal issues outside of the plaintiff's prima facie case so the defense cannot be raised though a simple denial in the answer. *Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734, 736 (N.D.Ill.1982).

#### A. ECS' First Affirmative Defense

ECS's first affirmative defense to the FDCPA claim is that plaintiff has failed to state a claim upon relief can be granted. (ECS' Answer at 15.) We agree with the Magistrate Judge that the Federal Rules permits a defendant to raise the defense of failure to state a claim in any pleading, including the answer. Fed.R.Civ.P. 12(h)(2). We also agree with the Magistrate Judge that the word "affirmative" be stricken from this defense because failure to state a claim is more properly viewed as a negative rather than affirmative defense. *SeeSwanson v. American Express, Inc.,* No. 89 C 2148, 1989 WL 36227, at \*1 (N.D. Ill. April 12, 1989); *Instituto Nacional de Comercializacion Agricola (Indeca) v. Continental Illinois Nat'l Bank and Trust Co.,* 576 F.Supp. 985, 991 (N.D.Ill.1983). We further agree with the Magistrate Judge that defendant has pleaded this defense adequately.

#### B. ECS' Second Affirmative Defense

ECS' second affirmative defense is that subject matter jurisdiction is lacking because ECS is not a "debt collector" within the meaning of the FDCPA. (ECS' Answer at 15.) We agree with the Magistrate Judge that this defense be stricken as an affirmative defense because it can be raised as a simple denial. Plaintiff must prove that ECS is a debt collector to prevail. *Whitaker,* 129 F.3d at 958. ECS has denied

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)**

this. (ECS Answer at 2.) Therefore, defendant already has pleaded this defense.

## C. ECS' Third Affirmative Defense

ECS' third affirmative defense is that subject matter jurisdiction is lacking because the plaintiff used the alleged bad checks in question for gambling purposes and not for the personal, family or household used which the Act requires. (ECS' Answer at 15.) We agree with the Magistrate Judge that this is not an affirmative defense because it raises no issues outside of plaintiff's prima facie case. Plaintiff must prove that his obligation to pay constitutes a debt within the meaning of the FDCPA. *Kang v. Eisenstein,* 962 F.Supp. 110, 114 (N.D.Ill.1997). Defendant has denied that the check in question is a debt and, therefore, has raised this defense.

## D. ECS' Fifth Affirmative Defense

*12 ECS' fifth affirmative defense is that plaintiff has suffered no damages. (ECS' Answer at 15.) We agree with the Magistrate Judge that this affirmative defense should be stricken with prejudice. An FDCPA plaintiff does not have to prove actual damages to establish a right to recovery. *Keele v. Wexler,* 149 F.3d 589, 593 (7th Cir.1998). Proof of a violation is sufficient to trigger the FDCPA's statutory damages provisions. 15 U.S.C. § 1692(a)(2)(A). Therefore, even assuming that plaintiff suffered no actual damages, plaintiff can still state a claim for relief under the FDCPA.

ECS' response is that a court can consider the dearth of actual damages in its determination of the appropriate statutory damages, citing *Emanuel v. American Credit Exchange,* 870 F.2d 805, 808 (2d Cir.1989) (Defendant's Response In Opposition to Plaintiff's Motion to Strike Affirmative Defenses at 6.) We agree with the Magistrate Judge that even if this is true, lack of actual damages does not constitute an affirmative defense because it does not call the plaintiff's "right of recovery" into question. *Bobbitt,* 532 F.Supp. at 736 (quoting 5 Wright &

Miller, Federal Practice and Procedure § 1270 at 292.)

## E. ECS' Sixth Affirmative Defense

ECS also has filed an affirmative defense which asserts a set-off of the alleged unpaid debt against damages which plaintiff may recover under the FDCPA. Because the Magistrate Judge allowed the counterclaim to proceed, she granted plaintiff's motion to strike this affirmative defense.

The difference between a counterclaim and a set-off is that a "counterclaim is broader and more comprehensive ... While a defendant who has asserted a counterclaim is entitled to an affirmative judgment ... a defendant who had pleaded a set-off is not entitled to recover the excess of his claim over the plaintiff's demand."*O'Connor v. Insurance Co. of North America,* 622 F.Supp. 611, 617 (N.D.Ill.1985) (quoting *Schenck v. Coordinated Coverage Corp.,* 50 A.D.2d 50, 376 N.Y.S.2d 131, 134 (1975)), *aff'd sub nom.,Stamp v. Insurance Co. of North America,* 908 F.2d 1375 (7th Cir.1990). Therefore, if plaintiff recovers nothing in this action or recovers less than the amount of the alleged set-off, ECS will not recover its entire debt in this action. In addition, if plaintiff's case does not proceed to judgment in his favor, ECS' set-off claim ceases to exist.

Courts have allowed defensive set-offs in similar circumstances. In actions under the analogous Consumer Leasing Act, 15 U.S.C. Section 1667(a)(11), part of the larger Truth In Lending Act ("TILA"), courts in this circuit have allowed set-offs for underlying debts to be alleged as affirmative defenses. In *Kedziora v. Citicorp Nat'l Servs., Inc,* Judge Castillo allowed such a set-off to stand even though he earlier had disallowed a counterclaim for the debt. 901 F.Supp. 1321, 1331-32 (N.D.Ill.1995). He reasoned that allowing the set-off in a case involving the TILA, where the damage award is intended to penalize and deter future violations, does not undermine the goals of the Act simply because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 11
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050)**

defendant may be allowed to reduce his damages by the amount of the set-off. *Id.* at 1332. Similarly, in *Olevares v. Viking Dodge, Inc.,* another TILA case, Judge Grady rejected the defendant's attempt to set off the amount it claimed that plaintiff owed under the installment contract after judgment because it "could have raised its claim as a set-off to plaintiff's TILA claim in the course of our adjudication." 626 F.Supp. 114, 116 (N.D.Ill.1985).

**\*13** Given the similar remedial purposes of the TILA and the FDCPA, this court is persuaded that allowing the set-off to be asserted here would not contravene the public policy of the FDCPA or have a chilling effect on potential claims under the Act. Therefore, we will permit ECS to assert the amount of the debt owed as a defensive set-off.

## CONCLUSION

For all of the foregoing reasons, we hereby decline to adopt that part of the Magistrate's Report and Recommendation concerning the motion to dismiss ECS' counterclaims and order the counterclaims dismissed. We further adopt the Report and Recommendation concerning the motion for summary judgment as to defendant EPS and order summary judgment in favor of EPS on the complaint. Finally, we adopt in part the Report and Recommendation concerning ECS' affirmative defenses and order that ECS' Second, Third and Fifth Affirmative Defenses be stricken and allowing ECS' First and Sixth Affirmative Defenses to stand.

N.D.Ill.,1998.
Crawford v. Equifax Payment Services, Inc.
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit
# B

Westlaw.

Slip Copy                                                              Page 1
Slip Copy, 2008 WL 781929 (N.D.Ill.)
**(Cite as: Slip Copy, 2008 WL 781929)**

Spaulding Moving and Storage, Inc. v. National
Forwarding Co., Inc.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
SPAULDING MOVING AND STORAGE, INC.,
individually and on behalf of all others similarly
situated, Plaintiff, Counterdefendant,
v.
NATIONAL FORWARDING CO., INC., Defend-
ant, Counterclaimant.
No. 07 C 4095.

March 20, 2008.

Dominic J. Rizzi, Anthony F. Fata, Christopher B.
Sanchez, Cafferty Faucher LLP, Chicago, IL,
George E. Sang, Schoenberg, Finkel, Newman &
Rosenberg, LLC, Chicago, IL, for Plaintiff, Coun-
terdefendant.
James Austin Christman, Michael Lee
McCluggage, Andrea L. Caron, Brent R. Austin,
Wildman, Harrold, Allen & Dixon, LLP, Chicago,
IL, for Defendant, Counterclaimant.

### OPINION AND ORDER

WILLIAM T. HART, District Judge.
**\*1** Plaintiff Spaulding Moving and Storage, Inc.,
both individually and on behalf of a putative class,
brings this action against defendant National For-
warding Co., Inc. Defendant has a contract with the
Department of Defense ("DOD") to provide mov-
ing services for DOD employees. Pursuant to a
"Hauling Contract," National Forwarding acts as
the billing agent when Spaulding and the putative
class members provide moving services for DOD
personnel. When plaintiffs provide such moving
services, they forward invoices to National For-
warding which sends revised invoices to the re-
sponsible DOD agency. National Forwarding re-
ceives payment from DOD and then provides ap-

propriate payment to the plaintiff that provided the
moving service. Spaulding alleges that defendant
breached the Hauling Contract by failing to pay to
plaintiff and the putative class members their prop-
er share of "Additional Transportation Charges"
that defendant received from DOD for moves to
certain counties. The one example plaintiff provides
of defendant's failure to remit additional transporta-
tion charges is in connection with a move conduc-
ted by plaintiff on or about February 9, 2005 en-
titling it to recover $497.61. Jurisdiction over
plaintiff's action is based on the Class Action Fair-
ness Act, 28 U.S.C. § 1332(d)(2)(A), there being
diversity of citizenship between some class mem-
bers and defendant and the amount in controversy
being in excess of $5,000,000. Named plaintiff and
defendant, however, are both citizens of Illinois.

National Forwarding has counterclaimed for
$15,790.76 that Spaulding allegedly owes it under
another contract (the "Management Contract") re-
lated to providing transportation services for DOD.
Under the Management Contract, National For-
warding agreed to provide traffic management for
military contracts of Spaulding. Under this arrange-
ment, National Forwarding received all revenues
under the contracts while paying Spaulding 3% of
the net linehaul.[FN1] In October 2004, Spaulding
informed National Forwarding that it was terminat-
ing the Management Contract effective April 13,
2005. National Forwarding contends that it was en-
titled to receive revenues for all pickups that oc-
curred prior to the termination date even if payment
was made after the termination date. National For-
warding further alleges that Spaulding changed the
payee codes under the military contracts so that
Spaulding received all payments made on April 13,
2005 and thereafter. National Forwarding alleges
that this resulted in Spaulding receiving payments
for three contracts that were picked up prior to the
termination date, but paid after the termination
date. Spaulding has moved to dismiss the counter-
claim on the ground that it is a permissive counter-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 781929 (N.D.Ill.)
**(Cite as: Slip Copy, 2008 WL 781929)**

Page 2

claim over which this court lacks jurisdiction.

> FN1. It is unclear from the parties' pleadings whether the payments that National Forwarding receives under the Hauling Contract are also governed by the Management Contract.

At the times the Complaint and Countercomplaint were filed, the Federal Rules of Civil Procedure defined a compulsory counterclaim as, in pertinent part, a claim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."Fed.R.Civ.P. 13(a) (2007). A permissive counterclaim was defined as "any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim."*Id.* 13(b).[FN2] The supplemental jurisdiction statute, 28 U.S.C. § 1367(a), provides that "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."The majority of courts apparently hold that a permissive counterclaim cannot fall within the purview of supplemental jurisdiction, *see* Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, & Richard D, Freer, *Federal Prac. & Proc.: Jurisdiction 2d* § 3523.1, 2007 Suppl. at 234-35 & nn. 53-56 (2007), essentially viewing arising out of the transaction or occurrence as coextensive with forming part of the same case or controversy. Those courts require that a permissive counterclaim always have an independent basis for jurisdiction.

> FN2. Effective December 1, 2007, nonsubstantive amendments went into effect. Rule 13(a)(1)(A) still includes "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" in the definition of a compulsory counterclaim. Rule 12(b) now defines a permissive counterclaim as "any [counter]claim that is not compulsory."

**\*2** The Seventh Circuit, however, views the case or controversy language of the supplemental jurisdiction statute as being broader than the transaction or occurrence provisions that define compulsory and permissive counterclaims. Thus, the Seventh Circuit holds that supplemental jurisdiction may be exercised over a permissive counterclaim that does not have an independent basis of jurisdiction as long as the counterclaim otherwise satisfies the requirements for exercising supplemental jurisdiction. *See Channell v. Citicorp Nat'l Serv., Inc.,* 89 P.3d 379, 384-86 (7th Cir.1996) (Easterbrook, J.); *Rothman v. Emory University,* 123 F.3d 446, 454 (7th Cir., 1997); *Leipzig v. AIG Life Ins. Co.,* 362 F.3d 406, 410 (7th Cir.2004) (*dictum* ) (Easterbrook, J.); *Colemon v. Marshall & Ilsley Bank,* 2007 WL 4305604 \*4 (E.D.Wis. Dec.7, 2007); *Conyers v. Abitz,* 2006 WL 3147402 \*12 (E.D.Wis. Oct.27, 2006); *Gross v. Town of Cicero,* 2005 WL 1126542 \*1 (N.D.Ill. May 3, 2005); *Adams Street Joint Venture v. Harte,* 231 F.Supp.2d 759, 762 & n. 1 (N.D.Ill.2002).*But see Oak Park Trust & Sav. Bank v. Therkildsen,* 209 F.3d 648, 651 (7th Cir.2000) (Easterbrook, J.);[FN3] *Chicago Reg'l Council of Carpenters Pension Fund v. Three Way Hanging, Inc.,* 200B WL 192939 \*1 (N.D.Ill. Jan. 22, 2008); *DirecTV v. Edwards,* 293 F.Supp.2d 873, 878 (N.D.Ind.2003); *Conner v. Instant Cash Advance,* 2003 WL 446378 \*3 (S.D.Ind. Feb.20, 2003).Section 1367(a)'s requirement that the counterclaim be so related to the original complaint that they form the same case or controversy may be satisfied even by a "loose factual connection between the claims" as long as the complaint and counterclaim derive from the same common nucleus of operative facts. *Strom v. Strom Closures, Inc.,* 2008 WL 489363 \*4 (N.D.Ill. Feb.20, 2008) (quoting *Sanchez & Daniels v. Koresko,* 503 F.3d 610, 614 (7th Cir.2007)); *Conyers,* 2006 WL 3147402 at \*12 (quoting *Ammerman v. Sween,* 54 F.3d 423, 424 (7th Cir.1995)); *Gross,* 2005 WL 1126542 at \*1 (same), Even if this requirement is met, it is still within the district court's discretion as to whether or not to exercise supplemental jurisdiction. 28 U.S.C. 1367(c); *Channel,* 89 F.3d at 386;*Strom,* 2008 WL 489363 at

Slip Copy
Slip Copy, 2008 WL 781929 (N.D.Ill.)
(Cite as: Slip Copy, 2008 WL 781929)

*5. The burden is on National Forwarding to establish that there is supplemental jurisdiction over the counterclaim. *Three Way Hanging,* 2008 WL 192989 at *1; *DirecTV,* 293 P. Supp.2d at 879; *Harte,* 231 F.Supp.2d at 761.

> FN3. *Channel,* which contains a developed discussion of the issue, and *Rothman* appear to state the current view of the Seventh Circuit, not *Therkildsen,* While *Harte* and *DirecTV* attempt to reconcile *Therkildsen* with *Channel* and *Rothman, Therkildsen* appears to be inconsistent with the other two in holding that permissive counterclaims always require an independent basis of jurisdiction. *See also Three Way Hanging, supr* a, and *Conner, supra.*

National Forwarding does not dispute that its counterclaim is permissive, not compulsory. It also does not dispute that there is no independent basis of jurisdiction for its counterclaim. National Forwarding, however, contends that its claim is sufficiently related to plaintiff's claims to fall within the supplemental jurisdiction of this court. Both sets of claims concern payments for transportation services and arise during the same time period. Both sets of claims also involve the same parties. Although the central legal issue in each set of claims focuses on different clauses of two contracts, there is sufficient factual overlap to support supplemental jurisdiction. This court will exercise its discretion to retain supplemental jurisdiction over the counterclaim since the exact same issue may be before the court anyway as an offset affirmative defense.[FN4] Even if not before the court in a similar affirmative defense, the counterclaim is not likely to predominate over the main issues raised in plaintiff's Complaint.

> FN4. In its brief opposing the motion to dismiss, National Forwarding contends that the same facts that underlie the counterclaim also underlie a possible offset affirmative defense. While supplemental jurisdiction itself cannot be based on a factual relationship between an affirmative defense and counterclaim, *see Ruhnke v. Pipe Fitters' Welfare Fund,* 2005 WL 1869740 *9 (N.D.Ill. Aug.4, 2005); *Lawrence & Assoc. v. Amdocs Champaign, Inc.,* 2007 WL 390732 *3 (E.D.Mo. Jan.31, 2007), in deciding whether to retain supplemental jurisdiction that otherwise exists, it would be appropriate to consider that the issue may also be before the court in an affirmative defense. Although suggested in the brief, it is noted that defendant's answer does not actually assert an offset affirmative defense.

**3** The Counterclaim will not be dismissed. Plaintiff shall promptly move for class certification.

IT IS THEREFORE ORDERED that plaintiff-counterdefendant's motion to dismiss [19] is denied. Within two weeks, counter-defendant shall answer the counterclaim. By April 14, 2008, plaintiff shall file its motion for class certification and supporting memorandum of law. Defendant's answer to the class certification motion shall be filed by May 5, 2008. Plaintiff's reply is due by May 19, 2008. All discovery is to be completed by September 26, 2008. A status hearing will be held on April 16, 2008 at 11:00 a.m.

N.D.Ill.,2008.
Spaulding Moving and Storage, Inc. v. National Forwarding Co., Inc.
Slip Copy, 2008 WL 781929 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit C

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 1114760 (N.D.Ill.), 2004-1 Trade Cases P 74,434, 72 U.S.P.Q.2d 1053
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1114760)**

C

International Sports Management, Inc. v. Stirling Bridge Group, Inc.

N.D.Ill.,2004.

United States District Court,N.D. Illinois, Eastern Division.
INTERNATIONAL SPORTS MANAGEMENT, INC., an Illinois corporation, Plaintiff,
v.
STIRLING BRIDGE GROUP, INC., a Nevada corporation, Kathleen Storen, Laurie Dimakos, and Lisa Scott, Defendants.
**No. 03 C 9027.**

May 17, 2004.

Robert Steven Markin, Matthew F. Carmody, Piper Rudnick LLP, Chicago, IL, for Plaintiff.

Bonita L. Stone, Linda Leigh Miller, William Jay Dorsey, Katten Muchin Zavis Rosenman, Chicago, Il, for Defendants.

MEMORANDUM OPINION DENYING DEFENDANTS' MOTION TO DISMISS COUNTS II-IV, VII, AND VIII OF THE AMENDED COMPLAINT

FILIP, J.

*1 Plaintiff's first amended complaint contains eight counts, including one brought under the Federal Trademark Act of 1946, as amended, 15 U.S.C. § 1051, *et seq.* ("Lanham Act") (Count I), and seven counts brought under state law (Counts II through VIII). Defendants have moved to dismiss Counts II-IV, VII, and VIII on the basis that the Court lacks subject matter jurisdiction over these Counts. Alternatively, assuming that this Court finds that supplemental jurisdiction exists under 28 U.S.C. § 1367, Defendants request that the Court decline to exercise its supplemental jurisdiction over Counts II-IV, VII, and VIII. As explained below, Defendants' motion to dismiss is denied and the Court maintains jurisdiction over all asserted claims.

## BACKGROUND

Plaintiff International Sports Management ("ISM"), "a company that provides hospitality services to select corporate clientele at major sporting events," essentially alleges that three of its former employees, Defendants Kathleen Storen, Laurie Dimakos, and Lisa Scott ("the individual Defendants"), "engaged in an orchestrated scheme to poach ISM's clients and start a competing company called Stirling Sports Group" ("Stirling"). (D.E.1, ¶ 1). Stirling is also named as a Defendant.[FN1]

> FN1. In their motion to dismiss, Defendants contend that "ISM did not allege a 'scheme' anywhere in the First Amended Complaint."(D.E. 19 at 7). However, not only did Plaintiff allege a "scheme," (D.E.1, ¶ 1), and a "pattern of deceptive acts," (*see id.,* ¶ 2), in describing Defendants' alleged conduct, but, as the following summary of the allegations will show, even without these labels, it would be evident that Defendants' alleged conduct had a common design-namely, to obtain Plaintiff's clients and other business through unfair competitive methods.

According to the allegations in the complaint-which must be accepted as true for present purposes-none of the individual Defendants had any of their own clients when they began work at ISM at various times in 2001 and 2002. Meanwhile, ISM has invested substantial resources in developing and maintaining its client base. In this regard, ISM has developed and keeps extensive information about its clients, including "inter alia, addresses and telephone numbers of company contacts, the name[s] of customer representatives, the types of services purchased over the course of the relationship, the event(s) preferred by the customer, past and current

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 1114760 (N.D.Ill.), 2004-1 Trade Cases P 74,434, 72 U.S.P.Q.2d 1053
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1114760)**

contracts with clients, and other information. This information is regularly updated by ISM and kept confidential."(*Id.,* ¶ 18).

The individual Defendants each entered into an employment agreement with ISM. Under the terms of these contracts, each individual Defendant agreed: (1) to use his or her "best efforts, skill and ability to promote the Company's interest during [his or] her employment,"(*id.,* ¶ 27); (2) not to disclose ISM's confidential client information; (3) not to solicit ISM clients and prospective customers for a year after the Defendant's termination of his or her employment relationship with ISM; and (4) not to recruit fellow employees or to induce them to leave ISM at any time during the Defendant's employment with ISM or for two years after the Defendant's termination of such employment.

Defendant Storen worked at Stirling and, in June 2003, she resigned from ISM. Storen then allegedly solicited Defendants Scott and Dimakos while those two still worked at ISM, and they "developed a plan to move to Stirling, taking as many ISM clients with them as possible."(*Id.,* ¶ 58). Before leaving ISM, Scott and Dimakos allegedly diverted business prospects to "the Stirling venture they planned to join."(*Id.,* ¶ 65). Scott resigned from ISM on Wednesday, November 12, 2003. Four days later, on Sunday, November 16, 2003, when all the other ISM employees were off for the weekend, Dimakos allegedly deleted ISM computer files and stole confidential ISM information from ISM's offices. That same day, Dimakos faxed her resignation letter to ISM's management.

**\*2** After resigning from ISM, Scott and Dimakos immediately started working for Stirling. Upon joining Stirling, the individual Defendants all allegedly began soliciting ISM clients and employees. As part of that solicitation effort, Dimakos allegedly made disparaging comments about ISM to ISM clients to convince those clients to do business with Stirling. Additionally, Stirling has allegedly placed on its website purported testimonials from satisfied clients without disclosing that the testimo-

nials were actually written to ISM by ISM's clients. According to Plaintiff, "[e]very reference or testimonial appearing anywhere on Stirling's website is inaccurate, false and has been stolen from ISM."(*Id.,* ¶ 97). Finally, according to Plaintiff, "Stirling has appropriated ISM's long time phone number, 780-0500. Stirling has added an '877' and made 877 780-0500 its own toll-free number."(*Id.,* ¶ 98). In sum, Plaintiff has alleged that Defendants have engaged in a "deliberate scheme to steal ISM's employees, clients, information and even customer recommendations."(*Id.,* ¶ 97).

Counts I, V, and VI, are brought under the Lanham Act, the Illinois Consumer Fraud Act, and for unjust enrichment, respectively, and are primarily based on Stirling's alleged use on its website of ISM's customer testimonials. In the Lanham Act claim, Plaintiff alleges that "Stirling's false and misleading statements and advertising were made knowingly, willfully and with malicious intent to divert customers from ISM to Stirling."(*Id.,* ¶ 110). Counts II and IV are brought for breach of contract and breach of the duty of loyalty, respectively, and chiefly concern the individual Defendants having allegedly stolen ISM's confidential information, recruited ISM's employees to work for Stirling, and solicited ISM's clients and prospective clients for the benefit of Stirling. Count III, for intentional interference with existing and prospective business relationships and economic advantage against all Defendants, is mainly based on the same alleged misconduct as Counts II and IV. Count VIII, for violation of the Illinois Trade Secrets Act, is also brought against all Defendants and is essentially founded on the Defendants' alleged misappropriation of ISM's confidential information and use of that information to solicit ISM clients. Count VII, for commercial defamation against Stirling and Dimakos, principally relates to defamatory comments that Stirling and Dimakos allegedly made about ISM to ISM's current and potential clients. In Count VII, Plaintiff alleges that the "defamatory statements made by Stirling and Dimakos were made maliciously and with willful intent to destroy and/

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 3
Not Reported in F.Supp.2d, 2004 WL 1114760 (N.D.Ill.), 2004-1 Trade Cases P 74,434, 72 U.S.P.Q.2d 1053
(Cite as: Not Reported in F.Supp.2d, 2004 WL 1114760)

or irreparably damage ISM's standing with its cur-
rent and prospective clients."(*Id.*, ¶ 152).

Plaintiff is seeking permanent injunctive relief
(having already received an agreed order of prelim-
inary injunction in settlement of the preliminary in-
junction litigation-in which no Defendant admitted
to any liability whatsoever), along with compensat-
ory damages, statutory attorneys' fees and interest,
statutory treble damages, and punitive damages.

## DISCUSSION

**\*3** Defendant contends that this Court lacks supple-
mental jurisdiction over Counts II-IV, VII, and VIII
because the issues involved in those state law
claims are "wholly unrelated to ISM's federal Lan-
ham Act claim."(D.E. 11 at 6). The Court respect-
fully disagrees.

The supplemental jurisdiction statute, 28 U.S.C. §
1367(a), "confers supplemental jurisdiction to the
limits Article III of the Constitution permits, au-
thorizing federal courts to hear all claims that 'are
so related to claims in the action within such origin-
al jurisdiction that they form part of the same case
or controversy.' " *Ammerman v. Sween*, 54 F.3d
423, 424 (7th Cir.1995) (quoting 28 U.S.C. §
1367(a)). Thus, "judicial power to hear both state
and federal claims exists where the federal claim
has sufficient substance to confer subject matter
jurisdiction on the court, and the state and federal
claims derive from a common nucleus of operative
facts." *Id.* As explained by the Seventh Circuit, "[a]
loose factual connection between the claims is gen-
erally sufficient." *Id.*

Supplemental jurisdiction exists in this case be-
cause all of the claims derive from a common nuc-
leus of operative facts. Specifically, all of Plaintiff's
claims concern Defendants' alleged "orchestrated
scheme to poach ISM's clients and start a compet-
ing company called Stirling Sports Group."(D.E. 1
at 1). Plaintiff has alleged that the false advertising
of the website quotes is part of this scheme:

"Stirling has intentionally listed these quotes, with
full knowledge they were deceptive and referred to
ISM, in furtherance of its deliberate scheme to steal
ISM's employees, clients, information and even
customer recommendations."(*Id.*, ¶ 97). In addition,
and independently, if it can be proven that the al-
leged false advertising is in fact part of such an
overall scheme, these circumstances would be rel-
evant to establishing, as part of Plaintiff's Lanham
Act claim, that "Stirling's false and misleading
statements and advertising were made knowingly,
willfully and with malicious intent to divert cus-
tomers from ISM to Stirling."(*Id.*, ¶ 110).*See Alpo
Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958,
967 (D.C.Cir.1990) (stating that willfulness means
"conduct aimed at a [particular] victim targeted by
the defendant.... In the broader false-advertising
context, 'willfulness' and 'bad faith' require a con-
nection between a defendant's awareness of its
competitors and its actions at those competitors' ex-
pense"). Proof of such willfulness or malicious in-
tent also can impact what remedies are available
under the Lanham Act. *See*15 U.S.C. § 1117(a); *see
also BASF Corp. v. Old World Trading Co., Inc.*,
41 F.3d 1081, 1099 (7th Cir.1994) ("The Lanham
Act allows for fees in 'exceptional cases,' 15
U.S.C. § 1117(a), which encompasses cases in
which the acts of infringement are malicious, fraud-
ulent, deliberate or willful.") (internal quotation
omitted).

**\*4** Thus, inasmuch as all of the Counts are based on
alleged conduct comprising part of this scheme,
there is, at a minimum, a loose factual connection
among the state law claims and the Lanham Act
claim sufficient to confer jurisdiction over the state
law claims. *See, e.g., Rothman v. Emory Univ.*, 123
F.3d 446, 454-55 (7th Cir.1997) (holding that,
where a plaintiff law student brought an action
against his law school for disability discrimination,
the court properly exercised supplemental jurisdic-
tion over the law school's counterclaim to force
plaintiff to repay the indebtedness on his student
loans where the plaintiff claimed that he believed
the law school's violation of the antidiscrimination

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 1114760 (N.D.Ill.), 2004-1 Trade Cases P 74,434, 72 U.S.P.Q.2d 1053

**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1114760)**

laws relieved him of his loan responsibilities); *Lait v. Genova*, No. 01 C 5125, 2001 WL 1249057, at *1 (N.D.Ill. Oct.17, 2001) (holding that, where plaintiff sued various city officials for retaliating against him for cooperating with a federal investigation, the court had supplemental jurisdiction over a $50 state law extortion claim against the mayor's wife where it was "all part of a common scheme"). As a result, jurisdiction exists under 28 U.S.C. § 1367(a).

It being established that supplemental jurisdiction is available, the Court will turn to whether the exercise of such jurisdiction is appropriate. The supplemental jurisdiction statute provides that a district court may decline to exercise supplemental jurisdiction where

(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In the event that conditions described in § 1367(c) are present, "a federal court must choose the course that 'best serves the principles of economy, convenience, fairness and comity which underlie the pendent jurisdiction doctrine.'" *Contico, Inc. v. Town of Brooklyn, Ill., Wisc.*, 148 F.3d 689, 704 (7th Cir.1998) (quoting *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 172-73, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (internal quotation omitted)).

Regardless of whether circumstances described in § 1367(c) may exist in this case, and it is not clear that any do, it would not be proper for the Court to decline jurisdiction over the state claims because doing so would not serve the governing principles articulated by the Seventh Circuit and Supreme Court. It would neither be efficient nor convenient to require the parties to litigate the same issues re-

lating to the same alleged scheme before two different judges. Indeed, it is entirely conceivable that if part of this case is dismissed and refiled in state court, one or both of the judges presiding over aspects of this case will be faced with a motion to stay proceedings pending the outcome of the related litigation. At the same time, the principle of comity does not weigh particularly heavily in favor of dismissal, because no difficult or complex state law question has been identified. There seems little reason to burden the judicial systems of both state and federal courts with a piecemeal litigation of this case, as it can most economically and conveniently be litigated here. Accordingly, the Court will retain jurisdiction over all claims asserted in the complaint.

CONCLUSION

**\*5** For the foregoing reasons, Defendants' motion to dismiss Counts II-IV, VII, and VIII is denied.

N.D.Ill.,2004.
International Sports Management, Inc. v. Stirling Bridge Group, Inc.
Not Reported in F.Supp.2d, 2004 WL 1114760 (N.D.Ill.), 2004-1 Trade Cases P 74,434, 72 U.S.P.Q.2d 1053

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.