**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, <br><br> Plaintiff, <br><br> v. <br><br> COMCAST OF ILLINOIS III, INC.; COMCAST CORP.; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No:  08 CV 1680

Honorable Elaine E. Bucklo

Magistrate Judge Martin C. Ashman

| | |
|---|---|
| COMCAST OF ILLINOIS III, INC.; COMCAST CORP.; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., <br><br> Counterclaimants, <br><br> v. <br><br> ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, <br><br> Counterdefendant, <br><br> and AT&T, INC., <br><br> Third-party Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**[redacted]ILLINOIS BELL TELEPHONE COMPANY'S  MEMORANDUM IN OPPOSITION TO COMCAST'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff and Counterdefendant Illinois Bell Telephone Company, d/b/a AT&T Illinois

("Illinois Bell") submits this memorandum in opposition of the motion for temporary restraining

order and preliminary injunction (Doc. 29) by Defendants and Counterplaintiffs Comcast Illinois

9173772

III, Inc., Comcast Corp., Comcast Holdings LLC, and Comcast of Chicago, Inc. (collectively, "Comcast").

Illinois Bell has installed its U-verse TV service in over ███ Illinois residences many of which are formerly served by Comcast's network.  Illinois Bell's installation protocols if properly followed maintain a complete separation between the networks, but an ongoing investigation indicates that technicians failed or may have failed to follow this protocol in approximately one-quarter of one percent of all installations.  Illinois Bell is working to achieve total compliance with its installation protocols through extensive training programs for technicians, monitoring performance, and disciplining those who fall short.  Illinois Bell is also collaborating with Comcast to disconnect the companies' networks where inadvertently connected in spite of Illinois Bell's best efforts.

Comcast now proposes that rather than focusing on training its technicians to follow the installation protocol that would eliminate any possibility of signal leak from the Illinois Bell network into the Comcast network, Illinois Bell implement an elaborate new procedure that will not address the underlying problem, but will result in Illinois Bell providing Comcast with the identity of each of its new customers before Illinois Bell performs an installation.

Such extraordinary injunctive relief is unjustified because Comcast is unlikely to succeed on the merits of its claims against Illinois Bell.  Further, the alleged disruptions represent a drop in the bucket when compared to the disruptions Comcast customers ordinarily endure on the Comcast network.  Any harm to Comcast's customer goodwill cannot be attributed to the few additional disruptions caused by Illinois Bell and is readily compensable as monetary damages.

Most importantly, Comcast's Proposed Order will not remedy the conflict between the parties.  Illinois Bell, like Comcast, does not want an interconnection between the networks.  The

9173772

Proposed Order does nothing to prevent the misinstallation of U-verse TV services, but is instead directed, at best, at allowing Comcast to more quickly detect any signal interruption that is not significantly impacting its network. Comcast is already capable of immediately detecting any signal interference that creates an outage for customers on its network and quickly detecting such interference that does not cause significant disruption. The proposal would not greatly improve this process, but it would divert Illinois Bell's resources away from addressing the underlying issue and place in Comcast's hands Illinois Bell's most sensitive competitive information.

## ARGUMENT

"A temporary restraining order or a preliminary injunction is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing." *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp. 2d 798, 803 (N.D. Ill. 2008). A party that cannot show that it is likely to prevail on the merits or that it will be irreparably harmed by waiting for a determination of the merits of its claim is not entitled to a temporary restraining order or preliminary injunctive relief. *Goodman v. Illinois Dept. of Fin. & Professional Regulation*, 430 F.3d 432, 437 (7th Cir.2005); *see also Patriot Homes, Inc. v. Forest River Housing, Inc.*, 512 F.3d 412 (7th Cir. 2008) (vacating a preliminary injunction for vagueness). Comcast's request that this Court enter its Proposed Order on an emergency basis— while the parties are successfully employing less anticompetitive means to arrive at the same resolution—suffers from both defects.

> **A.**    **Comcast Has Not and Can Not Show that It Is Likely to Prevail on the Merits of Its Claims Against Illinois Bell**
>
> > **1.**    **Illinois Bell does not intercept or receive Comcast's communication services.**

Comcast is not likely to succeed on its claim that misinstallations by Illinois Bell violate the Cable Communications Policy Act ("Cable Act"). The Cable Act provides that:

No person shall intercept or receive . . . any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

47 U.S.C. § 553.  Comcast provides three communications services over its cable system, video, high speed Internet and VoIP telephone.  Even Comcast does not allege that Illinois Bell by inadvertently failing to disconnect the Comcast cable feed to one of its customer's homes "receive[s] . . . communications service."  Illinois Bell may be receiving Comcast's signal, but it is certainly never decoded (nor capable of being decoded) into some useable form so that it could be said that Illinois Bell has received a "service."

Instead, Comcast alleges that Illinois Bell has intercepted its service.  (Doc. 36 at 7-8.)  Illinois Bell will present expert engineering testimony to establish that in the communications industry the distinction between "intercept[ing] . . . communications service" and receiving such service is that the signal does not continue past the point of interception to be received by others, whereas a person can receive a service while not preventing the service from getting to its intended target (*e.g.*, by inserting a splitter in the cable).  Interception of a communication service, however, still requires that a person obtain the signal carrying the service and decode (or at least be capable of decoding) it into some usable service.  Comcast cannot show that Illinois Bell has prevented Comcast customers from receiving communications service by diverting a Comcast "service"  to itself.

Comcast suggests that intercepting a service under the Cable Act includes the act of simply stopping the service from getting to a Comcast customer, even if Illinois Bell never accesses the service itself.  It relies on a dictionary definition to claim that this is the plain meaning of intercept.  In fact, "intercept" has competing connotations in certain contexts.  The tension between a reading of "intercept," on the one hand, as taking something away from another and using it oneself, or, on the other hand, as preventing anyone from having something

4

without possessing it oneself, is evident in typical definitions of the word. For example, Webster's Third New International Dictionary Unabridged defines "intercept" as "to take, seize, or stop by way or before arrival at the destined place: stop or interrupt the progress or course of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 1176 (Meriam-Webster 1993).

It can hardly be disputed that the plain meaning of the word intercept to Washington legislators drafting the Cable Act, many of whom are Redskins fans, is that it means more than just stopping or interrupting a cable service. When a defensive player catches a ball before it can be caught by an offensive player, sports fans call it an interception. Fans do not use the same term when the defensive player merely bats down the ball before it is caught by anyone else including the defensive player. The pass is instead ruled incomplete. In both cases the defensive player prevents the ball from reaching its intended target, but in the first case, the player takes or seizes the ball for him or herself while in the second case the player only stops or interrupts the ball's flight.

The ambiguity caused by the several connotations of "intercept" is no less evident in the provision of communications service. If interception requires the taking or seizing of a communications service intended for another, then the text of the Cable Act is directed narrowly at cable pirates and thieves. If interception requires only stopping or interrupting of a communications service, then the federal Cable Act extends civil liability to a broad range of potential violators including tree trimmers who inadvertently nick a cable line, construction workers who sever one while excavating a property, and AM radio stations and ham radio operators whose signal sometimes enters a cable network and interrupts the provision of cable services. *See* Curtis Dep. at 197-98. "The existence of alternative dictionary definitions of" a

word, "each making some sense under the statute, itself indicates that the statute is open to interpretation" and the word is ambiguous as between the two meanings. *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 418 (1992); *see also MCI Telecommunications Corp. v. AT & T Co.*, 512 U.S. 218, 226-27 (1994); FARNSWORTH ON CONTRACTS, § 7.8 (1982) ("Ambiguity is an entirely distinct concept. A word may have two entirely different connotations, so that it may be at the same time both appropriate and inappropriate. Thus the word *light* is ambiguous when considered in the context of dark feathers.").

The Supreme Court faced similar ambiguity in determining the scope of 18 U.S.C. § 924(c)(1), which criminalizes "use" of a firearm in relation to any drug trafficking crime. *Bailey v. United States*, 516 U.S. 137 (1995). The *Bailey* Court observed that:

> the word "use" poses some interpretational difficulties because of the different meanings attributable to it. Consider the paradoxical statement: "I *use* a gun to protect my house, but I've never had to *use* it."

*Id.* at 143. Depending on the connotation of "use" adopted, the scope of the statute's prohibition could dramatically increase.  If "use" in the statute meant use in the sense of the first half of the paradox—placement for protection or to embolden or provide a sense of security—then 924(c)(1) would sweep in any possession of a firearm at or near the scene of a drug transaction or its proceeds or paraphernalia. *See id.* at 147.  Instead, the *Bailey* Court fixed upon the more narrow use of the term from the second half of the paradox—active employment—as the meaning intended by Congress based on the "language, context, and history of § 924(c)(1)." *Id.* at 144.

As Illinois Bell has discussed at length elsewhere, the history of the Cable Act clearly demonstrates that Congress intended the narrower take/seize connotation of intercept than the broader stop/interrupt connotation.  (Doc. 47 at 6-8.) *See also* H.R. Rep. No. 934, 98th Cong.,

2d Sess. 83, *reprinted in* 1984 U.S.C.C.A.N. 4720 (indicating that the provision codified at 47

U.S.C. § 553 was directed at the prevention of cable piracy).  Comcast is not likely to succeed in

showing that Illinois Bell intercepted its signal in this sense, namely because there is no evidence

that Illinois Bell obtains Comcast's signal at all, let alone is capable of decoding it into a

communication service.[1]

Even if this Court were inclined to take a broader view of "intercept" in the context of the

statute, Comcast is not likely to succeed in its claim that Illinois Bell stopped or interrupted its

communication services.  From a technical perspective, the introduction of U-verse TV signals

into Comcast's network does not stop or interrupt service to Comcast's customers, it simply

creates noise in the network.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

*See* Curtis Dep. at 104, 214, 218.  █████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████    *See id.* at 124.

### 2.    Illinois Bell does not intentionally meddle with Comcast's chattel.

Under Illinois law, "'trespass is an *intentional* invasion of the exclusive possession' of

another, and trespass to chattel requires *intentional* dispossession of another's chattel or using or

---

[1]    The Cable Act allows courts to grant temporary injunctions "as it may deem reasonable" to prevent violations of the statute.  47 U.S.C. § 553(c)(2)(A).  Such relief is permissive, however, and not mandatory.  *Id.* at § 553(c)(2) ("The court may . . .").  Injunctive relief is inappropriate where Comcast is not likely to succeed in showing a violation.

Moreover, courts typically only provide for injunctive relief where the violation is ongoing—that is the nonmoving party continues to intercept or receive the cable company's communications service. *See, e.g.*, *CSC Holdings, Inc. v. KDE Electronics Corp.*, No. 99-C-1566, 2000 WL 284005, *6-7 (N.D. Ill. Mar. 13, 2000) (defendant continued to manufacture devices designed to steal cable).  Illinois Bell to the extent that it can be shown to have violated the Cable Act at all certainly has not committed an ongoing or continuing violation.  Illinois Bell has no intention to intercept the communications service and disconnects its network from Comcast to prevent that possibility as soon as it discovers a misinstallation. Hamilton Decl.  ¶¶ 4, 12.

interfering with a chattel possessed by another." *Microthin.com, Inc. v. Siliconezone USA, LLC*, No. 06 C 1522, 2006 WL 3302825, * 6 (N.D. Ill. Nov. 14, 2006) (quoting *Freese v. Buoy*, 576 N.E.2d 1176, 1182 (Ill. App. Ct. 1991), and citing Restatement (Second) of Torts § 217) (emphasis added). Comcast cannot succeed on the merits merely by showing that Illinois Bell caused a foreign signal to enter Comcast's network. It must also prove that Illinois Bell intended to introduce its signal onto Comcast's network.

In a case involving trespass to land, the Illinois Appellate Court clarified the standard for intent. One is liable for trespass "if he acts with knowledge that his conduct will, to a substantial degree of certainty, result in the intrusion." *Dietz v. Ill. Bell Tel. Co.*, 507 N.E.2d 24, 27 (Ill. App. Ct. 1987). The *Dietz* court very specifically stated that there can be no liability for trespass unless the defendant "know[s] with a high degree of certainty that the intrusion will naturally follow from his act." *Id.* In *Dietz*, Illinois Bell granted cable companies licenses to run their wiring along its telephone poles, but the licenses required the cable companies to secure a landowner's permission before entering private property. *Id.* at 27. Plaintiffs alleged that Illinois Bell aided and abetted the cable companies in trespassing because it knew that they would do so. But the *Dietz* court disagreed, holding that nothing in plaintiffs' complaint showed that Illinois Bell knew that trespasses "would naturally follow" from granting the licenses and, in addition, that Illinois Bell instruct or direct the cable companies to trespass or accept the proceeds of any trespasses "with full knowledge of illegality." *Id.* at 27.

Similarly, Comcast cannot meet its heavy burden to show intent in this case. Illinois Bell is not a hacker or commercial spammer. There is absolutely no evidence to indicate that Illinois Bell, or any of its technicians, *intended* to connect its network to Comcast's or to access Comcast's network illegally. To the contrary, the Illinois Bell's installation procedures—

contained in its M&P Manual—specifically and repeatedly instruct employees to avoid any connection between the two networks.  Hamilton Decl. ¶¶ 4-5.  By analogy to *Deitz*, here Illinois Bell specifically instructed its technicians not to interfere with any cable provider's network.

Moreover, Illinois Bell had no reason to believe that its installation methods and procedures were insufficient before it launched U-verse service in Illinois in late January 2008. In 2006 and 2007, there were allegations that U-verse misinstallations near San Antonio, Texas backfed onto a cable network.  *Id.* at ¶ 20.  Illinois Bell's investigation revealed that there were only two alleged misinstallations, and Illinois Bell has not been able to confirm that those misinstallations actually disrupted any cable network.  Thus, Illinois Bell had no notice before it launched its video service in Illinois that there was a "substantial degree of certainty" that its installation work would result in an intrusion.  *Id.*

In addition after its launch in Illinois, when Comcast informed Illinois Bell that it believed misinstallations were resulting in disruptive backfeeding, Illinois Bell immediately implemented new procedures to insure that installers follow the installation protocol, just as it did in Michigan and Indiana when a cable provider raised similar complaints (re-emphasis of the installation protocols have resolved the Michigan and Indiana complaints).  *Id.* at ¶¶ 14-17, 20. Even without these new procedures, the evidence will show that Illinois Bell's installations never have created a risk of intrusion in more than one-quarter of one percent of its installations. Moreover, Illinois Bell investigates every address that Comcast alleges is a source of interruption and it disconnects its system from the Comcast infrastructure as soon as it finds a noncompliant installation.  *Id.* at ¶ 12.

There simply is no evidence that Illinois Bell was "substantially certain" that introducing U-verse TV to the Chicago-area market would disrupt any cable provider's network.  This Court

cannot determine, on the basis of the evidence before it, that Illinois Bell had the requisite intent to commit a trespass to chattel.  As such, Comcast cannot show that it is likely to succeed on the merits of this claim.

        **3.**        **Illinois Bell has taken reasonable steps to prevent injury to Comcast.**

Further, only an injury that results from a lack of reasonable precautions constitutes negligence.  In Illinois, a plaintiff pleading negligence must "demonstrate that defendant breached a duty of care and that defendant proximately caused plaintiff's injuries." *Heupel v. Jenkins*, -- N.E.2d --, 2008 WL 615932, *4 (Ill. App. Ct. Mar. 5, 2008).  Even if Comcast can show that Illinois Bell caused a foreign signal to enter its network, Comcast must also show that Illinois Bell breached a duty of care to Comcast.  So long as Illinois Bell and its technicians took reasonable steps to prevent the injury that occurred, Illinois Bell is not negligent.

Illinois Bell takes extraordinary steps to ensure that its technicians comply with the installation protocol for U-verse.  ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Hamilton Decl. ¶¶ 6-9.  Technicians have been put on notice to avoid installation techniques that result in backfeeding and understand that the failure to follow existing installation protocol will result in discipline.  *Id.* at ¶¶ 14-17, 22.  If misinstallations occur, it is not for Illinois Bell's lack of care to avoid them.  *Cf. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (sexual harassment policy relevant to affirmative defense available in Title VII sexual harassment cases). In the face of evidence as to the substantial precautions Illinois Bell does take to avoid interconnection between the networks, Comcast cannot make a clear showing at this stage that it is likely to prevail on its negligence claim.

**B.    Comcast Has Not Shown that it is Harmed by Illinois Bell Let Alone Irreparably Harmed**

Comcast correctly states that harm to customer goodwill in certain circumstances may be irreparable,[2] but it has not clearly shown harm to customer goodwill.  Critically, the preliminary evidence demonstrates that where Illinois Bell's signals entered Comcast's network, Comcast cannot show that it had a significant impact on customer goodwill.  The impact of outages or degradations caused by Illinois Bell on customer goodwill is negligible against a backdrop of overwhelmingly more frequent outages and disruptions on the Comcast network unrelated to Illinois Bell's conduct.



*Curtis* Dep. at 42-44.

*Id.* at 42-43.

*Id.* at 44.

*Id.* at 190-93.

, *id.* at 248,

---

[2]    Comcast suggests that the fact of network interference is an irreparable harm without regard for its impact on customer goodwill.  (Doc. 36 at 11-12.)  The case Comcast cites for this proposition, *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058 (N.D. Ill. 2000), however, does not create an independent irreparable harm based on the fact of an electronic trespass *per se*.  The *eBay* court granted preliminary relief in that case because on the evidence before the court there was a risk that the harm to customer goodwill from the trespass was incalculable harm.  *Id.* at 1066.  As discussed in text, there is neither a harm to customer goodwill that is attributable to Illinois Bell nor would such harm be incalculable.

███████████████████████████████████████████████████████, *id.*
at 257-59.

Of the forty-two locations that form the basis for Comcast's request for injunctive relief,
a preliminary investigation by Illinois Bell indicates that at worst Illinois Bell failed to follow its
installation protocol in ███████. Hamilton Decl. ¶ 18. ███████████████████████

████████████████████████████████████████████████████

███████████████.[3] *See* Curtis Dep. at 104, 214, 218. ███████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ *See*, *e.g.*, *id.* at 49, 146, 151-52. To suggest then that two outages over the
course of four months and some additional degradations, many of which did not produce a single
customer complaint or other evidence of effect on service, over the same time period could
noticeably affect Comcast customer goodwill ██████████████████████████████

████████████████████████████████████████ is implausible.

Further, expenditures to maintain customer goodwill are recoverable at law where
nonspeculative. *See Kaiser Aluminum & Chemical Sales, Inc. v. PPG Industries, Inc.*, 42 F.3d
1147, 1151 (7th Cir. 1994) (reviewing precedent on recoverable consequential damages);
*Sampson v. Murray*, 415 U.S. 61, 90 (1974) (potentially calculable monetary damages are not
generally a proper foundation for injunctive relief). ██████████████████████████

████████████████████████████████████████████ *Id.* at 45-46.
Such expenditures are not uncertain and Illinois Bell would compensate Comcast for any injuries
it caused to customer goodwill in the form of damages.

---

[3] ██████████████████████████████████████████████████

████████████████████████████████████ Curtis Dep. at 248-49.

C.    **In the Balance of Hardships, Illinois Bell Would Be Irreparably Harmed by the Proposed Order**

Notwithstanding this litigation, Illinois Bell wants to avoid interconnection with foreign networks.  Misinstallation creates risks to the performance of U-verse TV service.  Hamilton Decl. ¶ 4.  Moreover, Illinois Bell risks losing customers where its product interferes with incumbent services provided to the customer by other networks.  *Id.*  The Proposed Order does not increase Illinois Bell's incentive to ensure full compliance with its installation protocols, but does risk lessening the competitiveness of Illinois Bell's video service in Illinois.  Because of the difficulty a start-up business has in proving its damages from being frozen out of a market, the Seventh Circuit has determined that such harm is irreparable.

Illinois Bell faces significant barriers to entry into the market for video services.  Illinois Bell must upgrade its existing network to allow it technologically to deliver video service.  Percy Aff. ¶ 9.  These upgrades, in addition to the operation of a video service system once operational, require permitting by several layers of government and regulatory authorities, accruing significant legal costs.  *Id.*  Also because Illinois Bell must educate potential customers both about the availability and operation of its video service, it has large marketing expenses.  *Id.* at ¶¶ 8-9.

Because Illinois Bell is entering markets in which incumbent cable companies have already paid and recouped these costs, Illinois Bell must keep the cost of U-verse TV service to consumers competitively low.  *Id.* at ¶7.  As a result, Illinois Bell can only enter markets where it can retain customers long enough to recoup over time the upfront investment of market entry.  *Id.* at ¶ 11.

Providing Comcast, a competitor in the video service market and the incumbent, with specific information about customers switching to Illinois Bell, as suggested by the Proposed

13

Order, before Illinois Bell has even installed its service, let alone operated long enough to recover the costs of that installation, will irreparably harm Illinois Bell's ability to compete against Comcast. Comcast can use that information to target the particular customer it is at risk of losing as well as work to retain that customer's neighbors with special service offers. By forcing Illinois Bell to reveal where it is targeting its efforts and building its network on a block-by-block basis (information that it otherwise does publicly disclose), Comcast can launch a preemptive strike. *Id.* at ¶ 13.

Of course, Comcast would work to prevent the loss of every customer to a new market entrant if it had perfect competitive information, but ordinarily such information is costly to obtain and retention efforts cannot be complete. *Id.* at ¶ 12. This allows new market entrants to compete against incumbents. The Proposed Order, however, gifts Comcast exactly the information it needs to prevent Illinois Bell from entering the market and competing against it.[4]

Because the lost sales of new businesses are difficult to prove, they are often deemed speculative and unrecoverable at law. *See, e.g., JamSports and Entertainment, LLC v. Paradama Productions, Inc.*, 336 F. Supp. 2d 824, 849 (N.D. Ill. 2004). As a result, Illinois Bell would likely be without recourse against Comcast if its business was injured by an erroneously granted temporary restraining order or preliminary injunction of the variety proposed here.

This irreparable harm is not only injurious to Illinois Bell, but to the public at large. The State of Illinois is working conscientiously towards increasing the level of competition in the delivery of video services. *See* Cable and Video Competition Law, 220 ILCS 5/21-100, *et seq.* The state considers competition in the market for video services and increased investment in the

---

[4]      No doubt although the reverse flow of information would also isolate homes at which a potential misinstallation could occur because the residence receives Comcast service and is requesting Illinois Bell service, Comcast would have very little interest in sharing information about its entire customer base with Illinois Bell to prevent relatively rare misinstallations.

9173772

infrastructure to deliver video service to be matters of public interest and highly beneficial to the public. *Id.* at 5/21-101.  The harm to the public of eliminating the major competitor to incumbent cable providers in the market for video services greatly outweighs the marginal detriment to the public ███████████████████████████████████████████████████████████

███████████████.

    **D.**    **The Proposed Order Will Not Prevent Network Interconnections, Will Not Appreciably Reduce Comcast's Exposure to Injury, And Will Interfere With Illinois Bell's Ongoing Efforts to Eliminate Its Installation Issues**

The central failing of the Proposed Order is that it does nothing to remedy the situation that animates this litigation, and perhaps even exacerbates it.  Injunctive remedies do not issue where they will not be effective.  *See*, *e.g.*, *O'Brien v. Town of Caledonia*, 748 F.2d 403, 406 (7th Cir. 1984) ("Past irreparable harm will not sustain a preliminary injunction.").

The failure to follow existing installation protocols that ensure a separation between Comcast's network and Illinois Bell's network is the cause of Comcast's alleged injury. The Proposed Order does not address this issue at all.  It also does not appreciably reduce the risk of injury to Comcast. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

Curtis Dep. at 49, 60, 146, 151-152.  The shrinking interval between when Comcast calls Illinois Bell to report signal leakage that did not result in any outage or customer complaint and the time of the U-verse installation at the address is evidence of the latter.  Hamilton Decl. ¶ 23.

Comcast suggests that the Proposed Order would facilitate its detection of Illinois Bell's signal because it could focus its surveillance systems on the area of its network where an installation is occurring. ██████████████████████████████████████████████████

██████████ *Id.*  From a system monitoring perspective, the Proposed Order in a matter of just a few days would advise Comcast to simply do what it already does—monitor every part of its

network where Illinois Bell offers video service. The proposed process would be no faster than the current process in which Comcast quickly calls Illinois Bell once it detects the presence of Illinois Bell's signal in its network and Illinois Bell dispatches to the U-verse installation site.

The additional requirement that Illinois Bell pre-clear installations with Comcast would create a new, and more complex, installation protocol, and require Illinois Bell to dedicate substantial resources to developing and training on the new protocol with the same, or greater, potential for errors that is involved in implementing any new protocol. Resources diverted to this task would leave Illinois Bell less equipped to continue its efforts to ensure compliance with the network isolation installation protocols already in place.

* * *

For the foregoing reasons, Illinois Bell requests that this Court deny Comcast's Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated: May 9, 2008                          Respectfully Submitted

                                            ILLINOIS BELL TELEPHONE COMPANY


                                             /s/ Ranjit J. Hakim
                                            _____

                                            Michael J. Gill
                                            Ranjit Hakim
                                            MAYER BROWN LLP
                                            71 South Wacker Drive
                                            Chicago, IL 60606
                                            (312) 782-0600
                                            (312) 701-7711 – Facsimile
                                            mgill@mayerbrown.com
                                            rhakim@mayerbrown.com

## CERTIFICATE OF SERVICE

I, Ranjit Hakim, an attorney, hereby certify that on May 9, 2008, a copy of the foregoing [redacted]ILLINOIS BELL TELEPHONE COMPANY'S MEMORANDUM IN OPPOSITION TO COMCAST'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION was served via email and the Court's CM/ECF system upon all counsel listed below.


/s/ Ranjit J. Hakim
Ranjit Hakim


Thomas P. Jirgal
Douglas N. Masters
Julie P. Samuels
Loeb & Loeb LLP
321 N. Clark Street
Suite 2300
Chicago, IL 60610

9173772

# EXCERPTS FROM THE TRANSCRIPT OF THE DEPOSITION OF ROBERT CURTIS 5/2/08 REDACTED

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| COMCAST OF ILLINOIS III, INC.; COMCAST CORP.; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., | ) ) ) ) ) ) | Case No:  08 CV 1680 Honorable Elaine E. Bucklo Magistrate Judge Martin C. Ashman |
| Defendants. | ) ) | |
| COMCAST OF ILLINOIS III, INC.; COMCAST CORP.; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., | ) ) ) ) ) | |
| Counterclaimants, | ) ) | |
| v. | ) ) | |
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, | ) ) ) | |
| Counterdefendant, | ) ) | |
| and AT&T, INC., | ) ) | |
| Third-party Defendant. | ) ) ) ) ) ) | |

**[redacted]DECLARATION OF DERRICK HAMILTON**

I, Derrick Hamilton, depose and state the following:

1.     My name is Derrick Hamilton.  I am over the age of twenty one (21), have never

been convicted of a felony or crime of moral turpitude, nor have I ever been adjudged

incompetent.  I am legally competent to make this Declaration.  I gained personal knowledge of the facts stated in this Declaration in the course of my employment.

2.      I am the Vice President of U-verse Field Operations for AT&T Midwest.  My responsibilities include oversight of all installations of AT&T-branded U-verse television service ("U-verse TV").  U-verse TV area managers report to a director who reports directly to me. Under the area managers, crew managers supervise groups of technicians.  U-verse TV technicians work full-time on U-verse TV.  The technicians sometimes work as a group or in teams, but are grouped under crew managers primarily for organizational purposes.

3.      U-verse TV is an advanced television service that AT&T Midwest offers through its subsidiary corporations, such as Illinois Bell Telephone Company ("Illinois Bell"), in competition with traditional cable television.  Whereas traditional cable television is carried through a network of fiber optic and coaxial cables, U-verse TV is carried by a combination of fiber optic cables and the existing copper wires in AT&T Midwest's telephone network or in some cases directly by fiber to the home.  AT&T Midwest began offering and installing U-verse TV service in the Chicago metropolitan area in January 2008.  That area includes Cook, DuPage, Kane, Lake, McHenry, and Will counties.  Most of the Chicago-area sales and installations involve residential customers living in Chicago's suburbs.

4.      AT&T Midwest has developed specific methods and procedures ("M&Ps") for its technicians to follow when installing U-verse TV at a customer's home.  These M&Ps, which are specific to U-verse TV, are detailed in an installation and repair manual that AT&T Midwest gives to every U-verse TV technician.  That manual is called "ATT-TELCO-IS-002-300-034 AT&T U-verse: U-verse Premises Technician Installation and Repair Processes" ("M&P Manual").  See M&P Manual, ATT1000042-187.  These M&Ps are specifically designed to

prevent AT&T Midwest's network from being connected with another provider's network. Such a connection may allow U-verse TV's signal to leak out of the AT&T Midwest network or foreign signals to leak in. The M&Ps require that the technician isolate wiring in a home where the consumer also receives cable service from another network. If the consumer does not receive another service, AT&T Midwest may use the customer's existing coaxial wiring to minimize disruption to the consumer's residence from the installation of U-verse TV service. In those situations, the technician is required to disconnect any coaxial cable line bringing a signal to the house and place a terminator on that line so that no signal can exit or enter the cable company's network or the customer's home network. Specifically, the M&Ps require the technician to locate the customer wires running to the coaxial cable network, unscrew and cap or cut, connectorize and cap them with a 75 Ω terminator. See *id.* at ATT1000098, ATT1000108.

5.      In the section covering Network Interface Devices ("NIDs"), the M&P Manual provides the following warning, set off from and printed in a box that is a different color than the rest of page 51:



ATT1000098. Section 14.4.3 of the M&P Manual ("Cable TV Grounding and Splitters") provides instructions for reusing previously installed coaxial cable to deliver U-verse TV service to the customer's television. That section, which is on page 61, states as follows:



ATT1000108.  See also Installing U-verse When CATV Drop Wire is Present, at ATT1000037-041 (the final page identifies the document as "U-verse Premises Installations, Job Aids and Resource Materials Guide").  If the AT&T Midwest M&Ps are followed, there is no possibility that the AT&T Midwest network will be interconnected with the Comcast network as a result of a U-verse installation.

     6.     In addition to developing the M&Ps and providing technicians with the M&P Manual, AT&T Midwest requires all U-verse TV technicians to graduate from an intensive six-week training program before they are allowed to install or repair U-verse TV service without

supervision.  The training period consists of fully-paid, 40-hour work weeks.  It begins with a full day orientation, hosted by one or more U-verse TV managers.  After the orientation, trainees attend a week of classroom instruction on U-verse TV technology.  The classroom instruction occurs at one of several sites in the Chicago area.  This instruction covers, among several topics, proper installation of U-verse TV service, including circumstances in which a new customer is retaining or discontinuing service from a cable provider.  See Module 7, Lesson 1, U-verse Installation Overview, Student Guide, February, 2008, at ATT1000001-012; Module 13, Lesson 1, Step by Step Overview, Student Guide, February, 2008, at ATT1000013-022; Module 13, Lesson 2, U-verse Customer Education, Student Guide, February, 2008, at ATT1000023-036.

7.     After the classroom instruction, each trainee completes a one-week ride-along. For one week, the trainee accompanies an experienced U-verse TV technician while the experienced technician installs and repairs U-verse TV service and observes the experienced technician at work.  Trainees are expected to ask questions about the technology and the installation and repair processes.  Experienced technicians are expected to share their experiences with the trainees and to instruct the trainees in proper and effective installation techniques.

8.     After the one-week ride-along, trainees attend an additional two weeks of technical training.  Again, this instruction occurs at one of several sites in the Chicago area and covers proper installation and repair protocol.  Following the technical training, trainees complete an additional two-week ride-along with an experienced U-verse TV technician.  During this second ride-along, however, the experienced technician allows the trainee to perform installation and repair work under his or her supervision.

9.     Students are tested twice during the six-week training period on the installation and repair protocol, among other topics.  The first test evaluates a trainee's status.  It is designed to determine whether the trainee is learning the material presented so that his or her instructors and supervising technicians can provide more specific help and instruction.  The second test is a pass/fail final exam given at the end of the second round of classroom instruction.  If a trainee fails the exam, AT&T Midwest releases him or her from its payroll.  In exceptional circumstances, such as an intervening personal tragedy impacting the trainee's ability to attend the training program, the trainee may retake the exam.  In such cases, AT&T Midwest works with the technicians' union to reach an appropriate accommodation, but in no case may a technician who has not passed the exam conduct installation and repair work unsupervised.

10.     The first time I learned that there were instances where U-verse TV installations might not have been compliant with the M&Ps by remaining connected to a coaxial cable network was in late March 2008.  I became aware of this possibility through allegations of the same by Comcast.  As I understand it, Comcast has alleged that U-verse TV installations at specified addresses in the Chicago area introduced the U-verse TV signal into Comcast's cable network.  Comcast has also alleged that this signal, and not other events, disrupted its cable, cable-based telephone, and cable-based high-speed internet services.  At the time Comcast filed its counterclaim, it identified 42 addresses where, it claimed, AT&T's installations introduced AT&T's signal into the Comcast network.  Comcast has since provided AT&T with an additional 18 addresses.

11.     I am responsible for AT&T Midwest's ongoing technical efforts to address this issue.  In that role, I have communicated with Comcast about these allegations, including participating in a conference call with Comcast representatives on April 7, 2008 where

representatives of the parties discussed a number of the addresses identified in Comcast's counterclaim. Robert Curtis, who I understand to be my counterpart at Comcast, additional engineering personnel from AT&T, and four or five other individuals whose names I cannot recall, participated for Comcast.

12.    During the conference call, AT&T Midwest and Comcast agreed to a procedure that would help Comcast report situations where it believed AT&T Midwest's U-verse service was connected to its coaxial cable network. Subsequent to the meeting, AT&T Midwest created a document outlining the procedure and forwarded it to Comcast. (A copy of that document is attached hereto as Exhibit A.) Pursuant to that procedure, AT&T Midwest created a telephone number to receive Comcast reports about any incidents of potential network interference that Comcast suspected were caused by U-verse TV installations. Comcast, in turn, could then use that number to inform AT&T Midwest of each subsequent incident that it believed was caused by AT&T Midwest's installation procedure. After each call, AT&T Midwest agreed to investigate the incident, as reported by Comcast, on a priority basis. AT&T Midwest's investigation is intended to determine whether AT&T Midwest technicians followed the M&Ps when installing or repairing U-verse TV. For example, AT&T Midwest technicians were to see whether Comcast's cable line was capped with 75 $\Omega$ terminator in instances where AT&T Midwest re-used coaxial cable in a home. If it was discovered that its procedures were not properly followed, AT&T Midwest would take corrective action to remedy the situation at the location and follow-up with the technician involved to ensure full future compliance with the M&Ps. As part of its continuing commitment to quality, AT&T Midwest may also discipline technicians who fail to follow its procedures.

13.     Comcast reported 26 addresses by email on April 7, 2008.  See Email from Karen Sebastian to Bob Curtis, April 7, 2008, at ATT1000318-320.  Comcast did not use the telephone procedure to report any problems from April 8, 2008 to April 17, 2008.  Comcast reported one incident on the afternoon of April 17, 2008.  The rest of Comcast's reports for this interval, however, came by email on April 25, 2008.

14.     AT&T Midwest takes this issue very seriously, and has made substantial efforts to prevent recurrence of any violation of its M&P's that might create network interference on Comcast's network.  Following the April 7, 2008 conference call, AT&T Midwest took a number of affirmative steps in addition to implementing the procedure outlined in Paragraph 12. These affirmative steps were designed to respond to Comcast's allegations by ensuring that AT&T Midwest's network was not connected to any other provider's network because of a deviation from the M&Ps.  First, I ordered my crew managers to discuss this issue in their morning meetings with U-verse TV technicians.  Technicians and their crew managers have a morning meeting one to three times per week, where they discuss (among other topics) ongoing technical issues.  I instructed my crew managers to highlight the network connection issue, and emphasize the great importance of following the established M&Ps when installing or repairing U-verse TV service.

15.     Second, I instituted a central tracking system to record all alleged incidents of interference with Comcast's network.  When a call or report of disruption comes in, the dispatcher is required to make an entry on a spreadsheet recording, among other things, the time of the call, the time the area manager was informed, the time a U-verse TV technician completed his or her investigation, and notes regarding the resolution of the investigation.  See Chart Labeled "Comcast Network Referral," at ATT1000340-349.

16.     Third, since April 23, 2008, I have directed my area managers to personally call me to report every incident that comes to their attention.  For each incident, I review with the area manager his findings with respect to the reported incident, and if an installation is deemed non-complaint with the M&P's, I review the work history of the technician involved.

17.     Finally, I directed my managers to follow up with any technician whenever a quality deviation is discovered.  A "quality deviation" is any violation of the M&Ps—in this case most likely a failure to unscrew and cap or cut, connectorize and cap Comcast's cable line.  Quality deviations are recorded, taken into account during technician performance evaluations, and can subject a technician to discipline.  In these cases, I have instructed my managers to discuss with the technician the significance of any installation scenarios that might have led to the introduction of the U-verse TV signal into a cable network, and warn the technician of the consequences of such deviations going forward.

18.     AT&T Midwest acknowledges that there have been instances where an AT&T Midwest technician has not followed the M&Ps with respect to unscrewing and capping or cutting, connectorizing and capping the cable feed to a home.  ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████████

████  For example, Comcast has alleged U-verse TV service has created a disruption to Comcast's network in situations where it could not possibly have done so.  At least five of the 42 addresses that Comcast has brought to AT&T Midwest's attention do not have and never have received an installation of U-verse TV service.  Two other addresses could not be physically

located because as far as AT&T Midwest knows, they do not exist.  One address is simply duplicative of another.  At other locations, AT&T Midwest's investigation found that there was no failure to follow the M&Ps or any other problem that could result in AT&T Midwest's signal entering Comcast's network.

19.    Nevertheless, the available evidence shows that the extensive training AT&T Midwest has instituted has been successful in ensuring that in the vast majority of cases our technicians correctly follow the M&Ps. ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

20.    No other AT&T company has experienced a persistent problem with technicians failing to follow the procedure for unscrewing and capping or cutting, connectorizing and capping the cable feed to home.  Prior to beginning U-verse TV service installation in Illinois under the same M&Ps and training regime used elsewhere, my review of company documents supplied by AT&T Texas indicates only two instances where the incumbent cable provider has claimed that U-verse TV service was mis-installed and caused interference with a connected cable network.  These allegations occurred in Texas in 2006 and 2007.  See Email from Vincent Paladini to Len Briley, September 29, 2006, at ATT1000241-242; Defendant's Original Answer and Counterclaims, *Sw. Bell Tel., L.P. v. Time Warner Cable San Antonio, L.P*., No. 2006CI18629 (288th Tex. Dist. Jan. 3, 2007); Southwestern Bell Telephone, L.P. d/b/a AT&T Texas' Objections and Responses to Defendant's First Set of Interrogatories, *Sw. Bell Tel., L.P.*

*v. Time Warner Cable San Antonio, L.P.*, No. 2006CI18629 (288th Tex. Dist. March 1, 2007). To date no AT&T affiliated company has been able to determine if either mis-installation caused the alleged disruption to the connected cable network. More recently, and after the launch of U-verse in Illinois, a provider made similar allegations of network interference in Michigan and Indiana, states for which I am also responsible for U-verse installation. E.g. Letter from Kyle T. Birch to Sid White, March 12, 2008, at ATT1000255-257 (two Michigan incidents); Letter from David K. Herzog to Stephanie Maidlow, March 12, 2008, at ATT1000210-212 (Indiana); Letter from Steven C. Powell to Stephanie Maidlow, February 1, 2008, at ATT1000196-197 (Michigan); Letter from Steven C. Powell to Sidney J. White, Jr., January 22, 2008, at ATT1000188-193 (Michigan). The efforts to reinforce the need for technicians to follow the existing M&Ps has remedied the situation. See Emails between Stephanie Maidlow and Steven C. Powell, April 8-9, 2008, at ATT1000208-209.

21.    ███████████████████████████████████████████████

████████    The launch of U-verse TV in this market required AT&T Midwest to train all of these new technicians. While we can not yet claim that we have fully remedied the situation in Illinois, I am confident that we are following a course that will remedy the problem going forward. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

22.    AT&T Midwest wants this problem remedied, as do I personally. We have committed substantial resources to addressing the problem, including 1) committing personnel in our U-verse Dispatch Center to receive notifications from Comcast where my personnel may

have failed to follow the defined M&P, to dispatch technicians to investigate the claims (and, if necessary, make repairs), and to record the results of each investigation; 2) committing substantial time by our managers and area managers to specifically discuss the importance of this issue with all AT&T Midwest U-verse technicians, to follow up on the results of each investigation and bring those results to my attention, and to implement any corrective action required; and 3) committing my time to review the results of each investigation, determine its cause, and if it is determined that there was a failure on the part of an AT&T Midwest technician to follow the M&Ps develop corrective action involving instruction or discipline of that employee.

23.    I have reviewed the procedure outlined in the proposed injunctive order submitted by Comcast, and apart from any concerns about the sharing of sensitive competitive information, see problems with the proposal.  First, AT&T Midwest's principal goal is to make sure that the failure to follow its M&Ps does not occur in the first place. The proposed injunctive order does not address the issue of preventing a process deviation at installation.  At best, it allows Comcast to detect certain types of signal interference (short of an outage) more efficiently by being able to focus attention on its surveillance devices with respect to a node on which an installation is occurring.  Second, implementation of a new, and in our view, a more complex M&P that would require a call to be made to report each installation at some time before it commences or is completed would require us to dedicate substantial resources to developing and training on the new M&P with the same, or greater, potential for errors that are involved in implementing any new M&P.

█████████████ I note that while there were in some cases very long delays between the dates of installation and the dates that Comcast reported network interference claims when we initially began discussions of this issue, we are now seeing that there is generally only a short delay between the time of an installation and the time that Comcast reports potential network interference for an address.  Accordingly, the procedure outlined in the proposed injunctive order does not address any real problem that currently exists.  It is my view, that the best way to remedy this situation is for AT&T Midwest to continue to commit its resources to assuring that its technicians follow the M&Ps in the first place, and if there are any who cannot be trained to do so, that they no longer be permitted to perform the installations.

24.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, pursuant to 28 U.S.C. § 1746.

Executed on the 9th day of May 2008.

Derrick Hamilton

**EXHIBIT A**

Document outlining procedures agreed to during
April 7, 2008 conference call

Comcast Network Referral

- Comcast calls UVDC 866-268-8755, Option #6
- Comcast provides
  - customer name
  - address
  - contact number
  - access information
  - Comcast contact name and number
- Jeopardy team creates U-Verse repair ticket (J1) with information Comcast provides
- Ticket number and commitment to be provided to Comcast
- Field and control manager notified of pending ticket with cc to field MT
- Ticket will be tracked until completion by jeopardy team
- Final ticket status with will be provided to Field MT, Director, VP that includes
  - Receipt Time
  - Clear Time
  - Ban number
  - Action taken
- Closure status to be provided to Comcast

**Redacted**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| COMCAST OF ILLINOIS III, INC.; COMCAST CORP.; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., | ) ) ) ) ) | Case No:  08 CV 1680 Honorable Elaine E. Bucklo |
| Defendants. | ) ) ) | Magistrate Judge Martin C. Ashman |
| COMCAST OF ILLINOIS III, INC.; COMCAST CORP.; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., | ) ) ) ) ) | |
| Counterclaimants, | ) ) | |
| v. | ) ) | |
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, | ) ) ) | |
| Counterdefendant, | ) ) | |
| and AT&T, INC., | ) ) | |
| Third-party Defendant. | ) ) ) ) ) ) ) | |

**[redacted]AFFIDAVIT OF CHRIS PERCY**

I, Chris Percy, being first duly sworn on oath, depose and state the following:

1

1.      My name is Chris Percy.  I am over the age of twenty one (21), have never been convicted of a felony or crime of moral turpitude, nor have I ever been adjudged incompetent.  I and am legally competent to make this Affidavit.

2.      I am the Vice President and General Manager ("VP/GM") of National, Diverse, and Local Markets for the Midwest Region of Ameritech Services, Inc. and have been in that position since April 2008.  As VP/GM, I am responsible for the overall consumer business for AT&T's Midwest which includes the states of Illinois, Wisconsin, Ohio, Indiana and Michigan.

3.      From January 2007 to March 2008, I was VP/GM for the Orange/Riverside Market Area in California.  In that position, I was responsible for consumer business in AT&T's West region.

4.      Prior to my tenure as a VP/GM in California, I was the Vice President of Consumer Sales for Helio LLC ("Helio"), a wireless reseller, from July 2005 to December 2006.  While at Helio, I managed company sales and distribution strategy and had responsibility for nationwide consumer sales distribution channels, including national retail, indirect agent sales, company stores, and alternative channels

5.      Before my time at Helio, I held various positions at Cingular Wireless LLC and AT&T Wireless Services, Inc.  These positions included Director of Retail Sales (November 2004 to July 2005), Vice President of Business Sales (October 2003 to October 2004), and Director of Indirect Sales (November 2002 to September 2003).  An updated copy of my resume is attached as Exhibit A.

6.      The sales and marketing experience that I gained through these various positions has been invaluable to me and has provided me with insight which is unique to the competitive telecommunications industry.

7.      Illinois Bell Telephone Company d/b/a AT&T Illinois ("Illinois Bell") is in the process of expanding its range of products and services by entering the highly competitive television entertainment market with its U-verse product.  AT&T's U-verse now offers Illinois consumers a new choice in television service.  However, the television market is currently dominated by cable and satellite providers.  As such, to gain market share, Illinois Bell must attract U-verse customers from incumbent cable providers such as Comcast.

8.      It is extremely costly for Illinois Bell to acquire new customers who switch from an incumbent provider.  This is true, in part, because the installation process for any television service, especially an innovative product such as U-verse TV, is costly and labor intensive.  In addition, due to the perceived inconvenience of switching television services, such as needing to be home during the installation, learning new channel lineups or new remote control functions, many consumers may not be readily amenable to switching to a new television service provider.  As a result, Illinois Bell provides promotions to consumers to sign up service with AT&T U-verse.  ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9.      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



10.    Illinois Bell has made a concerted effort to analyze and predict the strategy most likely to ensure its success.   To that end, Illinois Bell has invested in this strategy and is confident that in a fair competitive market, U-verse TV will be a viable and attractive alternative to consumers.

11.    Because of its financial commitment to U-verse, Illinois Bell cannot enter the market if many of its new customers return to incumbent providers before it has recovered its costs.  As such, in addition to providing good service and value, Illinois Bell protects its new customers by maintaining as confidential its U-verse marketing strategy. To this end, Illinois Bell does not provide public information on its U-verse network buildout.  In fact, all information about U-verse is reported on a nationwide basis so that competitive information about new customers is not available to competitors.

12.    Based on my personal experience in this highly competitive telecommunications market, companies spend extraordinary sums on marketing to gain and maintain a competitive advantage over others.  With accurate research and

information, marketing dollars can result in a significant competitive gain. Obtaining accurate competitive information, however, is ordinarily costly because of the amount of time and expense that is needed to obtain it.

13.     My professional experience has also taught me that if a company shares specific information regarding its customer base, including customer identities, general customer location or the customer's current service provider, with its competitors that company will suffer a severe competitive disadvantage. This is because competitors can use that information to efficiently focus their own marketing efforts to retain current customers and recover former customers that were lost to competition. These marketing efforts can take place through any number of means, including but not limited to comparative advertising that is targeted specific consumers, distribution tactics, and below-market retention and recovery offers. For instance, Comcast could engage in targeted advertising campaigns using doorhangers and door-to-door representatives to specifically call out the U-verse product. It could also phone customers whose information was provided by Illinois Bell and offer incentives for cancelling U-verse orders. In other words, Comcast could tailor its marketing strategy by neighborhood in direct response to Illinois Bell's efforts based on customer information provided by Illinois Bell.

14.     Accordingly, I believe requiring Illinois Bell to provide Comcast the information that Comcast is requesting in its Proposed Order will enable Comcast to focus its customer recovery and retention efforts on AT&T's newly acquired customers and service areas. AT&T invests a large amount of capital in strategically building its U-verse brand and customer base. In providing information regarding newly acquired

customers to Comcast, Comcast will, in effect, get free, perfectly-accurate marketing research on Illinois Bell's U-verse service. Although Comcast can no doubt determine which of its customers are lost in any given period, it cannot currently obtain complete and accurate information as to why its customers leave and for which carriers without investing its own time and energy towards the investigation.

15.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 7ᵗ day of May 2008.

_____
Chris Percy

# EXHIBIT A

# *Chris Percy*

(949) 338-1800, chris.percy@att.net

## OBJECTIVE

To lead and grow a business which creates significant value for the organization, its shareholders and its employees.

## SKILLS

- Proven business leader with a track record of exceeding revenue targets and financial results
- Focused individual who can achieve goals through strategic planning and teamwork
- Skilled in attaining sales and profit objectives in competitive environments
- Excellent communicator with solid interpersonal skills
- People motivator with proven leadership abilities focused on company goals
- Excellent public speaker and Management Action Process believer

## EXPERIENCE

◊ **AT&T, January 2007 to present**
  **Vice President & General Manager, Midwest Region, 4/08 to present**
  - Responsible for overall consumer business within Illinois, Wisconsin, Ohio, Indiana, and Michigan
  - Responsible for creating and implementing distribution and marketing strategy
  - Drive Best in Class Customer Satisfaction metrics to create "Willing to Recommend" customers
  - Exceed company objectives of all consumer product lines including; U-verse, Internet and Home Phone service
  - Achieve Revenue Targets for Midwest Consumer Business Unit
  - Develop and realize the potential of all consumer employees in the Midwest
  **Vice President & General Manager, Orange/Riverside Market Area, 1/07 to 3/08**
  - Responsible for overall consumer business within Orange and Riverside Market Area
  - Responsible for creating and implementing distribution and marketing strategy
  - Drive Best in Class Customer Satisfaction metrics to create "Willing to Recommend" customers
  - Exceed company objectives of all consumer product lines including; U-verse, Internet and Home Phone service
  - Achieve Revenue Targets for Midwest Consumer Business Unit
  - Develop and realize the potential of all consumer employees in the Midwest

◊ **HELIO LLC, July 2005 to December 2006**
  **Vice President of Consumer Sales; Los Angeles, California**
  - Built company sales and distribution strategy for a successful MVNO wireless launch
  - Nationwide Consumer Sales responsibility for sales and distribution which includes National Retail, Indirect Agent Sales, Company Stores, Web, Telesales and Alternative Channels
  - Responsible to achieve overall company revenue, sales and cost per gross add budgets
  - Successfully executed and launched national agreements with Best Buy, Gamestop, Trans World, Tower, Fry Electronics, and Douglas Stewart.  Additional agreements pending strategy implementation

- Executed and implemented agent agreements with Celluphone, Perfect Connections, American Wireless, Wireless Toyz, Wireless Giant, ERC, WDI, ING, Top Notch, TrySys, Horus, IWS, SEC, UBI, Selini, Sky Network, and Mobilution
- Built 2006 and 2007 forecasting model and budgets for sales targets, CPGA, product mix, distribution productivity and profit/loss accountability
- Successfully launched Helio.com store and online affiliate program
- Completed new store design, systems, sales process, construction and lease negotiations for 5 new company owned stores in 2006
- Launched successful Sales Operations support initiatives which include merchandising, web customer activation system, consumer promotions, compensation processes and staffing support

◊  **CINGULAR WIRELESS, August 1991 to July 2005**

**Director of Retail Sales; Irvine, California, 11/04 to 7/05**
- Responsible for sales and operations in 50 Company Owned Retail Locations in Los Angeles with 400 employees
- Grew per store sales 30% within 6 months while reducing expenses 15%
- Selected 15 new retail locations for company owned stores while closing 9 low producing locations

**Vice President, Business Sales; Irvine, California, 10/03 to 10/04**
- Presidents Club Winner 2004
- Increased production 231% over 2003
- Achieved record market performance of monthly attainment in August and September 2004
- Increased average productivity per seller to 57 while decreasing workforce by one team
- Integrated affiliate sales team with SBC business sales team to maximize joint selling to SBC accounts

**Director of Indirect Sales; Irvine, California, 11/02 to 9/03**
- Achieved 182% net sales attainment for 2003
- Achieved 122% gross sales attainment for 2003
- Largest Budgeted Quota for any Director within Cingular in excess of 60,000 per month
- Presidents Club Winner 2003

**General Manager and Executive Director; Bellevue, Washington, 10/00 to 11/02**
- Managed all sales distribution and marketing in Washington/Idaho which includes business sales, company stores, indirect sales and national retail
- Achieved 110% of sales targets for 2001 and 107% in 2002
- Negotiated and executed exclusive, non-exclusive and master agent agreements
- Built 73 exclusive points of distribution which include 8 new company stores and 65 new agent locations
- Negotiated and launched mass merchandisers: Circuit City, Best Buy, Good Guys, Sam's Club and Staples as distribution points
- Presidents Club Winner 2000

**Director of Business Sales; Los Angeles, California, 9/98 to 10/00**
- Managed a business to business sales department with 9 sales teams and 115 employees
- Increased productivity to 125% of quota from 75%

- Designed and implemented new sales compensation plans
- Implemented a new sales process to maximize customer satisfaction and referrals
- Designed and implemented a successful development program for each sales employee

**Senior Regional Sales Manager, Corporate Accounts; Los Angeles, California, 2/98 to 8/98**
- Launched and managed the corporate account organization in Los Angeles
- Signed top three largest contracts since market launch in July of 1997
- Achieved 122% of quota
- Established territory management utilizing account modules for all corporate, government and national accounts in Los Angeles

**Regional Sales Manager, Business Sales; Los Angeles, California, 5/97 to 1/98**
- Managed a business sales team of 4 Business Sales Managers and 32 Account Executives
- Successfully launched business to business  sales organization in Los Angeles
- 135% of quota for 1997
- Top Gun Winner for 1997 - Top 2 Regional Sales Manager - 4 Total
- Developed sales promotions and sales contests


◊   **AT&T WIRELESS, (formerly LA Cellular) August 1991 to May 1997**

**Business & Government Sales Manager, Newport Beach, California, 4/96 to 5/97**
- Managed, hired, trained and coached a business to business sales team with 15 Major Account Executives and Account Executives
- Acquired and retained corporate and government accounts within Los Angeles and Orange County
- #1 Business & Government Sales Manager in 1996 - 21 total
- 243% of quota for 1996
- Presidents Club Winner in 1996 and BellSouth FastStart Winner in 1996

**Major Account Executive; Cerritos, California, 11/92 to 4/96**
- Sold global accounts which included Time Warner, Ernst & Young and 3M
- 428% of quota in 1995
- #1 Major Account Executive in Los Angeles during 1995 - 40 total
- Presidents Club Winner and BellSouth FastStart Winner in 1995
- 178% of quota in 1994
- Responsible for over $16 million in total revenue

**Account Executive; Irvine, California, 8/91 to 11/92**
- Acquired and retained small and medium business in Orange County


# EDUCATION

**Colorado State University, Fort Collins, Colorado**
**Bachelor of Science, Business Administration**