IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, <br><br> Plaintiff, <br><br> v. <br><br> COMCAST OF ILLINOIS III, INC.; COMCAST CORP.; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., <br><br> Defendants. <br><br> COMCAST OF ILLINOIS III, INC.; COMCAST CORP.; COMCAST CABLE HOLDINGS LLC; and COMCAST OF CHICAGO, INC., <br><br> Counterclaimants, <br><br> v. <br><br> ILLINOIS BELL TELEPHONE, d/b/a AT&T ILLINOIS, <br><br> Counterdefendant, <br><br> and AT&T, INC., <br><br> Third-party Defendant. | Case No: 08 CV 1680 <br><br> Honorable Elaine E. Bucklo <br><br> Magistrate Judge Martin C. Ashman |

**ILLINOIS BELL TELEPHONE COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION TO RECONSIDER THE COURT'S DENIAL OF ITS MOTION TO DISMISS COMCAST'S COUNTERCLAIM FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND LACK OF FEDERAL SUBJECT MATTER <u>JURISDICTION</u>**

Plaintiff and Counterdefendant Illinois Bell Telephone Company, d/b/a AT&T Illinois ("Illinois Bell"), by its attorneys, Mayer Brown, LLP, submits this memorandum in support of its motion to reconsider the denial of its motion to dismiss Counts I, II, III, and IV of the

1

9173786

Counterclaims and Third-party Complaint by Defendants and Counterplaintiffs Comcast Illinois III, Inc., Comcast Corp., Comcast Holdings LLC, and Comcast of Chicago, Inc. (collectively, "Comcast").

Illinois Bell is mindful of Judge Shadur's frequent admonition that "this Court's opinions are not intended as mere first drafts," and of the "limited appropriateness of a motion for reconsideration." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988). However, where this Court ruled on an expedited basis without the benefit of a reply brief and in the process made a manifest error of law with far-reaching consequences for this case and others, Illinois Bell feels compelled to bring such a motion.

If Illinois Bell had filed a reply brief, it would have clarified that Comcast is incorrect in asserting that the plain meaning of "intercept," as used in the text of the Cable Communications Policy Act, 47 U.S.C. § 553(a)(1), is synonymous with "interrupt." Moreover, to the extent that the term's use in context is ambiguous, resort to the legislative history, which clearly confines the scope of the violation to theft of cable services, both willful and inadvertent, is appropriate.

## BACKGROUND

Illinois Bell presumes the Court's familiarity with its recent ruling, but briefly reviews:

The parties are involved in ongoing litigation pertaining to Comcast's false advertising. On April 20, 2008, Comcast filed counterclaims against Illinois Bell alleging a violation of the Cable Communications Policy Act (Count I), trespass to chattels (Count II), negligence (Count III), and common law unfair competition (Count IV).[1] (Doc. 27.) Comcast's central allegation, repeated in various forms throughout its pleading, is that Illinois Bell introduced its electronic

---

[1] Comcast also filed for a declaratory judgment that it is not engaged in false advertisement (Count IV). (Doc. 27.) Illinois Bell does not address that count here, but continues to reserve its right to do so at a later date. (Doc. 55 at 3 n.2.)

2

information into Comcast's cable infrastructure, preventing Comcast's telephone, Internet, and television services from reaching their intended target—Comcast customers.  (Doc. 36 at 7.)

Pursuant to an expedited briefing schedule, (Doc. 40,) Illinois Bell moved to dismiss Count I for failure to state a federal cause of action and Counts II-IV as lacking federal supplemental jurisdiction as a result.  (Doc. 47.)  Illinois Bell noted that no court had ever given the text of 47 U.S.C. § 553(a)(1) a reading so broad as to encompass the interruption of cable services alone without an attempt to seize or otherwise acquire them.  The sole outlier ignored legislative history that the Seventh Circuit had found useful in examining § 553 in another context and which clarified the limited scope of the prohibition.  Comcast responded on April 30, 2008, relying on this outlier decision and cherry-picking a meaning for the statute's operative term "intercept" as being synonymous with "stop" or "interrupt" while ignoring the same dictionary definitions that included "take" and "seize."  (Doc. 52.)

Due to the expedited nature of this proceeding, and without the benefit of any reply briefing by Illinois Bell, this Court ruled shortly thereafter on May 7, 2008.  (Doc. 55.)  The Court adopted Comcast's selective definition of "intercept" as "interrupt," which ignores both the clear meaning of the term in context, and to the extent that there could be any ambiguity, the equally clear legislative history.[2]  The Court's error, if uncorrected, will not only tie Illinois Bell's hands going forward in this litigation, but also grossly distort § 553(a)(1) beyond Congress' ability to recognize it and subject this Court to a flood of unintended litigation.

---

[2]    This Court did not reach the question of whether Illinois Bell is entitled to a dismissal of Counts II-IV on jurisdictional grounds.  Illinois Bell reasserts the argument that if Count I is dismissed, this Court lacks supplemental jurisdiction over the state common law claims and incorporates its prior reasoning by reference.  (Doc. 47.)

3

9173786

**ARGUMENT**

A.  **This Court Should Entertain a Motion for Reconsideration**

Courts "may reconsider . . . earlier orders where it is necessary among other things, to correct clear error or fact or law." *Maes v. Folberg*, 531 F. Supp. 2d 956, 957 (N.D. Ill. 2007) (reinstating plaintiff's punitive damages claim under a state statute after reviewing the statute's language and cases interpreting similar provisions). Here, as explained below, the Court made a manifest error of law in interpreting the term "intercept" in the Cable Communications Policy Act, 47 U.S.C. § 553(a)(1).

As a result, this court is entertaining claims for which there is no federal jurisdiction. The Court certainly has authority to rectify that error now. *Cf. Wisconsin v. Ho-Chunk Nation*, 463 F.3d 655, 661 (7th Cir. 2006) ("It is, however, axiomatic that '[n]o court may decide a case without subject matter jurisdiction, and neither the parties nor their lawyers may stipulate to jurisdiction or waive arguments that the court lacks jurisdiction.'") (quoting *United States v. Tittjung*, 235 F.3d 330, 335 (7th Cir.2000)).

Failure to do so may prejudice Illinois Bell's substantive defense of this matter by forcing it to create a factual record to justify a set of actions that are not prohibited by federal law. The immense burden the incorrectly expansive reading of the statute places on Illinois Bell risks both that it will not be able to properly preserve issues in the record for correction on appeal and that the Court's error will not be corrected on appeal because Illinois Bell will resolve this dispute without a judgment on the merits.

The Court's unappealed erroneous interpretation may also invite a flood of litigation beyond what Congress intended when it enacted § 553 to protect cable companies against the theft of cable services. As the Court is aware from other filings in this matter, cable systems can experience disruption of their communications service from a variety of sources. (Doc. 58 at 11-

4

12.) This Court's decision not to dismiss Count I of Comcast's Counterclaims and Third-party complaint as outside the scope of § 553 invites not only future litigation between communications firms that share customer-owned inside wiring, but also a flood of litigation in which ham and CB radio operators or any other operator of an electronic device whose signal enters a cable network and creates noise is hauled into federal court to answer civil and criminal penalties. Given the gross consequences of the Court's decision, its interpretation is worth re-examination.

### B.      "Intercept" Is Not Synonymous with "Interrupt" in the Cable Communications Policy Act

The Cable Communications Policy Act states in relevant part:

> No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

47 U.S.C. § 553(a)(1). Comcast's allegations are not that Illinois Bell "receive[s] . . . communications service" without its authorization—through leakage Illinois Bell may receive Comcast's signal, but it is never decoded into the useable form of Comcast's television, high-speed Internet, or Voice-Over-IP telephone services. Rather, Comcast alleges that Illinois Bell interrupts its service. (Doc. 27 at ¶¶ 25, 33, 41, 51, 60.) Interruption alone, however, is not within the ambit of "intercept" as used in § 553(a)(1).

While "intercept" is not defined in the Cable Communications Policy Act, it has a specific meaning in the context of communications legislation. In interpreting the term as used in § 553(a)(1), Judge Zagel observed:

> Although neither the individual statutes nor the Communications Act set forth a definition of the key term "intercept," the Supreme Court has interpreted the word "intercept," as used in the Communications Act, to "indicate[ ] the taking or seizure by the way or before arrival at the destined place." *Goldman v. United*

5

*States*, 316 U.S. 129, 134 (1942), *overruled on other grounds*, *Katz v. United States*, 389 U.S. 347 (1967).

*That's Entertainment, Inc. v. Anciano's Inc.*, No. 94 C 7199, 1996 WL 514989, *1 (N.D. Ill. Sept. 9, 1996). Interception has two requirements as used in § 553(a)(1): an acquisitive element ("taking or seizing") and a spatial element ("by the way or before arrival at the destined place").[3] *See id.* at *1-2 (finding no interception under § 553(a)(1) where the defendant videotaped a pay-per-view boxing match he ordered—capturing the content but only after it had arrived on his television—and noting instead an authorized reception).

      The centrality of the acquisitive element of "intercept" is further reinforced by looking to how the term has been defined in other statutes. *See*, *e.g.*, *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n. 14 (1985) (borrowing the definition for "pattern" in RICO from another statute). As the Supreme Court noted in *Securities Industry Ass'n v. Board of Governors of Federal Reserve System*, 468 U.S. 137 (1984), the use of terms in other legislation provides "considerable evidence to indicate . . . the ordinary meaning of the terms." *Id.* at 150-51 (defining "security" to include commercial paper). The Communications Policy Act was enacted to address gaps in the regulatory regime surrounding the theft of communications service created by the Omnibus Crime Control Act of 1968. *United States v. Norris*, 88 F.3d 462, 465-66 (7th Cir. 1996). Title III of the Omnibus Crime Control and Safe Streets Act of 1968 defined "intercept" as "the aural or other *acquisition of the contents of any wire, electronic, or oral*

---

[3]    The Tenth Circuit recently affirmed a conviction for the theft on non-wired communications service under the parallel provision to § 553(a)(1) for satellite-based video providers, 47 U.S.C. § 605(a). *DirecTV v. Crespin*, 224 Fed. Appx. 741 (10th Cir. 2007). The defendant there argued that the plain meaning of "intercept" was to be found in Webster's New Collegiate Dictionary as "to stop, seize, or interrupt in progress or course or before arrival." *Id.* at 150. The *DirectTV* court, however, found no error in the trial court's instruction that "intercept," "interception," "intercepted," and "intercepting" meant "that [DTV's] satellite transmissions were received and decoded without authorization by [DTV]." *Id.*

*communication* through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4) (emphasis supplied); *see also id.* at § 2516 (setting out a procedure for persons to be authorized to intercept communications); *United States v. New York Tel. Co.*, 434 U.S. 159, 166-167 (1977) ("Pen registers do not 'intercept' because they do not acquire the 'contents' of communications.").

It is because the definition of "intercept[ion]" in the context of communication services plainly requires the acquisition of a cable signal en route to another destination and its decoding into a useable service that every other of the over five hundred courts to apply the statute—with the exception of Judge McMahon in the Southern District of New York and now this Court—has done so in situations involving various forms of intentional and unintentional cable theft. (Doc. 47 at 4-5.)

Comcast argues that § 553(a)(1) should be understood to prohibit both cable theft and signal leakage that disrupts the performance of a cable network without actually acquiring the communications service in the process. (Doc. 52 at 4 n.1.) Against the weight of the ordinary meaning of "intercept" in the communications context, Comcast marshals several dictionaries which include, among other definitions, purely disruptive connotations for the term, such as "stop" or "interrupt" without an element of acquisition. (Doc. 52 at 8.)

Illinois Bell readily admits that when deprived of its communications context and read in a vacuum "intercept" is ambiguous. The term has multiple and, in certain usages, competing, meanings. Used acquisitively, "intercept" implies taking something away that was meant for someone else and using it for oneself. Used disruptively, "intercept" implies only preventing someone else from using something. This tension is evident in some of the very same definitions Comcast selects as evidence of the term's plain meaning. *See*, *e.g.*, WEBSTER'S NINTH NEW

7

COLLEGE DICTIONARY 630 (1988) ("to stop, seize, or interrupt in progress or course before arrival"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1176 (1986) ("1: to take, seize, or stop by way or before arrival at the destined place . . . 2 [] : to stop or prevent from doing something : HINDER").

Thus a football fan would strongly disagree with the characterization of a play as an "intercept[ion]" where the defensive player simply broke up the pass without gaining possession of the ball. In this context, the term is reserved for when the defensive player catches a ball in its path to an offensive player. A grammarian might be puzzled by the distinction. Indeed in both instances, the defensive player stopped or interrupted the ball on its way to the offensive player, but here the acquisitive connotation is determinative and the defensive player has not intercepted a ball that he has not taken or seized for himself. No doubt there are other circumstances in which the disruptive connotation of "intercept" is primary. Indeed this is Comcast's implicit position here when it selects only "interrupt," "obstruct," and "stop" from the available dictionary definitions for § 553(a)(1), eliding the omission of "take" and "seize" from its "plain meaning" argument. (Doc. 52 at 8.)

But without the benefit of its definition in other communications legislation, its several connotations render ambiguous results when the dictionary definitions of "intercept" are plugged into § 553(a)(1). If interception requires the taking or seizing of a communications service intended for another, then the text of the Cable Communications Policy Act is directed narrowly at cable pirates and thieves. If interception requires only the stopping or interrupting of a communications service, then the Cable Communications Policy Act extends civil liability to a broad range of potential violators, including tree trimmers who inadvertently nick a cable line, construction workers who sever one while excavating a property, and AM radio stations and ham

8

9173786

radio operators whose signals sometimes enter a cable network and interrupt the provision of cable services.

Courts interpreting statutes that are subject to such ambiguity do not simply throw up their hands and select one, another, or all meanings available to them. Instead they move beyond dictionaries and cannons to embrace both context and legislative history as a source of elucidation. For example, the Supreme Court faced similar ambiguity in determining the scope of 18 U.S.C. § 924(c)(1), which criminalizes "use" of a firearm in relation to any drug trafficking crime. *Bailey v. United States*, 516 U.S. 137 (1995). The *Bailey* Court observed that:

> the word "use" poses some interpretational difficulties because of the different meanings attributable to it. Consider the paradoxical statement: "I *use* a gun to protect my house, but I've never had to *use* it."

*Id.* at 143. Depending on the connotation of "use" adopted, the scope of the statute's prohibition could dramatically increase. If "use" in the statute meant use in the sense of the first half of the paradox—placement for protection or to embolden or provide a sense of security—then 924(c)(1) would sweep in any possession of a firearm at or near the scene of a drug transaction or its proceeds or paraphernalia. *See id.* at 147. Instead, the *Bailey* Court fixed upon the more narrow use of the term from the second half of the paradox—active employment—as the meaning intended by Congress based on the "language, context, and history of § 924(c)(1)." *Id.* at 144.

So to the extent that this Court embraces the ambiguity of Comcast's dictionary definitions instead of the ordinary meaning of "intercept" as it is used in the context of communications legislation, this Court should not deprive itself of the aid of legislative history. This history demonstrates that the use of the term "intercept" in the Cable Communications Policy Act is aligned with its usage in other communications legislation and favors the term's

9

acquisitive connotation. The House Report on the Cable Communications Policy Act notes of the provision at issue:[4]

> Section 634 of the bill sets forth a liability provision *specifically applicable to theft of services* offered over a cable system, while also providing specific criminal and civil remedies for violation of the section. Paragraph 634(a)(1) prohibits any person from intercepting or receiving, or from assisting in the interception or reception of, any service offered over a cable system, unless the cable operator specifically authorizes the reception or it is otherwise specifically authorized by law.
>
> The committee intends the phrase 'service offered over a cable system' to *limit the applicability of this section to theft of a service* from the point at which it is actually being distributed over a cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under Section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.

H.R. Rep. No. 934, 98th Cong., 2d Sess. 83, *reprinted in* 1984 U.S.C.C.A.N. 4720 (emphasis added); *see also Norris*, 88 F.3d at 466 ("Congress enacted § 553 in an effort to remedy 'a problem which was increasingly plaguing the cable industry—theft of cable services.'"). This history unambiguously demonstrates that "intercept" is used in § 553(a)(1) acquisitively and not simply disruptively.[5] Neither Comcast nor any court to examine this history has contended otherwise.

---

[4] The provision now codified at 47 U.S.C. § 553 was § 634 in its original enactment and the legislative history often refers to it as such.

[5] There are a number of ways in which the acquisitive reading of "intercept" in § 553(a)(1) leaves room for "receive." The first resorts to the football analogy. Interception could imply exclusive possession. That is while multiple people can receive a cable signal and decode it into communications service without affecting another receiver's use (*e.g.*, by inserting a splitter in the cable), interception could require that the communication service is taken or seized to the exclusion of others (*e.g.*, by cutting and re-routing a cable line). Alternatively, interception may cover any acquisition of a decodable cable signal, exclusively or nonexclusively, along its way to its intended target (*e.g.*, by inserting a splitter or cutting and re-routing the cable line), while reception involves theft at a point where a cable signal is intended to be conveyed, but not

(cont'd)

Further, although Illinois Bell is facing civil penalties under § 553(c) here, § 553(b) renders willful violations of § 553(a)(1) criminal.[6] The rule of lenity requires courts to read ambiguous civil statutes whose governing standards are set forth in criminal statutes narrowly "to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability." *Crandon v. United States*, 494 U.S. 152, 158 (1990). Because the acquisitive definition of "intercept" adds to the disruptive definition advanced by Comcast, it is narrower and preferable under the applicable trope of statutory construction.

### C.    Comcast Does Not State a Claim for Violation of § 553(a)(1)

Because "intercept" as used in § 553(a)(1) is not synonymous with "interrupt," Comcast's allegation that the introduction of foreign information into Comcast's infrastructure has prevented Comcast's communications service from reaching its intended target does not state a claim a federal cause of action. Comcast has not pled, and cannot plead, that Illinois Bell acquired its communications service en route to Comcast customers. Comcast does not allege that Illinois Bell received Comcast's cable signal. Comcast does not allege that Illinois Bell was able to decode this signal into some useable form of communications service. Moreover, as the foregoing analysis demonstrates, Comcast's allegation that Illinois Bell prevented Comcast

---

decoded without authorization (*e.g.*, by using a descrambler box to unlock encoded pay-per-view content).

[6]    Illinois Bell notes that Congress was particularly concerned about the economic toll of cable theft on cable companies when it enacted the civil remedies for aggrieved persons in parallel with the criminal provisions of § 553. H.R. Rep. No. 934, 98th Cong., 2d Sess. 83, *reprinted in* 1984 U.S.C.C.A.N. 4720. In addition, because individuals could unwittingly violate the statute, for instance, by moving into a multi-dwelling unit building where each unit illegally intercepted or received cable service from a single authorized account, Congress envisioned lesser penalties for nonwillful violators. *Id.* at 4721-22.

customers from receiving and decoding the Comcast cable signal does not state a claim for relief under § 553(a)(1).

Without Count I, this Court must consider the question of whether it can exercise supplemental jurisdiction over Counts II-IV. Comcast asserts that it should because the remaining federal claim, Illinois Bell's Lanham Act claim against Comcast for false advertising, will involve a description of Illinois Bell's technology and Comcast's common law claims based on signal leak also might include technical issues. At a high enough level of generality likely every case on the Court's docket shares some common issues with every other. This is not, however, the "loose factual connection" the Seventh Circuit envisioned in *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995). This Court readily dismisses pendant state claims arising out of a set operative facts with a much closer connection than Counts II-IV and Illinois Bell's false advertising claim and should do the same here. (Doc. 47 at 9-10.)

* * *

For the foregoing reasons, Illinois Bell requests that this Court reconsider its Order of May 7, 2008, and dismiss Count I of Comcast's Counterclaim and Third-party Complaint for the failure to state a federal claim and Counts II, III, and IV for a lack of subject matter jurisdiction.


Dated: May 12, 2008                                Respectfully Submitted

                                                   ILLINOIS BELL TELEPHONE COMPANY


                                                    /s/ Ranjit J. Hakim
                                                   _____

                                                   Michael J. Gill
                                                   Ranjit Hakim
                                                   MAYER BROWN LLP
                                                   71 South Wacker Drive
                                                   Chicago, IL 60606
                                                   (312) 782-0600

                (312) 701-7711 – Facsimile
                mgill@mayerbrown.com
                rhakim@mayerbrown.com

9173786

**CERTIFICATE OF SERVICE**

      I, Ranjit Hakim, an attorney, hereby certify that on May 12, 2008, a copy of the foregoing ILLINOIS BELL TELEPHONE COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION TO RECONSIDER THE COURT'S DENIAL OF ITS MOTION TO DISMISS COMCAST'S COUNTERCLAIM FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND LACK OF FEDERAL SUBJECT MATTER JURISDICTION was served via email and the Court's CM/ECF system upon all counsel listed below.

                                                         /s/ Ranjit J. Hakim
                                                         Ranjit Hakim

Thomas P. Jirgal
Douglas N. Masters
Julie P. Samuels
Loeb & Loeb LLP
321 N. Clark Street
Suite 2300
Chicago, IL 60610

9173786